FILED

2013 OCT -2  PM 3: 38

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1  Neal R. Marder (SBN: 126879)
   *nmarder@winston.com*
2  Ali R. Rabbani (SBN: 253730)
   *arabbani@winston.com*
3  Ian C. Eisner (SBN: 254490)
   *ieisner@winston.com*
4  WINSTON & STRAWN LLP
   333 South Grand Avenue
5  Los Angeles, CA 90071
   Telephone: 213 615 1700
6  Facsimile: 213 615 1750

7  Attorneys for Plaintiffs
   MJC America, Ltd. dba Soleus
8  International Inc., MJC
   America Holdings Co., Inc., and
9  MJC Supply, LLC

<div style="text-align:center">

10

11

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

</div>

| | |
|---|---|
| 12  MJC America, Ltd. dba Soleus<br>13  International Inc., MJC America<br>Holdings Co., Inc., and MJC Supply,<br>14  LLC<br>15        Plaintiffs,<br>16      vs.<br>17  Gree Electric Appliances, Inc. of Zhuhai,<br>Hong Kong Gree Electric Appliances<br>18  Sales Ltd., and Does 1 through 10,<br>19  inclusive,<br>20        Defendants,<br>21  and<br>22  Gree USA, Inc., a California<br>corporation,<br>23        Nominal Defendant | Case No. **CV13-04264-SJO (CWx)**<br><br>Assigned to Hon. S. James Otero<br><br>**PLAINTIFFS' VERIFIED FIRST<br>AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br><br><br><br>Complaint Filed: June 13, 2013 |

24

25      Plaintiffs MJC America, Ltd. dba Soleus International Inc. ("MJC America"),

26  MJC America Holdings Co., Inc. ("MJC Holdings"), and MJC Supply, LLC ("MJC

27  Supply") (collectively, "Plaintiffs") allege:

28

<div style="text-align:center">

1

</div>

<div style="text-align:left">

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

</div>

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

## NATURE OF THE ACTION

1.      Defendant Gree Electric Appliances, Inc. of Zhuhai ("Gree China") is one of the largest manufacturers of air conditioners and household appliances in the world.  On April 23, 2010, Gree China and its wholly-owned subsidiary, Defendant Hong Kong Gree Electric Appliances Sales Ltd. ("Hong Kong Gree," and together with Gree China, the "Gree China Entities") entered into an agreement with Plaintiff MJC America, a privately-held California-based manufacturer, importer, and distributor of home comfort products, to form Gree USA, Inc., a closely-held corporation that would sell to United States-based customers dehumidifiers and other products manufactured by Gree China and exported by Hong Kong Gree.

2.      MJC America and the Gree China Entities agreed that MJC America would transfer its lucrative customer accounts – which included several large household product brands – to Gree USA.  MJC America would also provide sales, marketing, and post-sales services on behalf of Gree USA in return for a portion of the sales profits.

3.      On April 26, 2010, Gree USA was incorporated in California, with 51 percent of its stock owned by Hong Kong Gree and the remaining 49 percent owned by MJC Holdings.

4.      The combination of the Gree China Entities' manufacturing and shipping muscle and MJC America's substantial customer base and well-developed marketing, sales, and service networks initially made Gree USA very successful.  Indeed, in 2012, Gree USA, which had been formed with an initial capital investment of only $80,000, sold over 1.2 million units of air conditioners and dehumidifiers, with a sales volume of over $150 million.

5.      However, in July 2012, after Gree USA had fulfilled nearly all of its orders for that year and had already negotiated sales contracts for 2013 in excess of $100 million, MJC America's customer service department began to receive complaints that the dehumidifiers manufactured by Gree China, exported by Hong

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1   Kong Gree, and sold by Gree USA were overheating and catching fire.

2       6.      MJC America took these complaints seriously and immediately reported
3   them to the Gree China Entities. While the Gree China entities denied that there were
4   any problems, it soon became clear, through numerous independent investigations and
5   tests commissioned by MJC America and third parties, that the dehumidifiers
6   manufactured by Gree China and exported by Hong Kong Gree were indeed defective.
7   As a result, in November 2012, MJC America informed the Gree China Entities that it
8   would stop selling through Gree USA the defective humidifiers.

9       7.      The Gree China Entities continued to deny that the dehumidifiers
10  suffered from any problems despite overwhelming evidence to the contrary. They
11  also attempted to pressure MJC America to cover-up the mounting customer
12  complaints of overheating and/or fire associated with the dehumidifiers or, at
13  minimum, delay reporting these complaints to the United States Consumer Product
14  Safety Commission ("CPSC"). MJC America informed the Gree China Entities that
15  they were obligated to report these complaints to the CPSC fully and without delay
16  because of, among other reasons, the potential risk of injury or even death to the
17  general public posed by the dehumidifiers.

18      8.      In response, the Gree China Entities engaged in a campaign to intimidate
19  and destroy Gree USA and, by extension, MJC America (and certain related entities)
20  which, after having transferred its lucrative customer accounts to Gree USA, had
21  become largely reliant on Gree USA for its own success. On information and belief,
22  the Gree China Entities' campaign to destroy Gree USA and MJC America was
23  orchestrated by a high-powered individual named Dong Mingzhu, who has served as
24  the Chairperson of Gree USA since its inception and is also the Chairperson and Chief
25  Executive Officer of both Gree China and Hong Kong Gree.

26      9.      Among other misdeeds, the Gree China Entities (i) caused Gree USA
27  customers to terminate their accounts with Gree USA and/or transfer them to the Gree
28  China Entities; (ii) ordered Gree China's production department to cease

3

1   manufacturing certain products sold by Gree USA, which has made it impossible for

2   Gree USA to fulfill a significant portion of its confirmed orders for 2013; and

3   (iii) intentionally disrupted the contractual relationships between Gree USA and MJC

4   America (and certain related entities).

5       10.   Moreover, on information and belief, at the time MJC America was

6   negotiating with the Gree China Entities regarding the potential formation of Gree

7   USA, the Gree China Entities knew that the dehumidifiers to be sold by Gree USA,

8   which Gree China had begun manufacturing in late-2009, were defective.   Indeed,

9   these dehumidifiers are now the subject of a massive recall announced in September

10   2013.   However, to induce MJC America to form Gree USA and, *inter alia*, transfer

11   its lucrative customer accounts to Gree USA, the Gree China Entities concealed the

12   dehumidifier defects from MJC America.   Had MJC America known the truth about

13   the defective dehumidifiers, they never would have agreed to form Gree USA with the

14   Gree China Entities.

15       11.   The Gree China Entities' misconduct described above, and in more detail

16   below, has damaged Plaintiffs in an amount not less than $150,000,000 to be

17   established at trial.

18               **THE PARTIES**

19       12.   Plaintiff MJC America is and, at all times mentioned herein was, a

20   California corporation with its principal place of business in California.   Founded in

21   1998 and privately held by three shareholders, MJC America imports, distributes, and

22   manufactures, almost exclusively through Original Equipment Manufacturers

23   ("OEMs"), home comfort products, including but not limited to electric space heaters,

24   fans, and dehumidifiers under the trade name "SoleusAir," and variations thereof.

25       13.   Plaintiff MJC Supply is, and at all times mentioned herein was, a

26   California-based limited liability company.   MJC Supply functions primarily to

27   distribute proceeds paid by Gree USA to the various entities performing Gree USA's

28   management and administrative functions, including but not limited to MJC America,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

which performs sales, marketing, logistics, and after-sales services for Gree USA. MJC Supply also owns the trademark "SoleusAir."

14.   Plaintiff MJC Holdings is and, at all times mentioned herein was, a California corporation with its principal place of business in California. It was formed for the sole purpose of holding a 49 percent ownership interest in Gree USA.

15.   Plaintiffs are informed and believe, and on that basis allege, that Defendant Gree China is a corporation incorporated under the laws of the People's Republic Of China, has its principal place of business in, and is managed from, Zhuhai, China, and is listed on the China Stock Exchange. Plaintiffs are further informed and believe, and on that basis allege, that Gree China, which has over 80,000 employees, including 3,000 in-house engineers, is one of the largest manufacturers of air conditioners and household appliances in the world, with approximately US$16 billion in sales for 2012.

16.   Plaintiffs are informed and believe, and on that basis allege, that Defendant Hong Kong Gree is a wholly-owned subsidiary of Gree China and is incorporated under the laws of Hong Kong. Plaintiffs are further informed and believe, and on that basis allege, that Hong Kong Gree functions primarily as an export hub for Gree China and, at all times, operates at the direction and under the control of Gree China. Almost all of Gree China's international trade goes through Hong Kong Gree, which had sales totaling approximately US$1 billion in 2012.

17.   Nominal Defendant Gree USA is a California corporation with its principal place of business in California.

18.   Plaintiffs are ignorant of the true names and capacities of the defendants identified as "Does 1 through 10, inclusive," and therefore sue them by such fictitious names. Plaintiffs will amend this pleading to allege their true names and capacities when the same are ascertained.

19.   Plaintiffs are informed and believe, and on that basis allege, that each "Doe" defendant herein is legally responsible in some manner for the acts, omissions,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    and occurrences herein alleged, and proximately caused damage, as herein alleged, to

2    Plaintiffs.   Each reference in this complaint to defendant or a specifically named

3    defendant refers also to all defendants sued under fictitious names.

4        20.   Plaintiffs are informed and believe, and on that basis allege, that at all

5    times mentioned herein, all defendants herein were the agents, employees, servants,

6    and/or representatives of each of the other defendants, and in doing the things

7    hereafter alleged, were acting within the scope and course of their authority as such

8    agents, employees, servants, and/or representatives, and with the permission and

9    consent of each of the other defendants.

10                **JURISDICTION AND VENUE**

11        21.   This Court has jurisdiction of the subject matter of this action by virtue of

12    diversity of citizenship of the sides under 28 U.S.C. Section 1332.   The amount in

13    controversy exceeds $75,000.00, exclusive of interest and costs.   The controversy is

14    between citizens of a state (California), on the one hand, and citizens or subjects of

15    foreign states on the other hand.

16        22.   Venue is proper in this Court and Judicial District pursuant to 28 U.S.C.

17    Sections 1391(b) and 1391(c), because Defendants have transacted and continue to

18    transact business in this Judicial District to a degree rendering them subject to

19    personal jurisdiction, and in any case are not residents anywhere else in the United

20    States.  In addition, the unlawful acts of Defendants have been and are occurring in

21    this District within the jurisdictional limits of this Court.

22               **INTRADISTRICT ASSIGNMENT**

23        23.   Pursuant to this Court's General Orders Nos. 349 and 98-03, this action

24    should be assigned to the Western Division of the Central District of California, in

25    that all Plaintiffs reside within the geographic limits of the Western Division, and the

26    majority of all claims arose in, or are related to, the Western Division.

27               **DERIVATIVE ALLEGATIONS**

28        24.   With respect to MJC Holdings' claim for interference with prospective

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  economic advantage, alleged derivatively on behalf of Gree USA against the Gree

2  China Entities (count IV below), MJC Holdings brings this claim as the owner of 49%

3  of the shares of Gree USA.

4      25.    Gree USA has only two shareholders:  MJC Holdings and Hong Kong

5  Gree.  MJC Holdings owns 49% of the stock of Gree USA.  Hong Kong Gree owns

6  51% of the stock of Gree USA.

7      26.    MJC Holdings is, and at all relevant times was, a shareholder of Gree

8  USA, including at the time of the complained of transactions.

9      27.    Gree USA initially named only four persons to its Board of Directors:

10  Dong Mingzhu, Lam Hou Kong, also known as "Larry Lam" (Vice General Manager

11  of Hong Kong Gree), Charley Loh (CEO of MJC America), and Jimmy Loh (CFO of

12  MJC America).

13      28.    On October 25, 2012, however, Larry Lam resigned as a Director of Gree

14  USA.  That same day, Zhang Guoqiang was appointed to replace Larry Lam.  On

15  October 25, 2012, the Gree USA Board unanimously executed a "Consent to Action

16  Taken in Lieu of the Meeting of the Board of the Directors of Gree USA, Inc.," which,

17  among other things, resolved that "Guoqiang Zhang is appointed as a director of the

18  corporation replacing Lam Hou Kong for the remaining term of Lam Hou Kong's

19  directorship."

20      29.    On May 13, 2013, MJC Holdings received a letter dated April 25, 2013,

21  in which Hong Kong Gree purported to unilaterally replace Director Zhang Guoqiang

22  with Zhang Zhenghu and to appoint Jian Chen to serve as a fifth Director of Gree

23  USA.  This letter was signed by Dong Mingzhu.

24      30.    Under Gree USA's Bylaws, attached hereto as Exhibit A and

25  incorporated herein by reference, "directors may not be elected by written consent

26  except by the unanimous written consent of all shares entitled to vote for the election

27  of directors."  The Bylaws thus do not permit Hong Kong Gree to unilaterally replace

28  current Directors or appoint new Directors by written resolution signed only by Dong

7

Mingzhu.

31.   No demand was made on the Gree USA Board of Directors to pass a board resolution to pursue the claim herein alleged on Gree USA's behalf against the Gree China Entities because such a demand would have been futile.

32.   Indeed, there is an ongoing dispute between Gree USA's only two shareholders, Hong Kong Gree and MJC Holdings, regarding the composition of Gree USA's Board.  Hong Kong Gree did not properly appoint Zhang Zhenghu and Jian Chen as Directors of Gree USA.  Therefore, Zhang Zhenghu and Jian Chen are not duly appointed Directors of Gree USA and they cannot participate in any decision by the Board to adopt a resolution to sue the Gree China Entities.

33.   Moreover, even if Zhang Zhenghu and Jian Chen were properly appointed as Directors of Gree USA through unanimous written consent of all shareholders, they are neither disinterested nor independent and thus would not have voted to pass a resolution to file suit against the Gree China Entities.  Zhang Zhenghu is the head of Gree China and Hong Kong Gree's export department.  For his part, Jian Chen is not disinterested because, among other reasons, his salary is paid by Hong Kong Gree and he was appointed to Gree USA's board by Hong Kong Gree.  Both of these individuals are dominated and controlled by Gree USA's controlling shareholder, Hong Kong Gree.

34.   Additionally, even if Directors Charley Loh and Jimmy Loh voted to pass a resolution to bring suit against the Gree China Entities, Hong Kong Gree would, on information and belief, contend that the votes of Directors Charley Loh and Jimmy Loh are insufficient to pass such a resolution given the dispute between Hong Kong Gree and MJC Holdings regarding the composition of Gree USA's Board.

35.   The remaining Director, Dong Mingzhu, is also not disinterested because she is the Chairperson and Chief Executive Officer of both Gree China and Hong Kong Gree.  Dong Mingzhu is not independent of misconduct alleged herein.

36.   This action is not a collusive one to confer jurisdiction that this Court

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1 would otherwise lack.

2 <center>**UNDERLYING FACTS**</center>

3 A.   **Formation of Gree USA**

4      37.   Prior to the formation of Gree USA, Gree China functioned as an OEM

5 for several major household product brands.  For over ten years prior to the formation

6 of Gree USA, Gree China also functioned as an OEM for MJC America.

7      38.   During the global financial crisis in 2007, both the Gree China Entities

8 and MJC America sustained substantial setbacks with respect to their respective North

9 America sales.   As a result, in late-2009, the parties began serious in-person

10 negotiations taking place in both Zhuhai, China and in California to form a

11 corporation combining the Gree China Entities' research and development, and

12 manufacturing capacity with MJC America's well-established marketing, sales,

13 logistics and after-sales service platform in the United States.

14      39.   Throughout these negotiations, including in April 2010, Dong Mingzhu

15 and Larry Lam, on behalf of the Gree China Entities, repeatedly asserted to Jimmy

16 Loh and Charley Loh, the CFO and CEO of MJC America, respectively, that all

17 products to be sold by Gree USA, including the dehumidifiers, were high quality, met

18 applicable safety standards and were appropriate for sale under the regulatory

19 requirements in the United States, and had significant sales potential.   The

20 dehumidifiers were to be the primary product sold by Gree USA and thus crucial to its

21 success.

22      40.   Based on the representations of Dong Mingzhu and Larry Lam (which, as

23 discussed below, were intentionally and materially false and misleading), MJC

24 America decided to form Gree USA with the Gree China Entities.  On April 23, 2010,

25 at Zhuhai, China, Gree China and MJC America executed, on behalf of Hong Kong

26 Gree and MJC Holdings, respectively, a Memorandum of Understanding (attached

27 hereto as Exhibit B and incorporated herein by reference).   The Memorandum of

28 Understanding, which was ratified by the parties' conduct, provides, *inter alia*:

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

<center>9</center>

a.     Gree USA would be formed as a California corporation, with Hong Kong Gree owning 51% of its shares and MJC Holdings owning the remaining 49% of its shares.

b.     Gree USA would primarily sell dehumidifiers and air conditioners, as well as certain other products, manufactured by Gree China and exported by Hong Kong Gree and would be responsible for the costs associated with acquiring these products from the Gree China Entities.

c.     MJC America, which had preexisting business relationships with the majority of the major chain stores in the United States, would transfer its customer accounts to Gree USA.

d.     MJC America and its affiliates would provide sales, marketing, and after-sales services to Gree USA and, in return, receive compensation from Gree USA.

e.     Gree USA would use the "SoleusAir" trademark (and variations thereof), which is owned by MJC Supply and had been used by MJC America, on certain of its products, including dehumidifiers.

**B.     Gree USA Begins Operating**

41.   On April 26, 2010, Gree USA was incorporated as a California corporation.   It was capitalized with $80,000.00 in early 2011 and held a grand opening ceremony in City of Industry, California in June 2011.

42.   Gree USA named only four directors: Dong Mingzhu, Larry Lam, Charley Loh, and Jimmy Loh.   The meeting minutes of its first and only board meeting (attached hereto as Exhibit C and incorporated herein by reference), which occurred on June 19, 2011, reflects and affirms the parties' understanding of certain of their respective obligations concerning Gree USA, including the following:

a.     Gree USA would use the brand and trademark "SoleusAir Powered By Gree" for products sold to mass merchants, including dehumidifiers.

b.     The Gree China Entities would "fully support" Gree USA by,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

10

1    among other ways: (i) offering Gree USA the "best prices" on products manufactured

2    by Gree China and sold by Gree USA; (ii) stopping their solicitation of new United

3    States-based customers and ultimately ceasing to function as an OEM for existing

4    United States-based manufacturers and suppliers other than Gree USA; and (iii)

5    stocking their United States-based warehouses with products manufactured by Gree

6    China and exported by Hong Kong Gree.

7       43.    During 2012, in its first full year in business, Gree USA achieved sales

8    growth that, on information and belief, no China-based company in the same industry

9    has ever achieved in the United States market.  With an initial capital investment of

10    only $80,000.00, in 2012 Gree USA sold 1.2 million units of dehumidifiers and air

11    conditioners, with a sales volume exceeding $150 million.

12       44.    Critical to this success was the fact that, as requested by the Gree China

13    Entities, MJC America transferred to Gree USA all of its major accounts.

14       45.    As contemplated by the parties in a Memorandum of Understanding,

15    beginning in or around June 2011, MJC America provided sales, marketing, and post-

16    sales services to Gree USA and, in return for these services, Gree USA paid MJC

17    Supply a specified amount of sales commissions and other payments.  On or around

18    December 9, 2011, MJC Supply, MJC America, and Gree USA executed an

19    Agreement of Distribution of Gross Profit for Major Account Sales ("Agreement of

20    Distribution"), attached hereto as Exhibit D, and incorporated herein by reference, that

21    memorialized this relationship.  The Agreement of Distribution was to bind the parties

22    thereto for the minimum 10-year duration of Gree USA set forth in Gree USA's

23    Articles of Association.  In Gree USA's first full year of operation, MJC Supply

24    earned approximately $18 million for services rendered by MJC America and

25    affiliated entities to Gree USA.

26    **C.    Gree China Manufactures Defective Dehumidifiers for Gree USA**

27       46.    In July 2012, after nearly all of Gree USA's orders for 2012 had been

28    fulfilled and it had already negotiated sales contracts for 2013 in excess of $100

*Winston & Strawn LLP*
*333 S. Grand Avenue*
*Los Angeles, CA 90071-1543*

1   million, MJC America's customer service department began to receive complaints that
2   the dehumidifiers manufactured by Gree China and sold by Gree USA were
3   overheating and catching on fire.

4        47.   MJC America took the complaints seriously and reported them
5   immediately to Gree China and Hong Kong Gree.   In addition, MJC America
6   requested that Gree China test the dehumidifiers to determine the cause of the
7   overheating and fires.   MJC also informed Gree China that the Consumer Product
8   Safety Commission treats appliance fires very seriously and that manufacturers
9   typically recall dehumidifiers after receiving only a few complaints of products having
10  caught on fire.

11       48.   On or around August 9, 2012, MJC America shipped certain of the
12  dehumidifiers that had reportedly overheated and/or caught fire to Gree China for
13  further investigation.   On or around September 19, 2012, Larry Lam, on behalf of the
14  Gree China Entities, claimed that Gree China tested the dehumidifiers at issue and
15  could not duplicate the reported problems.   Larry Lam also dismissed a report by an
16  investigator retained by an insurance company that concluded that Gree China had
17  manufactured the dehumidifiers at issue using non-fire retardant materials.   Larry Lam
18  claimed that only a small batch of the dehumidifiers manufactured by Gree China
19  were constructed with non-fire retardant materials and that many major Chinese
20  appliance manufacturers use the same non-fire retardant materials to construct their
21  products.

22       49.   On or around October 10, 2012, MJC America requested that Gree China
23  provide it with a copy of an Underwriters Laboratories ("UL") report that, according
24  to Gree China, certified that the dehumidifiers at issue were manufactured using
25  flame-retardant materials in compliance with applicable United States safety
26  standards.   Retailers generally require that appliance products obtain this certification
27  before agreeing to sell them.   Gree China concealed and refused to provide to MJC
28  America the portion of the UL report detailing the materials that Gree China used to

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

manufacture the sample dehumidifiers it sent to UL for testing. On information and belief, this is because, unbeknownst to MJC America, Gree China manufactured the sample dehumidifiers sent to UL using high-grade fire-retardant materials, but, as a cost-cutting measure, used lower-grade non-fire retardant materials to manufacture the dehumidifiers that were actually mass produced and sold. MJC America's suspicion was well-founded, as independent testing ultimately reported that the dehumidifiers mass produced by Gree China were indeed defective.

50.     On or around October 30, 2012, MJC America sent two new dehumidifiers along with one that overheated to Intertek Testing Services NA, Inc. ("Intertek"), a multinational inspection, product testing, and certification company, to conduct its own tests regarding what was causing the dehumidifiers manufactured by Gree China to overheat and/or catch fire. Intertek reported to MJC America that there was a design error with respect to the compressor overload protector for smaller capacity dehumidifiers (45 pints and smaller). Shortly thereafter, on or around November 23, 2012, MJC America informed Gree China that it would stop selling dehumidifiers of that size. Gree China subsequently disputed Intertek's report and demanded that MJC America lift its stop-sale order.

51.     It was not until February 20, 2013, after MJC America's legal counsel requested that Gree China join MJC America in reporting the dehumidifier issues to the CPSC and informed Gree China of the substantial penalties it could potentially face for its failure to report, that Gree China agreed to submit a report to the CPSC concerning the dehumidifier problems. However, on information and belief, Gree China failed to provide to the CPSC all material information concerning the non-fire retardant materials used to manufacture the dehumidifiers at issue.

52.     Thereafter, on or around April 9, 2013, MJC America sent four randomly selected dehumidifiers manufactured in 2010, 2011, and 2012 to CRT Laboratories, Inc. ("CRT"), a leading failure analysis laboratory, to test the flammability of the plastic used to construct the dehumidifiers. On April 30, 2013, MJC also sent two

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    dehumidifiers manufactured in 2013 to CRT for flammability testing.

2       53.    In a report dated May 10, 2013, CRT concluded that all four units

3 manufactured in 2010, 2011, and 2012 failed to meet the applicable fire retardant

4 material standards. CRT did, however, conclude that the dehumidifiers manufactured

5 in 2013 satisfied the applicable fire retardant material standards. On information and

6 belief, Gree China upgraded the material used to manufacture the dehumidifiers in

7 2013 because it knew that the dehumidifiers manufactured in 2010 through 2012 were

8 constructed with materials that failed to satisfy applicable fire retardant standards.

9       54.    On or around June 13, 2013, Gree China finally issued a stop-sale order

10 on all the humidifiers manufactured from January 2010 through 2012.

11       55.    Finally, on September 12, 2013, the CPSC announced a massive recall of

12 the dehumidifiers manufactured by Gree China since late-2009 because they posed

13 what the CPSC termed "serious fire and burn hazards."

**D.    Gree China and Hong Kong Gree's Plan to Destroy MJC America and**

15       **Gree USA**

16       56.    Shortly after MJC America's customer service department began

17 receiving complaints in mid-2012 concerning the dehumidifiers manufactured by Gree

18 China, MJC America demanded that Gree China rectify the quality and design issues

19 pertaining to the dehumidifiers. MJC America also informed Gree China that it was

20 obligated to report the complaints to the CPSC fully and without delay because of the

21 potential threat of injury or even death posed by the dehumidifiers. MJC further

22 informed Gree China that MJC America was concerned about damage to its reputation

23 for integrity and would not cover up the serious safety issues associated with Gree

24 China's dehumidifiers.

25       57.    In response, Gree China, with the cooperation and assistance of Hong

26 Kong Gree, and at the direction of Dong Mingzhu, embarked on a campaign to

27 intimidate and ultimately destroy Gree USA and MJC America, which had transferred

28 substantial operational and intellectual property assets to Gree USA, and was now

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

largely reliant on Gree USA for its own success.  Gree China and/or Hong Kong Gree engaged in the following misconduct as part of a campaign to destroy Gree USA, which would, by design, significantly damage MJC America and its affiliates:

    a.    On or around September 17, 2012, Larry Lam, on behalf of Hong Kong Gree, informed Jimmy and Charley Loh that Dong Mingzhu ordered Hong Kong Gree and Gree China to stop the production and export of products needed to fulfill Gree USA's 2013 contracts with retailers, which cost Gree USA and the MJC entities millions of dollars;

    b.    Starting in or around September 2012, Hong Kong Gree stopped processing and paying legitimate sales and other invoices submitted to it by Gree USA;

    c.    On or around November 29, 2012, Lizzy Gao, the Vice Regional Manager of Gree China, informed MJC America that Gree China would not fill orders pursuant to Gree USA's contracts except with respect to a limited number of retailers, and further insisted that Gree USA transfer all other companies' orders back to MJC America – an impossibility under the circumstances;

    d.    On or around December 2, 2012, Gordon Zhang, on behalf of Gree China, informed MJC America that Gree China no longer wanted Gree USA's business;

    e.    In a telephone conference in December 2012, Dong Mingzhu told Jimmy Loh that MJC America's operational infrastructure, including but not limited to, its sales, marketing, and customer service forces, and all of its officers and employees, would need to be immediately transferred to Gree USA without any compensation; and

    f.    Larry Lam, on behalf of the Gree China Entities, demanded that the products designated to fill Gree USA's confirmed orders for 2013 use the trademark "Gree" instead of "SoleusAir Powered by Gree" even though the contracts for those orders had already been executed.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

58.   In addition to the above, on information and belief, in or around December 2012, Gree China began to contact Gree USA's customers to solicit sales directly for the Gree China Entities to the detriment of Gree USA and MJC America and its affiliates.  By way of example:

a.   On or around December 19, 2012, Gree China directly contacted and made price quotations to Interline Brands, Inc., an existing customer of Gree USA, without the knowledge or approval of Gree USA or MJC America, to steer Interline Brands' business away from Gree USA and directly to Gree China.

b.   On or about January 1, 2013, Gree China directly contacted Watsco, Inc., another customer of Gree USA, and convinced Watsco to transfer its account from Gree USA to Hong Kong Gree, again without the knowledge or approval of Gree USA or MJC America.

c.   On information and belief, on or around mid-February 2013, Gree China approached the Hong Kong office of one of Gree USA's major brand clients for the purpose of doing OEM business directly with that major brand client, and in so doing, attempted to undercut Gree USA.  This conduct permanently damaged Gree USA's relationship with this major brand client, resulting in the loss of business.

59.   The actions of the Gree China Entities effectively destroyed Gree USA's business, which had the intended effect of substantially damaging MJC Supply and MJC America.

## COUNT I

## (BY MJC AMERICA AND MJC SUPPLY AGAINST DEFENDANTS GREE CHINA AND HONG KONG GREE) FOR FRAUD IN THE INDUCEMENT

60.   Plaintiffs reallege the allegations of Paragraphs 1 through 59 above as if set forth in full herein.

61.   In late-2009, Jimmy Loh and Charley Loh, on behalf of MJC America and MJC Supply (which is managed by Jimmy Loh), and Dong Mingzhu and Larry Lam, on behalf of the Gree China Entities, began serious in-person negotiations taking

place in both Zhuhai, China and in California to form a corporation combining the Gree China Entities' research and development, and manufacturing capacity with MJC America's well-established marketing, sales, logistics and after-sales service platform in the United States.

62.     Throughout these negotiations, including in April 2010, Dong Mingzhu and Larry Lam repeatedly asserted to Jimmy Loh and Charley Loh that all products to be sold by Gree USA, including the dehumidifiers, were high quality, met applicable safety standards and were appropriate for sale under the regulatory requirements in the United States, and had significant sales potential.  The dehumidifiers were to be the primary product sold by Gree USA and crucial to its success.

63.     The Gree China Entities made each of these misrepresentations with the intent to induce MJC America to form Gree USA with the Gree China Entities.  The Gree China Entities sought to benefit from, *inter alia*, the transfer of MJC America's valuable customer accounts to Gree USA and its use of the "SoleusAir" trademark and variations thereof.

64.     The Gree China Entities made each of these representations with knowledge of their falsity or reckless disregard for the truth.  At the time, on information and belief, the Gree China Entities were aware that the dehumidifiers to be sold by Gree USA, which Gree China began manufacturing in late-2009, were manufactured using materials, including a plastic casing, that posed fire hazards, failed to satisfy applicable safety and UL standards in the United States (including UL 94), and would run afoul of the Consumer Products Safety Commission's prohibition on distributing products that have design and manufacturing defects that make them substantial product hazards.  On information and belief, Gree China and Hong Kong Gree, having manufactured and shipped dehumidifiers and other products to United States-based retailers for several years, were well aware of and understood these standards.  Further, on information and belief, at all relevant times, Gree China and Hong Kong Gree were in possession of internal documents, including testing reports,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    that made clear that the dehumidifiers were defective and failed to satisfy applicable

2    safety, UL, and CPSC standards.

3        65.    Moreover, in light of the statements noted above and the nature of Gree

4    USA's contemplated business, the Gree China Entities had a duty to disclose to MJC

5    America and MJC Supply, prior to formation of Gree USA, that the dehumidifiers

6    manufactured by Gree China were defective, posed a fire hazard, and failed to satisfy

7    applicable safety standards as noted above.

8        66.    As detailed above, it was not until late-2013, in connection with the stop-

9    sale order issued on all dehumidifiers manufactured by Gree China from January 2010

10   through 2012, and the subsequent recall of these dehumidifiers (as well as those

11   manufactured in late-2009), that Gree China was forced to publicly acknowledge that

12   the dehumidifiers were defective.

13       67.    MJC America and MJC Supply were unaware of the falsity of, and

14   reasonably relied to their detriment on, the statements and material omissions of the

15   Gree China Entities in deciding to join with the Gree China Entities to form Gree

16   USA, transfer MJC America's customer accounts to Gree USA, and permit Gree USA

17   to use the "SoleusAir" trademark, and variations thereof, on the defective

18   dehumidifiers.

19       68.    Had MJC America and MJC Supply been told the truth about the

20   defective dehumidifiers, they would not have partnered with the Gree China Entities

21   to form Gree USA to sell dehumidifiers and other products to United States-based

22   customers.   MJC America's business, reputation, and customer relationships have

23   been damaged as a result of its reasonable reliance on the Gree China Entities'

24   material misrepresentations and omissions.   Further, the brand "SoleusAir" and

25   variations thereof have been tarnished in reputation.

26       69.    The Gree China Entities' misstatements and omissions were made

27   willfully and/or with reckless disregard for the truth, and for reasonably relying on

28   these misstatements and omissions and their resulting injuries, MJC America and

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    MJC Supply are entitled to compensatory, punitive, and exemplary damages.

2                                    **COUNT II**

3    **(BY MJC AMERICA AND MJC SUPPLY AGAINST DEFENDANTS GREE**

4    **CHINA AND HONG KONG GREE) FOR INTENTIONAL INTERFERENCE**

5                       **WITH CONTRACTUAL RELATIONS**

6         70.    Plaintiffs reallege the allegations of Paragraphs 1 through 69 above as if

7    set forth in full herein.

8         71.    At all relevant times, Gree China and Hong Kong Gree were aware of the

9    Agreement of Distribution and/or the rights and obligations specified therein.  The

10   Agreement of Distribution constitutes a valid and existing agreement between Gree

11   USA and MJC America and MJC Supply.

12        72.    MJC America and MJC Supply have performed all of their obligations

13   pursuant to the Agreement of Distribution.

14        73.    By engaging in the conduct described in Paragraphs 57 through 59 above,

15   Gree China and Hong Kong Gree have substantially and intentionally interfered with

16   and disrupted Gree USA's performance of the Agreement of Distribution by, among

17   other ways, driving Gree USA into insolvency and impeding its ability to (i) obtain

18   new customer contracts, and (ii) make required payments to MJC Supply and MJC

19   America, including payments currently due and owing.  This has had the intended

20   effect of substantially damaging both MJC Supply and MJC America after MJC

21   America had refused to participate in the dehumidifier cover-up.

22        74.    But for Gree China and Hong Kong Gree's conduct, Gree USA would

23   have been able to perform its obligations pursuant to the Agreement of Distribution.

24        75.    The Gree China Entities' conduct has proximately caused damage,

25   including the loss of profits, to MJC America and MJC Supply in an amount to be

26   proven at trial.

27        76.    The Gree China Entities' conduct was done willfully and/or with

28   reckless disregard for the rights of MJC America and MJC Supply, thus warranting

1   the imposition of punitive damages.

### COUNT III

### (BY MJC AMERICA AND MJC SUPPLY AGAINST DEFENDANTS GREE CHINA AND HONG KONG GREE) FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

77.     Plaintiffs reallege the allegations of Paragraphs 1 through 69 above as if set forth in full herein.

78.     MJC America and MJC Supply have a valid existing business relationship with Gree USA whereby MJC America provides, *inter alia*, sales, marketing, and post-sales services for Gree USA in connection with Gree USA's sale of dehumidifiers and other products manufactured by Gree China and exported by Hong Kong Gree.  In return for these services, Gree USA pays MJC America, through MJC Supply, commissions and other payments.

79.     This relationship had produced economic benefit to MJC America and MJC Supply and was reasonably certain to produce future economic benefit to these entities.  Pursuant to Gree USA's Articles of Association, Gree USA is to continue operating for a minimum of 10 years.  MJC America would have been uniquely suited to provide sales, marketing, and post-sales services during this period and beyond.

80.     By engaging in the conduct described in Paragraphs 57 through 59 above, Gree China and Hong Kong Gree intentionally interfered with and disrupted this business relationship.  As a result of this wrongful conduct, which was done in retaliation for MJC America's refusal to join the Gree China Entities in their attempt to conceal the dehumidifier safety issues from the CPSC, among other governmental entities, Gree USA has been substantially damaged, including with respect to its ability to (i) obtain customer contracts, and (ii) pay MJC Supply for the services performed by MJC America.

81.     The Gree China Entities' conduct has proximately caused damage, including the loss of profits, to MJC America and MJC Supply in an amount to be

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  proven at trial.

2      82.   The Gree China Entities' conduct was done willfully and/or with reckless

3  disregard for the rights of MJC America and MJC Supply, thus warranting the

4  imposition of punitive damages.

5  ### COUNT IV

6  ### (BY MJC HOLDINGS DERIVATIVELY ON BEHALF OF GREE USA

7  ### AGAINST DEFENDANTS GREE CHINA AND HONG KONG GREE) FOR

8  ### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC

9  ### ADVANTAGE

10      83.   Plaintiffs reallege the allegations of Paragraphs 1 through 82 above, as if

11  set forth in full herein.

12      84.   Gree USA was involved in valid existing business relationships with

13  customers that had been transferred to it by MJC America, including relationships

14  with large name brand customers.

15      85.   These relationships had produced substantial economic benefit to Gree

16  USA and were reasonably certain to produce future economic benefit to Gree USA.

17      86.   Gree China and Hong Kong Gree were aware of Gree USA's economic

18  relationships with its customers.

19      87.   Gree China and Hong Kong Gree's intentional and wrongful acts

20  described in Paragraphs 57 through 59 above, done in retaliation for MJC America's

21  refusal to participate in the dehumidifier cover-up, among other reasons, were

22  designed to and did disrupt and permanently damage Gree USA's relationships with

23  these customers.

24      88.   MJC Holdings is informed and believes, and on that basis alleges, that

25  the Gree China Entities' intentional interference with Gree USA's business

26  relationships resulted in substantial damages to Gree USA, including the loss of

27  customer accounts such as Watsco and Interline Brands, in an amount to be proven at

28  trial.

89.   The Gree China Entities' conduct was done willfully and/or with reckless disregard for the rights of Gree USA, thus warranting the imposition of punitive damages.

## COUNT V

## (BY MJC AMERICA AND MJC SUPPLY AGAINST DEFENDANTS GREE CHINA AND HONG KONG GREE) FOR VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200 *ET SEQ.*

90.   Plaintiffs reallege the allegations of Paragraphs 1 through 89 above, as if set forth in full herein.

91.   As described in detail above, the Gree China Entities, on information and belief, knowingly manufactured defective dehumidifiers that, *inter alia*, posed significant safety hazards, failed to satisfy applicable safety and UL standards in the United States (including UL 94), and ran afoul of the Consumer Products Safety Commission's prohibition on distributing products that have design and manufacturing defects that make them substantial product hazards as well as 15 USC Section 2068(a)(12).   When MJC America encouraged the Gree China Entities to report the dehumidifier defects to the Consumer Product Safety Commission, the Gree China Entities refused.   Further, the Gree China Entities retaliated against MJC America and MJC Supply for refusing to participate in a cover-up of the dehumidifier defects by, among other ways, intentionally interfering with and damaging their contractual and business relationships.

92.   The Gree China Entities' conduct, as alleged above, constitutes unlawful or unfair business practices under the purview of Section 17200 of the California Business and Professions Code.   The Gree China Entities' conduct offends public policy, is immoral, unethical, and offensive, and has caused substantial injury to MJC America and MJC Supply.

93.   The Gree China Entities' retaliatory conduct alleged herein occurred and continues to occur in the ordinary course of their business, including with respect to

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1   Gree USA, MJC America, and MJC Supply.

2       94.    MJC America and MJC Supply are entitled to relief pursuant to Section

3   17203 of the California Business and Professions Code, including enjoining the Gree

4   China Entities to cease and desist from engaging in the retaliatory conduct described

5   above.  MJC America and MJC Supply are entitled to an award of attorneys' fees and

6   costs pursuant to California Code of Civil Procedure Section 1021.5.

7

8       WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

9       1.    For general damages;

10      2.    For actual damages in an amount in excess of $150,000,000.00;

11      3.    For exemplary or punitive damages;

12      4.    For incidental damages;

13      5.    For interest on all monetary damages, to the maximum extent allowed by

14  law;

15      6.    For appropriate preliminary and permanent injunctive relief, as

16  appropriate;

17      7.    For costs of suit herein incurred, including attorneys' fees as allowed by

18  law; and

19      8.    For such other, different or further relief as the Court may deem just and

20  proper.

21  Dated:  October 2, 2013        WINSTON & STRAWN LLP

22

23          By:  /s/ Neal R. Marder

24          Neal R. Marder
            Ali R. Rabbani

25          Ian C. Eisner

26          *Attorneys for Plaintiffs*
            *MJC America, Ltd. dba Soleus*

27          *International Inc., MJC*
            *America Holdings Co., Inc., and MJC*

28          *Supply, LLC*

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

23

## DEMAND FOR JURY TRIAL

Pursuant to FRCP 38(b), and Local Rule 38-1 of the Central District of California, Plaintiffs hereby demand trial by jury on all allegations of the Complaint, on which trial by jury may be had.

Dated:  October 2, 2013                    WINSTON & STRAWN LLP


By:  /s/ Neal R. Marder
     Neal R. Marder
     Ali R. Rabbani
     Ian C. Eisner

*Attorneys for Plaintiffs*
*MJC America, Ltd. dba Soleus*
*International Inc., MJC*
*America Holdings Co., Inc., and MJC*
*Supply, LLC*

## VERIFICATION

I, Jimmy Loh, am and, at all relevant times was, (i) a shareholder, director, and Secretary of Plaintiff MJC America, Ltd., (ii) a shareholder, director, CFO, and Secretary of Plaintiff MJC America Holdings Co., Inc., (iii) a member and Manager of Plaintiff MJC Supply, LLC, and (iv) a director and Secretary of Nominal Defendant Gree USA, Inc.  I declare under penalty of perjury under the laws of the United States that I have read the foregoing Verified First Amended Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 2nd day of October 2013, at Los Angeles, California.

_____

Jimmy Loh

LA:341512.1

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

# EXHIBIT A

Gree USA, Inc.

## BY-LAWS OF

## GREE USA, INC.

Corporation Organized Pursuant to the California
Corporations Code of 1977, as amended

### Article I - Offices

The principal executive office of the corporation shall be located at 20035 E. Walnut Dr, North, City of Industry, CA 91789, USA.

The Board of Directors (hereinafter referred to as the Board) shall have the authority to change the principal executive office. The corporation may have other offices, either within or without the State of California as the Board may designate or as the business of the corporation may from time to time required.

### Article II – Joint Venture

The corporation is a Joint Venture between Hong Kong Gree Electric Appliances Sales Ltd., a corporation formed under the laws of Hong Kong, and MJC America Holdings, Inc., a California corporation.

The corporation shall operate in accordance with the Principles of Operations dated October 30, 2010 executed by Chairman and CEO of Hong Kong Gree Electric Appliances Sales Ltd. Dong Ming Zhu and Chairman and CFO of MJC America Holdings, Inc, Jimmy Loh. (Thereafter "Principles")

Principles are constituted as a fundamental part of this By-Laws.

### Article III – Doing Business Name

The corporation should use Gree USA Sales Ltd, as its doing business name.

### Article IV - Shareholders Meetings

1. Place of Meetings

Meetings of shareholders shall be held at the principal executive office of the corporation or at any other place designated by the Chairman of the Board or by majority consent, in writing, or all

By-Laws 1

Gree USA, Inc.

persons entitled to vote thereat, given before or after the meeting and filed with the Secretary.

2.     Annual Meetings

The annual meeting of the shareholders shall be held in the month of May in each year, beginning with the year 2011, for the purpose of the transaction of such business as may come before the meeting.

3     Special Meetings

Special meetings of the shareholders may be called at any time by the Board, Chairman of the Board, CEO, and Secretary or by holders of shares entitled to cast not less than 10 percent of the votes at the meeting. Except as hereafter provided notice shall be given in the same manner as notice for an annual meeting. Upon receipt of a mailed or personally delivered written request addressed to the Chairman of the Board, President, Vice President or Secretary by any person (other than the Board), entitled to call a special meeting of shareholders the officer shall cause to be given to the shareholders entitled to vote, a notice that a meeting will be held at a time requested by the person(s) calling the meeting, not less than 25 nor more than 60 days after receipt of such request. The person entitled to call the meeting may give the notice if the notice was not given within 20 days after receipt of the request.

4.     Notice of Meeting and Reports

Notice of annual or special meetings shall be given in writing not less than 15 nor more than 60 days before the date of the meeting, to shareholders entitled to vote thereat by the Secretary or an Assistant Secretary, or if there be no such officer, or in the case of neglect or refusal, by any director or shareholder. The notice or any reports shall be given personally or by mail or other means of written communication as provided in Corp. C. Sec. 601 and shall be sent to the shareholder's address appearing on the books of the corporation, or supplied to the corporation by the shareholder for the purpose of notice. In the absence thereof, notice shall be deemed to have been given if mailed to the principal executive office of the corporation or published at least once in a newspaper of general circulation in the county in which the principal executive office is located.

Notice of any meeting of shareholders shall specify the place, the day and the hour of meeting, and (a) in case of a special meeting, the general nature of the business to be transacted and no other business may be transacted, or (b) in the case of an annual meeting, those matters which the directors at date of mailing intend to present for action by the shareholders. At any meetings where directors are to be elected, notice shall include the name of the nominees, if any, intended at date of notice to be presented by management for election.

Notice shall be deemed given at the time it is delivered personally or deposited in the mail or sent

By-Laws 2

Gree USA, Inc.

by other means of written communication. The officer giving such notice or report shall prepare and file an affidavit or declaration thereof. It shall not be necessary to give any notice of adjournment or of the business to be transacted at an adjourned meeting other than by announcement at the meeting at which such adjournment is taken; however, when a meeting is adjourned for 45 days or more, notice of the adjourned meeting shall be given in the same manner as an original meeting.

5.    Quorum

At any meeting of shareholders a fifty one percent (51%) of the outstanding shares entitled to vote, represented in person or by proxy, shall constitute a quorum. If less than said number of outstanding shares are represented at a meeting, a majority of the shares so represented may adjourn the meeting from time to time without further notice. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notice. The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.

6.    Voting

The shareholders entitled to notice of any meeting or to vote at any meeting shall be only the persons in whose names shares stand on the share records of the corporation on the record date determined in accordance with these by-laws.

If no record date is determined, (a) the record date for determining shareholders entitled to notice of, or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day on which notice is given, or if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held, (b) the record date for determining shareholders entitled to give consent to corporate actions in writing without a meeting when no prior action by the Board is necessary, shall be the day on which the first written consent is given, and (c) the record date for determining shareholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto, or the 60th day prior to the date of such other action, whichever is later.

Every shareholder entitled to vote shall be entitled to one vote for each share held, except for the election of directors. In an election for directors, if a candidate's name has been placed in nomination prior to the voting and one or more shareholders has given notice at the meeting prior to the voting of the shareholder's intent to cumulate the shareholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of shares which the shareholder is entitled to vote, or distribute the votes on the same principle amount as may candidates as the shareholder chooses. The candidates receiving the highest number of votes up to the number of directors to be elected shall be elected. Upon the

Gres USA, Inc.

demand of any shareholder made before the voting begins, the election of directors shall be by ballot.

7.    Proxies

Every person entitled to vote shares may do so by one or more persons authorized by proxy in writing executed by such shareholder and filed with the Secretary.

Every proxy continues in full force and effect until revoked by the person executing it prior to the vote pursuant thereto, provided however, that no proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy.

8.    Waivers and Consents

Actions taken at a meeting of shareholders however called and noticed, where a quorum is present in person or by proxy are as valid as if taken after regular call and notice, provided that each person entitled to vote either before or after the meeting signs a written waiver of notice or consent to the holding of the meeting or an approval of the minutes thereof. All waivers, consents and approvals shall be made part of the minutes of the meeting. Neither the business to be conducted nor the purpose of any regular or special meeting must be set forth in any waiver of notice, except as provided by Corp. C. Sec. 601 (f). Attendance shall constitute a waiver of notice unless objection is made as provided in Corp. C. Sec. 601(e).

9.    Action Without Meeting

Any action which may be taken at an annual or special meeting of shareholders may be taken without a meeting and without prior notice if a consent in writing, setting forth the action taken, shall be signed by the shareholders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Unless the consents of all shareholders entitled to vote have been solicited in writing, notice of any shareholder's approval of (a) a contract or other transaction between the corporation and one or more of its directors or another corporation, firm or association in which one or more of its directors has a material financial interest pursuant to Corp. C. Sec. 310, (b) indemnification of an agent of the corporation pursuant to Corp. C. Sec. 317, (c) the principal terms of a reorganization pursuant to Corp. C. Sec. 1201, and (d) a plan of distribution as part of the winding up of the corporation pursuant to Corp. C. Sec. 2007, without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval.

Prompt notice shall be given to any other corporate action taken by shareholders without a

By-Laws 4

Gree USA, Inc.

meeting by less than an unanimous written consent to those shareholders entitled to vote who have not consented in writing.

Notwithstanding any of the foregoing provisions of this section, directors may not be elected by written consent except by the unanimous written consent of all shares entitled to vote for the election of directors.

A written consent may be revoked by a writing received by the corporation prior to the time that written consents of the number of shares required to authorize the proposed action have been filed with the Secretary of the corporation, but may not be revoked thereafter.  Such revocation is effective upon its receipt by the Secretary of the corporation.

Any shareholder giving a written consents, or the shareholder's proxy holders, or a transferee of the shares of a personal representative of the shareholder or their respective proxy holders, may revoke the consent by a writing received by the corporation prior to the time that written consents of the number of shares required to authorize the proposed action have been filed with the Secretary of the corporation, but may not do so thereafter.  Such revocation is effective upon its receipt by the Secretary of the corporation.

## Article V - Board of Directors

1.    General Powers

The business and affairs of the corporation shall be managed and its corporate powers exercised by its Board of Directors.  The directors shall in all case's act as a board, and they may adopt such rules and regulations for the conduct of their meetings and the management of the corporation as they may deem proper, not inconsistent with these By-Laws, the Articles of Incorporation, the California Corporations Code and any shareholders' agreement relating to any of the affairs of the corporation as long as it remains a close corporation.

The number and tenure of Board of Directors, the meetings, quorum for conduct businesses, notice and waives of meetings, and compensation of Directors shall be dictated by Section 5 of Principles.

2.    Action Taken without Meeting

Any action required or permitted to be taken by the Board may be taken without a meeting if all members of the Board shall individually or collectively consent in writing to such action. The consent Board and shall be filed with the minutes of the proceedings of the Board.

By-Laws 5

Gree USA, Inc.

## Article VI - Officers

1.    Officers

The officers of the corporation shall be a Chairman, Deputy Chairman, CEO, CFO, COO, CAO, secretary and vice presidents.

2.    Election and Term of Office

The election and term of office are dictated under Section 7 of Principles.

3.    Compensation of Officers

The salaries of the officers shall be fixed, from time to time, by the Board.

## Article VII - Corporate Records and Reports

1.    Records

The corporation shall maintain adequate and correct accounts, books, and records of its business and properties in accordance with generally accepted accounting principles. All of such books, records and accounts shall be kept at its principal executive office. Section 12 of Principles establishes the financial records, reports and audit requirements.

2.    Inspection by Shareholders

The share register, accounting books and records and minutes of proceedings of the shareholders, the Board and committees of the Board shall be open to inspection and copying by any shareholder or holder of a voting trust certificate at any time during usual business hours upon written demand on the corporation, for a purpose reasonably related to such holder's interest as a shareholder or a voting trust certificate. Inspection and copying may be made in person, by agent, or by attorney.

Shareholders shall also have the right to inspect the original or certified copy of these By-Laws, as amended to date, kept at the corporation's principal executive office, at all reasonable times during business hours.

If any record subject to inspection pursuant to this chapter is not maintained in written form, a request for inspection is not complied with unless and until the corporation at its expense make such record available in written form.

By-Laws 6

Gree USA, Inc.

3.     Inspection by Directors

Each director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents of every kind and to inspect the physical properties of the corporation and also all of its subsidiary corporations. Inspection by a directors may be made in person or by agent or by attorney and includes the right to copy and obtain extracts.

4.     Waiver of Annual Report

The annual report to shareholders, described in Corp. C. Sec. 1501 is hereby expressly waived.

## Article VIII - Shares

1.     Certificates for Shares

Certificates representing shares of the corporation shall be in such form as shall be determined by the Board. Certificates shall be signed by the CEO and by the Secretary or by such other officers authorized by law and by the Board. They shall state the name of the record holder of the shares represented thereby, the total authorized issue, the number of shares represented by the particular certificate, the designation, if any, the class or series of shares represented thereby, and any statement or legend required by the California Corporations Code. All certificates for shares shall be consecutively numbered and issued in consecutive order with the date of issuance entered thereon.

Any or all the signatures on the certificates may be made by facsimile provided that they are countersigned by a transfer agent or transfer clerk and registered by an incorporated bank or trust company, either domestic or foreign, as registrar of transfers.

2.     Transfer on the Books

Upon surrender to the Secretary or transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the corporation to issue a new certificate  the person entitled thereto, cancel the old certificate and record the transaction upon its share register.

3.     Lost or Destroyed Certificates

Any person claiming a share certificate to be lost or destroyed shall made an affidavit or affirmation of that fact and shall, if the Board so require, give the corporation a bond of indemnity, in form and with one or more sureties satisfactory to the Board, in at least double the value of the shares represented by the lost certificate, whereupon a new certificate may be issued

By-Laws 7

Gree USA, Inc.

in the same tenor and for the same number of shares as the one alleged to be lost or destroyed.

4.   Record Date and Closing of Transfer Books

The Board may fix in advance a record date for the determination of the shareholders entitled to notice of and to vote at any meeting of shareholders, or entitled to receive payment of any dividend or distribution, or any allotment of rights, or to exercise rights in respect to any other lawful action. The record date so fixed shall not be more than sixty (60) nor less than ten (10) days prior to the date of the meeting or event for the purpose for which it is fixed. When a record date is fixed, only shareholders of record on that date are entitled to notice of and to vote at the meeting, or to receive the dividend, distribution, or allotment of rights, or to exercise the rights as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date. The Board may close the books of the corporation against transfers of shares during the whole or any part of a period of not more than sixty (60) days prior to the date of a shareholders' meeting, or the date when the right to any dividend, distribution, or allotment of rights vests, or the effective date of any change, conversion or exchange of shares.

### Article VII - Miscellaneous

1.   Indemnification

The directors and officers of the corporation shall be indemnified by the corporation to the fullest extent not prohibited by the California Corporations Code.

2.   Insurance

The corporation shall have the power to purchase and maintain insurance on behalf of any agent (as defined in Corp. C. Sec. 317) against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such, whether or not the corporation would have the power to indemnify the agent against such liability under the provisions of Corp. C. Sec. 317.

3.   Construction, Definitions, and References

The general provisions, rules of construction and definitions contained in the General Provisions of the California Corporations Code and in the California General Corporation Law shall govern the construction of these By-Laws, unless the context requires otherwise. Corp. C. Sec. reference herein refer to the equivalent sections of the General Corporation Law, effective January 1, 1977, as amended.

4.   Corporate Seal

The Board shall provide a corporate seal which shall be circular in form and shall have inscribed

By-Laws 8

Gree USA, Inc.

thereon the name of the corporation, the state of incorporation, the date of incorporation and the words "Corporate Seal" or Incorporated."

### Article VIII - Amendments

By-Laws may be amended or repealed by written consent of both Hong Kong Gree Electric Appliances Sales Ltd. and MJC America Holdings, Inc.

By-Laws 9

Gree USA, Inc.

### Certification of the Adoption of the By-Laws

The undersigned, Secretary of the corporation, hereby certifies that the foregoing is a true and correct copy of the By-Laws of the corporation adopted as of 10/30/2010 by the Incorporator of the corporation.

Dated:  10/30/2010

Jimmy Loh, Secretary

· By-Laws 10

# EXHIBIT B

MEMORADUM OF UNDERSTANDING

Zhu Hai, China

This memorandum of understanding is entered into on April 23, 2010 at Zhuhai, China between Gree Hong Kong Electric Appliances, a subsidiary of Gree Electrical Appliance Inc of Zhuhai (Party A), and MJC Holding Co., Inc., an affiliate of MJC America Ltd. (Party B)

Parties desire to form a joint venture to further sales of Party A's products in the North America, using Party B's expertise and facilities in sales, logistics, and after sales services.

The following are the form and structure of the joint venture, as tentatively agreed by both parties.

1)  The legal name of the joint venture will be Gree USA, Inc.  It's doing business name is Soleus N.A.
2)  The joint venture will be a corporation incorporated in the state of California.  The corporation should be formed in late April or early May of 2010.
3)  Party A and Party B will own 51% and 49% outstanding common stock of the Gree USA, respectively.  The corporation will issue only one class of stock.
4)  The initial capital of Gree USA will be $200,000.  The initial capital should be deposited into the corporation bank account on or before May 15, 2010.
5)  The initial administrative office will be in Greater Los Angeles area. Gree USA will intend to lease an office and initially hire one or two clerical employees in year 2011. Tentatively Gree USA will use the Part's office for company registration.
6)  The Party A should appoint 3 directors and Party B should appoint 2 directors for Gree USA.  The board of directors should convey meeting at a minimum annually.
7)  The Board of Directors of Gree USA should name executive officers of the joint venture.
8)  Neither directors nor executive officers will be compensated by Gree USA for the first two years of the joint venture.
9)  The mission of Gree USA is to advance sales of Gree residential air conditioner and dehumidifier (including Gree brand) products in United States of America.
10) Gree USA will focus sales to largest chain stores in United States of America initially.  And gradually spread its sales to middle and smaller chain stores.
11) Gree USA will use existing sales and marketing force of Party B, to conduct sales presentation to potential customers.
12) Most major chain stores have existing relationship with Party B and its affiliates.  Party B will cause the existing accounts with the customers to be transferred to Gree USA.

Exhibit B, page 36

13) In order to broader product category and continuing existing appearance in front of major chain stores, Gree USA will present both Party A and Party B products in order to increase placement chances.

14) Gree USA should select Party A's products as the primary products and add Party B's as supplemental products for major chain store presentation.

15) Upon receiving orders from major chain stores Party A will fulfill the orders of its product and Party B will fulfill the orders of its products.

16) Gree USA will only incur major costs associated with the order received, fulfilled, and payment received from customers, such as commission to sales company, administrative and after sales services cost to Party B and affiliates.

17) All anticipated costs will added to production costs to determine product presentation prices for a given potential customer.  Party A has power to determine the final product prices for its product.

18) In no event Gree USA should be responsible for any costs associate with marketing, presentation, sales, and after sales services for sales associated with any Party B products.

19) Gree USA will use product brands owned and controlled by either parties, its parents and affiliates, or other brands approved Board of Directors of the company.

Signed by:

GREE ELECTRIC APPLIANCES INC. of ZHUHAI

Name: _Namdou Tay_

Title: _Vic Gr of Gree Overseas Sales Co._

Date: _23 April 2010_


MJC America, Limited

Name: _Vmri_

Title: _Chairman, Secretary of MJC America Ltd._

Date: _April 23, 2010_

# EXHIBIT C

Minutes of the Board of Directors Meeting
Of
Gree USA, Inc.
A California Corporation

A meeting of the Board of Directors is held on June 19, 2011 at headquarter of the company at 20035 E. Walnut Dr. North, City of Industry, CA at 10:30 AM. Attending for the meeting are Chairwoman Dong Ming Zhu, Director Jimmy Loh, Director Charley Loh, and Director Lam Hou Kong.

Secretary Jimmy Loh announces the presence of a quorum to conduct businesses for the board of directors.

CEO Charley Loh reports to the Board the sales activities of Gree USA under the PBG (SoleusAir Powered by Gree). He states that the US mass merchants are receptive to PBG brand. And the outlook of Gree USA future is bright.

CEO Charley Loh thanks for the supports that Gree headquarter has been giving to Gree USA.

Chairwoman Dong appraised the hard work of the Gree USA US team to prepare and execute the Grand Opening event. She set her vision for the future direction of Gree USA by stating:

1) Gree headquarter trusts the integrity and ability of the Gree USA management team. She believes that with the researching and development, manufacturing and quality control system of the factory, and the US marketing and sales experiences of MJC, Gree USA can make Gree the largest air conditioner suppler in the US.
2) In order to avoid having Gree brand becoming a cheap air conditioner brand in the US, Gree USA should use PBG for the products sold to the mass merchants. Products sold to mass merchants such as window ACs and dehumidifiers are commodity type of products and have very low profit margins.
3) Gree brand should be used for the products with higher tech content, or certain specialty products which can demand a higher profit margin. After the US consumers recognizes that Gree is a premium brand for air conditioners and dehumidifiers, Gree brand can then be used for products sold to the mass merchants.
4) Gree USA should focus on penetration of the US market by generating sales quantity. Gree USA should generate annual sales of 1 million unit or more within next two years.
5) Gree headquarter will fully support Gree USA by a) offering the best prices. Gree factory only needs to make 1 to 2% of the products sold to Gree USA. b) stop new OEM customers. After Gree USA establishes itself with sales quantity Gree headquarter will stop OEM all together. c) Gree headquarter will not take its share of Gree USA's profits for the first three years. Gree headquarter's portion of profits will be retained by Gree USA for promotion and marketing expenses in the US. d) Gree USA will receive 1.5 to 2% of the sales rebates at the end of a year if its annual sales exceed 1 million units. Gree headquarter has the similar program for its domestic sales companies. f) Gree headquarter will support Gree USA's sales by having local inventories in the US warehouses. Eventually Gree headquarter will consider to invest and acquire warehouses

spaces in the US. g) Gree headquarter is considering investing manufacturing facilities in the US in the future. h) Gree headquarter will place high priority for development of the products suitable for the US market, such as VRFs and central ACs.

6) Gree USA should look into the possibility of opening Gree specialty stores in the US, which only carry and sell Gree products. It is recommended to open the initial Gree specialty stores in the areas where Chinese population are highly concentrated.

Moved by Director Jimmy Loh, seconded by Director Charley Loh, the board approved the following resolutions.

RESOLVED, that Chairwoman Dong Ming Zhu's visions for the company stated to above are hereby adopted as the future direction of the company.

RESOLVED FURTHER that the actions taken since the organization meeting dated October 30, 2010 by the board of directors and management are hereby ratified.

There are no further business and the meeting is adjoined at 11:00 AM.


Prepared and certified to be true and correct minutes of the meeting by:


Jimmy Loh
Secretary

# EXHIBIT D

## AGREEMENT OF DISTRIBUTION OF GROSS PROFIT OF MAJOR ACCOUNT SALES

This agreement is made this December 9, 2011 between Gree USA, Inc., (herein below "Gree USA"), and MJC Supply, LLC (herein below "MJC Supply") with consent of MJC America Ltd. (herein below "MJC America"), an affiliated of MJC Supply.

Whereas, Gree USA is a Joint Venture between Hong Kong Gree Electric Appliance Sales Ltd. (herein below "Gree HK"), a fully owned subsidiary of Gree Electric Appliance Co. Ltd. of Zhuhai (herein below "Gree Zhuhai"), and MJC American Holdings Co. Inc., an affiliate to MJC Supply.

Whereas, based on the principals of the joint venture MOU dated April 23, 2010 and the resolutions adopted by the Board of Directors of Gree USA on June 19, 2011, MJC America will transfer all its major US accounts to Gree USA. Gree USA will be the entity to make sales to these accounts. MJC America and its affiliates will provide operation management, marketing, sales, logistic, and after sales services relating to the sales made by Gree USA.

Whereas, Gree USA will purchase products from Gree HK, and in turn sell the products to the US major accounts.

Whereas, Gree HK has the sole discretion to determine both the purchase prices and the sales prices of Gree USA for the products.

Whereas, Gree HK and Gree USA agreed to use a Form titled "Account Project Set UP Sheet", a Spaceman attached herein, (Agreement Form) to determine the percentage of gross sales of a major account which should be paid to Gree USA and MJC America and its affiliated for their roles and contributions. Each and every Agreement Form must be signed by the officers of Gree HK and Gree USA.

Whereas, based on the Agreement Form, there are a "standard build up %" column and a "this account % break down" column. Information in the "standard build up %" represents the bench marks and information in "this account % break down" column represent the actual percentage of itemized breakdown agreed by Gree HK and Gree USA for the subject account. These percentages represent the compensations entitled by Gree USA and MJC America and its affiliated for the specific sales.

Whereas, there is a row titled "Extra / Short build up", which represents the difference between agreed build up for the account, and percentage in the cell titled "Gross profit". Gree USA will retain the amount of Gross Profit upon receipt of the sales proceeds from the subject account. If number in Extra / Short Build Up is negative; it means Gree HK owes Gree USA and MJC and its affiliates for additional fund other than calculated based on Gross Profit percentage; and if it is positive, it means Gree USA and MJC America and its affiliated owe to Gree HK for additional fund other than calculated based on Gross Profit percentage. Gree HK and Gree USA agreed that periodically they shall add the percentages (offset positive to negative) at Extra / Short Build Up for all accounts. If the net amount is positive, Gree USA shall make payment to Gree HK, and if the net amount is negative, Gree HK shall make payment to Gree USA.

NOW, for valuable consideration, IT IS AGREED that,

1.  Gree USA shall retain, for each account and each sales, the percentage in the first "Sub Total", "This acct % break down" cell at the Agreement Form all the time regardless if there is an Extra/Short Build Up. Gree USA is responsible only for returns directly from the subject account.

2.  MJC Supply shall be paid by Gree USA for the percentage in the second "Sub Total", "This acct % break down" cell adjusted to Extra / Short Build Up percentage at the time when Gree USA receives the sales proceeds from subject account. At time of periodical settling of all the accounts, MJC Supply shall be 100% responsible to reimburse Gree USA if the net Build Up is positive, or receive 100% funds from Gree USA if the net Build Up is negative, and only when Gree USA receives settlement funds from Gree HK.

3.  Based on the promise from Gree Zhuhai, Gree USA would receive for additional bonus and other promotional rewards from Gree Zhuhai or Gree HK. Based on the actual responsibility and work performed by Gree USA and MJC America and its affiliated, it is agreed that Gree USA shall retain 10% for the bonus and rewards of this nature upon receipt and the remaining 90% shall be paid to MJC.

4.  This Agreement shall remain valid continuously until it is amended or altered in writing by and signed by all Parties.

Executed in the State of California, County of Los Angeles,

Gree USA Inc.
By Charley Loh, Its CEO

MJC Supply LLC
By Jimmy Loh, its Member

MJC America Ltd agrees and consents the above agreements without reservation. MJC America Ltd. hereby agrees that it will not assert any claim against Gree USA for its performances and roles in operation management, marketing, sales, logistic, and after sales service of Gree USA's businesses.

MJC America Ltd.
By Jimmy Loh, its Secretary