1  Neal R. Marder (SBN: 126879)
   *nmarder@winston.com*
2  Ali R. Rabbani (SBN: 253730)
   *arabbani@winston.com*
3  Ian C. Eisner (SBN: 254490)
   *ieisner@winston.com*
4  WINSTON & STRAWN LLP
   333 South Grand Avenue
5  Los Angeles, CA 90071
   Telephone: 213 615 1700
6  Facsimile: 213 615 1750

7  Attorneys for Plaintiffs
   MJC America, Ltd. dba Soleus
8  International Inc., MJC
   America Holdings Co., Inc., and
9  MJC Supply, LLC

10            **UNITED STATES DISTRICT COURT**

11           **CENTRAL DISTRICT OF CALIFORNIA**

12  MJC America, Ltd. dba Soleus          )  **Case No. CV13-04264-SJO (CWx)**
    International Inc., MJC America        )
13  Holdings Co., Inc., and MJC Supply,   )  Assigned to Hon. S. James Otero
    LLC                                    )
14                                         )  **PLAINTIFFS' VERIFIED SECOND**
              Plaintiffs,                  )  **AMENDED COMPLAINT**
15                                         )
         vs.                               )
16                                         )  **DEMAND FOR JURY TRIAL**
    Gree Electric Appliances, Inc. of Zhuhai, )
17  Hong Kong Gree Electric Appliances     )
    Sales Ltd., and Does 1 through 10,     )
18  inclusive,                             )
                                           )
19            Defendants,                  )
                                           )
20  and                                    )
                                           )
21  Gree USA, Inc., a California           )
    corporation,                          )
22                                         )
              Nominal Defendant            )
23  _____)  Original Complaint Filed: June 13, 2013

24

25        Plaintiffs MJC America, Ltd. dba Soleus International Inc. ("MJC America"),

26  MJC America Holdings Co., Inc. ("MJC Holdings"), and MJC Supply, LLC ("MJC

27  Supply") (collectively, "Plaintiffs") allege:

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA  90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

**NATURE OF THE ACTION**

1.      Defendant Gree Electric Appliances, Inc. of Zhuhai ("Gree China") is one of the largest manufacturers of air conditioners and household appliances in the world.  On April 23, 2010, Gree China and its wholly-owned subsidiary, Defendant Hong Kong Gree Electric Appliances Sales Ltd. ("Hong Kong Gree," and together with Gree China, the "Gree China Entities") entered into an agreement with Plaintiff MJC America, a privately-held California-based manufacturer, importer, and distributor of home comfort products, to form Gree USA, Inc., a closely-held corporation that would sell to United States-based customers dehumidifiers and other products manufactured by Gree China and exported by Hong Kong Gree.

2.      MJC America and the Gree China Entities agreed that MJC America would transfer its lucrative customer accounts – which included several large household product brands – to Gree USA.  MJC America would also provide sales, marketing, and post-sales services on behalf of Gree USA in return for a portion of the sales profits.

3.      On April 26, 2010, Gree USA was incorporated in California, with 51 percent of its stock owned by Hong Kong Gree and the remaining 49 percent owned by MJC Holdings.

4.      The combination of the Gree China Entities' manufacturing and shipping muscle and MJC America's substantial customer base and well-developed marketing, sales, and service networks initially made Gree USA very successful.  Indeed, in 2012, Gree USA, which had been formed with an initial capital investment of only $80,000, sold over 1.2 million units of air conditioners and dehumidifiers, with a sales volume of over $150 million.

5.      However, in July 2012, after Gree USA had fulfilled nearly all of its orders for that year and had already negotiated sales contracts for 2013 in excess of $100 million, MJC America's customer service department began to receive complaints that the dehumidifiers manufactured by Gree China, exported by Hong

1   Kong Gree, and sold by Gree USA were overheating and catching fire.

2       6.   MJC America took these complaints seriously and immediately reported

3   them to the Gree China Entities.  While the Gree China entities denied that there were

4   any problems, it soon became clear, through numerous independent investigations and

5   tests commissioned by MJC America and third parties, that the dehumidifiers

6   manufactured by Gree China and exported by Hong Kong Gree were indeed defective.

7   As a result, in November 2012, MJC America informed the Gree China Entities that it

8   would stop selling through Gree USA the defective humidifiers.

9       7.   The Gree China Entities continued to deny that the dehumidifiers

10  suffered from any problems despite overwhelming evidence to the contrary.  They

11  also attempted to pressure MJC America to cover-up the mounting customer

12  complaints of overheating and/or fire associated with the dehumidifiers or, at

13  minimum, delay reporting these complaints to the United States Consumer Product

14  Safety Commission ("CPSC").  MJC America informed the Gree China Entities that

15  they were obligated to report these complaints to the CPSC fully and without delay

16  because of, among other reasons, the potential risk of injury or even death to the

17  general public posed by the dehumidifiers.

18      8.   In response, the Gree China Entities engaged in a campaign to intimidate

19  and destroy Gree USA and, by extension, MJC America (and certain related entities)

20  which, after having transferred its lucrative customer accounts to Gree USA, had

21  become largely reliant on Gree USA for its own success.  On information and belief,

22  the Gree China Entities' campaign to destroy Gree USA and MJC America was

23  orchestrated by a high-powered individual named Dong Mingzhu, who has served as

24  the Chairperson of Gree USA since its inception and is also the Chairperson and Chief

25  Executive Officer of both Gree China and Hong Kong Gree.

26      9.   Among other misdeeds, the Gree China Entities (i) caused Gree USA

27  customers to terminate their accounts with Gree USA and/or transfer them to the Gree

28  China Entities; (ii) ordered Gree China's production department to cease

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

3

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  manufacturing certain products sold by Gree USA, which has made it impossible for

2  Gree USA to fulfill a significant portion of its confirmed orders for 2013; and

3  (iii) intentionally disrupted the contractual relationships between Gree USA and MJC

4  America (and certain related entities).

5      10.   Moreover, on information and belief, at the time MJC America was

6  negotiating with the Gree China Entities regarding the potential formation of Gree

7  USA, the Gree China Entities knew that the dehumidifiers to be sold by Gree USA,

8  which Gree China had begun manufacturing in late-2009, were defective.  Indeed,

9  these dehumidifiers are now the subject of a massive recall announced in September

10  2013.  However, to induce MJC America to form Gree USA and, *inter alia*, transfer

11  its lucrative customer accounts to Gree USA, the Gree China Entities concealed the

12  dehumidifier defects from MJC America.  Had MJC America known the truth about

13  the defective dehumidifiers, they never would have agreed to form Gree USA with the

14  Gree China Entities.

15      11.   The Gree China Entities' misconduct described above, and in more detail

16  below, has damaged Plaintiffs in an amount not less than $150,000,000 to be

17  established at trial.

18                         **THE PARTIES**

19      12.   Plaintiff MJC America is and, at all times mentioned herein was, a

20  California corporation with its principal place of business in California.  Founded in

21  1998 and privately held by three shareholders, MJC America imports, distributes, and

22  manufactures, almost exclusively through Original Equipment Manufacturers

23  ("OEMs"), home comfort products, including but not limited to electric space heaters,

24  fans, and dehumidifiers under the trade name "SoleusAir," and variations thereof.

25      13.   Plaintiff MJC Supply is, and at all times mentioned herein was, a

26  California-based limited liability company.  MJC Supply functions primarily to

27  distribute proceeds paid by Gree USA to the various entities performing Gree USA's

28  management and administrative functions, including but not limited to MJC America,

which performs sales, marketing, logistics, and after-sales services for Gree USA. MJC Supply also owns the trademark "SoleusAir."

14.   Plaintiff MJC Holdings is and, at all times mentioned herein was, a California corporation with its principal place of business in California.  It was formed for the sole purpose of holding a 49 percent ownership interest in Gree USA.

15.   Plaintiffs are informed and believe, and on that basis allege, that Defendant Gree China is a corporation incorporated under the laws of the People's Republic Of China, has its principal place of business in, and is managed from, Zhuhai, China, and is listed on the China Stock Exchange.  Plaintiffs are further informed and believe, and on that basis allege, that Gree China, which has over 80,000 employees, including 3,000 in-house engineers, is one of the largest manufacturers of air conditioners and household appliances in the world, with approximately US$16 billion in sales for 2012.

16.   Plaintiffs are informed and believe, and on that basis allege, that Defendant Hong Kong Gree is a wholly-owned subsidiary of Gree China and is incorporated under the laws of Hong Kong.  Plaintiffs are further informed and believe, and on that basis allege, that Hong Kong Gree functions primarily as an export hub for Gree China and, at all times, operates at the direction and under the control of Gree China.  Almost all of Gree China's international trade goes through Hong Kong Gree, which had sales totaling approximately US$1 billion in 2012.

17.   Nominal Defendant Gree USA is a California corporation with its principal place of business in California.

18.   Plaintiffs are ignorant of the true names and capacities of the defendants identified as "Does 1 through 10, inclusive," and therefore sue them by such fictitious names.  Plaintiffs will amend this pleading to allege their true names and capacities when the same are ascertained.

19.   Plaintiffs are informed and believe, and on that basis allege, that each "Doe" defendant herein is legally responsible in some manner for the acts, omissions,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

VERIFIED SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

and occurrences herein alleged, and proximately caused damage, as herein alleged, to Plaintiffs.  Each reference in this complaint to defendant or a specifically named defendant refers also to all defendants sued under fictitious names.

20.     Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned herein, all defendants herein were the agents, employees, servants, and/or representatives of each of the other defendants, and in doing the things hereafter alleged, were acting within the scope and course of their authority as such agents, employees, servants, and/or representatives, and with the permission and consent of each of the other defendants.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction of the subject matter of this action by virtue of diversity of citizenship of the sides under 28 U.S.C. Section 1332.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.  The controversy is between citizens of a state (California), on the one hand, and citizens or subjects of foreign states on the other hand.

22.     Venue is proper in this Court and Judicial District pursuant to 28 U.S.C. Sections 1391(b) and 1391(c), because Defendants have transacted and continue to transact business in this Judicial District to a degree rendering them subject to personal jurisdiction, and in any case are not residents anywhere else in the United States.  In addition, the unlawful acts of Defendants have been and are occurring in this District within the jurisdictional limits of this Court.

## INTRADISTRICT ASSIGNMENT

23.     Pursuant to this Court's General Orders Nos. 349 and 98-03, this action should be assigned to the Western Division of the Central District of California, in that all Plaintiffs reside within the geographic limits of the Western Division, and the majority of all claims arose in, or are related to, the Western Division.

## DERIVATIVE ALLEGATIONS

24.     With respect to MJC Holdings' claim for interference with prospective

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

6

economic advantage, alleged derivatively on behalf of Gree USA against the Gree China Entities (count IV below), MJC Holdings brings this claim as the owner of 49% of the shares of Gree USA.

25.    Gree USA has only two shareholders:  MJC Holdings and Hong Kong Gree.  MJC Holdings owns 49% of the stock of Gree USA.  Hong Kong Gree owns 51% of the stock of Gree USA.

26.    MJC Holdings is, and at all relevant times was, a shareholder of Gree USA, including at the time of the complained of transactions.

27.    Gree USA initially named only four persons to its Board of Directors: Dong Mingzhu, Lam Hou Kong, also known as "Larry Lam" (Vice General Manager of Hong Kong Gree), Charley Loh (CEO of MJC America), and Jimmy Loh (CFO of MJC America).

28.    On October 25, 2012, however, Larry Lam resigned as a Director of Gree USA.  That same day, Zhang Guoqiang was appointed to replace Larry Lam.  On October 25, 2012, the Gree USA Board unanimously executed a "Consent to Action Taken in Lieu of the Meeting of the Board of the Directors of Gree USA, Inc.," which, among other things, resolved that "Guoqiang Zhang is appointed as a director of the corporation replacing Lam Hou Kong for the remaining term of Lam Hou Kong's directorship."

29.    On May 13, 2013, MJC Holdings received a letter dated April 25, 2013, in which Hong Kong Gree purported to unilaterally replace Director Zhang Guoqiang with Zhang Zhenghu and to appoint Jian Chen to serve as a fifth Director of Gree USA.  This letter was signed by Dong Mingzhu.

30.    Under Gree USA's Bylaws, attached hereto as Exhibit A and incorporated herein by reference, "directors may not be elected by written consent except by the unanimous written consent of all shares entitled to vote for the election of directors."  The Bylaws thus do not permit Hong Kong Gree to unilaterally replace current Directors or appoint new Directors by written resolution signed only by Dong

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

7

Mingzhu.

31.    No demand was made on the Gree USA Board of Directors to pass a board resolution to pursue the claim herein alleged on Gree USA's behalf against the Gree China Entities because such a demand would have been futile.

32.    Indeed, there is an ongoing dispute between Gree USA's only two shareholders, Hong Kong Gree and MJC Holdings, regarding the composition of Gree USA's Board.  Hong Kong Gree did not properly appoint Zhang Zhenghu and Jian Chen as Directors of Gree USA.  Therefore, Zhang Zhenghu and Jian Chen are not duly appointed Directors of Gree USA and they cannot participate in any decision by the Board to adopt a resolution to sue the Gree China Entities.

33.    Moreover, even if Zhang Zhenghu and Jian Chen were properly appointed as Directors of Gree USA through unanimous written consent of all shareholders, they are neither disinterested nor independent and thus would not have voted to pass a resolution to file suit against the Gree China Entities.  Zhang Zhenghu is the head of Gree China and Hong Kong Gree's export department.  For his part, Jian Chen is not disinterested because, among other reasons, his salary is paid by Hong Kong Gree and he was appointed to Gree USA's board by Hong Kong Gree.  Both of these individuals are dominated and controlled by Gree USA's controlling shareholder, Hong Kong Gree.

34.    Additionally, even if Directors Charley Loh and Jimmy Loh voted to pass a resolution to bring suit against the Gree China Entities, Hong Kong Gree would, on information and belief, contend that the votes of Directors Charley Loh and Jimmy Loh are insufficient to pass such a resolution given the dispute between Hong Kong Gree and MJC Holdings regarding the composition of Gree USA's Board.

35.    The remaining Director, Dong Mingzhu, is also not disinterested because she is the Chairperson and Chief Executive Officer of both Gree China and Hong Kong Gree.  Dong Mingzhu is not independent of misconduct alleged herein.

36.    This action is not a collusive one to confer jurisdiction that this Court

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

would otherwise lack.

## UNDERLYING FACTS

**A.     Formation of Gree USA**

37.     Prior to the formation of Gree USA, Gree China functioned as an OEM for several major household product brands.  For over ten years prior to the formation of Gree USA, Gree China also functioned as an OEM for MJC America.

38.     During the global financial crisis in 2007, both the Gree China Entities and MJC America sustained substantial setbacks with respect to their respective North America sales.  As a result, in late-2009, the parties began serious in-person negotiations taking place in both Zhuhai, China and in California to form a corporation combining the Gree China Entities' research and development, and manufacturing capacity with MJC America's well-established marketing, sales, logistics and after-sales service platform in the United States.

39.     Throughout these negotiations, including in April 2010, Dong Mingzhu and Larry Lam, on behalf of the Gree China Entities, repeatedly asserted to Jimmy Loh and Charley Loh, the CFO and CEO of MJC America, respectively, that all products to be sold by Gree USA, including the dehumidifiers, were high quality, met applicable safety standards and were appropriate for sale under the regulatory requirements in the United States, and had significant sales potential.   The dehumidifiers were to be the primary product sold by Gree USA and thus crucial to its success.

40.     Based on the representations of Dong Mingzhu and Larry Lam (which, as discussed below, were intentionally and materially false and misleading), MJC America decided to form Gree USA with the Gree China Entities.  On April 23, 2010, at Zhuhai, China, Gree China and MJC America executed, on behalf of Hong Kong Gree and MJC Holdings, respectively, a Memorandum of Understanding (attached hereto as Exhibit B and incorporated herein by reference).   The Memorandum of Understanding, which was ratified by the parties' conduct, provides, *inter alia*:

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

a.      Gree USA would be formed as a California corporation, with Hong Kong Gree owning 51% of its shares and MJC Holdings owning the remaining 49% of its shares.

b.      Gree USA would primarily sell dehumidifiers and air conditioners, as well as certain other products, manufactured by Gree China and exported by Hong Kong Gree and would be responsible for the costs associated with acquiring these products from the Gree China Entities.

c.      MJC America, which had preexisting business relationships with the majority of the major chain stores in the United States, would transfer its customer accounts to Gree USA.

d.      MJC America and its affiliates would provide sales, marketing, and after-sales services to Gree USA and, in return, receive compensation from Gree USA.

e.      Gree USA would use the "SoleusAir" trademark (and variations thereof), which is owned by MJC Supply and had been used by MJC America, on certain of its products, including dehumidifiers.

**B.      Gree USA Begins Operating**

41.     On April 26, 2010, Gree USA was incorporated as a California corporation.  It was capitalized with $80,000.00 in early 2011 and held a grand opening ceremony in City of Industry, California in June 2011.

42.     Gree USA named only four directors: Dong Mingzhu, Larry Lam, Charley Loh, and Jimmy Loh.  The meeting minutes of its first and only board meeting (attached hereto as Exhibit C and incorporated herein by reference), which occurred on June 19, 2011, reflects and affirms the parties' understanding of certain of their respective obligations concerning Gree USA, including the following:

a.      Gree USA would use the brand and trademark "SoleusAir Powered By Gree" for products sold to mass merchants, including dehumidifiers.

b.      The Gree China Entities would "fully support" Gree USA by,

VERIFIED SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

among other ways: (i) offering Gree USA the "best prices" on products manufactured by Gree China and sold by Gree USA; (ii) stopping their solicitation of new United States-based customers and ultimately ceasing to function as an OEM for existing United States-based manufacturers and suppliers other than Gree USA; and (iii) stocking their United States-based warehouses with products manufactured by Gree China and exported by Hong Kong Gree.

43.     During 2012, in its first full year in business, Gree USA achieved sales growth that, on information and belief, no China-based company in the same industry has ever achieved in the United States market.  With an initial capital investment of only $80,000.00, in 2012 Gree USA sold 1.2 million units of dehumidifiers and air conditioners, with a sales volume exceeding $150 million.

44.     Critical to this success was the fact that, as requested by the Gree China Entities, MJC America transferred to Gree USA all of its major accounts.

45.     As contemplated by the parties in a Memorandum of Understanding, beginning in or around June 2011, MJC America provided sales, marketing, and post-sales services to Gree USA and, in return for these services, Gree USA paid MJC Supply a specified amount of sales commissions and other payments.  On or around December 9, 2011, MJC Supply, MJC America, and Gree USA executed an Agreement of Distribution of Gross Profit for Major Account Sales ("Agreement of Distribution"), attached hereto as Exhibit D, and incorporated herein by reference, that memorialized this relationship.  The Agreement of Distribution was to bind the parties thereto for the minimum 10-year duration of Gree USA set forth in Gree USA's Articles of Association.  In Gree USA's first full year of operation, MJC Supply earned approximately $18 million for services rendered by MJC America and affiliated entities to Gree USA.

**C.     Gree China Manufactures Defective Dehumidifiers for Gree USA**

46.     In July 2012, after nearly all of Gree USA's orders for 2012 had been fulfilled and it had already negotiated sales contracts for 2013 in excess of $100

11

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1   million, MJC America's customer service department began to receive complaints that

2   the dehumidifiers manufactured by Gree China and sold by Gree USA were

3   overheating and catching on fire.

4       47.    MJC America took the complaints seriously and reported them

5   immediately to Gree China and Hong Kong Gree.  In addition, MJC America

6   requested that Gree China test the dehumidifiers to determine the cause of the

7   overheating and fires.  MJC also informed Gree China that the Consumer Product

8   Safety Commission treats appliance fires very seriously and that manufacturers

9   typically recall dehumidifiers after receiving only a few complaints of products having

10   caught on fire.

11       48.    On or around August 9, 2012, MJC America shipped certain of the

12   dehumidifiers that had reportedly overheated and/or caught fire to Gree China for

13   further investigation.  On or around September 19, 2012, Larry Lam, on behalf of the

14   Gree China Entities, claimed that Gree China tested the dehumidifiers at issue and

15   could not duplicate the reported problems.  Larry Lam also dismissed a report by an

16   investigator retained by an insurance company that concluded that Gree China had

17   manufactured the dehumidifiers at issue using non-fire retardant materials.  Larry Lam

18   claimed that only a small batch of the dehumidifiers manufactured by Gree China

19   were constructed with non-fire retardant materials and that many major Chinese

20   appliance manufacturers use the same non-fire retardant materials to construct their

21   products.

22       49.    On or around October 10, 2012, MJC America requested that Gree China

23   provide it with a copy of an Underwriters Laboratories ("UL") report that, according

24   to Gree China, certified that the dehumidifiers at issue were manufactured using

25   flame-retardant materials in compliance with applicable United States safety

26   standards.  Retailers generally require that appliance products obtain this certification

27   before agreeing to sell them.  Gree China concealed and refused to provide to MJC

28   America the portion of the UL report detailing the materials that Gree China used to

manufacture the sample dehumidifiers it sent to UL for testing.  On information and belief, this is because, unbeknownst to MJC America, Gree China manufactured the sample dehumidifiers sent to UL using high-grade fire-retardant materials, but, as a cost-cutting measure, used lower-grade non-fire retardant materials to manufacture the dehumidifiers that were actually mass produced and sold.  MJC America's suspicion was well-founded, as independent testing ultimately reported that the dehumidifiers mass produced by Gree China were indeed defective.

50.   On or around October 30, 2012, MJC America sent two new dehumidifiers along with one that overheated to Intertek Testing Services NA, Inc. ("Intertek"), a multinational inspection, product testing, and certification company, to conduct its own tests regarding what was causing the dehumidifiers manufactured by Gree China to overheat and/or catch fire.  Intertek reported to MJC America that there was a design error with respect to the compressor overload protector for smaller capacity dehumidifiers (45 pints and smaller).  Shortly thereafter, on or around November 23, 2012, MJC America informed Gree China that it would stop selling dehumidifiers of that size.  Gree China subsequently disputed Intertek's report and demanded that MJC America lift its stop-sale order.

51.   It was not until February 20, 2013, after MJC America's legal counsel requested that Gree China join MJC America in reporting the dehumidifier issues to the CPSC and informed Gree China of the substantial penalties it could potentially face for its failure to report, that Gree China agreed to submit a report to the CPSC concerning the dehumidifier problems.  However, on information and belief, Gree China failed to provide to the CPSC all material information concerning the non-fire retardant materials used to manufacture the dehumidifiers at issue.

52.   Thereafter, on or around April 9, 2013, MJC America sent four randomly selected dehumidifiers manufactured in 2010, 2011, and 2012 to CRT Laboratories, Inc. ("CRT"), a leading failure analysis laboratory, to test the flammability of the plastic used to construct the dehumidifiers.  On April 30, 2013, MJC also sent two

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

13

1    dehumidifiers manufactured in 2013 to CRT for flammability testing.

2        53.    In a report dated May 10, 2013, CRT concluded that all four units

3    manufactured in 20l0, 2011, and 2012 failed to meet the applicable fire retardant

4    material standards.  CRT did, however, conclude that the dehumidifiers manufactured

5    in 2013 satisfied the applicable fire retardant material standards.  On information and

6    belief, Gree China upgraded the material used to manufacture the dehumidifiers in

7    2013 because it knew that the dehumidifiers manufactured in 2010 through 2012 were

8    constructed with materials that failed to satisfy applicable fire retardant standards.

9        54.    On or around June 13, 2013, Gree China finally issued a stop-sale order

10   on all the humidifiers manufactured from January 2010 through 2012.

11       55.    Finally, on September 12, 2013, the CPSC announced a massive recall of

12   the dehumidifiers manufactured by Gree China since late-2009 because they posed

13   what the CPSC termed "serious fire and burn hazards."

**D.    Gree China and Hong Kong Gree's Plan to Destroy MJC America and**
14
15   **Gree USA**

16       56.    Shortly after MJC America's customer service department began

17   receiving complaints in mid-2012 concerning the dehumidifiers manufactured by Gree

18   China, MJC America demanded that Gree China rectify the quality and design issues

19   pertaining to the dehumidifiers.  MJC America also informed Gree China that it was

20   obligated to report the complaints to the CPSC fully and without delay because of the

21   potential threat of injury or even death posed by the dehumidifiers.  MJC further

22   informed Gree China that MJC America was concerned about damage to its reputation

23   for integrity and would not cover up the serious safety issues associated with Gree

24   China's dehumidifiers.

25       57.    In response, Gree China, with the cooperation and assistance of Hong

26   Kong Gree, and at the direction of Dong Mingzhu, embarked on a campaign to

27   intimidate and ultimately destroy Gree USA and MJC America, which had transferred

28   substantial operational and intellectual property assets to Gree USA, and was now

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

14

largely reliant on Gree USA for its own success.  Gree China and/or Hong Kong Gree engaged in the following misconduct as part of a campaign to destroy Gree USA, which would, by design, significantly damage MJC America and its affiliates:

a.     On or around September 17, 2012, Larry Lam, on behalf of Hong Kong Gree, informed Jimmy and Charley Loh that Dong Mingzhu ordered Hong Kong Gree and Gree China to stop the production and export of products needed to fulfill Gree USA's 2013 contracts with retailers, which cost Gree USA and the MJC entities millions of dollars;

b.     Starting in or around September 2012, Hong Kong Gree stopped processing and paying legitimate sales and other invoices submitted to it by Gree USA;

c.     On or around November 29, 2012, Lizzy Gao, the Vice Regional Manager of Gree China, informed MJC America that Gree China would not fill orders pursuant to Gree USA's contracts except with respect to a limited number of retailers, and further insisted that Gree USA transfer all other companies' orders back to MJC America – an impossibility under the circumstances;

d.     On or around December 2, 2012, Gordon Zhang, on behalf of Gree China, informed MJC America that Gree China no longer wanted Gree USA's business;

e.     In a telephone conference in December 2012, Dong Mingzhu told Jimmy Loh that MJC America's operational infrastructure, including but not limited to, its sales, marketing, and customer service forces, and all of its officers and employees, would need to be immediately transferred to Gree USA without any compensation; and

f.     Larry Lam, on behalf of the Gree China Entities, demanded that the products designated to fill Gree USA's confirmed orders for 2013 use the trademark "Gree" instead of "SoleusAir Powered by Gree" even though the contracts for those orders had already been executed.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

15

58.     In addition to the above, on information and belief, in or around December 2012, Gree China began to contact Gree USA's customers to solicit sales directly for the Gree China Entities to the detriment of Gree USA and MJC America and its affiliates.  By way of example:

a.     On or around December 19, 2012, Gree China directly contacted and made price quotations to Interline Brands, Inc., an existing customer of Gree USA, without the knowledge or approval of Gree USA or MJC America, to steer Interline Brands' business away from Gree USA and directly to Gree China.

b.     On or about January 1, 2013, Gree China directly contacted Watsco, Inc., another customer of Gree USA, and convinced Watsco to transfer its account from Gree USA to Hong Kong Gree, again without the knowledge or approval of Gree USA or MJC America.

c.     On information and belief, on or around mid-February 2013, Gree China approached the Hong Kong office of one of Gree USA's major brand clients for the purpose of doing OEM business directly with that major brand client, and in so doing, attempted to undercut Gree USA.  This conduct permanently damaged Gree USA's relationship with this major brand client, resulting in the loss of business.

59.     The actions of the Gree China Entities effectively destroyed Gree USA's business, which had the intended effect of substantially damaging MJC Supply and MJC America.

**E.     Hong Kong Gree Intentionally Infringes on MJC's Trademark as Part of Its Campaign to Damage MJC**

60.     As part of its ongoing campaign to damage MJC, Hong Kong Gree has, on information and belief, willfully infringed on MJC's trademark.

61.     On September 3, 2002, MJC America registered with the United States Patent and Trademark Office the trademark "Soleus Air" (U.S. Registration No. 2615080) (the "Soleus Air mark") with respect to, among other things, air conditioners, portable air conditioners, electric fans, electric tower fans, humidifiers,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

dehumidifiers, household air cleaners, air purifiers, and electric space heaters (collectively, "Home Comfort Products").  *See* Exhibit E hereto.  In or around May 27, 2009, the rights to the Soleus Air Mark were sold to MJC Supply, which licensed the use of the Soleus Air mark to MJC America (together with MJC Supply, the "MJC Entities").  Since June 2013, MJC America has been an exclusive licensee.

62.    The federal registration of MJC Supply's Soleus Air mark evidences the MJC Entities' right to use the Soleus air mark in connection with the Home Comfort Products.

63.    The Soleus Air mark, which has been in continuous use by the MJC Entities as early as June 2001, is inherently and highly distinctive and represents the exceedingly valuable goodwill of the MJC Entities and the Soleus brand.  It is an extremely valuable asset.

64.    The MJC Entities have invested considerable time, energy, and resources in the protection of the Soleus Air mark nationwide.

65.    Through the MJC Entities' use of the famous Soleus Air mark in connection with the Home Comfort Products, the Soleus Air mark has been associated in the minds of the public with the MJC Entities and their Soleus products.

66.    The Gree China Entities have, at all relevant times, been aware of MJC Entities' ownership and use of the Soleus Air mark.

67.    By letter dated June 14, 2013 – after the instant action was filed – MJC Supply advised the Gree China Entities that they must "obtain written consent to sell any merchandise bearing the [Soleus Air mark] in the United States."  Attached hereto as Exhibit F is a copy of the letter (the "Cease and Desist Letter").

68.    Beginning in our around early 2014 – *after* the Gree China Entities had received the Cease and Desist Letter – Hong Kong Gree, in a further effort to steal MJC's business and destroy MJC, intentionally infringed on the Soleus Air mark by selling products bearing the Soleus Air mark, including but not limited to air conditioners, to certain retailers, suppliers, and/or distributors without the MJC

17

Entities' knowledge or permission.

69.    For instance, on July 11, 2014, MJC Supply obtained a "Confirmation Letter," dated March 18, 2014, from Hong Kong Gree to Golden Opportunity, Inc. in which Hong Kong Gree purports to authorize Golden Opportunity to "SELL ITS AC INVENTORY FROM US WAREHOUSE *UNDER SOLEUSAIR BRAND NAME*." (Emphasis added.)  A copy of the "Confirmation Letter" is attached hereto as Exhibit G.

70.    The products at issue bearing the Soleus Air mark, including those sold by Hong Kong Gree to Golden Opportunity, have entered into the same or similar channels commerce as those utilized by the MJC Entities and, information and belief, have been to sold to the same or similar consumers.

71.    Hong Kong Gree's unauthorized sale of products bearing the Soleus Air mark has created confusion, mistake, and/or deception in the marketplace as to the origin, sponsorship, and/or affiliation of the products at issue.  Hong Kong Gree's misconduct has also impaired (i) the distinctiveness and reputation of the Soleus Air mark; (ii) the MJC Entities' ability to utilize the Soleus Air mark; and (iii) the MJC Entities' rights in the Soleus Air mark.

72.    The Gree China Entities engaged in substantial efforts to conceal from the MJC Entities the intentional infringement of the Soleus Air mark by Hong Kong Gree, including by falsely representing to the MJC Entities, as recently as late July 2014, that Hong Kong Gree did not authorize any entities to sell or distribute products bearing the Soleus Mark since receiving the Cease and Desist Letter in June 2013.

73.    On information and belief, Hong Kong Gree continues to make use of, and infringe on, the Soleus Air mark.

74.    Hong Kong Gree's conduct has deprived the MJC Entities of revenue that rightfully belongs to the MJC Entities.

75.    The MJC Entities have no adequate remedy at law and will suffer irreparable injury to the goodwill of their mark, rights, and business unless and until

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    Hong Kong Gree and any others in active concert with it are enjoined from continuing

2    their wrongful acts.

3    **F.      Gree China Breaches Its Indemnification Agreement With the MJC**

4    **         Entities as Part of Its Ongoing Campaign to Destroy the MJC Entities**

5          76.     On or around September 5, 2012, Gree China entered into an

6    indemnification agreement with the MJC Entities (the "MJC Indemnification

7    Agreement").  A copy of the MJC Indemnification Agreement, along with an English

8    translation thereof, is attached hereto as Exhibit H.

9          77.      Pursuant to the MJC Indemnification Agreement, the MJC Entities

10   agreed, *inter alia*, to "handle the local logistics" with respect to the quality issues

11   impacting the dehumidifiers manufactured by Gree China and sold by the MJC

12   Entities.  Gree China agreed, *inter alia*, that it would "be responsible for the relevant

13   economic damages resulting from the quality issues and all expenses accrued while

14   addressing the quality issues" incurred by the MJC Entities.

15         78.     As alleged above, these dehumidifiers manufactured by Gree China and

16   sold by Gree USA and the MJC Entities are now the subject of a recall mandated by

17   the United States Consumer Product Safety Commission.

18         79.     As a direct result of quality issues impacting these dehumidifiers, the

19   MJC Entities have suffered substantial economic damages, including but not limited

20   to damages suffered due to multiple customer accounts withholding and/or offsetting

21   legitimate amounts due and owing to the MJC Entities to cover their purported losses

22   incurred in connection with the defective dehumidifiers.  The MJC Entities would not

23   have continued to sell dehumidifiers manufactured by Gree China but for Gree

24   China's promises and representations in the MJC Indemnification Agreement.

25         80.     On June 27, 2014, the MJC Entities made a formal demand that Gree

26   China reimburse and/or indemnify the MJC Entities for the economic damages the

27   MJC Entities have suffered as a direct result of the dehumidifier quality issues as

28   required under the MJC Indemnification Agreement.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

81.     On or around July 1, 2014, as part of its ongoing campaign to damage the MJC Entities, Gree China breached the MJC Indemnification Agreement by rejecting the MJC Entities' demand for indemnification despite having been aware of the substantial damages suffered by the MJC Entities as a direct result of the dehumidifier quality issues.  Gree China further asserted that any indemnification claims the MJC Entities have would be a "future offset of what they owe Gree, not a basis for payments from them to Gree."

**G.     Gree China Breaches Its Indemnification Agreement with Gree USA as Part of Its Ongoing Campaign to Damage Gree USA and the MJC Entities**

82.     On or around January 23, 2013, Gree China entered into an indemnification agreement with Gree USA (the "Gree USA Indemnification Agreement").  A copy of the Gree USA Indemnification Agreement, along with an English translation thereof, is attached hereto as Exhibit I.

83.     Pursuant to the Gree USA Indemnification Agreement, Gree USA agreed to, *inter alia*, (i) sell certain dehumidifiers in its stock manufactured by Gree China after Gree China had denied that those dehumidifiers "fall under the [United States Consumer Product Safety Commission] requirements for recall or reporting based on safety concerns"; and/or (ii) forebear from exercising its right not to sell such products.  Gree China agreed, *inter alia*, to "assume the economic damages and legal responsibilities" of Gree USA in connection with any losses "suffered as a result of the quality issues involving the aforementioned dehumidifiers" in Gree USA's stock.  Gree USA would not have continued to sell dehumidifiers manufactured by Gree China but for Gree China's promises and representations in the Gree USA Indemnification Agreement.

84.     As alleged above, the dehumidifiers manufactured by Gree China and sold by Gree USA are now the subject of a recall mandated by the United States Consumer Product Safety Commission.

85.     As a direct result of the quality issues impacting these dehumidifiers,

VERIFIED SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  Gree USA has suffered substantial economic damages, including but not limited to

2  damages due to multiple Gree USA accounts withholding and/or offsetting legitimate

3  amounts due and owing to Gree USA for their purported losses incurred in connection

4  with the defective dehumidifiers.

5  86.   On June 18, 2014, Gree USA made a formal demand that Gree China

6  reimburse and/or indemnify Gree USA for the economic damages and losses Gree

7  USA has suffered as a direct result of the dehumidifier quality issues as required under

8  the Gree USA Indemnification Agreement.  Such damages exceed $28 million.

9  87.   On or around June 24, 2014, as part of its ongoing campaign to damage

10  Gree USA, Gree China breached the Gree USA Indemnification Agreement by

11  rejecting Gree USA's demand for indemnification despite having been aware of the

12  substantial damages suffered by Gree USA as a direct result of the dehumidifier

13  quality issues.

## COUNT I

## (BY MJC AMERICA AND MJC SUPPLY AGAINST DEFENDANTS GREE CHINA AND HONG KONG GREE) FOR FRAUD IN THE INDUCEMENT

17  88.   Plaintiffs reallege the allegations of Paragraphs 1 through 87 above as if

18  set forth in full herein.

19  89.   In late-2009, Jimmy Loh and Charley Loh, on behalf of MJC America

20  and MJC Supply (which is managed by Jimmy Loh), and Dong Mingzhu and Larry

21  Lam, on behalf of the Gree China Entities, began serious in-person negotiations taking

22  place in both Zhuhai, China and in California to form a corporation combining the

23  Gree China Entities' research and development, and manufacturing capacity with

24  MJC America's well-established marketing, sales, logistics and after-sales service

25  platform in the United States.

26  90.   Throughout these negotiations, including in April 2010, Dong Mingzhu

27  and Larry Lam repeatedly asserted to Jimmy Loh and Charley Loh that all products to

28  be sold by Gree USA, including the dehumidifiers, were high quality, met applicable

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

21

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

safety standards and were appropriate for sale under the regulatory requirements in the United States, and had significant sales potential. The dehumidifiers were to be the primary product sold by Gree USA and crucial to its success.

91. The Gree China Entities made each of these misrepresentations with the intent to induce MJC America to form Gree USA with the Gree China Entities. The Gree China Entities sought to benefit from, *inter alia*, the transfer of MJC America's valuable customer accounts to Gree USA and its use of the "SoleusAir" trademark and variations thereof.

92. The Gree China Entities made each of these representations with knowledge of their falsity or reckless disregard for the truth. At the time, on information and belief, the Gree China Entities were aware that the dehumidifiers to be sold by Gree USA, which Gree China began manufacturing in late-2009, were manufactured using materials, including a plastic casing, that posed fire hazards, failed to satisfy applicable safety and UL standards in the United States (including UL 94), and ran afoul of the Consumer Products Safety Commission's prohibition on distributing products that have design and manufacturing defects that make them substantial product hazards. On information and belief, Gree China and Hong Kong Gree, having manufactured and shipped dehumidifiers and other products to United States-based retailers for several years, were well aware of and understood these standards. Further, on information and belief, at all relevant times, Gree China and Hong Kong Gree were in possession of internal documents, including testing reports, that made clear that the dehumidifiers failed to satisfy applicable safety, UL, and CPSC standards.

93. Moreover, in light of the statements noted above and the nature of Gree USA's contemplated business, the Gree China Entities had a duty to disclose to MJC America and MJC Supply, prior to formation of Gree USA, that the dehumidifiers manufactured by Gree China were defective, posed a fire hazard, and failed to satisfy applicable safety standards as noted above.

94.     As detailed above, it was not until late-2013, in connection with the stop-sale order issued on all dehumidifiers manufactured by Gree China from January 2010 through 2012, and the subsequent recall of these dehumidifiers (as well as those manufactured in late-2009), that Gree China was forced to publicly acknowledge that the dehumidifiers were defective.

95.     MJC America and MJC Supply were unaware of the falsity of, and reasonably relied to their detriment on, the statements and material omissions of the Gree China Entities in deciding to join with the Gree China Entities to form Gree USA, transfer MJC America's customer accounts to Gree USA, and permit Gree USA to use the "SoleusAir" trademark, and variations thereof, on the defective dehumidifiers.

96.     Had MJC America and MJC Supply been told the truth about the defective dehumidifiers, they would not have partnered with the Gree China Entities to form Gree USA to sell dehumidifiers and other products to United States-based customers.   MJC America's business, reputation, and customer relationships have been damaged as a result of its reasonable reliance on the Gree China Entities' material misrepresentations and omissions.   Further, the brand "SoleusAir" and variations thereof have been tarnished in reputation.

97.     The Gree China Entities' misstatements and omissions were made willfully and/or with reckless disregard for the truth, and for reasonably relying on these misstatements and omissions and their resulting injuries, MJC America and MJC Supply are entitled to compensatory, punitive, and exemplary damages.

## COUNT II

## (BY MJC AMERICA AND MJC SUPPLY AGAINST DEFENDANTS GREE CHINA AND HONG KONG GREE) FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

98.     Plaintiffs reallege the allegations of Paragraphs 1 through 97 above as if set forth in full herein.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

99.   At all relevant times, Gree China and Hong Kong Gree were aware of the Agreement of Distribution and/or the rights and obligations specified therein.   The Agreement of Distribution constitutes a valid and existing agreement between Gree USA and MJC America and MJC Supply.

100.   MJC America and MJC Supply have performed all of their obligations pursuant to the Agreement of Distribution.

101.   By engaging in the conduct described in Paragraphs 57 through 59 above, Gree China and Hong Kong Gree have substantially and intentionally interfered with and disrupted Gree USA's performance of the Agreement of Distribution by, among other ways, driving Gree USA into insolvency and impeding its ability to (i) obtain new customer contracts, and (ii) make required payments to MJC Supply and MJC America, including payments currently due and owing.   This has had the intended effect of substantially damaging both MJC Supply and MJC America after MJC America had refused to participate in the dehumidifier cover-up.

102.   But for Gree China and Hong Kong Gree's conduct, Gree USA would have been able to perform its obligations pursuant to the Agreement of Distribution.

103.   The Gree China Entities' conduct has proximately caused damage, including the loss of profits, to MJC America and MJC Supply in an amount to be proven at trial.

104.    The Gree China Entities' conduct was done willfully and/or with reckless disregard for the rights of MJC America and MJC Supply, thus warranting the imposition of punitive damages.

**COUNT III**

**(BY MJC AMERICA AND MJC SUPPLY AGAINST DEFENDANTS GREE CHINA AND HONG KONG GREE) FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

105.   Plaintiffs reallege the allegations of Paragraphs 1 through 104 above as if set forth in full herein.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

24

106.   MJC America and MJC Supply have a valid existing business relationship with Gree USA whereby MJC America provides, *inter alia*, sales, marketing, and post-sales services for Gree USA in connection with Gree USA's sale of dehumidifiers and other products manufactured by Gree China and exported by Hong Kong Gree.  In return for these services, Gree USA pays MJC America, through MJC Supply, commissions and other payments.

107.   This relationship had produced economic benefit to MJC America and MJC Supply and was reasonably certain to produce future economic benefit to these entities.  Pursuant to Gree USA's Articles of Association, Gree USA is to continue operating for a minimum of 10 years.  MJC America would have been uniquely suited to provide sales, marketing, and post-sales services during this period and beyond.

108.   By engaging in the conduct described in Paragraphs 57 through 59 above, Gree China and Hong Kong Gree intentionally interfered with and disrupted this business relationship.  As a result of this wrongful conduct, which was done in retaliation for MJC America's refusal to join the Gree China Entities in their attempt to conceal the dehumidifier safety issues from the CPSC, among other governmental entities, Gree USA has been substantially damaged, including with respect to its ability to (i) obtain customer contracts, and (ii) pay MJC Supply for the services performed by MJC America.

109.   The Gree China Entities' conduct has proximately caused damage, including the loss of profits, to MJC America and MJC Supply in an amount to be proven at trial.

110.   The Gree China Entities' conduct was done willfully and/or with reckless disregard for the rights of MJC America and MJC Supply, thus warranting the imposition of punitive damages.

VERIFIED SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

## COUNT IV

## (BY MJC HOLDINGS DERIVATIVELY ON BEHALF OF GREE USA AGAINST DEFENDANTS GREE CHINA AND HONG KONG GREE) FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

111.   Plaintiffs reallege the allegations of Paragraphs 1 through 110 above, as if set forth in full herein.

112.   Gree USA was involved in valid existing business relationships with customers that had been transferred to it by MJC America, including relationships with large name brand customers.

113.   These relationships had produced substantial economic benefit to Gree USA and were reasonably certain to produce future economic benefit to Gree USA.

114.    Gree China and Hong Kong Gree were aware of Gree USA's economic relationships with its customers.

115.   Gree China and Hong Kong Gree's intentional and wrongful acts described in Paragraphs 57 through 59 above, done in retaliation for MJC America's refusal to participate in the dehumidifier cover-up, among other reasons, were designed to and did disrupt and permanently damage Gree USA's relationships with these customers.

116.   MJC Holdings is informed and believes, and on that basis alleges, that the Gree China Entities' intentional interference with Gree USA's business relationships resulted in substantial damages to Gree USA, including the loss of customer accounts such as Watsco and Interline Brands, in an amount to be proven at trial.

117.   The Gree China Entities' conduct was done willfully and/or with reckless disregard for the rights of Gree USA, thus warranting the imposition of punitive damages.

**COUNT V**

**(BY MJC AMERICA AND MJC SUPPLY AGAINST DEFENDANTS GREE CHINA AND HONG KONG GREE) FOR VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200 *ET SEQ*.**

118.   Plaintiffs reallege the allegations of Paragraphs 1 through 117 above, as if set forth in full herein.

119.   As described in detail above, the Gree China Entities, on information and belief, knowingly sold defective dehumidifiers that, *inter alia*, posed significant safety hazards, failed to satisfy applicable safety and UL standards in the United States (including UL 94), and ran afoul of the Consumer Products Safety Commission's prohibition on distributing products that have design and manufacturing defects that make them substantial product hazards as well as 15 USC Section 2068(a)(12).  When MJC America encouraged the Gree China Entities to report the dehumidifier defects to the Consumer Product Safety Commission, the Gree China Entities refused. Further, the Gree China Entities retaliated against MJC America and MJC Supply for refusing to participate in a cover-up of the dehumidifier defects by, among other ways, intentionally interfering with and damaging their contractual and business relationships.

120.   The Gree China Entities' conduct, as alleged above, constitutes unlawful or unfair business practices under the purview of Section 17200 of the California Business and Professions Code.  The Gree China Entities' conduct offends public policy, is immoral, unethical, and offensive, and has caused substantial injury to MJC America and MJC Supply.

121.   The Gree China Entities' retaliatory conduct alleged herein occurred and continues to occur in the ordinary course of their business, including with respect to Gree USA, MJC America, and MJC Supply.

122.   MJC America and MJC Supply are entitled to relief pursuant to Section 17203 of the California Business and Professions Code, including enjoining the Gree

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1   China Entities to cease and desist from engaging in the retaliatory conduct described

2   above.  MJC America and MJC Supply are entitled to an award of attorneys' fees and

3   costs pursuant to California Code of Civil Procedure Section 1021.5.

4                                    **COUNT VI**

5   **(BY MJC SUPPLY AGAINST HONG KONG GREE) FOR FEDERAL**

6   **TRADEMARK INFRINGEMENT (15 U.S.C. §§ 1114-1118)**

7        123.   Plaintiffs reallege the allegations of Paragraphs 1 through 122 above, as

8   if set forth in full herein.

9        124.   Hong Kong Gree has, through the conduct described above, infringed and

10  continues to infringe upon the Soleus Air trademark.

11       125.   As a consequence of Hong Kong Gree's infringements, MJC Supply has

12  suffered damages and is entitled to relief as set forth below.

13                                   **COUNT VII**

14  **(BY MJC SUPPLY AGAINST HONG KONG GREE) FOR FEDERAL UNFAIR**

15  **COMPETITION (15 U.S.C. § 1125)**

16       126.   Plaintiffs reallege the allegations of Paragraphs 1 through 125 above, as

17  if set forth in full herein.

18       127.   The Soleus Air mark is distinctive and has acquired secondary meaning

19  and significance in the minds of the relevant public.

20       128.   Hong Kong Gree has unfairly competed with the Soleus Air mark in

21  interstate commerce and in this district by various acts, including the selling of Home

22  Comfort Products using the Soleus Air mark.  Hong Kong Gree's conduct as alleged

23  herein constitutes a willful and intentional tort, in derogation of MJC Supply's rights.

24  Acts of unfair competition commenced and have continued in spite of Hong Kong

25  Gree's knowledge that the use of Soleus Air mark was and is in contravention of MJC

26  Supply's rights.

27       129.   Hong Kong Gree's conduct has caused and, if not enjoined, will continue

28  to cause irreparable damage to the rights of MJC Supply in the Soleus Air mark, and

the MJC Entities' business, reputation, and goodwill.

130.  As a consequence of Hong Kong Gree's violations, MJC Supply has suffered damages in an amount to be established at trial and is entitled to relief as set forth below.

**COUNT VIII**

**(BY MJC SUPPLY AGAINST HONG KONG GREE) FOR TRADEMARK DILUTION UNDER FEDERAL LAW (15 U.S.C. § 1125)**

131.  Plaintiffs reallege the allegations of Paragraphs 1 through 130 above, as if set forth in full herein.

132.  Hong Kong Gree commenced the use of the Soleus Air mark in interstate commerce, after Soleus Air mark was distinctive and famous.

133.  Hong Kong Gree, through the conduct and violations alleged above, has diluted and is likely to further dilute the distinctive quality of the Soleus Air mark, such that consumers are less able to identify and distinguish the MJC Entities' goods. Hong Kong Gree's actions have injured, and are likely to further injure, MJC Supply and the MJC Entities' business, reputation, and goodwill.

134.  Hong Kong Gree has intended to dilute the Soleus Air mark and violation of MJC Supply's rights under the Lanham Act.

135.  As a consequence of Hong Kong Gree's violations, MJC Supply has suffered damages in an amount to be established at trial and is entitled to relief as set forth below.

**COUNT IX**

**(BY MJC SUPPLY AND MJC AMERICA AGAINST GREE CHINA) FOR BREACH OF CONTRACT**

136.  Plaintiffs reallege the allegations of Paragraphs 1 through 135 above, as if set forth in full herein.

137.  The MJC Indemnification Agreement constitutes a valid and binding contract under applicable law.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

138.   The MJC Entities have materially performed all of their obligations under the MJC Indemnification Agreement to the extent required by law.

139.   Gree China breached the MJC Indemnification Agreement by, among other ways, rejecting the MJC Entities' demand for reimbursement and/or indemnification despite having been aware of the substantial damages suffered by the MJC Entities as a direct result of the dehumidifier quality issues alleged above.

140.   As a direct and proximate result of Gree China's breach of the MJC Indemnification Agreement, the MJC Entities have suffered and will continue to suffer damages in an amount in excess of $3 million to be established at trial.

## COUNT X

## (BY MJC SUPPLY AND MJC AMERICA AGAINST GREE CHINA) FOR PROMISSORY ESTOPPEL

141.   Plaintiffs reallege the allegations of Paragraphs 1 through 140 above, as if set forth in full herein.

142.   At all relevant times, MJC Supply and MJC America were acting in reasonable and foreseeable reliance on the promises and representations made by Gree China in the MJC Indemnification Agreement as alleged above.

143.   MJC Supply and MJC America were, as alleged above, injured by their reasonable and foreseeable reliance on the promises and representations made by Gree China in the MJC Indemnification Agreement and have suffered and will continue to suffer damages in an amount in excess of $3 million to be established at trial.

## COUNT XI

## (BY MJC HOLDINGS DERIVATIVELY ON BEHALF OF GREE USA AGAINST GREE CHINA) FOR BREACH OF CONTRACT

144.   Plaintiffs reallege the allegations of Paragraphs 1 through 143 above, as if set forth in full herein.

145.   The Gree USA Indemnification Agreement constitutes a valid and binding contract under applicable law.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

146.   Gree USA has materially performed all of its obligations under the Gree USA Indemnification Agreement to the extent required by law.

147.   Gree China breached the Gree USA Indemnification Agreement by, among other ways, rejecting Gree USA's demand for reimbursement and/or indemnification despite having been aware of the substantial damages suffered by Gree USA as a direct result of the dehumidifier quality issues alleged above.

148.   As a direct and proximate result of Gree China's breach of the Gree USA Indemnification Agreement, Gree USA has suffered and will continue to suffer damages in an amount in excess of $28 million to be established at trial.

## COUNT XII

## (BY MJC HOLDINGS DERIVATIVELY ON BEHALF OF GREE USA AGAINST GREE CHINA) FOR PROMISSORY ESTOPPEL

149.   Plaintiffs reallege the allegations of Paragraphs 1 through 148 above, as if set forth in full herein.

150.   At all relevant times, Gree USA was acting in reasonable and foreseeable reliance on the promises and representations made by Gree China in the Gree USA Indemnification Agreement as alleged above.

151.   Gree USA was, as alleged above, injured by its reasonable and foreseeable reliance on the promises and representations made by Gree China in the Gree USA Indemnification Agreement and has suffered and will continue to suffer damages in an amount in excess of $28 million to be established at trial.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.      For general damages;

2.      For actual damages in an amount in excess of $150,000,000.00;

3.      For exemplary or punitive damages;

4.      For incidental damages;

5.      For treble damages;

6.      For interest on all monetary damages, to the maximum extent allowed by

31

law;

7.    For appropriate preliminary and permanent injunctive relief, as appropriate;

8.    For costs of suit herein incurred, including attorneys' fees as allowed by law; and

9.    For such other, different or further relief as the Court may deem just and proper.

Dated: September 5, 2014        WINSTON & STRAWN LLP


By: /s/ Neal R. Marder
       Neal R. Marder
       Ali R. Rabbani
       Ian C. Eisner

*Attorneys for Plaintiffs*
*MJC America, Ltd. dba Soleus*
*International Inc., MJC*
*America Holdings Co., Inc., and MJC*
*Supply, LLC*

**Winston & Strawn LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Winston & Strawn LLP**
**333 S. Grand Avenue**
**Los Angeles, CA 90071-1543**

# DEMAND FOR JURY TRIAL

Pursuant to FRCP 38(b), and Local Rule 38-1 of the Central District of California, Plaintiffs hereby demand trial by jury on all allegations of the Complaint, on which trial by jury may be had.


Dated:  September 5, 2014                 WINSTON & STRAWN LLP


By:  /s/ Neal R. Marder
     Neal R. Marder
     Ali R. Rabbani
     Ian C. Eisner

     *Attorneys for Plaintiffs*
     *MJC America, Ltd. dba Soleus*
     *International Inc., MJC*
     *America Holdings Co., Inc., and MJC*
     *Supply, LLC*

## VERIFICATION

I, Jimmy Loh, am and, at all relevant times was, (i) a shareholder, director, and Secretary of Plaintiff MJC America, Ltd., (ii) a shareholder, director, CFO, and Secretary of Plaintiff MJC America Holdings Co., Inc., (iii) a member and Manager of Plaintiff MJC Supply, LLC, and (iv) a director and Secretary of Nominal Defendant Gree USA, Inc.  I declare under penalty of perjury under the laws of the United States that I have read the foregoing Verified Second Amended Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 11th day of August, 2014, at Los Angeles County, California.

_____
Jimmy Loh

LA:365019.2

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

# Exhibit A

Gree USA, Inc.

## BY-LAWS OF

### GREE USA, INC.

Corporation Organized Pursuant to the California
Corporations Code of 1977, as amended

### Article I - Offices

The principal executive office of the corporation shall be located at 20035 E. Walnut Dr. North,
City of Industry, CA 91789, USA.

The Board of Directors (hereinafter referred to as the Board) shall have the authority to change
the principal executive office.  The corporation may have other offices, either within or without
the State of California as the Board may designate or as the business of the corporation may from
time to time required.

### Article II -- Joint Venture

The corporation is a Joint Venture between Hong Kong Gree Electric Appliances Sales Ltd., a
corporation formed under the laws of Hong Kong, and MJC America Holdings, Inc., a California
corporation.

The corporation shall operate in accordance with the Principles of Operations dated October 30,
2010 executed by Chairman and CEO of Hong Kong Gree Electric Appliances Sales Ltd. Dong
Ming Zhu and Chairman and CFO of MJC America Holdings, Inc. Jimmy Loh.  (Thereafter
"Principles")

Principles are constituted as a fundamental part of this By-Laws.

### Article III -- Doing Business Name

The corporation should use Gree USA Sales Ltd. as its doing business name.

### Article IV - Shareholders Meetings

1.      Place of Meetings

Meetings of shareholders shall be held at the principal executive office of the corporation or at
any other place designated by the Chairman of the Board or by majority consent, in writing, or all

By-Laws 1

Gree USA, Inc.

persons entitled to vote thereat, given before or after the meeting and filed with the Secretary.

2.     Annual Meetings

The annual meeting of the shareholders shall be held in the month of May in each year, beginning with the year 2011, for the purpose of the transaction of such business as may come before the meeting.

3      Special Meetings

Special meetings of the shareholders may be called at any time by the Board, Chairman of the Board, CEO, and Secretary or by holders of shares entitled to cast not less than 10 percent of the votes at the meeting.  Except as hereafter provided notice shall be given in the same manner as notice for an annual meeting.  Upon receipt of a mailed or personally delivered written request addressed to the Chairman of the Board, President, Vice President or Secretary by any person (other than the Board), entitled to call a special meeting of shareholders the officer shall cause to be given to the shareholders entitled to vote, a notice that a meeting will be held at a time requested by the person(s) calling the meeting, not less than 25 nor more than 60 days after receipt of such request.  The person entitled to call the meeting may give the notice if the notice was not given within 20 days after receipt of the request.

4.     Notice of Meeting and Reports

Notice of annual or special meetings shall be given in writing not less than 15 nor more than 60 days before the date of the meeting, to shareholders entitled to vote thereat by the Secretary or an Assistant Secretary, or if there be no such officer, or in the case of neglect or refusal, by any director or shareholder.  The notice or any reports shall be given personally or by mail or other means of written communication as provided in Corp. C. Sec. 601 and shall be sent to the shareholder's address appearing on the books of the corporation, or supplied to the corporation by the shareholder for the purpose of notice.  In the absence thereof, notice shall be deemed to have been given if mailed to the principal executive office of the corporation or published at least once in a newspaper of general circulation in the county in which the principal executive office is located.

Notice of any meeting of shareholders shall specify the place, the day and the hour of meeting, and (a) in case of a special meeting, the general nature of the business to be transacted and no other business may be transacted, or (b) in the case of an annual meeting, those matters which the directors at date of mailing intend to present for action by the shareholders.  At any meetings where directors are to be elected, notice shall include the name of the nominees, if any, intended at date of notice to be presented by management for election.

Notice shall be deemed given at the time it is delivered personally or deposited in the mail or sent

By-Laws 2

Gree USA, Inc.

by other means of written communication. The officer giving such notice or report shall prepare and file an affidavit or declaration thereof. It shall not be necessary to give any notice of adjournment or of the business to be transacted at an adjourned meeting other than by announcement at the meeting at which such adjournment is taken; however, when a meeting is adjourned for 45 days or more, notice of the adjourned meeting shall be given in the same manner as an original meeting.

5.      Quorum

At any meeting of shareholders a fifty one percent (51%) of the outstanding shares entitled to vote, represented in person or by proxy, shall constitute a quorum. If less than said number of outstanding shares are represented at a meeting, a majority of the shares so represented may adjourn the meeting from time to time without further notice. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notice. The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.

6.      Voting

The shareholders entitled to notice of any meeting or to vote at any meeting shall be only the persons in whose names shares stand on the share records of the corporation on the record date determined in accordance with these by-laws.

If no record date is determined, (a) the record date for determining shareholders entitled to notice of, or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day on which notice is given, or if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held, (b) the record date for determining shareholders entitled to give consent to corporate actions in writing without a meeting when no prior action by the Board is necessary, shall be the day on which the first written consent is given, and (c) the record date for determining shareholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto, or the 60th day prior to the date of such other action, whichever is later.

Every shareholder entitled to vote shall be entitled to one vote for each share held, except for the election of directors. In an election for directors, if a candidate's name has been placed in nomination prior to the voting and one or more shareholders has given notice at the meeting prior to the voting of the shareholder's intent to cumulate the shareholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of shares which the shareholder is entitled to vote, or distribute the votes on the same principle amount as may candidates as the shareholder chooses. The candidates receiving the highest number of votes up to the number of directors to be elected shall be elected. Upon the

Gree USA, Inc.

demand of any shareholder made before the voting begins, the election of directors shall be by ballot.

7.   Proxies

Every person entitled to vote shares may do so by one or more persons authorized by proxy in writing executed by such shareholder and filed with the Secretary.

Every proxy continues in full force and effect until revoked by the person executing it prior to the vote pursuant thereto, provided however, that no proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy.

8.   Waivers and Consents

Actions taken at a meeting of shareholders however called and noticed, where a quorum is present in person or by proxy are as valid as if taken after regular call and notice, provided that each person entitled to vote either before or after the meeting signs a written waiver of notice or consent to the holding of the meeting or an approval of the minutes thereof. All waivers, consents and approvals shall be made part of the minutes of the meeting. Neither the business to be conducted nor the purpose of any regular or special meeting must be set forth in any waiver of notice, except as provided by Corp. C. Sec. 601 (f). Attendance shall constitute a waiver of notice unless objection is made as provided in Corp. C. Sec. 601(e).

9.   Action Without Meeting

Any action which may be taken at an annual or special meeting of shareholders may be taken without a meeting and without prior notice if a consent in writing, setting forth the action taken, shall be signed by the shareholders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Unless the consents of all shareholders entitled to vote have been solicited in writing, notice of any shareholder's approval of (a) a contract or other transaction between the corporation and one or more of its directors or another corporation, firm or association in which one or more of its directors has a material financial interest pursuant to Corp. C. Sec. 310, (b) indemnification of an agent of the corporation pursuant to Corp. C. Sec. 317, (c) the principal terms of a reorganization pursuant to Corp. C. Sec. 1201, and (d) a plan of distribution as part of the winding up of the corporation pursuant to Corp. C. Sec. 2007, without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval.

Prompt notice shall be given to any other corporate action taken by shareholders without a

Gree USA, Inc.

meeting by less than an unanimous written consent to those shareholders entitled to vote who have not consented in writing.

Notwithstanding any of the foregoing provisions of this section, directors may not be elected by written consent except by the unanimous written consent of all shares entitled to vote for the election of directors.

A written consent may be revoked by a writing received by the corporation prior to the time that written consents of the number of shares required to authorize the proposed action have been filed with the Secretary of the corporation, but may not be revoked thereafter.  Such revocation is effective upon its receipt by the Secretary of the corporation.

Any shareholder giving a written consents, or the shareholder's proxy holders, or a transferee of the shares of a personal representative of the shareholder or their respective proxy holders, may revoke the consent by a writing received by the corporation prior to the time that written consents of the number of shares required to authorize the proposed action have been filed with the Secretary of the corporation, but may not do so thereafter.  Such revocation is effective upon its receipt by the Secretary of the corporation.

<u>Article V - Board of Directors</u>

1.      General Powers

The business and affairs of the corporation shall be managed and its corporate powers exercised by its Board of Directors.  The directors shall in all case's act as a board, and they may adopt such rules and regulations for the conduct of their meetings and the management of the corporation as they may deem proper, not inconsistent with these By-Laws, the Articles of Incorporation, the California Corporations Code and any shareholders' agreement relating to any of the affairs of the corporation as long as it remains a close corporation.

The number and tenure of Board of Directors, the meetings, quorum for conduct businesses, notice and waives of meetings, and compensation of Directors shall be dictated by Section 5 of Principles.

2.      Action Taken without Meeting

Any action required or permitted to be taken by the Board may be taken without a meeting if all members of the Board shall individually or collectively consent in writing to such action.  The consent Board and shall be filed with the minutes of the proceedings of the Board.

By-Laws 5

Gree USA, Inc.

## Article VI - Officers

1. Officers

The officers of the corporation shall be a Chairman, Deputy Chairman, CEO, CFO, COO, CAO, secretary and vice presidents.

2. Election and Term of Office

The election and term of office are dictated under Section 7 of Principles.

3. Compensation of Officers

The salaries of the officers shall be fixed, from time to time, by the Board.

## Article VII - Corporate Records and Reports

1. Records

The corporation shall maintain adequate and correct accounts, books, and records of its business and properties in accordance with generally accepted accounting principles. All of such books, records and accounts shall be kept at its principal executive office. Section 12 of Principles establishes the financial records, reports and audit requirements.

2. Inspection by Shareholders

The share register, accounting books and records and minutes of proceedings of the shareholders, the Board and committees of the Board shall be open to inspection and copying by any shareholder or holder of a voting trust certificate at any time during usual business hours upon written demand on the corporation, for a purpose reasonably related to such holder's interest as a shareholder or holder of a voting trust certificate. Inspection and copying may be made in person, by agent, or by attorney.

Shareholders shall also have the right to inspect the original or certified copy of these By-Laws, as amended to date, kept at the corporation's principal executive office, at all reasonable times during business hours.

If any record subject to inspection pursuant to this chapter is not maintained in written form, a request for inspection is not complied with unless and until the corporation at its expense make such record available in written form.

By-Laws 6

Gree USA, Inc.

3.    Inspection by Directors

Each director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents of every kind and to inspect the physical properties of the corporation and also all of its subsidiary corporations. Inspection by a directors may be made in person or by agent or by attorney and includes the right to copy and obtain extracts.

4.    Waiver of Annual Report

The annual report to shareholders, described in Corp. C. Sec. 1501 is hereby expressly waived.

<u>Article VIII - Shares</u>

1.    Certificates for Shares

Certificates representing shares of the corporation shall be in such form as shall be determined by the Board. Certificates shall be signed by the CEO and by the Secretary or by such other officers authorized by law and by the Board. They shall state the name of the record holder of the shares represented thereby, the total authorized issue, the number of shares represented by the particular certificate, the designation, if any, the class or series of shares represented thereby, and any statement or legend required by the California Corporations Code. All certificates for shares shall be consecutively numbered and issued in consecutive order with the date of issuance entered thereon.

Any or all the signatures on the certificates may be made by facsimile provided that they are countersigned by a transfer agent or transfer clerk and registered by an incorporated bank or trust company, either domestic or foreign, as registrar of transfers.

2.    Transfer on the Books

Upon surrender to the Secretary or transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the corporation to issue a new certificate the person entitled thereto, cancel the old certificate and record the transaction upon its share register.

3.    Lost or Destroyed Certificates

Any person claiming a share certificate to be lost or destroyed shall made an affidavit or affirmation of that fact and shall, if the Board so require, give the corporation a bond of indemnity, in form and with one or more sureties satisfactory to the Board, in at least double the value of the shares represented by the lost certificate, whereupon a new certificate may be issued

By-Laws 7

Gree USA, Inc.

in the same tenor and for the same number of shares as the one alleged to be lost or destroyed.

4.    Record Date and Closing of Transfer Books

The Board may fix in advance a record date for the determination of the shareholders entitled to notice of and to vote at any meeting of shareholders, or entitled to receive payment of any dividend or distribution, or any allotment of rights, or to exercise rights in respect to any other lawful action.  The record date so fixed shall not be more than sixty (60) nor less than ten (10) days prior to the date of the meeting or event for the purpose for which it is fixed.  When a record date is fixed, only shareholders of record on that date are entitled to notice of and to vote at the meeting, or to receive the dividend, distribution, or allotment of rights, or to exercise the rights as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date.  The Board may close the books of the corporation against transfers of shares during the whole or any part of a period of not more than sixty (60) days prior to the date of a shareholders' meeting, or the date when the right to any dividend, distribution, or allotment of rights vests, or the effective date of any change, conversion or exchange of shares.

Article VII - Miscellaneous

1.    Indemnification

The directors and officers of the corporation shall be indemnified by the corporation to the fullest extent not prohibited by the California Corporations Code.

2.    Insurance

The corporation shall have the power to purchase and maintain insurance on behalf of any agent (as defined in Corp. C. Sec. 317) against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such, whether or not the corporation would have the power to indemnify the agent against such liability under the provisions of Corp. C. Sec. 317.

3.    Construction, Definitions, and References

The general provisions, rules of construction and definitions contained in the General Provisions of the California Corporations Code and in the California General Corporation Law shall govern the construction of these By-Laws, unless the context requires otherwise.  Corp. C. Sec. reference herein refer to the equivalent sections of the General Corporation Law, effective January 1, 1977, as amended.

4.    Corporate Seal

The Board shall provide a corporate seal which shall be circular in form and shall have inscribed

By-Laws 8

Gree USA, Inc.

thereon the name of the corporation, the state of incorporation, the date of incorporation and the words "Corporate Seal" or Incorporated."

<u>Article VIII – Amendments</u>

By-Laws may be amended or repealed by written consent of both Hong Kong Gree Electric Appliances Sales Ltd. and MJC America Holdings, Inc.

By-Laws 9

Gree USA, Inc.

<u>Certification of the Adoption of the By-Laws</u>

The undersigned, Secretary of the corporation, hereby certifies that the foregoing is a true and
correct copy of the By-Laws of the corporation adopted as of 10/30/2010 by the Incorporator of
the corporation.

Dated:  10/30/2010

Jimmy Loh, Secretary

By-Laws 10

# Exhibit B

MEMORADUM OF UNDERSTANDING

Zhu Hai, China

This memorandum of understanding is entered into on April 23, 2010 at Zhuhai, China between Gree Hong Kong Electric Appliances, a subsidiary of Gree Electrical Appliance Inc of Zhuhai (Party A), and MJC Holding Co., Inc., an affiliate of MJC America Ltd. (Party B)

Parties desire to form a joint venture to further sales of Party A's products in the North America, using Party B's expertise and facilities in sales, logistics, and after sales services.

The following are the form and structure of the joint venture, as tentatively agreed by both parties.

1)   The legal name of the joint venture will be Gree USA, Inc.  It's doing business name is Soleus N.A.
2)   The joint venture will be a corporation incorporated in the state of California.  The corporation should be formed in late April or early May of 2010.
3)   Party A and Party B will own 51% and 49% outstanding common stock of the Gree USA, respectively.  The corporation will issue only one class of stock.
4)   The initial capital of Gree USA will be $200,000.  The initial capital should be deposited into the corporation bank account on or before May 15, 2010.
5)   The initial administrative office will be in Greater Los Angeles area. Gree USA will intend to lease an office and initially hire one or two clerical employees in year 2011. Tentatively Gree USA will use the Part's office for company registration.
6)   The Party A should appoint 3 directors and Party B should appoint 2 directors for Gree USA. The board of directors should convey meeting at a minimum annually.
7)   The Board of Directors of Gree USA should name executive officers of the joint venture.
8)   Neither directors nor executive officers will be compensated by Gree USA for the first two years of the joint venture.
9)   The mission of Gree USA is to advance sales of Gree residential air conditioner and dehumidifier (including Gree brand) products in United States of America.
10)  Gree USA will focus sales to largest chain stores in United States of America initially.  And gradually spread its sales to middle and smaller chain stores.
11)  Gree USA will use existing sales and marketing force of Party B, to conduct sales presentation to potential customers.
12)  Most major chain stores have existing relationship with Party B and its affiliates. Party B will cause the existing accounts with the customers to be transferred to Gree USA.

13) In order to broader product category and continuing existing appearance in front of major chain stores, Gree USA will present both Party A and Party B products in order to increase placement chances.

14) Gree USA should select Party A's products as the primary products and add Party B's as supplemental products for major chain store presentation.

15) Upon receiving orders from major chain stores Party A will fulfill the orders of its product and Party B will fulfill the orders of its products.

16) Gree USA will only incur major costs associated with the order received, fulfilled, and payment received from customers, such as commission to sales company, administrative and after sales services cost to Party B and affiliates.

17) All anticipated costs will added to production costs to determine product presentation prices for a given potential customer.  Party A has power to determine the final product prices for its product.

18) In no event Gree USA should be responsible for any costs associate with marketing, presentation, sales, and after sales services for sales associated with any Party B products.

19) Gree USA will use product brands owned and controlled by either parties, its parents and affiliates, or other brands approved Board of Directors of the company.

Signed by:

GREE ELECTRIC APPLIANCES INC. of ZHUHAI

Name: _____

Title: _Vic Gen of Gree Overseas Sales Co._

Date: _3 April 2010_


MJC America, Limited

Name: _____

Title: _Chairman, Secretary of MJC America Ltd._

Date: _April 23, 2010_

Exhibit C

Minutes of the Board of Directors Meeting
Of
Gree USA, Inc.
A California Corporation

A meeting of the Board of Directors is held on June 19, 2011 at headquarter of the company at
20035 E. Walnut Dr. North, City of Industry, CA at 10:30 AM. Attending for the meeting are
Chairwoman Dong Ming Zhu, Director Jimmy Loh, Director Charley Loh, and Director Lam
Hou Kong.

Secretary Jimmy Loh announces the presence of a quorum to conduct businesses for the board of
directors.

CEO Charley Loh reports to the Board the sales activities of Gree USA under the PBG
(SoleusAir Powered by Gree). He states that the US mass merchants are receptive to PBG brand.
And the outlook of Gree USA future is bright.

CEO Charley Loh thanks for the supports that Gree headquarter has been giving to Gree USA.

Chairwoman Dong appraised the hard work of the Gree USA US team to prepare and execute the
Grand Opening event. She set her vision for the future direction of Gree USA by stating:

1) Gree headquarter trusts the integrity and ability of the Gree USA management team. She
believes that with the researching and development, manufacturing and quality control
system of the factory, and the US marketing and sales experiences of MJC, Gree USA
can make Gree the largest air conditioner suppler in the US.
2) In order to avoid having Gree brand becoming a cheap air conditioner brand in the US,
Gree USA should use PBG for the products sold to the mass merchants. Products sold to
mass merchants such as window ACs and dehumidifiers are commodity type of products
and have very low profit margins.
3) Gree brand should be used for the products with higher tech content, or certain specialty
products which can demand a higher profit margin. After the US consumers recognizes
that Gree is a premium brand for air conditioners and dehumidifiers, Gree brand can then
be used for products sold to the mass merchants.
4) Gree USA should focus on penetration of the US market by generating sales quantity.
Gree USA should generate annual sales of 1 million unit or more within next two years.
5) Gree headquarter will fully support Gree USA by a) offering the best prices. Gree
factory only needs to make 1 to 2% of the products sold to Gree USA. b) stop new OEM
customers. After Gree USA establishes itself with sales quantity Gree headquarter will
stop OEM all together. c) Gree headquarter will not take its share of Gree USA's profits
for the first three years. Gree headquarter's portion of profits will be retained by Gree
USA for promotion and marketing expenses in the US. d) Gree USA will receive 1.5 to 2%
of the sales rebates at the end of a year if its annual sales exceed 1 million units. Gree
headquarter has the similar program for its domestic sales companies. f) Gree
headquarter will support Gree USA's sales by having local inventories in the US
warehouses. Eventually Gree headquarter will consider to invest and acquire warehouses

spaces in the US. g) Gree headquarter is considering investing manufacturing facilities in the US in the future. h) Gree headquarter will place high priority for development of the products suitable for the US market, such as VRFs and central ACs.

6) Gree USA should look into the possibility of opening Gree specialty stores in the US, which only carry and sell Gree products. It is recommended to open the initial Gree specialty stores in the areas where Chinese population are highly concentrated.

Moved by Director Jimmy Loh, seconded by Director Charley Loh, the board approved the following resolutions.

RESOLVED, that Chairwoman Dong Ming Zhu's visions for the company stated to above are hereby adopted as the future direction of the company.

RESOLVED FURTHER that the actions taken since the organization meeting dated October 30, 2010 by the board of directors and management are hereby ratified.

There are no further business and the meeting is adjoined at 11:00 AM.

Prepared and certified to be true and correct minutes of the meeting by:

Jimmy Loh
Secretary

Exhibit D

## AGREEMENT OF DISTRIBUTION OF GROSS PROFIT OF MAJOR ACCOUNT SALES

This agreement is made this December 9, 2011 between Gree USA, Inc., (herein below "Gree USA"), and MJC Supply, LLC (herein below "MJC Supply") with consent of MJC America Ltd. (herein below "MJC America"), an affiliated of MJC Supply.

Whereas, Gree USA is a Joint Venture between Hong Kong Gree Electric Appliance Sales Ltd. (herein below "Gree HK"), a fully owned subsidiary of Gree Electric Appliance Co. Ltd. of Zhuhai (herein below "Gree Zhuhai"), and MJC American Holdings Co. Inc., an affiliate to MJC Supply.

Whereas, based on the principals of the joint venture MOU dated April 23, 2010 and the resolutions adopted by the Board of Directors of Gree USA on June 19, 2011, MJC America will transfer all its major US accounts to Gree USA. Gree USA will be the entity to make sales to these accounts. MJC America and its affiliates will provide operation management, marketing, sales, logistic, and after sales services relating to the sales made by Gree USA.

Whereas, Gree USA will purchase products from Gree HK, and in turn sell the products to the US major accounts.

Whereas, Gree HK has the sole discretion to determine both the purchase prices and the sales prices of Gree USA for the products.

Whereas, Gree HK and Gree USA agreed to use a Form titled "Account Project Set UP Sheet", a Spaceman attached herein, (Agreement Form) to determine the percentage of gross sales of a major account which should be paid to Gree USA and MJC America and its affiliated for their roles and contributions. Each and every Agreement Form must be signed by the officers of Gree HK and Gree USA.

Whereas, based on the Agreement Form, there are a "standard build up %" column and a "this account % break down" column. Information in the "standard build up %" represents the bench marks and information in "this account % break down" column represent the actual percentage of itemized breakdown agreed by Gree HK and Gree USA for the subject account. These percentages represent the compensations entitled by Gree USA and MJC America and its affiliated for the specific sales.

Whereas, there is a row titled "Extra / Short build up", which represents the difference between agreed build up for the account, and percentage in the cell titled "Gross profit". Gree USA will retain the amount of Gross Profit upon receipt of the sales proceeds from the subject account. If number in Extra / Short Build Up is negative; it means Gree HK owes Gree USA and MJC and its affiliates for additional fund other than calculated based on Gross Profit percentage; and if it is positive, it means Gree USA and MJC America and its affiliated owe to Gree HK for additional fund other than calculated based on Gross Profit percentage. Gree HK and Gree USA agreed that periodically they shall add the percentages (offset positive to negative) at Extra / Short Build Up for all accounts. If the net amount is positive, Gree USA shall make payment to Gree HK, and if the net amount is negative, Gree HK shall make payment to Gree USA.

NOW, for valuable consideration, IT IS AGREED that,

1.   Gree USA shall retain, for each account and each sales, the percentage in the first "Sub Total", "This acct % break down" cell at the Agreement Form all the time regardless if there is an Extra/Short Build Up.  Gree USA is responsible only for returns directly from the subject account.

2.   MJC Supply shall be paid by Gree USA for the percentage in the second "Sub Total", "This acct % break down" cell adjusted to Extra / Short Build Up percentage at the time when Gree USA receives the sales proceeds from subject account.  At time of periodical settling of all the accounts, MJC Supply shall be 100% responsible to reimburse Gree USA if the net Build Up is positive, or receive 100% funds from Gree USA if the net Build Up is negative, and only when Gree USA receives settlement funds from Gree HK.

3.   Based on the promise from Gree Zhuhai, Gree USA would receive for additional bonus and other promotional rewards from Gree Zhuhai or Gree HK.  Based on the actual responsibility and work performed by Gree USA and MJC America and its affiliated, it is agreed that Gree USA shall retain 10% for the bonus and rewards of this nature upon receipt and the remaining 90% shall be paid to MJC.

4.   This Agreement shall remain valid continuously until it is amended or altered in writing by and signed by all Parties.

Executed in the State of California, County of Los Angeles,

Gree USA Inc.
By Charley Loh, Its CEO

MJC Supply LLC
By Jimmy Loh, its Member

MJC America Ltd agrees and consents the above agreements without reservation.  MJC America Ltd. hereby agrees that it will not assert any claim against Gree USA for its performances and roles in operation management, marketing, sales, logistic, and after sales service of Gree USA's businesses.

MJC America Ltd.
By Jimmy Loh, its Secretary

# Exhibit E

Trademark Electronic Search System (TESS)                                    Page 1 of 2



**United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Jun 13 03:20:31 EDT 2013*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At:          OR   Jump   to record:        **Record 2 out of 2**

TSDR   ASSIGN Status   TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | **SOLEUS AIR** |
| **Goods and Services** | IC 011. US 013 021 023 031 034. G & S: air conditioners, portable air conditioners, electric fans, electric tower fans, humidifiers, dehumidifiers, household air cleaners, air purifiers and electric space heaters. FIRST USE: 20010601. FIRST USE IN COMMERCE: 20010601 |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Serial Number** | 76314124 |
| **Filing Date** | September 20, 2001 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | June 11, 2002 |
| **Registration Number** | 2615080 |
| **Registration Date** | September 3, 2002 |
| **Owner** | (REGISTRANT) MJC AMERICA LTD. CORPORATION CALIFORNIA 20035 E. WALNET DRIVE NORTH CITY OF INDUSTRY CALIFORNIA 91789 |
| | (LAST LISTED OWNER) MJC SUPPLY, LLC. LIMITED LIABILITY COMPANY CALIFORNIA 20741 E. CREST LANE, #C DIAMOND BAR CALIFORNIA 91765 |
| **Assignment** | |

Trademark Electronic Search System (TESS)                                              Page 2 of 2

| | |
|---|---|
| Recorded | ASSIGNMENT RECORDED |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "AIR" APART FROM THE MARK AS SHOWN |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Affidavit Text | SECT 8 (6-YR). SECTION 8(10-YR) 20110921. |
| Renewal | 1ST RENEWAL 20110921 |
| Live/Dead Indicator | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST

NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Exhibit F

PETER S. HWU, P. C.

ATTORNEY AT LAW

500 Sutter Street, Suite 922
San Francisco, California 94102
Tel: (415) 398-8329 Fax: (415) 398-7329

LOS ANGELES OFFICE
1108 South Baldwin Avenue, Suite 250
Arcadia, California 91007
Tel: (626) 457-2889
Fax: (626) 457-5520

June 14, 2013

By E-mail Only
wjd@gree.com.cn

Mr. Wang Jing Dong
Executive Vice-President and
Chief Financial Officer
Gree Electric Appliances, Inc. of Zhuhai
West Jinji Road
Qianshan, Zhuhai China

By E-mail Only
wangbo@gree.com.cn

Mr. Wang Bo
Department Chief
Security and Legal Affair
Gree Electric Appliances, Inc. of Zhuhai
West Jinji Road
Qianshan, Zhuhai China

                    Re:    Soleus Air Trademark


Dear Messrs. Wang:

        Our law office represents MJC Supply, LLC, the owner of federal registration
number 2615080 for the Soleus Air trademark with respect to air conditioners, portable air
conditioners, electric fans, electric tower fans, humidifiers, dehumidifiers, household air cleaners,
air purifiers, and electric space heaters.

Mssrs. Wang
June 14, 2013
Page 2


We have been instructed by MJC Supply, LLC to demand that you obtain written consent to sell any merchandise bearing the Soleus Air trademark in the United States.

Very truly yours,

Peter S. Hwu

STH:ph

Enclosure

cc: Mr. Jun Oyang
    (by e-mail only w/encl.)

Trademark Electronic Search System (TESS)                                    Page 1 of 2

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Jun 13 03:20:31 EDT 2013*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At:          OR  Jump  to record:          **Record 2 out of 2**

TSDR   ASSIGN Status   TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*

# Soleus Air

| | |
|---|---|
| **Word Mark** | **SOLEUS AIR** |
| **Goods and Services** | IC 011. US 013 021 023 031 034. G & S: air conditioners, portable air conditioners, electric fans, electric tower fans, humidifiers, dehumidifiers, household air cleaners, air purifiers and electric space heaters. FIRST USE: 20010601. FIRST USE IN COMMERCE: 20010601 |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Serial Number** | 76314124 |
| **Filing Date** | September 20, 2001 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | June 11, 2002 |
| **Registration Number** | 2615080 |
| **Registration Date** | September 3, 2002 |
| **Owner** | (REGISTRANT) MJC AMERICA LTD. CORPORATION CALIFORNIA 20035 E. WALNAT DRIVE NORTH CITY OF INDUSTRY CALIFORNIA 91789 |
| | (LAST LISTED OWNER) MJC SUPPLY, LLC. LIMITED LIABILITY COMPANY CALIFORNIA 20741 E. CREST LANE, #C DIAMOND BAR CALIFORNIA 91765 |
| **Assignment** | |

Trademark Electronic Search System (TESS)                                    Page 2 of 2

| | |
|---|---|
| Recorded | ASSIGNMENT RECORDED |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "AIR" APART FROM THE MARK AS SHOWN |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Affidavit Text | SECT 8 (6-YR). SECTION 8(10-YR) 20110921. |
| Renewal | 1ST RENEWAL 20110921 |
| Live/Dead Indicator | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST

NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# Exhibit G

 **GREE** HONG KONG GREE ELECTRIC APPLIANCES SALES LIMITED

Unit 2612, 26/F, Miramar Tower, 132 Nathan Road, TsimSha Tsui,Kowloon, HK

Tel: 00852-3165 8898    Fax: 00852-3165 1030

## Confirmation Letter

TO:

GOLDEN OPPORTUNITY INC.

ADDRESS: WOOD RIDGE INDUSTRIAL CENTER, 42 PASSAIC STREET

BUILDING #42, WOOD-RIDGE, N.J. 07075

TEL: 973-928-1187

DATE: March 18, 2014

THIS IS AN AUTHORIZATION LETTER FROM HONG KONG GREE ELECTRIC APPLIANCES SALES LIMITED, ALLOWING GOLDEN OPPORTUNITY INC. TO SELL ITS AC INVENTORY FROM US WAREHOUSE UNDER SOLEUSAIR BRAND NAME. THE MODEL NUMBERS ARE AS FOLLOWING:

WAC MODELS:

SG-WAC-05SM-C

SG-WAC-06ESE-C

SG-WAC-08ESE-C

SG-WAC-10ESE-C

SG-WAC-12ESE-C

PAC MODELS:

GB-PAC-08E4

SG-PAC-10E2

SG-PAC-12E1

TTW MODELS:

SG-TTW-12ESEZ

MORE MODELS IN FUTURE ORDERS WILL BE ADDED IN ATTACHMENT.

BEST REGARDS.

HONG KONG GREE ELECTRIC APPLIANCES SALES LIMITED

Exhibit H

**GREE ELECTRIC APPLIANCES, INC.OF ZHUHAI**
W.Jinji  Road,  Qiangshan,  Zhuhai  519070,  Guangdong,  China
Tel:  +86-756-8614883        Fax:  +86-756-8614998866



## 关于近期 MJC 除湿机质量问题的处理意见

　　对于 MJC 近来报给格力的关于销售给客户 Menards 除湿机的质量问题，格力希望 MJC 以格力的指导思想为主导，以尽可能减少对格力公司声誉和格力品牌形象的不良影响为目标，在美国当地处理此事件。

　　MJC 负责在当地处理细务，格力将派技术人员去美国配合工作。格力相信以 MJC 的经验和资历能够以双方最少的代价和损失来处理此事，因产品质量问题导致的相关经济损失、因处理此质量问题而产生的各项费用，将由格力承担，具体费用项目和金额将以 MJC 开出的发票和相关证明资料为准。

　　　　　　　　　　　　　　　　　　　　　　　　　　　格力电器

　　　　　　　　　　　　　　　　　　　　　　　　　　　2012-9-5

TRANSLATION

## GREE ELECTRIC APPLIANCES, INC.OF ZHUHAI                    (LOGO)

W.Jinji Road, Qiangshan, Zhuhai 519070, Guangdong, China
Tel: +86-756-8614883 Fax: +86-756-8614998866

ADVICE ON ADDRESSING RECENT MJC DEHUMIDIFIER QUALITY ISSUE

With regard to the quality issues concerning the dehumidifiers sold to Menards, as reported to Gree recently by MJC, it is Gree's hope that MJC will follow Gree's guiding principles and address the issues locally, with an aim to minimize, as much as possible, the negative impact on Gree's reputation and brand image.

MJC will be in charge of handling the local logistics of the matter, and Gree will dispatch technical personnel to the US to assist with the work. It is Gree's belief that with MJC's experiences and qualifications, it will be able to address the issues in a way that keeps the cost and damage to both sides at their minimum. Gree will be responsible for the relevant economic damages resulting from the quality issues and all expenses accrued while addressing the quality issues. The specific types and amounts of the expenses will base on the invoices and relevant evidentiary materials submitted by MJC.

Gree Electric Appliances

2012-9-5

# Exhibit I

关于同意继续在美国市场销售库存除湿机的意见函

格力美国销售有限责任公司：

　　我司收到贵司提供的除湿机有关明火和过热的相关事故报告及第三方独立测试中心关于除湿机安全问题的报告后安排测试。经技术部门对销售到美国市场发生火灾事故的同类机型除湿机进行检测，根据检测结果，未发现除湿机存在导致起火的共同缺陷。

　　因此，出口美国的除湿机不符合美国产品安全局（USCPSC）不安全产品召回或申报的要求，我司同意贵司继续在美国市场销售库存除湿机。

　　如果后续我司发现存在召回或申报必要时会直接与美国产品安全局相关部门联系并承担贵司销售以上库存除湿机因质量问题遭受的经济损失和诉讼责任。

珠海格力电器股份有限公司

2013 年 1 月 23 日

AGREEMENT TO CONTINUE SALE IN THE U.S. OF DEHUMIDIFERS  IN STOCK

Gree USA Sales Ltd.:

Pursuant to receiving from you the incident reports on the dehumidifiers catching fire and overheating, along with the third-party test reports on the safety of the dehumidifiers, we arranged for testing. The tech department conducted testing on the dehumidifier model that is the same as the one sold in the U.S. market and was involved in the fire incident. The test result(s) showed no common defect(s) to cause the dehumidifier to catch fire.

Therefore, the dehumidifiers exported to the U.S. market do not fall under the USCPSC requirements for recall or reporting based on product safety concerns. You have our agreement to continue to sell in the U.S. market the dehumidifiers you have in stock.

Should we discover, at a later time, that it has become necessary to recall or report the product, we will get in touch with the USCPSC directly and assume the economic damages and legal responsibilities you have suffered as a result of quality issues involving the aforementioned dehumidifiers in your stock.

Gree Electric Appliances, Inc. Zhuhai

(Seal of Gree Electric Alliances, Inc. Zhuhai)

January 23, 2013