# EXHIBIT A

*The Law Office of Alan H. Schoem LLC*

At the request of counsel for MJC America, Ltd. and MJC Supply, Inc. (hereinafter "MJC"), I am retained as an expert in the matter of *MJC America Limited et al. vs. Gree Electric Appliances, Inc. of Zhuhai et al.,* U.S. Dist. Ct. (C.D. CA) Case No. 2:13-cv-04264-SJO-(CWx).  I am retained for the purpose of rebutting the letter report of Gree Electric Appliances, Inc. of Zhuhai and Gree Hong Kong (hereinafter "Gree")'s expert Richard L. Stern, Exponent, Inc.  I submit this report in support of my opinions in connection with the above referenced case.

The opinions included in this report are based upon my review of the Plaintiffs' Verified Second Amended Complaint and Defendants' Answers and Counterclaims in this matter, and the documents identified in Attachment 1, from my expertise in the area of product safety and product recalls including my expertise gained from serving at the CPSC from 1973-2004, and from my practicing before the Commission from 2004 to the present.   To the extent that additional documentation or information becomes available, my analysis may result in different opinions and conclusions.

Since 1973, I have spent my professional career in the area of product safety, first, as a government regulator, and later as a consultant at Marsh USA where I assisted firms in complying with federal agency regulatory requirements and industry voluntary standards, establishing procedures for minimizing the need for product recalls, preparing for and deploying product recalls, and recovering from product recalls.  I started my own law firm in January 2012, through which I advise companies on a variety of product safety-related issues involving the CPSC, including complying with regulatory requirements enforced by the CPSC.  Occasionally I serve as an expert in litigation.

The following sections set forth my qualifications as an expert, expert testimony experience, my opinions, and the bases for my opinions.

## I.     QUALIFICATIONS AND EXPERT TESTIMONY EXPERIENCE

- In January 2012, I started my own practice, The Law Office of Alan H. Schoem LLC, in which, among other things, I assist clients with product safety-related issues primarily involving the CPSC, including regulatory compliance, establishing product recall processes and procedures, and assisting in conducting product recalls. As part of my practice in the area of regulatory compliance, I advise firms on interpretations of CPSC statutes and regulations, including jurisdictional issues.

- From September 2004 through December 2011, I was an expert consultant in the Global Product Risk Practice within Marsh Risk Consulting, part of Marsh & McLennan Companies.  I provided expert professional consulting services for clients who encountered

a product risk issue including the need for a product recall. My clients' included firms requesting guidance in dealing with consumer product, food, medical device and automotive equipment issues.   I worked with companies on regulatory compliance, minimizing the potential for product recalls, preparing for recalls, conducting product recalls and recovering from product recalls.

- I served as the Director of the Office of Compliance at the CPSC from 1997 to 2004. In this capacity, I was responsible for the enforcement program of the CPSC including conducting investigations of potentially defective products, pursuing product recalls, conducting administrative litigation, advising firms on complying with CPSC rules and regulations, evaluating whether firms had an obligation to report to CPSC under its statutes, and pursuing civil penalties against firms that violated CPSC rules and regulations.  As Director, I was involved in assessing the risk of injury associated with consumer products and in assessing corrective actions to address the risk.

- Prior to serving as Director of Compliance at the CPSC, I held various roles at the CPSC from 1973 to 1997, including in reverse chronological order, Executive Assistant in the Office of Compliance, Director of the Office of Administrative Litigation in the Office of Compliance, Assistant General Counsel and staff attorney in the CPSC's Office of the General Counsel.  In these capacities, I was responsible at various times for, among other things, participating in assessment of product risk, CPSC's administrative litigation, pursuing civil penalties against firms who violated mandatory safety standards and banning regulations including violations of the Consumer Product Safety Act reporting requirements, information disclosure, pursuing federal court litigation through the Department of Justice, providing legal advice and guidance on CPSC rulemaking activities, interpreting CPSC regulations and statutes, providing jurisdictional opinions in the form of Office of the General Counsel Advisory Opinions, and providing legal advice and guidance to the CPSC Commissioners and staff.

- During my tenure at the CPSC, I also served as a Legal Assistant to Chairman Ann Brown from March 1994 until October 1996, providing legal and policy advice and guidance. In addition, I also participated in a LEGIS Fellows program from 1992-1993 working for Senator Paul Wellstone (D. MN), participating in legislative activities of the Senator including developing position papers and statements.

- I graduated from American University, Washington College of Law in 1972 with a Juris Doctor degree. I received my undergraduate B.A. degree from the University of Maryland College Park in 1968. I am admitted to the Bars of Maryland and the District of Columbia.

- A copy of my CV is provided as Attachment 2.

## II.   EXPERT TESTIMONY EXPERIENCE

A list of my expert witness deposition and trial testimony is included as Attachment 3.

## III.   SUMMARY OPINION

- The CPSC is a U.S. Federal regulatory agency responsible for protecting consumers form unreasonable risks of injury associated with consumer products.
- Manufacturers who obtain information reasonably supporting the conclusion that a product (1) has a defect which could create a substantial product hazard or (2) creates an unreasonable risk of serious injury or death are required to report that information immediately to CPSC.
- As early as mid-July 2012, MJC provided Gree information about certain of its dehumidifiers spontaneously igniting.
- MJC provided Gree test data documenting that its dehumidifiers did not meet UL requirements for flame retardancy and corresponded with and met with Gree representatives in September 2012 to urge them to report to CPSC.
- The CPSC reporting requirement is not dependent upon a firm establishing the root cause of a safety problem.
- Gree's hiring Exponent to evaluate its dehumidifiers was not a reason to delay reporting to CPSC.
- Gree should have reported to CPSC significantly earlier than it did and the delay in reporting appears to have been motivated by its financial concerns.

## IV.   The Consumer Product Safety Commission

The U.S. Consumer Product Safety Commission (CPSC) is an independent federal regulatory agency created by Congress in 1972 through enactment of the Consumer Product Safety Act (CPSA), 15 U.S.C. §§ 2051-2089.  The Commission began operating in May 1973.  The CPSC is responsible for, among other things, protecting the public from unreasonable risks of injury associated with consumer products.  15 U.S.C. § 2051(b)(1).  The CPSC administers a number of statutes with the relevant statutes for purposes of this proceeding being the CPSA and the Consumer Product Safety Improvement Act of 2008 (Public Law 110-314, 122 Stat. 3016) (hereinafter "CPSIA").

To carry out its responsibilities, the CPSC has broad regulatory authority including the authority to issue mandatory safety standards, to ban products where no standard is feasible and to compel the recall of consumer products if it can prove in an administrative adjudicatory proceeding that a product is defective and creates a substantial risk of injury to the public. 15 U.S.C. §§ 2056, 2057, 2058, 2064.  Nearly all CPSC announced recalls are "voluntary" in that firms agree in cooperation with CPSC to conduct a recall without the necessity of litigation.

The CPSC learns about potential safety problems with products through a variety of sources including consumer complaints, trade complaints, media reports and a system of statistically located hospitals that report on emergency room treated injuries associated with consumer products (National Electronic Injury Surveillance System or NEISS). CPSC places "reports of harm" (complaints) that meet certain criteria in a public database at www.saferproducts.gov.

In addition, manufacturers who, among other things, obtain information reasonably supporting the conclusion that a product (1) has a defect which could create a substantial product hazard or (2) creates an unreasonable risk of serious injury or death are required to report that information immediately to CPSC. 15 U.S.C. § 2064(b). In determining whether a product could create a substantial product hazard, the CPSC considers, among other things, the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, the likelihood of injury and the vulnerability of the population at risk. 15 U.S.C. § 2064(a); 16 CFR § 1115.12.

## V.   Manufacturer's Responsibility

It is a basic tenet of product safety that safety must be designed and built into a product. Prudent manufacturers should use designs that eliminate or minimize potential product hazards. If all potential hazards cannot be eliminated by design, manufacturers should consider possible guards against remaining potential hazards. Finally, manufacturers also should provide warnings regarding any remaining hazard. Manufacturers, therefore, should design safety into a product, consider guards against potential hazards that cannot be addressed by product design alone, and provide warnings for remaining potential hazards.

In designing a product, a manufacturer should conduct a foreseeable use analysis that "considers the potential ways that a consumer will interact with and/or operate a product. It is a critical step in designing a safe consumer product. Foreseeable use includes the use as intended by the manufacturer, and also use in ways that were not intended but can reasonably be expected to occur." In other words, a product must be designed in a way that takes into account reasonably foreseeable use and misuse of the product. Handbook for Manufacturing Safer Consumer Products, U.S. Consumer Product Safety Commission (July 2006) (hereinafter "CPSC Handbook"), at 9.

With respect to product design, the CPSC Handbook provides that:

> Changes in design, production and distribution must be subject to control, be made matters of record, and be incorporated into all documentation affecting the product. Supporting technical documentation (e.g., drawings, replacement parts data, production, inspection, testing and repair instructions, and operating handbooks) must be current with design. Obsolete documents and data are to be removed from all places where they might be used inadvertently.

CPSC Handbook at 10.

## VI.    Analysis

Mr. Stern in his letter report dated February 5, 2015, discusses Gree's decision to retain a third party expert, Exponent, to assist in replicating its dehumidifier failures, Gree's decision to conduct a recall of its dehumidifiers in cooperation with the CPSC, Gree's decision to retain a 3rd party logistics center to assist in implementing the dehumidifier recall, and Gree's decision to use Exponent to conduct a review of Gree's safety compliance management program.

Gree's decision to hire Exponent to replicate its dehumidifier failures and evaluate its safety compliance programs and Stericycle to serve as a recall logistics provider appears to have occurred significantly later in time than was reasonable; and did not affect Gree's responsibility to report its dehumidifier fires to CPSC immediately.  Indeed, Mr. Stern's analysis starts in the middle of the chronicle of Gree's dehumidifier issues rather than at the beginning.  Mr. Stern's accounting starts approximately 10 months after MJC first reported to Gree safety problems with Gree's dehumidifiers.  Mr. Stern also erroneously concludes that "prior to 2013, Gree reportedly had not identified any product safety issues associated with their product line that would have presented a substantial product hazard.  Stern Letter Report, Exhibit B at Page 2.  It would appear that Gree may not have shared with Mr. Stern information about its dehumidifier fires that MJC provided to Gree in late July 2012.

Beginning in July 2012, MJC reported to Gree three incidents of spontaneous ignition involving the Gree dehumidifier including a YouTube video of a Gree dehumidifier that had spontaneously ignited.  GREE-CPSC0000001, GREE-OGC0000214, GREE0006800; Huang Deposition, at 69, 71 (February 9, 2015).  By mid-August 2012, Gree had received five reports of fires involving its dehumidifiers.  Exhibit 4 to Huang deposition (February 9, 2015).

In September 2012, MJC reported to Gree that based on a report from its insurance company and related testing, the Gree dehumidifiers did not meet UL fire retardant requirements.  Gree met with MJC in the United States in September 2012.  At the meeting, Gree admitted that it was using noncompliant plastics in its dehumidifiers; and that it had a repair to address the risk of fire. .  Huang Deposition, Exhibit 11 to Huang Deposition.   At that meeting, MJC urged Gree to report to CPSC.  Exhibits 11 and 19 to Huang Deposition; Gree 0011539-0011569; See also, Gree's Amended Responses to Counter Defendants Requests For Admission, Set One.  While Gree claimed that the design specifications for the dehumidifiers met UL requirements, there is no indication that Gree actually tested or evaluated its dehumidifiers to determine whether they were manufactured to the applicable fire retardant requirements or Gree's design specifications.  Finally, Gree admitted that as of August or September, 2012, Gree was aware that certain plastics used in the dehumidifiers were not in compliance with UL standards.  Gree's Amended Responses to Counter Defendants Requests For Admission, Set One; Huang Deposition 143-144.

Gree opined, at least in some cases, that fires were "manmade" assuming in part that the plastic used in its dehumidifiers were flame retardant.  GREE-CPSC0000026, GREE-OGC0000004, GREE0006680.  In fact, Gree finally admitted that its dehumidifiers failed to meet the UL requirements for fire retardancy to which the dehumidifiers were certified.  Huang Deposition, at pages at 50-52 (February 9, 2015).  Once Gree recognized that its dehumidifiers did not comply with UL's flame retardancy requirements, it was required to report to CPSC.  Further, it is a prohibited act for Gree to sell a dehumidifier bearing a UL mark where Gree knew or should have known that the mark was not authorized.  Because the dehumidifiers did not meet UL's flame retardancy requirements, Gree would not have been authorized to use the UL mark.

Exponent's report dated July 19, 2013, noted a potential for fire with non-UL compliant rated plastic. No doubt this is why Exponent's Letter Report dated February 5, 2015, prepared by Mr. Stern, recommends that Gree "[c]onduct a detailed audit of the day-to-day actions of the production…[department] to identify potential nonconformance with Gree's internal quality, compliance and safety requirements."

In addition, Gree was aware by late 2012 of a November 12, 2012, report by Intertek identifying "noncompliances" to the applicable standards.

Because of the fire incidents, in an email dated September 27 from Jimmy Loh and Charlie Loh, MJC, to Chairman Dong Mingzhu, Gree, the Lohs' urged Gree to report to CPSC as soon as possible.

By mid-October 2012, MJC had informed Gree of a total of nine fire incidents involving the Gree dehumidifiers and by the end of November 2012, MJC was advising Gree to report the fire issues involving the Gree dehumidifier to CPSC.  See, Plaintiff's Exhibit J, Gree-OGC0000052-55, and Exhibit 11 to Huang Deposition.  In fact, Gree implemented design changes at its factory in late 2012 for new production intended to reduce the risk of fire but did not offer  the remedy for consumers who already owned the product, and those dehumidifiers already in the stream of commerce.   Exhibit 15 to Huang deposition; Huang deposition at 129-132.  Exhibit H to Gree and MJC's Joint Report to CPSC.

Because Gree claimed it was not able to replicate the fires reported by consumers using its dehumidifier, in a letter to MJC dated January 25, 2013, Gree took the position that the dehumidifiers need not be recalled, and that if a report to CPSC was necessary, Gree would report to CPSC directly and assume to costs of any recall should one become necessary.  Huang Deposition at 79.

As it turns out, Gree in fact was well aware of the issues involving the problems with its Gree dehumidifiers.  In 2010 Gree was aware of safety issues with dehumidifiers manufactured for GE, which GE recalled in January 2011.  GE recalled its dehumidifiers for safety issues that either were very similar to or identical to the safety issues that MJC and Gree identified in 2012 involving the Gree dehumidifiers.  There were safety issues common to both the GE

6

dehumidifiers recalled in January 2011 and the Gree humidifiers recalled in 2013.  Deposition of Yao Gang (October 23, 2014) at Pages 127-136.

Finally, after MJC's counsel asked Gree to consider a joint report to CPSC, Gree agreed and Gree and MJC submitted an initial report on March 15, 2013, and a Full Report on April 30, 2013, both under 15 U.S.C. § 2064(b).

According to the U.S. Court of Appeals for the Ninth Circuit, the Consumer Product Safety Act ("CPSA") establishes a complex regulatory framework for keeping dangerous consumer products out of the market-place…Among its most potent weapons is its reporting requirement."  *US v Mirama,* 387 F.3d 983 (9th Cir. 2004).

Gree's obligation to report to CPSC arose as soon as Gree had information reasonably supporting the conclusion that its dehumidifiers contained a defect that could create a substantial product hazard or an unreasonable risk of serious injury or death.  The CPSC reporting obligation is not dependent on a firm replicating a product failure.  It arises upon the receipt of information reasonably supporting the conclusion that a product has a defect which could create a Substantial Product Hazard or information reasonably supporting the conclusion that a product creates an unreasonable risk of serious injury or death.  15 U.S.C. § 2064(b).  Gree had this information when it had information that its dehumidifiers did not meet the UL flame retardancy requirements.

Dehumidifier fires that escape the unit are the type of information that is reportable to CPSC.  By mid-October 2012, MJC had provided Gree information about 9 fires some of which escaped the Gree dehumidifier.  The CPSC reporting obligation is not dependent upon whether a firm such as Gree did or did not have the expertise to evaluate the cause of the fires.  Indeed, CPSC admonishes firms to err on the side of caution and if in doubt about whether a report is required, report.  CPSC also makes clear that a report does not necessarily mean that a recall is required because the obligation to report is broader than the obligation to conduct a product recall.  Despite having knowledge of and having read and understood CPSC's Recall Handbook, (Huang Deposition at 87-88; Plaintiff's Exhibits 9 and 10 to Huang Deposition), Gree apparently erroneously took the position that it had to have proof of the cause of the fires before it reported.  Mr. Huang stated in response to a question about MJC urging Gree to report to CPSC that Gree waited to report until March 2013 because "[w]e did not receive sufficient proof."   Huang Deposition, at 92 (February 9, 2015).

In fact, it appears that Gree was delaying reporting to CPSC and conducting a recall for economic reasons.  In a variety of documents, it is clear that Gree appears more concerned with the cost of a recall, potential damage to its reputation, and its effect on its ability to sell humidifiers in 2012 and 2013.  See, for example, Plaintiff's Exhibits 5, 8, 13, to the Huang Deposition; Exhibit 7 to the Yao Gang Deposition.

If as Mr. Stern states, Gree acted responsibly in retaining Exponent to assist in evaluating its dehumidifiers, in my opinion Gree should not have waited nine months to do so. Rather, when Gree could not replicate fires, it took the position that the fires were the consumers fault. See, for example, GREE-CPSC0000026, GREE-OGC0000004, GREE0006680. Nonetheless, as noted above, Gree had developed a solution to the fires by September 2012 but did not offer it to consumers at that time. Exhibit 15 to Huang deposition; Huang deposition at 129-132.

Mr. Stern's evaluation of Gree's procedures identifies a number of weaknesses including its tendency "to rely upon evaluating the types most easily identified based on technical knowledge of expected failure modes and on those failures which previously occurred" rather than on "failure modes …[that] have a low likelihood of occurring and have not previously occurred in one of Gree's products." Stern Letter Report, Exhibit B at Page 18.

CPSC interpretive reporting obligations advise firms that "When in doubt, firms should report. Firms should clearly err on the side of over-reporting, rather than under-reporting." 49 Fed. Reg. at 13822. Text following 16 CFR §1115.4(e). CPSC also interprets the statutory requirement that firms report "immediately: to mean within 24 hours, after a firm has obtained information which reasonably supports the conclusion that its product contains a defect which could create a substantial risk of injury to the public or creates an unreasonable risk of serious injury or death. 16 CFR 1115.14(e). The CPSC goes on to say that firms can take a reasonable period of time to investigate, generally no more than 10 days, unless a firm can show that a longer period is reasonable. In this regard, CPSC also says a subject firm should not await complete or accurate risk estimates before reporting. 16 CFR 1115.14(c).

In interpreting the reporting obligation, the Ninth Circuit Court of Appeals has said, "Information about a *possible* defect triggers the duty to report, which in turn allows the Commission either to conclude that no defect exists or to require appropriate corrective action." (Emphasis added). *U.S. v Mirama Enterprises, Inc.* 387 F. 3d 983 (9th Cir. 2004).

The requirement that firms notify CPSC when a responsible party "obtains information which reasonably supports the conclusion that its product creates an unreasonable risk of serious injury or death is intended to require firms to report even when no final determination of risk is possible." 16 CFR 1115.6(a). The CPSC advises firms in determining whether they have a reporting obligation to consider, among other things, product liability suits and claims for personal injury or damage, information from an independent testing laboratory, complaints from a consumer, information received from other firms including information from distributors and retailers, and the severity of the risk. 16 CFR 1115. 12(f) and (g).

Stern's report on his review of Gree's safety and compliance program specifies that he (Stern) failed to talk to any Gree employees. [Stern Exhibit B at Page 7]. In my experience, companies may have excellent written programs but upon interviewing employees responsible for the implementation of the program, I have found that in a number of cases, the employees do not

follow the written procedures, are unaware of them, or have modified them in practice.  In my opinion, it is not reasonably possible to know if safety and quality procedures are followed by reviewing written documents and talking only to management officials.  Rather, it is essential to interview those employees who actually conduct or perform the written requirements to assure they are being followed.  Stern recognized this in his recommendation's 7 and 8 where he states that Gree should"[c]onduct a detailed audit of the day-to-day actions of the production and customer service departments to identify potential nonconformance with Gree's internal quality, compliance and safety requirements" and "[c]onsider revising the existing customer service process and procedures to more aggressively pursue the return of field units related to potential safety-related allegations."  Stern Report, Exhibit B, at Page 19.]

## VII.    Conclusions

- The CPSC is responsible for protecting consumers form unreasonable risks of injury associated with consumer products.
- Manufacturers are required to report to CPSC immediately if they obtain information reasonably supporting the conclusion that a product (1) has a defect which could create a substantial product hazard or (2) creates an unreasonable risk of serious injury or death.
- As early as mid-July 2012, MJC provided Gree information about certain of its dehumidifiers spontaneously igniting.
- MJC provided Gree test data documenting that its dehumidifiers did not meet UL requirements for flame retardancy and corresponded with and met with Gree representatives in September 2012 to urge them to report to CPSC.
- The CPSC reporting requirement is not dependent upon a firm establishing the root cause of a safety problem.
- In 2010, Gree was aware of safety issues with dehumidifiers manufactured for GE that were similar to or identical to the safety issues involving the Gree dehumidifiers.
- Gree's hiring Exponent to evaluate its dehumidifiers was not a reason to delay reporting to CPSC.
- Because its dehumidifiers spontaneously ignited and did not meet UL flame retardancy requirements, Gree should have reported to CPSC months earlier than it did; and the delay in reporting appears to have been motivated by Gree's financial concerns.

Alan H. Schoem
February 18, 2015

**Attachment 1**

*MJC America vs. Gree Electric Appliances, Inc. and Gree USA, Inc,* U.S. Dist. Ct. (C.D. CA)
Case No. 2:13-cv-04264-SJO-(CWx)

**Documents Reviewed**


- Defendant and Counterclaimant Hong Kong Gree Electric Appliances Sales Ltd.'s Amended Responses to Counter-Defendants' Requests for Admission, Set One.
- Defendant and Counterclaimant Gree Electric Appliances, Inc. of Zhuhai's Amended Responses to Counterdefendants' Requests for Admission, Set One.
- Deposition of Huang Hui, 2 Monday, 9 February 2015, and Exhibits
- Deposition of Yao Gang, 23 October 2014, and Exhibits
- Gree's April 11, 2014, response with attachments to CPSC's March 16, 2014, information and document requests.
- February 5, 2014, letter report from Richard Stern, Exponent to Ellen Nudelman Adler, Esq., Morrison & Foerster, LLP with attachments.
- Gree Electric Appliances Corrected Second Amended Counterclaims with Exhibits.
- Gree Zhuhai, Gree USA, and MJC America's April 30, 2013, Full Report to CPSC, with attachments.
- Gree Analysis of Exponent Metal Cover
- CRT Report
- UL Report Oct 2009 rev Dec 2012
- October 2013 Exponent Report
- November 2012 Intertek Report
- July 2013 Exponent Report
- Gree explanation of CRT Report
- Gree Analysis of Exponent Plastics Report

**Attachment 2**

ALAN H. SCHOEM
14809 Rolling Green Way
North Potomac, MD 20878

*Professional Experience*

January 1, 2012 – Present
The Law Office of Alan H. Schoem LLC
- Provides legal advice and guidance on a variety of product safety issues concerning consumer products subject to statutes and regulations administered by the U.S. Consumer Product Safety Commission

September 2004 – December 2011
Senior Vice President, Marsh USA
- Worked with companies to evaluate and establish procedures to minimize the potential for product recalls, to prepare for, implement and recover from product recalls and to understand and comply with statutory and regulatory requirements

October 1997 - September 2004
Director, Office of Compliance, U.S. Consumer Product Safety Commission
- Effectively managed the Consumer Product Safety Commission's compliance and administrative enforcement activities under all of the statutes administered by the Commission including initiating investigations of potentially defective products or products that violated mandatory safety standards and banning regulations, and seeking corrective action and civil penalties where appropriate
- Provided advice and guidance to industry on complying with all statutes and laws administered by the Commission
- Provided advice and guidance to CPSC Commissioners and staff on CPSC rules, regulations and ongoing enforcement activities
- Worked with the U.S. Department of Justice on specific CPSC investigations involving violations of CPSC statutes and regulations

October 1996 - October 1997
Executive Assistant, Office of Compliance, U.S. Consumer Product Safety Commission
- Responsible for implementing key programs of the Office of Compliance including product investigations and product recalls

March 1994 – October 1996
Detailed to the Office of Chairman Ann Brown to serve as a legal advisor providing advice and guidance on legal and policy issues.

1992-1993
LEGIS Fellow to Senator Paul Wellstone
- Participated in legislative activities of Senator Wellstone including developing position papers and statements

**Attachment 2**

October 1986 - October 1996
Director, Division of Administrative Litigation, Office of Compliance, U.S. Consumer Product Safety Commission
- Successfully managed attorneys in the Office of Compliance in pursuing product recalls through administrative litigation and pursuing civil penalties for violations of CPSC rules and regulations
- Successfully coordinated administrative and civil penalty activities with CPSC Compliance Officers and the CPSC General Counsel and staff

September 1979 – October 1986
Assistant General Counsel, Office of the General Counsel, U.S. Consumer Product Safety Commission
- Successfully managed CPSC's federal court enforcement activities in coordination with the U.S. Department of Justice
- Successfully managed and implemented CPSC's information disclosure activities and provided advice and guidance to the General Counsel, CPSC staff and Commission

June 1973 – September 1979
Attorney-Advisor, Office of the General Counsel, U.S. Consumer Product Safety Commission
- Responsible for a variety of CPSC rulemaking and enforcement activities
- Responsible for developing CPSC jurisdictional opinions
- Responsible for working with the U.S. Department of Justice in defending CPSC activities in federal court

September 1972 – June 1973
Attorney Advisor, Office of the General Counsel, General Accounting Office
- Responsible for analyzing legal issues in the area of procurement law and resolving challenges to awards of government contracts

*Bar Membership*
Maryland Bar 1973
DC Bar 1973

*Education*
J.D., 1972, American University Washington College of Law, Washington, D.C.
B.A., 1968, University of Maryland, College Park, MD

*Select Publications*

CPSC and Civil Penalties.  2012 Product Safety & Recall Directory.

Canada Consumer Product Safety Act. The New Canada Consumer Product Safety Act—Are You Prepared? Marsh Insights, 2011

**Attachment 2**

 "New Consumer Product Complaint Database Could Pose
Challenges For Consumer Product Stakeholders." - Marsh White Paper, 2011
The CPSA's Information Disclosure Rules-Myths v. Reality, 39 PSLR 145,
2/27/2011

Beware of Increased Civil Penalties for Consumer Product Violations – Are You
Vulnerable" Product Safety Letter, July 19, 2009

When is a CPSC Civil Penalty Settlement Not a Settlement? Product Safety
Letter, June 19, 2009

The Line on Lead Testing, How Much Testing is Too Much? (DeRagon and
Schoem), Playthings, April 1, 2009

 "New U.S. Consumer Product Safety Legislation Focuses on
Lead and Children's Products; Increases Civil Penalties 12-fold for Statutory and
Regulatory Violations."  Marsh White Paper, 2008

New European Union Product Recall Rules and Regulations Follow U.S. Model;
Safety of European Consumers at the Core," 33 PSLR 211, 2/21/2005

"Managing Product Recall and Defect Reporting with the
CPSC."  Marsh White Paper, 2005

Preparing For and Conducting a Product Recall, 33 PSLR 107, 1/24/2005.
Harvard Business Review Case Study - When No News is Good News, 79 HBR
No. 4 at 39 (April 2001)


**Select Presentations**

Webinar, The Evolving CPSC—How Developments Affect You, Product Safety Letter, May
20, 2014

Webinar, Product Recalls Under the CPSIA, Saint Louis University Product Safety
Management Course, May 8, 2014).

International Consumer Product Health and Safety Organization (ICPHSO), March, 2013

   Panel participant: ABA Law Day: Recalls through Administrative Litigation: When
   Recalls are Not 'voluntary'

International Consumer Product Health and Safety Organization (ICPHSO), March, 2012

   Panel participant: CPSIA, CCPSA and European – Assembly of your Technical Files and
   Documentation Requirements.

**Attachment 2**

Panel Participant: Risk Management: True Risk vs. Myth

DRI's Strictly Retail Seminar, Chicago, IL May 12, 2011

International Consumer Product Health and Safety Organization ICPHSO), February 23, 2011, "Product Recalls:  Are They Necessary?"  Orlando, FL

The Compliance and Practical Solutions for Industry Approach to the Consumer Product Safety Improvement Act (The CPSIA to the CPSIA), DRI Las Vegas, NV April 2010

Association of Corporate Counsel, The Consumer Product Safety Improvement Act of 2008, October 19, 2009 Boston, MA

Product Safety: Understanding the 'Made in China' Brand, The Asia Society, April 28, 2008

DRI Children's Products SLG, Update on Increasing Civil and Criminal Penalties For Failure to Report Product Hazards: A View From Both Sides, April 16, 2005, Los Angeles, CA

**Memberships**
International Consumer Product Health and Safety Organization
ASTM F963

Schoem Deposition Testimony

Attachment 3

*Othon, JR., et al. v. The Bon Ton Department Stores,* United States District Court for the Southern District of Iowa, Central Division, Civil Action No. 4:11-cv-0039-RP-CFB (Deposition July 24, 2013)

*Guadarrama v. Larin Corporation and Tractor Supply Company*, Case No. 11CZ470, In the Sixth Circuit Court for Davidson County, Tennessee at Nashville (Deposition September 19, 2013)

*Worthington Cylinder Corporation v Schrader International Corporation*, Case No. 2:12-cv-554, United States District Court, Southern District of Ohio, Eastern Division (Deposition 12/12/2013)

*Hillerich & Bradsby v. Charles Products, Inc.* United States District Court for the Western District of Kentucky, 3:13-CV-00978-CRS.  (Deposition (Deposition January 29, 2015)

EXHIBIT B



**Failure Analysis Associates®**

Exponent
4580 Weaver Parkway
Suite 100
Warrenville, IL 60555

telephone 630-658-7500
facsimile 630-658-7599
www.exponent.com

February 5, 2015

Ellen Nudelman Adler, Esq.
Morrison & Foerster, LLP
12531 High Bluff Drive, Suite 100
San Diego, California  92130

Subject:   Gree Dehumidifier Matter – Expert Opinions
Exponent Project No. 1500606.000

Dear Ms. Adler:

You retained Exponent, Inc. (Exponent) to provide an expert opinion regarding the actions of your client, Gree Electric Appliances (Gree), with regard to several aspects of their investigation into alleged failures of dehumidifiers manufactured by Gree and exported to the United States (U.S.), and their subsequent product recall negotiations and recall implementation. Specifically, you requested that we review the following:

1. Gree's decision to retain outside expert assistance in replicating the alleged dehumidifier failures;
2. Gree's decision to negotiate a U.S. Consumer Product Safety Commission (CPSC) - approved corrective action plan and implement a recall of the affected dehumidifiers;
3. Gree's decision to retain Stericycle to assist in the administration of the CPSC-approved recall and associated corrective action plan; and
4. Gree's decision to retain an outside expert to conduct an independent review of their safety/compliance management program.

**Executive Summary**

Based on my knowledge of this matter from reviewing documents, discussions with Gree employees, and my experience, education, background and expertise in the area of product and process safety management as well as in consumer product safety regulatory interpretation, enforcement and compliance, it is my expert opinion that:

1. Gree acted in a manner consistent with best industry safety management practices when they retained Exponent to assist in a very complex and difficult to replicate product failure analysis that was technically beyond their previous experience;

1500606.000 - 1518

Ellen Nudelman Adler, Esq.
February 5, 2015
Page 2

2. Gree acted in a manner consistent with best industry safety management practices in working cooperatively with the staff of the CPSC to develop and implement an acceptable corrective action plan;

3. Gree acted in a manner consistent with best industry safety management practices when they hired Stericycle, a globally-recognized product recall service company with many years of experience implementing a wide variety of product recalls, to provide expert assistance in the implementation of the CPSC-approved corrective action plan and recall; and

4. Gree acted in a manner consistent with best industry safety management practices when they hired Exponent to conduct an independent review of their safety/compliance management programs to identify areas for possible improvement and provide recommendations on possible methods for improvement.

The opinions presented herein are made to a reasonable degree of professional certainty. My services for this work are billed at a rate of $320 per hour.

## 1.  Expert Qualifications

My Curriculum Vitae is attached as Exhibit A.  My opinions regarding the conduct of Gree are based on my experience, education, background, and expertise in the area of product and process safety management as well as in consumer product safety regulatory interpretation, enforcement, and compliance. I have been directly involved in all aspects of product and process safety management, as both a manufacturer and as a regulator.

I am currently employed at Exponent as a Manager in their Mechanical Engineering Practice. I have previously been employed as a General Engineer by the United States Department of Energy (DOE), as a Senior and Supervisory Compliance Officer by the CPSC, and as a Senior Product Safety Manager by Whirlpool Corporation. I am regularly requested by the John Cook School of Business at Saint Louis University to present workshops and seminars on Developing Effective Product Safety/Compliance Management Programs as part of their Center for Supply Chain Management Studies advanced training courses. I have also been requested by the National Transportation Safety Board to testify before them on CPSC regulations and enforcement as part of an investigation into a fire onboard a cargo plane, suspected to be caused by notebook computer batteries.

I have a Bachelor of Electrical Engineering from the Georgia Institute of Technology and passed the Engineer in Training exam[1] in Georgia in 1990. I am currently a member of the Institute of Electrical and Electronic Engineers (IEEE), the American Society of Safety Engineers (ASSE), and the International Consumer Product Health and Safety Organization (ICPHSO).

---

[1] The Engineer-in-Training exam, as it was called in 1990, is currently referred to as the Fundamentals of Engineering exam.



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 3

While working at the DOE, I was a headquarters program manager responsible for overseeing Electrical Safety, Training and Qualifications, Occupational Safety and Health, and other operational programs necessary for the safe operation of a large manufacturing complex in Tennessee. One of my duties was to participate in the investigation of onsite incidents and work with the operating contractor to develop effective and appropriate corrective actions. I was the headquarters approval authority for those corrective action plans.

While working at the CPSC, I personally conducted hundreds of alleged product safety defect investigations. I reviewed the product design and manufacturing processes of many of the largest consumer product companies in the United States. I negotiated product recalls and corrective action plans to minimize the risk to the public, and minimize the likelihood that the issue(s) leading to the recall would be repeated by that company. I was also closely involved in thousands of investigations conducted by the Compliance Officers who reported to me. In addition to the thousands of consumer product recalls I was directly and indirectly involved with, I also conducted thousands of additional product safety defect allegation investigations which did not result in a product recall.

While working at Whirlpool, I was their global product safety manager for innovation products and also their global safety manager for corporate product safety training. I was responsible for developing appropriate training materials, setting global product safety training schedules, and conducting training for Whirlpool employees around the world to ensure their understanding of Whirlpool's corporate product safety program and processes. I conducted more than ten training sessions every year for Whirlpool employees throughout the U.S. and I trained four regional trainers to conduct training outside of the U.S. when I was not available to teach or assist. I was responsible for ensuring that all new product categories (referred to by Whirlpool as "innovation products") investigated by Whirlpool were thoroughly reviewed for potential safety concerns. I participated in all aspects of product hazard identification, hazard evaluation, and hazard mitigation, while ensuring that Whirlpool engineers adhered to the company's corporate product safety process.

Although I have worked in the area of product and process safety for almost twenty years, I have only recently been in a position to be able to provide expert testimony in litigation matters. The first seventeen years of my professional career was with the United States federal government and was never involved in a matter associated with civil litigation. Since leaving federal service I have been retained as an expert on multiple occasions; however, thus far, all of these cases settled prior to trial, and only a single case[2] has proceeded far enough to require my deposition as an expert witness. In that case I am retained to review the available information and provide an expert opinion regarding the company's compliance with applicable product safety standards and regulations, including the Consumer Product Safety Act.

---

[2] Case No. 2012 CA 292, Division K in the Circuit Court in and for Escambia County, Florida – Darian Bunch, a minor, by Sherri Bunch and Lawrence Bunch as Natural Guardians and next friends, and Darian Bunch v. Kung Hsue She, Inc., KHS Bicycles, Inc., Free Agent BMX and Cycle Sports of Pensacola, Inc. d/b/a Cycle Sports Bicycles



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 4

While I have prepared and provided numerous presentations on the CPSC, its regulations and
regulatory enforcement, and product safety management, I have not yet published any articles
pertaining to these matters.

## 2.  Case Background

Gree became aware of safety allegations pertaining to dehumidifiers they manufactured and
exported to the United States. Specifically, Gree received reports involving allegations of fire
damage due to the failure of their dehumidifier. Gree undertook an investigation into the
allegations and was unable to replicate the alleged failures in their laboratory. Gree
subsequently retained Exponent to provide expert engineering assistance in the forensic
evaluation of field units and the development and conduct of creative laboratory simulations of
the alleged failures.

As Gree's investigation progressed they determined that there was a sufficient basis to warrant a
consumer-level product recall of the affected dehumidifiers. Gree worked cooperatively with the
CPSC staff to develop an acceptable corrective action plan. Gree also retained Stericycle to
provide expert recall assistance in implementing the CPSC-accepted corrective plan. Subsequent
to the recall announcement, Gree again retained Exponent, this time to conduct an independent
review of their product safety process and identify any areas for possible improvement.

## 3.  Opinions

### A.  Gree's Internal Technical Expertise

According to Gree's website,[3] the company was founded in 1991 and is "the world's largest
specialized air conditioning enterprise which has integrated R&D, manufacturing, marketing
and service." The website additionally states that "Gree is committed to providing global users
with high-tech and high quality products." A company such as Gree that has expertise in
designing and manufacturing high quality products might automatically be considered by some
to also have expertise in product failure investigation, forensic engineering and forced failure
testing[4] of the products they design and manufacture. In fact, product failure investigation,
forensic engineering and forced failure testing is a very different and complex process compared
to designing and manufacturing a product. Becoming proficient, let alone expert, in product
failure investigation, forensic engineering and forced failure testing requires a significant
amount of experience and practice with a wide range of products and product failure modes.

---

[3] www.gree.com.cn

[4] Forced failure testing refers to the process of producing (forcing) a product to failure in a worst-case condition in
    order to observe the effects and potential safety ramifications of such a failure.



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 5

Unless a manufacturer is frequently investigating product failure allegations and performing an associated root cause analysis and forced failure testing, a manufacturer may have very limited experience and practice in these matters. There is frequently an inverse relationship between a company designing and manufacturing quality products and the quantity of product failure investigations, forensic engineering and forced failure testing the company performs. On the other hand, Exponent has been performing product failure investigations, forensic engineering and forced failure testing for decades, and has done so in a wide variety of industries and with a wide array of products.

Gree attempted to use their expertise in designing and manufacturing dehumidifiers to investigate the alleged failures reported to them. Because they did not have a lot of experience in this area, their attempts to replicate the reported failures were unsuccessful.

B.  Gree's Retention of Exponent

When Gree found itself unable to replicate the reported failure, it is my expert opinion that they acted in a manner consistent with best industry safety management practices by seeking outside expertise to assist in replicating the reported failures and enabling Gree to complete its root cause analysis and develop appropriate corrective actions. Gree provided Exponent with design and manufacturing details for the dehumidifier models associated with the reported failures. They also provided Exponent with incident units as well as exemplar units for testing. Because of Exponent's significant experience and expertise in forensic engineering and forced failure testing, Exponent was able to develop a failure theory and devise a method of generating a product failure while bypassing the dehumidifier safety devices. After considerable effort, Exponent completed its investigation and reported their findings and recommendations to Gree.[5] Upon reviewing Exponent's report and discussing the results internally and with the associated Exponent staff, Gree determined that the information available to them regarding the reported dehumidifier failures warranted a product recall, and in my expert opinion Gree acted in a manner consistent with best industry safety management practices by determining that a voluntary recall of the affected dehumidifiers was warranted.

C.  Gree's Recall Program Development and Implementation

Once Gree determined that a recall of affected dehumidifiers was warranted, it is my expert opinion that Gree proceeded in a manner consistent with best industry safety management practices by working cooperatively with the CPSC staff to develop an acceptable corrective action plan for a voluntary recall. As Gree had no prior experience developing and implementing a product recall, it is my expert opinion they acted in a responsible manner by relying upon the guidance provided by CPSC and Exponent staff. It is my expert opinion that Gree continued to act in a manner consistent with best industry safety management practices by retaining Stericycle to assist with the implementation of the recall program.

---

[5] Exponent report *Gree Dehumidifier Investigation*, Exponent Project No. 1303054, dated July 19, 2013



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 6

D.  Gree's Retention of Stericycle

Stericycle, an expert recall service provider, has been assisting businesses to "protect people and brands, promote health, and safeguard the environment[6]" since 1989. Stericycle began its operation concentrating on disposal services for medical and biohazardous waste. They operate medical waste services in eleven countries,[7] and as such, have significant expertise researching, interpreting and complying with international safety regulations. Stericycle created their ExpertSOLUTIONS division to expand their service offerings to include manufacturers of durable goods and consumer goods and to "provide customized solutions to maintain brand integrity either proactively for quality assurance or reactively in recall situation.[8]"

I have had the opportunity to work with Stericycle while I was working at the CPSC. They were retained by multiple firms to assist in the development and implemention of corrective action plans and product recalls I was negotiating on behalf of the CPSC. My experience with Stericycle has been positive and I've observed the extensive breadth and depth of their recall services. It is my expert opinion that Gree acted in a manner consistent with best industry safety management practices by retaining Stericycle to assist in the dehumidifier recall.

E.  Safety/Compliance Program Review

After Gree obtained CPSC approval for their corrective action plan, and Gree successfully implemented the recall with the expert assistance of Stericycle, Gree took the additional proactive step of retaining the services of an outside expert in product and process safety management. Gree retained my services through Exponent to perform an independent evaluation of their product and process safety management programs. I had the opportunity to review Gree's safety-related policies, procedures and processes, visit their manufacturing facility in Zhuhai, China and meet with personnel directly involved in their dehumidifier design, testing, manufacturing and failure investigation programs. At the conclusion of my review I prepared a report of my evaluation, which included my conclusions and recommendations. This report is dated January 9, 2014, and titled *Gree Humidifier Matter – Compliance Program Review*. Gree acted proactively, and in my expert opinion, acted responsibly and in a manner consistent with best industry safety management practices in seeking out an independent review of their safety/compliance management program and in quickly seeking to identify and implement safety program improvements. This report incorporates by reference my January 9, 2014 report, provided as Exhibit B.

Based on my experience, education, background and expertise in the area of product and process safety management as well as in consumer product safety regulatory interpretation, enforcement and compliance, it is my expert opinion that:

---

[6] www.stericycle.com

[7] United States, United Kingdom, Ireland, Canada, Mexico, Brazil, Argentina, Chile, Romania, Spain, and Portugal

[8] www.stericycle.com



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 7

1. Gree acted in a manner consistent with best industry safety management practices when they retained Exponent to assist in a very complex and difficult to replicate product failure analysis that was technically beyond their previous experience;

2. Gree acted in a manner consistent with best industry safety management practices in working cooperatively with the staff of the CPSC to develop and implement an acceptable corrective action plan;

3. Gree acted in a manner consistent with best industry safety management practices in retaining the services of Stericycle to assist in the implementation of the CPSC-approved dehumidifier recall program; and

4. Gree acted in a manner consistent with best industry safety management practices in retaining the services of an outside expert in safety/compliance program management to conduct a review their systems and offer recommendations on areas for possible improvement.

## Limitations

At the request of Morrison & Foerster, LLP, Exponent reviewed information pertaining to Gree's investigation into reported dehumidifier failures and their subsequent recall actions. The limited scope of services performed during this evaluation may not adequately address the needs of other users of this report, and any reuse of this report or its findings, conclusions, or recommendations is at the sole risk of the user. The opinions and comments formulated during this evaluation are based on observations and information available at the time of the evaluation. The ultimate responsibility for the design, manufacture, performance, compliance, and safety of Gree's products lies completely with Gree.

The findings presented herein are made to a reasonable degree of professional certainty. Exponent has endeavored to be accurate and complete in the assignment. If new data become available or there are perceived omissions or misstatements in this report, we ask that they be brought to our attention as soon as possible so that we have the opportunity to address them.

If you have any questions or require additional information, please do not hesitate to contact Exponent.

Sincerely,

*Richard S. Stern* (signature)

Richard L. Stern
Manager
Mechanical Engineering Practice

Ex™

## Exhibit A

**Cirriculum Vitae of**
**Richard L. Stern**



**Failure Analysis Associates®**

Exponent
4580 Weaver Parkway
Suite 100
Warrenville, IL 60555

telephone 630-658-7500
facsimile 630-658-7599
www.exponent.com

## Richard L. Stern
**Manager**

### Professional Profile

Mr. Richard Stern is a Manager in Exponent's Mechanical Engineering practice. Mr. Stern specializes in evaluating and developing management systems and processes intended to design, manufacture, import, distribute, and sell safe products. He has 23 years of experience enforcing or complying with local, state, federal and international laws and regulations pertaining to product and personnel safety, including 6 years with Whirlpool Corporation and 10 years with the U.S. Consumer Product Safety Commission.

As a Senior Manager with Whirlpool Corporation's Global Product Safety Department, Mr. Stern taught employees around the world about the firm's product hazard management systems and how to properly use them. Mr. Stern also provided daily product safety and compliance advice and guidance to Whirlpool staff involved in developing and manufacturing new or innovative products.

As a Senior Compliance Officer and Associate Director for the U.S. Consumer Product Safety Commission's Recalls and Compliance Division, Mr. Stern conducted investigations into potential consumer product safety hazards, performed risk assessments, and negotiated corrective action plans in accordance with the Consumer Product Safety Act and other regulations under the agency's jurisdiction.

### Academic Credentials and Professional Honors

B.E.E., Electrical Engineering, Georgia Institute of Technology, 1990

### Presentations

Stern RL. Product safety program development workshop. Saint Louis University, John Cook School of Business, 2013.

Stern RL. Developing a product safety program. Saint Louis University, John Cook School of Business, 2013

Stern RL. Guest Instructor – "Building product safety into manufacturing," and "Developing a product safety program. Saint Louis University Center for Supply Chain Management Studies, 2011–present.

Stern RL. Panelist – "Introduction to the Consumer Product Safety Commission, Consumer Product Safety Act, and the Consumer Product Safety Improvement Act of 2008," American Bar Association Inaugural Consumer Products Subcommittee Meeting, September 17, 2009.

09/13

Stern RL.  Health & safety issues.  U.S. Patent & Trademark Office – Global Intellectual
Property Academy, July 11, 2007.

Stern RL.  Enforcement of intellectual property rights.  U.S. Patent & Trademark Office –
Global Intellectual Property Academy, June 15, 2007.

Stern RL.  CPSC program updates and status.  Lighter Association Annual Meeting, May 16,
2007.

Stern RL.  Recalls process – From case building to CAP.  International Consumer Product
Safety Organization Conference, April 2007.

Stern RL.  Battery investigations & recalls, codes & standards.  24th International Battery
Seminar, March 19, 2007.

Stern RL.  CPSC – Who we are, what we do, how we do it.  Consumer Electronics Association
Technology and Standards Forum, February 27, 2007.

Stern RL.  U.S. Consumer Product Safety Commission Electronics and Appliance Safety
Symposium, Shanghai, China, October 16, 2006.

Stern RL.  Electronics and appliances safety symposium.  Hong Kong Electronics Fair, October
14, 2006.

Stern RL.  CPSC-negotiated battery recalls.  Lithium Battery Technical/Safety Group,
September 6, 2006.

Stern RL.  CPSC compliance overview.  U.S. Customs and CPSC Regulations with Joint
Enforcement-Product Surveillance and Ports.  International Consumer Product Safety
Organization Conference, May 9–12, 2006.

Stern RL.  Battery safety and consumer product recalls.  23rd International Battery Seminar,
March 13, 2006.

Stern RL.  Carbon monoxide hazards and investigations.  New York City Office of Coroner and
Medical Examiner, July 26, 2005.

**Prior Experience**

- Senior Manager, Whirlpool Corporation, Global Product Safety Department, 2007–2013
- Associate Director, U.S. Consumer Product Safety Commission, Recalls and
  Compliance Division, 1998–2007
- General Engineer, U.S. Department of Energy, Defense Programs, 1990–1998



**Academic Appointments**

- Visiting Instructor, Saint Louis University, John Cook School of Business, 2011–present

**Professional Affiliations**

- Institute of Electrical and Electronics Engineers (member)

E$^x$ ™

## Exhibit B

## Exponent Report of
## January 9, 2015



**Failure Analysis Associates®**

Exponent
4580 Weaver Parkway
Suite 100
Warrenville, IL 60555

telephone 630-658-7500
facsimile 630-658-7599
www.exponent.com

January 9, 2014

Ellen Nudelman Adler, Esq.
Morrison & Foerster, LLP
12531 High Bluff Drive
Suite 100
San Diego, California  92130

Subject:    Gree Dehumidifier Matter – Compliance Program Review
            Exponent Project No. 1305806.000

Dear Ms. Adler:

At your request, on behalf of Gree Electric Appliances ("Gree"), Exponent Failure Analysis Associates ("Exponent") conducted a reliability and safety/compliance program review related to Gree dehumidifiers.  This limited review was focused on Gree's programs, processes and procedures associated with dehumidifier design and manufacture, and was based on a review of available documentation as well as onsite meetings at Gree's facilities in Zhuhai, China.  Based on the review completed to date, which is detailed below, we have reached the following conclusions:

1.  Gree management is committed to fostering a culture that embraces product reliability, compliance and safety.

2.  Gree has a comprehensive set of policies, procedures and worker aides addressing important aspects of the design and manufacturing process.

3.  Gree has policies, procedures and requirements for the collection and investigation of post-sale field complaints, but has to rely on their foreign agents to adhere to those requirements and to inform Gree of potential field issues.

4.  Gree's combined approach toward addressing reliability, compliance and safety has been effective in minimizing reliability and compliance issues, but might not maximize the potential to identify very low likelihood safety-related failures with potentially unacceptable severity levels.

5.  Gree's existing reliability, compliance and safety program provides a well-established and effective framework from which to build upon to incorporate changes to further minimize potential safety risks associated with their products.

Ellen Nudelman Adler, Esq.
January 9, 2014
Page 2

6. Gree should consider implementing internal audits (or utilize external auditors) of their production and customer service departments to identify potential nonconformance to their internal quality, compliance and safety program.

7. Gree should consider revising the existing customer service process and procedures to more aggressively pursue the return of field units related to potential safety-related allegations.

## Background

According to Gree's website, Gree Electric Appliances, Inc. of Zhuhai was founded in 1991, and represents the largest air conditioner enterprise that integrates R&D, manufacturing, marketing and services globally.

Gree has nine production facilities located in Zhuhai, Chongqing, Hefei, Zhengzhou, Wuhan, Shijiazhuang, Brazil, Pakistan and Vietnam with an annual production capacity of 60 million residential air conditioners (RAC) and 5.5 million commercial air conditioners (CAC). With more than 200 million users globally, Gree is reportedly the largest RAC manufacturer in the world in terms of sales volume since 2005.

In addition to Gree's experience in the residential air conditioner market, they also design and manufacture a wide array of other consumer products, including:

- dehumidifiers
- air purifiers
- electric fans
- electric heaters
- water dispensers
- induction cookers
- rice cookers
- kettles

Prior to 2013, Gree reportedly had not identified any product safety issues associated with their product line that would have presented a substantial product hazard necessitating a product recall. In 2013, however, Gree conducted a voluntary product recall of certain dehumidifiers in both the United States and Canada.

As part of Gree's dehumidifier investigation, they sought to identify any technical and programmatic changes necessary to properly address the recalled products and to minimize the likelihood of any similar safety-related issues occurring in the future.

Exponent was retained to assist Gree in their investigation to provide technical support in identifying the most likely root cause(s) of the reported dehumidifier failures and to evaluate the



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 3

role(s) of engineering changes over time in the event of a product failure. They also retained Exponent to provide support in identifying and addressing any safety program weaknesses which could have contributed to the dehumidifier recall and to assist Gree in their process improvement efforts.

This report solely addresses the review of Gree's safety program related to dehumidifiers and does not address any specific technical issues associated with the recalled dehumidifiers.

## Gree's Dehumidifier Product Safety/Compliance Program

The review of Gree's current product safety/compliance program was conducted through a combination of a document review, a facility site visit, and discussions with both Gree management and staff, and addresses the design process, production process, and post-production process. The documents reviewed included a broad range of policies, procedures, checklists, assembly aides and standards. The list of available documents that were reviewed includes:

1. QC1200.03-02 Product Risk Management (English)
2. QG0302.03-04 Product Development Management (English)
3. QC0600.05-02 Product Sampling Test Management (English)
4. QC0203.01-05 Product Certification Control Management Measures (English)
5. Gree Product Safety Issues Handling Procedure (English)
6. Design Checklist (English)
7. CKB-SHZ-201203—01 Overseas Sales Agent Monitoring and Management Regulations (English)
8. GX110560_01_GDN100AM-A3EBA1A Process Audit Document Pack in Sample Evaluation Phase (Chinese)
9. GX110560 US Dehumidifier GDN100AM-A3EBA1A Testing Summary (Chinese)
10. GX110560-US New 100 pint Dehumidifier GDN100AM-A3EBA1A-Check List for High Risk Problems in Controller (Chinese)
11. GX1105600.1_GDN100AM-A3EB1A_Approval Form for Sample Evaluation of Display Board D10803 and PCB GRJ108-B 6-2 (Chinese)
12. Product Testing Checklist and Summary for Audited Problems – GX110560.01_GDN100AM-A3EBA1A_Evaluation (Non-inverter) (Chinese)
13. GX110560 01_GDN100AM-A3EBA1A New development 100p dehumidifier review application form for North America export (Chinese)
14. GX110560 Export for North America New 100pint dehumidifier display board D10803 and PCB board GRJ108-B etc. electric controller inspection form- 1 (Chinese)



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 4

15. GX110560 GDN100AM-A3EBA1A dehumidifier export for North America test information collection (Chinese)

16. GX110560.01 certification application form (Chinese)

17. GX110560.01 GDN100AM-A3EBA1A dehumidifier export for North America production document(Lambda QXA-A081xL130A) (Chinese)

18. GX110560.01 GDN100AM-A3EBA1A dehumidifier export for North America specification (Chinese)

19. GX110560.01 GDN100AM-A3EBA1A dehumidifier export for North America standardization inspection report (sample) (Chinese)

20. GX110560.01_display board D10803 and PCB board GRJ108-B of 100 pint dehumidifier for North America electric controller inspection form-2 (Chinese)

21. GX110560_GDN100AM-A3EBA1A electric controller matching declaration form (Chinese)

22. GX110560.01_GDN100AM-A3EBA1A intellectual property rights inspection form (Chinese)

23. GX110560.01_GDN100AM-A3EBA1A plan review patent inspection report (Chinese)

24. GX110560.01 GDN100AM-A3EBA1A Certification inspection report (Chinese)

25. "GX110560.01-GDN100AM-A3EBA1A New product trail produce information feedback" (sic) (Chinese)

26. GX110560.01-GDN100AM-A3EBA1A Printing materials inspection form (Chinese)

27. GX110560_01_GDN100AM-A3EBA1A sample crafts reviewing inspection information collection form (Chinese)

28. GX110560_2012 100pint dehumidifier export for North America 2012 development plan (Chinese)

29. Need to make improvement questions record (Chinese)

30. Procedure record (Chinese)

31. GX110560_01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier product design plan confirmation letter (Chinese)

32. GX110560_01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier raw material cost inspection form (Chinese)

33. 100 pint dehumidifier key questions form during the process of development (Chinese)

34. 2012 plan-new 100 pint dehumidifier export for North America_SM0 0314447 (Chinese)

35. GX110560.01_GDN100AM-A3EBA1A electric controller matching declaration form (Chinese)

36. GX110560.01_GDN100AM-A3EBA1A electrical reviewing report (Chinese)



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 5

37. GX110560.01_GDN100AM-A3EBA1A packaging inspection form (Chinese)
38. GX110560.01_GDN100AM-A3EBA1A technical service manual information integrality (sic) inspection form (Chinese)
39. GX110560.01_GDN100AM-A3EBA1A_100P dehumidifier new design standard man-hours inspection (Chinese)
40. GX110560.01_GDN100AM-A3EBA1A printing material inspection form (Chinese)
41. GX110560.01_GDN100AM-A3EBA1A New development 100 Pint dehumidifier design summary report (Chinese)
42. GX110560.01_GDN100AM-A3EBA1A sample evaluating craft inspection data summary (Chinese)
43. GX110560.01_GDN100AM-A3EBA1A_Ne development 100 pint dehumidifier new design and improved design, new technology application inspection form (Chinese)
44. GX110560.01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier contents of inspection documents (Chinese)
45. GX110560.01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier customized requirements inspection form (Chinese)
46. GX110560.01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier key components matching space form (2D drawing) (Chinese)
47. GX110560.01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier muti-mold (sic) and cavity parts inspection summary (Chinese)
48. 22_GL03_001-02-Abnormal quality problem's handling procedure and requirements feedback by after sales service (Chinese – flowcharts)

The documents reviewed demonstrate a comprehensive and detailed program to design and manufacture dehumidifiers with a heavy focus on reliability and regulatory/standards compliance. In its current form, product safety evaluations are integrated into this program to create a single process used for the reliability, compliance and safety system.

## Gree's Design Process

Compliance, reliability and safety are most effectively controlled during the design process. If a product is designed with a focus toward achieving compliance with applicable regulations and standards and reasonably maximizing reliability and safety, the production and post-production processes can then be used for verification and feedback of the design assumptions. A general outline of Gree's overall design process is summarized as follows:

1. Applicable laws, industry standards, internal standards and customer requirements are identified and provided to the project team by the responsible departments.



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 6

2. The project team reviews the design plan with the Chief Engineer and any changes are incorporated.

3. The structure of the product is designed and the necessary components are identified.

4. If necessary, new tooling is designed and built.

5. Prototype is manufactured and assembled.

6. Prototype is tested to all previously identified requirements (regulatory, reliability, safety, customer-supplied, and any other applicable product requirements).

7. Any issue associated with product compliance or performance is evaluated and corrections are incorporated.

8. A revised prototype is subsequently manufactured and assembled.

9. Any non-compliant tests are repeated and any additional testing is performed.

10. Any issue associated with product non-compliance or performance is evaluated and corrections are incorporated to address these non-compliant areas.

11. The project team reviews the prototype product and any design revisions with the Chief Engineer.

12. If approved by the Chief Engineer, an application for third-party certification is prepared and submitted. If the product and design are not approved by the Chief Engineer, necessary changes are incorporated and an application for third-party certification is prepared and submitted.

13. Pilot production commences and assembled products are tested for compliance with previously-identified requirements.

14. Any issue with product compliance or performance is evaluated and corrections are incorporated, as necessary.

15. Pilot production resumes with corrections incorporated and testing is repeated to verify that the corrections incorporated resolved previously non-compliant test results.

16. If any additional issues are identified at this time, modifications are incorporated and the testing process is repeated until the pilot production process results in compliant products. Once pilot production results in compliant products, a final evaluation is conducted by the Chief Engineer.

17. Any necessary changes are incorporated; if no changes are necessary, the product is approved for high volume production.

For any system to function as intended, the responsible people must be aware that a system is in place, understand the system, and use the system correctly. As indicated by the depth and breadth of the system documents previously identified, Gree has created and documented a formalized system to design and manufacture products which are expected to comply with

$E^x$™

Ellen Nudelman Adler, Esq.
January 9, 2014
Page 7

applicable regulations, standards and expectations while minimizing the potential for quality, reliability or safety issues. Gree has developed new employee training and an Employee Manual that creates awareness of this system. Through its Employee Manual and training, Gree provides clear notification to all employees that reliability and safety is critically important to the company and that all employees are required to report any such issues they may encounter. Any attempt by a Gree employee to intentionally avoid these issues can result in employee discipline, up to and including termination of employment. The message is reinforced to the employees throughout the workplace via the use of posters, signage and other messaging systems championing quality and safety. While it is important to have clearly defined employee requirements regarding safety-related issues, those policies are ineffective if they are not enforced. Although Exponent did not have the opportunity to interview random employees in the plant, we were informed that employees have been disciplined for failure to fully comply with Gree's policy on safety. This provides a clear and strong message that the staff's safety responsibilities are important and are being enforced by Gree's management team.

Gree's product design process begins with the identification of the applicable laws, regulations, codes, industry standards, internal standards and customer-specific requirements. To assist in this process, Gree has a Corporate Management department which is responsible for keeping track of global regulations and industry standards and updating Gree's internal standards accordingly to ensure that compliance with Gree's standards will result in compliance with the applicable regulations and industry standards. This same group is responsible for incorporating any "lessons learned" changes to internal standards identified by Gree's Quality or Safety departments.

Once Gree's technical department obtains the full list of requirements for a specific product, they begin the design process. Per Gree's policy, as part of the design phase of product development, the technical department "should list main components and their design plans, including the function, performance, reliability, serviceability, safety, indemnification and so on and should give full consideration to their impact on the product safety, compliance and quality; and should do hazard evaluation on anticipated use and find all potential failure modes and analyze the outcomes."[1] Furthermore, Gree's process department "is responsible to evaluate the manufacturing, packaging and storage of the products and list impacts from all relevant manufacturing process, transportation, storage process and environment; to identify key impact on consumer safety, such as pollution from foreign matters, chemical and biological pollution and so on; to find all potential failure modes and to analyze the possible outcomes."[2]

---

[1] Gree's supplied translation of QG1200 03-02 *GREE Electric Appliances Inc., of Zhuhai, Management Criterion. System Running and Assessment Management Criterion. Product Risk Assessment Management Rules. Page 8. Number 1.*

[2] Gree's supplied translation of QG1200 03-02 *GREE Electric Appliances Inc., of Zhuhai, Management Criterion. System Running and Assessment Management Criterion. Product Risk Assessment Management Rules. Page 8. Number 2.*



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 8

Once the product design has been completed and approved by the Chief Engineer, a prototype is
produced and evaluated for compliance with respect to the previously identified requirements.
Gree has the laboratory capabilities to conduct all of the necessary testing in-house.  They
conduct a complete analysis of incoming materials to determine compliance with global
regulations such as the Federal Hazardous Substances Act (FHSA) and the Restriction of the
Use of Certain Hazardous Substances in Electrical and Electronic Equipment (RoHS).  Gree's
laboratories conduct testing to determine compliance with the applicable industry standards and
any additional customer-specific requirements.  All of Gree's products exported to the United
States are Underwriter's Laboratories (UL) Listed and their laboratory is UL accredited.

Based on their prior experience and knowledge gained through their interaction with other
manufacturers, customers and technical organizations, Gree has developed additional internal
standards which, where determined to be appropriate, go beyond the minimum requirements of
the industry standards.  Including these additional internal requirements is likely to increase the
cost and time to market of their products, but where Gree has determined that meeting the
industry standard alone does not meet their corporate expectations for reliability, performance
and safety of their products, they accept these additional cost and time burdens.  Some of the
areas where Gree has developed more stringent internal standards related to their dehumidifier
and other products include:

1. Fan blade life testing
2. Salt spray testing
3. Burn testing
4. Testing protocol for unit operation representing a range of low refrigerant conditions
   (developed recently in response to the recall investigation)

Another critical aspect of Gree's design process is their risk assessment process.  As
summarized in Gree's program documents, after all potential failures have been identified,
"these failures need to be evaluated according "Affiliate 4: Severity Scoring Standard",
"Affiliate 5: Occurrence Scoring Standard", "Affiliate 6: Difficulty of being tested Scoring
Standard"; and need to be recorded into "Affiliated Chart 1: Failure Mode and Impact Analysis
Chart" and relevant failure mode, outcome, severity, occurrence, difficulty of being tested,
current control methods should be recorded."[3]

Gree performs a Failure Mode and Effects Analysis (FMEA) for each product.  The FMEA is
used to identify the potential failure modes for the product being designed and manufactured.  A
critical aspect of the FMEA is the evaluation of the risk associated with each potential failure
mode.  Gree uses the Risk Priority Number (RPN) methodology and their past experience and

---

[3]  Gree's supplied translation of QG1200 03-02 *GREE Electric Appliances Inc., of Zhuhai, Management Criterion.
   System Running and Assessment Management Criterion. Product Risk Assessment Management Rules. Page 9.
   Number 3.3.4.*



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 9

engineering judgment to rate each potential failure according to three rating scales: Severity, Likelihood, and Testability.

Gree's Severity Scoring Standard has a range of failure severities, and is scored as follows:

| IMPACT | SCORE |
|---|---|
| None | 1 |
| Very Minor | 2 |
| Minor | 3 |
| Very Low | 4 |
| Low | 5 |
| Moderate | 6 |
| High | 7 |
| Very High | 8 |
| Hazardous-with warning | 9 |
| Hazardous-without warning | 10 |

Gree's Occurrence Scoring Standard has a similar range:

| OCCURRENCE | SCORE | FAILURE % |
|---|---|---|
| Remote | 1 | ≤ 0.67PPM |
| Very Low | 2 | 6.67 PPM |
| Low | 3 | 67 PPM |
| Moderate | 4 | 500 PPM |
| | 5 | 0.0025 |
| | 6 | 0.0125 |
| High | 7 | 0.05 |
| | 8 | 0.125 |
| Very High | 9 | 0.33 |
| | 10 | ≥ 50% |

Gree's Testability Scoring Standard attempts to assign a score based on the likelihood that laboratory testing being used to assess a risk will be able to create/recreate a particular failure. The scoring is assigned as follows:

| TESTABILITY | SCORE | RATE OF BEING TESTED |
|---|---|---|
| Almost Certain | 1 | 90 – 100 % |



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 10

| Very High | 2 | 0.8 |
|---|---|---|
| High | 3 | 0.7 |
| Moderately High | 4 | 0.6 |
| Moderate | 5 | 0.5 |
| Low | 6 | 0.4 |
| Very Low | 7 | 0.3 |
| Remote | 8 | 0.2 |
| Very Remote | 9 | 0.1 |
| Almost Never | 10 | 0 |

Once all three scores have been determined for each potential failure mode, those scores are then used to calculate the resultant RPN, where:

$$RPN = Severity \times Likelihood \times Testability$$

Once the RPN has been calculated, a determination is then made regarding the acceptability of the individual failures. This step of determining the risk acceptability is a fundamental element of an effective risk management program.

Because it is not possible to eliminate all risk from any product, each company involved in designing, manufacturing, importing and distributing a product has to determine their individual company's risk tolerance. In determining a company's risk tolerance, the senior leaders of the company must consider the difficult balance between the risk of a product or particular failure mode and the cost necessary to make an incremental reduction in that risk. At some point, the incremental cost of reducing a particular risk further becomes unreasonable or impractical. Each company has to determine their own definition of "reasonable" and in so doing, they determine their risk tolerance.

Gree's senior management has considered their corporate risk tolerance and documented that in QG1200.03-02. Specifically, they have determined that a combination of either of the following is unacceptable:

Severity S ≥ 7, and Risk Priority Number RPN ≥ 60; or,
Severity S < 7, and Risk Priority Number RPN ≥ 100

An unacceptable risk results in the responsible departments taking proactive steps (i.e., change the product design, change component(s), change the manufacturing process) to reduce the risk. Once those proactive steps have been implemented, the product is re-evaluated. If the re-evaluation finds that the Severity and Risk Priority Number have decreased to an acceptable level, the project can proceed. If the re-evaluation determines that the Severity and Risk Priority Number are still unacceptable, the process repeats until the risk is reduced to level which is acceptable to Gree.



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 11

Once the product design process has completed, Gree has a product that, if produced in
accordance with its approved design, will comply with all applicable regulation, industry
standards, customer-specific requirements, Gree internal standards, and have reasonably
maximized reliability and safety. The next step is to manufacture the product.

## Gree's Production Process

Gree's corporate headquarters in Zhuhai, China, has more than 20,000 employees and over 1
million $ft^2$ of production facilities, laboratories and office space. Gree follows the Six Sigma
approach in its manufacturing. Six Sigma is a disciplined, data-driven approach and
methodology for eliminating defects. To achieve Six Sigma, a process must not produce more
than 3.4 defects per million opportunities. A Six Sigma defect is defined as anything outside of
both internal and customer specifications. A Six Sigma opportunity is then the total quantity of
chances for a defect.

At the same time that Gree is working on obtaining internal approval from the Chief Engineer
for the product design, they are also working on the development of production-specific
documents and equipment. Where necessary, they design and construct special tooling, develop
assembly aids for production workers, determine the order of production/assembly steps and
what, if any, sections of the product will be produced as sub-assemblies which are then
assembled into the product. Based on all of the information available from the product design
and the production-specific process requirements, Gree develops a quality plan that is specific to
a given product design and manufacturing process.

The first critical step in producing the product as designed is identifying suppliers for raw
materials and components. Gree specifically tailors the material receipt inspection program to
the individual supplier. Because of Gree's large production volume they purchase large
quantities of materials and components and have developed a list of trusted suppliers. Even
when obtaining materials and parts from a trusted supplier, Gree conducts material receipt
inspection and testing to verify that the supplier has sent exactly what was ordered. This
inspection and testing includes chemical analysis of materials to ensure compliance with global
chemical regulations as well as component performance, reliability and safety testing. At a
minimum, all batches received are randomly sampled. Shipments from suppliers with whom
Gree does not have extensive experience receive a higher frequency of inspection.

Prior to beginning production, Gree determines what worker aids and instructions are important
to ensure the correct production of the product, as designed. They evaluate the product design
and determine the appropriate assembly order and prepare assembly instructions and worker
aids specific to the individual production line stations. The quality department reviews the
production plans and determines the most appropriate places throughout the process to conduct
required quality checks and tests. The same process is followed for the production of any



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 12

product sub-assemblies. Full production does not begin until Gree is satisfied that they have the materials specified by the design and the production workers have been instructed on the proper manufacturing and assembly aspects of the product.

Staff from the quality department are located in the production facility and readily available to respond to questions or concerns from the production lines. There is also constant oversight from supervisors along the product lines to verify that procedures are followed and that the product is properly assembled.

Random quality control checks are performed every two hours on products at the end of the production line. Certain critical aspects of the product, such as weld seam integrity of any component intended to be pressurized, are tested and verified multiple times throughout the production process. Each sub-assembly production process has its own quality control checks specific to the sub-assembly. An additional random quality control check is performed on the finished product in Gree's warehouse.

Gree recently implemented improvements to their process as a result of their investigation and recall of certain dehumidifiers in the U.S. and Canada. During that investigation, it was determined that plastic parts intended for use in dehumidifiers outside of North America had been inadvertently used for the construction of dehumidifiers distributed in North America. Although the North America and non-North America components appear identical and have identical physical dimensions, they have different flammability ratings based on the requirements of the respective markets.[4]

In response to this discovery, Gree implemented the following changes[5] to the production (and design) process to minimize the potential for an inadvertent use of incorrect parts in the future:

1. Change the color and/or physical characteristics of identical parts with different certification requirements to differentiate these parts.

2. Reinforce to the injection molding workshop the need to divide and isolate different materials. Check if the mold recycling logo is consistent with the production status before mass production.

3. Implement a dual verification system with the assembly staff and inspector during the initial assembly inspection. The assembly staff must compare the actual material code on the part against the code specified in Bill of Materials

---

[4] As explained on page 1 of Gree's report to the U.S. Consumer Product Safety Commission titled *Explanation of Inadvertent Use of Non-compliant ABS Materials*

[5] Paraphrased from pages 2-5 of Gree's report to the U.S. Consumer Product Safety Commission titled *Explanation of Inadvertent Use of Non-compliant ABS Materials*



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 13

(BOM) and document the confirmation. This new requirement has been written into the management document "KSGB-0203-03–Management of Product Initial Inspection".

4.  Reinforce control of material on Parts Delivery Carts. Each Delivery Cart must have clear signage identifying the parts on the cart and the location for delivery. Once all parts have been removed from the Delivery Cart, the signage is to be removed to avoid confusion. This requirement has been written into the management document "KSGB-0407-02–Management of Dispatching Device".

5. Reinforce control of material in Parts Transfer Carts. When moving items from one production stage to the next, a green sticker must be placed on the materials before putting them on the Transfer Cart to distinguish the materials being transferred from the materials already present at the next stage and the Transfer Cart must include complete documentation of the contents of the Transfer Cart. Workers receiving the Transfer Cart are authorized to reject the Cart if it does not contain the proper documents and the materials are not properly marked. This requirement has been written into the management document "KSGB-0203-03–Management of Product Initial Inspection".

6. Reinforce management of residual materials during production. Residual materials are to be clearly marked, separated and placed in segregated areas. When residual parts are later transferred back to the production line, the worker is to use the Product Initial Inspection process to verify that the part delivered matches the part specified on the BOM. This requirement has been written into the management document "KSGB-0212-03–Management of Quality Supervision".

Once products have been manufactured and shipped, the final piece of a comprehensive quality/safety program is to identify any product failures in the field, evaluate these failed products and feed that information back into the design and production processes for any necessary changes to the existing product.  In addition, this information can be considered in the design process of future similar products, including the introduction of new internal standards.

## Gree's Post-Production Process

The post-production process (i.e., timeframe beginning after the customer purchases the product) serves not only as a mechanism to identify potential problems with existing products, but also serves as a check of the design and production processes.  Potential safety-related problems discovered post-production require comprehensive evaluation in order to determine whether the scenario presents a risk of injury and, if so, whether or not that risk is high enough



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 14

(i.e., unreasonable) to require reporting to the responsible government(s), potentially requiring a product recall. Whether the potential problem presents a risk of injury or only reflects a customer satisfaction issue, the issue requires investigation into the direct and contributing cause(s) so that changes can be made to the product design and/or manufacturing to prevent future products from being produced with the same issue. There also needs to be a determination made whether the issue necessitates a broader review and possible revision to higher level policies, programs and procedures which apply to other products designed and manufactured by the company.

For products distributed within China, consumers have the ability to contact Gree directly with product complaints and allegations of quality or safety concerns. Those contacts go to Gree's Customer Service department which then is responsible for forwarding quality-related and potential safety-related complaints to the Quality Department. The Quality Department reviews the complaints and either evaluates the allegations in their department or forwards the complaint to the responsible department (i.e., Safety, Engineering, Manufacturing). It is possible that the field unit could be returned to Gree for physical examination and testing. If the field unit is not available for examination and Gree believes testing is necessary to complete their investigation, they will check their inventories for a unit of the same design as the field unit. If a sample unit is not available and Gree believes testing is necessary to complete their investigation, they will build a unit to the specifications applicable to the field unit. Once an investigation into the allegation has been completed and direct and contributory causes have been identified, Gree will evaluate the potential risk presented by the products manufactured and distributed and determine if the potential risk meets the requirements for government reportability for each country where the product was distributed. At the same time, Gree will identify the necessary design, manufacturing and process changes to eliminate, if reasonably possible, or minimize the potential for the problem to occur in the future. For products distributed outside of China, Gree only has limited, if any, access to field information and units.

Dehumidifiers manufactured by Gree are sold in the U.S. under the following brand names:
1. Danby
2. De'Longhi
3. Fedders
4. Fellini
5. Frigidaire
6. General Electric
7. Gree
8. Kenmore
9. Norpole
10. Premiere
11. Seabreeze
12. SoleusAir
13. SuperClima

1305806.000 -9999



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 15

The dehumidifiers are imported and distributed in the U.S. by multiple companies. Gree USA and MJC America Ltd. are the U.S. importers for Soleus Air and Kenmore brand dehumidifiers. As described on the Gree USA website ([www.greeusa.com](www.greeusa.com)):

> GreeUSA is a joint venture established by MJC America Holdings and Hong Kong Gree Electric Appliances Sales, Ltd. in 2010 to be the exclusive US distributor of certain SoleusAir and other products manufactured by Gree Electric Appliances of Zhuhai China.
>
> GreeUSA is not a subsidiary or affiliate of Gree Electric Appliances Inc. of Zhuhai China. Headquartered just outside of Los Angeles, California; GreeUSA strives to provide reliable products that are easy to use and look great in your home.

Because sales and distribution outside of China is not conducted by Gree, Gree attempts to standardize the responsibilities of their foreign agents through the use of a document titled "Guidelines of oversea (sic) after-sales service for Gree agents." The general format and content of this document is as follows:

1.  Purpose
2.  Applicable range
3.  Responsibility
4.  Basic requirements for Gree agents
5.  Basic principles for after-sales service
6.  Basic principles for after-sales service personnel
7.  After-sales service standards
8.  Spare parts management
9.  Basic principle for feedback of after-sales quality information
10. Warning and related principles of installation and maintenance
11. Other clauses by mutual agreement
12. Supplement (sic) clauses
13. Subsidiary clauses

Focusing on Section 9 of the guidelines as the section most directly related to Gree's quality and safety management program, the specific requirements state:

> The contents below should be fed backed to Gree in time as required and fill in the "sheet of after-sales quality information":
> 9.1 When the product is tested by third part institute, the result may go against the product;
> 9.2 The air conditioners (three or more than 3 sets) of the same model appear the same quality problem in the same region;
> 9.3 Injury, fire hazard or other incidents due to electricity leakage of the product, but the cause and responsibility are being investigated;
> 9.4 The product occurs big quality problems which is universal and can't be solved.



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 16

> 9.5 If the spare parts are used for solving epidemic quality problem, the agent must inform us before placing the spare part order;
> 9.6 Requirement of filling "sheet of after-sales quality information"
> 9.6.1 When filling the sheet, all the items must be filled, especially the model, manufacture date, barcode, name and contact way of installation and maintenance;
> 9.6.2 For the problems of package, transportation, loading, storing and leakage, the agent must provide related picture of the problems except filling the sheet.
> 9.6.3 For the system problem of the unit, the maintenance personnel must write down the malfunction phenomenon in details and provide related specification such as running time, pressure and current, etc.

If the information required by Section 9 of the guidelines is collected by Gree's agents and is provided to Gree in a timely manner, Gree will have the information necessary to be able to identify potential compliance, quality and safety issues, and to begin the appropriate investigation and possible correction.  Gree must rely upon their agents fulfilling their obligations under the agreement.  If their agents do not meet their obligations in reporting field issues back to Gree, Gree might not become aware of a potential issue for an extended period of time, if at all, introducing a level of corporate risk.

When investigating potential product safety allegations, the most useful and informative step is to perform a thorough examination of field, incident units in question. A basic description of the incident provided by a customer may not be accurate or complete. For example, individuals can fail to note critical distinctions such as "fire" versus "smoke", "electric shock" versus "static electricity" or  "burned" versus "melted". A detailed examination of the incident unit by an expert(s) experienced in performing product investigations can resolve many of these issues and aid in the determination of the operative root cause and failure mechanism.  This evaluation can also help determine if the failure is the result of an isolated or limited production issue or is likely systemic in nature

Because of the importance of being able to examine field, incident units which potentially present a safety risk, a firm should have an aggressive process in place to both request and incentivize the return of field, incident units from consumers. Customer Service Operators should be instructed how to effectively identify potential safety-related reports, and either directly, or through a supervisor or specially trained "safety team", take reasonable steps to obtain these field, incident units. This could range from paying for the cost of shipping the product back to the firm to purchasing the product from the consumer. In certain circumstances, where the specific conditions warrant, paying the consumer more than the price of the product might be reasonable if the potential safety risk is sufficiently high.

## Summary/Recommendations

The review of Gree's quality, compliance and safety program described in this report is a broad overview of policies, programs and procedures in place at the time of the review and is primarily a review of Gree's intended program.  Although an in-depth audit of Gree's actual



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 17

practices was not performed to determine the extent of their day-to-day compliance with their
documented program, enough information was available and observed to have indicated if any
clear areas of noncompliance with their program existed. No obvious areas of noncompliance
were identified during this review. A detailed, independent audit of Gree's day-to-day
adherence to their written procedures and specifications would be beneficial in identifying any
less obvious internal noncompliance or manufacturing quality control issues. Such an audit
would include a detailed review of daily quality and performance checks along with all
associated actions taken and the actions of operators in each manufacturing process step. A
detailed review of customer/ consumer complaints should also be considered, with an audit
performed on the actions taken in response to allegations of potential safety concerns.

The existing foundation of Gree's combined quality, compliance and safety program is strong
enough that the potential oversight of unusual, low likelihood and high severity failure modes
could be minimized with some targeted program revisions. The purpose of this report is to
provide Gree's senior management with enough information to discuss with their quality,
compliance and safety departments and determine what, if any, specific program changes are
warranted.

Gree developed and implemented a comprehensive quality control, compliance and safety
program. The depth, breadth and enforcement of this program are indicative of Gree's
corporate commitment to the program. They instruct all new employees regarding this program
and the responsibility for all employees to report potential safety issues or face disciplinary
action.

Gree has developed a strong in-house laboratory capable of testing to the applicable industry
standards and regulatory requirements. They also coordinate with the engineering department to
identify areas where the regulations and standards are believed to be insufficient for the Gree
products. Where such areas are identified, Gree develops their own internal standards
(performance, quality and safety) to address their desire for and commitment to the highest
reasonably attainable quality and safety.

Gree has embedded staff from their quality department in the manufacturing facility and that
staff provide a constant presence on the production line to reinforce Gree's commitment to
quality. Gree conducts regular, random incoming material inspections to ensure they are
receiving the material and components specified and ordered. They conduct multiple, random
quality inspections throughout the production process as well as random inspections of product
in their warehouse.

Gree has a process in place to handle incoming product complaints and forward them to the
quality department for review and resolution. Where appropriate, they work with the other
departments (i.e., safety, engineering, production) to ensure that a complete evaluation of the
allegation is performed and any lessons learned from the evaluation are incorporated into their



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 18

internal standards, designs, production process, quality control plans, policies and any other portion of their program which should be revised to address the issue and minimize the likelihood of recurrence. Gree requires their foreign (non-China) agents to sign an agreement which obligates the agent to both collect and report to Gree any field complaints related to quality.

Gree's combined quality, compliance and safety program attempts to equally address all three components. The foundation of their program is the quality component and this aspect of their product design and manufacturing, as described throughout this report, appears to be largely effective. The compliance component is also a critical piece and, as described in this report, Gree established a department which is responsible for researching, tracking and documenting legal and regulatory requirements as well as all applicable industry standards in every country where their products are distributed.

Gree's combined program places a reliance on the quality and compliance components to also address many aspects of the safety component. The risk presented by a product is a combination of the likelihood of a particular failure occurring and the severity of the potential injury should the failure actually occur. It follows that the higher the quality of the product, the lower the rate of failure and therefore the lower the risk. While this approach to minimizing the potential risk from a product is sound and reasonably effective, it tends to rely upon evaluating the types of failures most easily identified based on technical knowledge of expected failure modes and on those failures which previously occurred. This approach to identifying failure modes which require evaluation can potentially miss failure modes because they have a low likelihood of occurring and have not previously occurred in one of Gree's products. A failure mode with a low or very low likelihood of occurrence might still warrant a design or manufacturing change if the potential severity of the failure is unacceptable.

After reviewing the documented quality, compliance and safety program and having discussions with Gree staff to determine Gree's intent, an attempt was made to identify any evidence that the intended program is not being implemented. Prior to the 2013 dehumidifier recall, Gree had not conducted any product recalls. While it is possible that the need for a recall could have been missed or ignored by Gree, this appears to be unlikely. Given the large quantity of products Gree distributes globally, even a problem with a low likelihood of occurrence could equate to hundreds or even thousands of failures. With the growing global awareness of consumer product safety by consumers, governments and media, a problem resulting in hundreds of failures annually is likely to be detected, even if not made aware to or acknowledged by Gree.

Furthermore, in examining the results of the investigation into the 2013 dehumidifier matter, it appears as if the primary reason for the reported failures was a failure to identify the specific failure mode during the design process and make the appropriate changes prior to unit production. The failure to identify the specific failure mode was due to Gree's reliance on their historical experience with their products and their scientific and engineering knowledge. Had



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 19

the specific failure mode been identified during the FMEA process, Gree would have documented it and the resulting effect(s) of extended operation without refrigerant would have been evaluated and tested and changes would have been incorporated, as is done for other failure modes identified. Subsequent to the dehumidifier investigation, Gree modified the relevant procedures, test protocols and internal standards to require that the potentially hazardous condition of operating for an extended duration without refrigerant will be evaluated going forward, regardless of the underlying root cause(s). The recalled dehumidifier design resulted from a failure of Gree's highly experienced engineers to identify a low likelihood failure mechanism that reportedly was not previously encountered in any of their products.

To assist Gree in determining what specific program/process changes could be considered, Exponent provides the following:

1.  Expand the hazard/failure mode identification process and technical makeup of the responsible team with internal and/or external resources to identify and consider a broader array of potential failures, even if the potential failure has not occurred in a Gree product previously.

2.  Incorporate the identification of foreseeable use/misuse actions into the hazard identification process to assist in identifying low likelihood failures associated with foreseeable consumer action or inaction.

3.  Utilize a template or other document to create a comprehensive list of potential hazards associated with every product Gree has designed and manufactured that will serve as a tool for future project teams to use in identifying all of the potential hazards for a product which must be considered.

4.  Adapt the existing risk assessment process, which is primarily focused on the risk of product failure, to create a companion risk assessment process focused on the risk to the user from the specific product failure mode.

5.  Evaluate potential methods to enforce and increase the compliance of Gree's foreign agents with their requirement to report field after-sales quality issues to Gree in a timely manner.

6.  Consider conducting worst-case, forced failure testing to better understand the potential severity of very low likelihood failure modes to determine if the potential failure creates an unacceptable injury severity even with a low likelihood of failure. External resources can provide assistance, if necessary.

7.  Conduct a detailed audit of the day-to-day actions of the production and customer service departments to identify potential nonconformance with Gree's internal quality, compliance and safety program requirements.

8.  Consider revising the existing customer service process and procedures to more aggressively pursue the return of field units related to potential safety-related allegations.



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 20

## Limitations

At the request of Morrison & Foerster, LLP, Exponent has conducted a targeted review of Gree's existing Reliability, Compliance and Safety Programs.  Exponent reviewed and evaluated documents provided by Gree and visited one of Gree's manufacturing locations in Zhuhai, China.  The limited scope of services performed during this investigation may not adequately address the needs of other users of this report, and any reuse of this report or its findings, conclusions, or recommendations is at the sole risk of the user.  The opinions and comments formulated during this investigation are based on observations and information available at the time of the investigation.  The ultimate responsibility for the design, manufacture, performance, compliance, and safety of Gree's products lies completely with Gree.

The findings presented herein are made to a reasonable degree of scientific certainty.  Exponent has endeavored to be accurate and complete in the assignment.  If new data become available or there are perceived omissions or misstatements in this report, we ask that they be brought to our attention as soon as possible so that we have the opportunity to address them.

If you have any questions or require additional information, please do not hesitate to contact Exponent.

Sincerely,

*Richl S St*

Richard L. Stern
Manager
Mechanical Engineering Practice

Ex™

EXHIBIT C

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                          WESTERN DIVISION

4

5

6

7
    MJC AMERICA LTD,                    )
8                                       )
                                        )
9          PLAINTIFF,                   )
                                        ) CASE NO.:  CV 13-4264-SJO(CW)
10         V.                           )
                                        )
11                                      )
    GREE ELECTRIC APPLIANCES, INC.) LOS ANGELES, CALIFORNIA
12  OF ZHUHAI, ET AL.,                  )
                                        )
13                                      ) NOVEMBER 12, 2014
           DEFENDANTS.                  )
14                                      ) (10:03 A.M. TO 11:06 A.M.)
                                        )
15

16
                                HEARING
17
                BEFORE THE HONORABLE CARLA M. WOEHRLE
18                  UNITED STATES MAGISTRATE JUDGE

19  APPEARANCES:            SEE NEXT PAGE

20  COURT REPORTER:         RECORDED; COURT SMART

21  COURTROOM DEPUTY:       GAY ROBERSON

22  TRANSCRIBER:            DOROTHY BABYKIN
                            COURTHOUSE SERVICES
23                          1218 VALEBROOK PLACE
                            GLENDORA, CALIFORNIA  91740
24                          (626) 963-0566

25  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
    TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

```
 1   APPEARANCES:  (CONTINUED)
     FOR THE PLAINTIFFS:        WINSTON & STRAWN
 2                              BY:  IAN C. EISNER
                                     ATTORNEY AT LAW
 3                              333 SOUTH GRAND AVENUE
                                LOS ANGELES, CALIFORNIA  90071
 4
     FOR THE DEFENDANTS:        MORRISON & FOERSTER LLP
 5                              BY:  JOANNA L. SIMON
                                     ATTORNEY AT LAW
 6                              12531 HIGH BLUFF DRIVE
                                SUITE 100
 7                              SAN DIEGO, CALIFORNIA  92130

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X
CASE CV 13-4264-SJO(CW)              NOVEMBER 12, 2014

2

PROCEEDINGS:   MOTION TO COMPEL RESPONSES TO PRODUCTION OF

3                DOCUMENTS.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          LOS ANGELES, CALIFORNIA; WEDNESDAY, NOVEMBER 12, 2014

2                            10:03 A.M.

3               THE CLERK:  ALL RISE.  THIS UNITED STATES DISTRICT

4     COURT IS NOW IN SESSION.  THE HONORABLE CARLA M. WOEHRLE,

5     UNITED STATES MAGISTRATE JUDGE, PRESIDING.

6               THE COURT:  GOOD MORNING.

7               THE CLERK:  PLEASE BE SEATED.

8               CALLING CASE NUMBER CV 14-4264, MJC AMERICA LTD, ET

9     AL. VERSUS GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, ET AL.

10              COUNSEL, PLEASE MAKE YOUR APPEARANCES FOR THE

11    RECORD.

12              MR. EISNER:  GOOD MORNING, YOUR HONOR.

13              IAN EISNER ON BEHALF OF PLAINTIFFS AND

14    COUNTERDEFENDANTS.

15              THE COURT:  GOOD MORNING.

16              MS. SIMON:  GOOD MORNING, YOUR HONOR.

17              JOANNA SIMON ON BEHALF OF DEFENDANTS AND

18    COUNTERCLAIMANTS.

19              THE COURT:  GOOD MORNING.

20              OKAY.  SO -- YOU CAN BE SEATED.

21              I'LL TELL YOU WHAT I'M -- MY TENTATIVE VIEWS ARE ON

22    THE THREE CATEGORIES AT ISSUE ON THE MOTION.

23              FIRST, WITH RESPECT TO NUMBER 6, WHICH IS THE

24    DOCUMENTS RELATED TO THE ACCOUNT PROJECT SET-UP SHEETS, I

25    BELIEVE THAT WHAT MJC HAS OFFERED AND AGREED TO PRODUCE IS

42

1    HYPOTHETICAL, THAT WE'RE GOING TO USE AN EXPERT THAT HAPPENS

2    TO WORK AT A COMPETITOR OF GREE.  AND BECAUSE OF THAT NOW WE

3    HAVE TO JUMP THROUGH ALL THESE HOOPS AND DISCLOSE WHO OUR

4    EXPERTS ARE NOW, ALL OF OUR EXPERTS, SO THAT GREE CAN APPROVE

5    THEM.  AND IF WE -- I MEAN, IT'S --

6         THE COURT:  WELL, IT JUST SEEMS -- IT JUST SEEMS

7    UNLIKELY TO ME THAT THE -- THAT IF AN EXPERT OR A CONSULTANT

8    WERE RETAINED TO WHO WOULD HAVE NEED OF THESE KINDS OF DESIGN

9    DOCUMENTS -- THE DESIGN, UNLESS I'M MISSING SOMETHING HERE,

10   REALLY DOESN'T SEEM TO BE WHAT THIS CASE IS ABOUT.  I MEAN,

11   THERE'S BEEN A RECALL.  THAT'S HAPPENED.  EVERYTHING ABOUT

12   THE DESIGN IT SEEMS TO ME IS KIND OF WATER UNDER THE BRIDGE.

13   AND THAT'S NOT THE FOCUS OF THE LITIGATION, WHICH MAKES IT

14   VERY DIFFERENT THAN A PATENT CASE.

15        MS. SIMON:  AND, YOUR HONOR, GREE WOULD AGREE WITH

16   YOU THAT THE DESIGN IS CERTAINLY NOT THE FOCUS OF THIS

17   LITIGATION.  BUT MJC -- FROM GREE'S PERSPECTIVE THIS IS

18   BASICALLY A BUSINESS DISPUTE AT THIS POINT.  BUT MJC HAS BEEN

19   SUBPOENAING, INTENDS TO SUBPOENA CERTAIN O.E.M. MANUFACTURERS

20   WHERE GREE HAS BEEN THE O.E.M. FOR OTHER ENTITIES TO DISCUSS

21   THE DESIGN CHANGES BETWEEN THE SOLEUS AIR BRAND AND THE OTHER

22   BRANDS OF DEHUMIDIFIERS.  THEY'RE PUTTING THE DESIGN

23   DIFFERENCES AND THE DESIGN DRAWINGS AT ISSUE.

24        THE COURT:  OKAY.

25        MR. EISNER:  GO AHEAD, YOUR HONOR.  I'M SORRY.

45

C E R T I F I C A T E

    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

/S/ DOROTHY BABYKIN                           11/26/14

_____           _____

FEDERALLY CERTIFIED TRANSCRIBER           DATED

DOROTHY BABYKIN