MARK C. ZEBROWSKI (CA SBN 110175)
MZebrowski@mofo.com
ELLEN NUDELMAN ADLER (CA SBN 235534)
EAdler@mofo.com
JOANNA L. SIMON (CA SBN 272593)
JoannaSimon@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California  92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendants and Counterclaimants
GREE ELECTRIC APPLIANCES, INC.
OF ZHUHAI and HONG KONG GREE
ELECTRIC APPLIANCES SALES LTD.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MJC America, Ltd. dba Soleus International, Inc. and MJC America Holdings Co., Inc., and MJC Supply, LLC,<br><br>　　　　　Plaintiffs,<br><br>　　　vs.<br><br>Gree Electric Appliances, Inc. of Zhuhai and Hong Kong Gree Electric Appliances Sales Ltd., and Does 1 through 10, inclusive,<br><br>　　　　　Defendants,<br><br>　　　and<br><br>Gree USA, Inc., a California corporation,<br><br>　　　　　Nominal Defendant. | Case No. 2:13-cv-04264-SJO-(CWx)<br><br>**GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI AND HONG KONG GREE ELECTRIC APPLIANCES SALES LTD.'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>The Honorable S. James Otero<br><br>Date:　　　April 21, 2015<br>Time:　　　9:00 a.m.<br>Ctrm:　　　1 – 2nd Floor<br><br>Complaint filed:  June 13, 2013 |

1  Gree Electric Appliances, Inc. of
   Zhuhai and Hong Kong Gree Electric
2  Appliances Sales Ltd.,

3              Counterclaimants,

4  vs.

5  MJC America Holdings Co., Inc., MJC
   Supply, LLC, Charley Loh, Jimmy Loh,
6  and Simon Chu, and Does 11-20,
   inclusive,
7
               Counterdefendants,
8
   and
9
   Gree USA, Inc., a California
10 corporation,

11             Nominal Defendant.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREE DEFENDANTS' MEMO OF CONTENTIONS
OF FACT AND LAW

# I. PLAINTIFFS' CLAIMS

## A. Count I: By MJC America and MJC Supply Against Gree For *Fraud in the Inducement*

Plaintiffs allege Gree fraudulently induced them to form Gree USA based on misrepresentations by Gree that Gree's products were high quality, met all applicable safety standards, and were appropriate for sale under the regulatory requirements in the United States (collectively, the "quality representations").[1]

### 1. Fraud in the Inducement Elements

The elements of fraud in the inducement are: (a) misrepresentation; (b) knowledge of the falsity; (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage.[2]

### 2. Facts In Opposition to Plaintiffs' Fraud in the Inducement Claim

#### a. Gree had no knowledge of the falsity of its representations as to the quality of its products

Gree believed its representations that its products were high quality and met safety and regulatory standards.[3]  Gree had no knowledge to the contrary, as it had no quality problems before.

Gree did not know of any quality problems or complaints in the United States or abroad in 2010,[4] when Gree USA was being formed.  From 2005 through 2011, Gree did not receive any reports notifying Gree that its dehumidifiers were possibly overheating or catching fire.[5]  Gree learned for the first time about dehumidifiers possibly overheating or catching fire from MJC in July 2012.[6]  Before the 2013

---

[1] Second Amended Complaint ("SAC"), Count I.
[2] *See Austero v. Aurora Loan Servs., Inc.*, No. C-11-00490 JCS, 2011 U.S. Dist. LEXIS 85356, at *23 (N.D. Cal. Aug. 3, 2011).
[3] Decl. of M. Zebrowski ("Zebrowski Decl.") Ex. A (Madam Dong Depo. 31:17-25; 34:9-16).
[4] *Id.* Ex. C (Larry Lam Depo. 29:13-16); *id.* Ex. D (H. Hui Depo. 64:5-10); *id.* Ex. B (Y. Gang Depo. 115:13-116:16).
[5] *Id.* Ex. E (T. Xiao Hui Depo. 39:9-17).
[6] *Id.* Ex. E (T. Xiao Hui Depo. 42:16-23); *id.* Ex. F (W. Jingdong Depo. 41:7-11); *id.* Ex. C (L. Lam Depo. 59:8-18).

1  Gree dehumidifier recall, none of Gree's products had ever been recalled.[7]

2      MJC argues that Gree knew that its dehumidifiers for Gree USA were low

3  quality and posed a fire and overheating hazard because Gree made GE

4  dehumidifiers to different specifications.  MJC's argument is off the mark.  GE's

5  witness testified that even GE was not aware of any specific risk related to the Gree

6  dehumidifiers[8] and it did not believe the changes were "necessary."[9]

7      Thus, at the time of the joint venture creation, Gree had no knowledge from

8  GE, or any other source, that its dehumidifiers posed an overheating or fire hazard.

9         **b.     Gree had no intent to defraud MJC.**

10      There is no evidence that Gree had any intent to defraud MJC with respect to

11  the alleged misrepresentations.  Gree had no incentive to deliver substandard

12  products to Gree USA, its only distributor of Gree's products in the U.S.

13        **c.     MJC did not justifiably rely on Gree's statements in
              entering the joint venture.**

14

15      MJC had been doing business with Gree for ten years and had first-hand

16  experience with Gree's products.  MJC did not form Gree USA because Gree said

17  its products were good; MJC knew the Gree products were high quality.

18        **d.     MJC suffered no damages as a result of the alleged
              misrepresentations.**

19

20      MJC was not damaged by allegedly relying on Gree's quality

21  representations.  None of MJC's alleged damages relate to any product quality

22  problem.

23

24  _____

25      [7] Ex. B (Y. Gang Depo. 47:21-48:11).
        [8] Ex. G (M. Copelli (GE) Depo. 110:4-12) ("At the time of the
26  recommendations, there was no information available to us, that indicated any –
    any risk to that pop – to the Gree population.  So, at that point, we had no reason to
27  believe that were issues on the Gree products.")).
        [9] *Id.* (M. Copelli (GE) Depo. 101:19-102:4) ("Well, the changes, I wouldn't
28  describe them as being necessary.")).

**B.     Count II: By MJC America and MJC Supply Against Gree  For** *Intentional Interference with Contractual Relations*

Plaintiffs allege Gree intentionally interfered with contractual relations by not honoring the alleged Agreement of Distribution of Gross Profit of Major Account Sales ("Profit Distribution Agreement"), which purported to set out the distribution of Gree USA's profits between Gree and MJC.[10]

**1.     Intentional Interference with Contractual Relations Elements**

The elements of intentional interference with contractual relations are: (a) a contract between MJC and Gree USA; (b) Gree knew of the contract; (c) Gree's conduct prevented performance or made performance more expensive or difficult; (d) Gree intended to disrupt the performance of this contract or knew that disruption of performance was certain or substantially certain to occur; (e) MJC was harmed; and (f) Gree's conduct was a substantial factor in causing MJC's harm.[11]

**2.     Facts In Opposition to Count II**

**a.     There was no Profit Distribution Agreement between MJC and Gree USA**

The Profit Distribution Agreement was only signed by the counter-defendant Lohs on behalf of MJC and Gree USA; it was not signed by Gree.  Larry Lam, the key Gree representative for Gree USA, testified that he never saw or agreed to the Profit Distribution Agreement, Gree never agreed to its terms, he did not have the authority to agree to the terms, and the Lohs knew all of this.[12]

MJC never produced the original word file or metadata for the Profit Distribution Agreement, allegedly entered into on December 9, 2011.  It produced only a pdf with a creation date of July 1, 2013—two weeks after MJC sued Gree.

---

[10] SAC, Count II; Zebrowski Decl. Ex. H (the purported Profit Distribution Agreement).

[11] *See* Judicial Council of Cal. Jury Instns. (2015 edition), CACI No. 2201.

[12] Ex C (L. Lam Depo. 24:14-25:7).

Furthermore, the alleged Profit Distribution Agreement would be invalid under the Gree USA Equity Joint Venture Contract ("JV Contract"). A requirement that Gree Hong Kong (the 51% shareholder) fund Gree USA operating expenses, as is set forth in the Profit Distribution Agreement, is a capital call. However, the JV Contract requires a Board resolution and an amendment to increase the parties' capital requirements.[13] Jimmy Loh was aware of this requirement, but there was no such resolution or amendment.[14] Jimmy Loh also knew Mr. Lam had no authority to obligate Gree to make an additional capital contribution.[15]

### b. Gree Did Not Know of the Profit Distribution Agreement Before the Litigation

No Gree employee ever saw the Profit Distribution Agreement before the litigation between the parties. Thus, Gree could not have intended to disrupt the contract. There is also no evidentiary support for any of the other claim elements.

### c. Even if Gree Signed the Profit Distribution Agreement, Which It Did Not, It Could not "Interfere" With Its Own Contract

A party to a contract cannot interfere with its own contractual relationship. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 513-14 (1994). Thus, even if a Gree representative signed the Profit Distribution Agreement, and none did, Gree could not have interfered with the contract.

### C. Count III: By MJC America and MJC Supply Against Gree For *Intentional Interference with Prospective Economic Advantage*

#### 1. Elements

The elements of intentional interference with prospective economic advantage are: (a) an economic relationship that would have resulted in an economic benefit; (b) knowledge of the relationship; (c) wrongful retaliatory

---

[13] Ex. I (Joint Venture Agreement, Article 14).
[14] Ex. J (J. Loh Depo. 218:22-25).
[15] *Id.* (J. Loh Depo. 249:3-15).

conduct designed to interfere and disrupt the relationship; (d) intention to disrupt the relationship; (e) actual disruption of the relationship; (f) harm; and (g) the conduct was a substantial factor in causing the harm.[16]

## 2.      Facts In Opposition to Count III

### a.      Gree Did Not Engage in Wrongful Retaliatory Conduct Towards MJC

MJC claims Gree retaliated against MJC to prevent it from reporting dehumidifier problems to the CPSC.   Not so.

First, MJC and Gree *jointly* submitted the initial and full reports to the CPSC in March 2013 and April 2013.

Second, MJC, as an importer and distributor, had an independent legal obligation to report to the CPSC.[17]  Indeed, MJC told Gree that MJC was legally required to do so.[18]  MJC's designated most knowledgeable CPSC / recall witness, Teresa Kamiya, testified that the CPSC reporting obligations apply directly to MJC, MJC could and should have reported to the CPSC regardless of whether Gree did so, and by September 2012, MJC had reportable information, but it did not report.[19] There was nothing Gree could do to stop MJC from complying with its legal duty.

Third, the Lohs admit that no one at Gree ever threatened MJC with any adverse consequences if MJC did report.[20]  To the contrary, Gree's second-ranking officer, Huang Hui, told Charley Loh that if MJC decided to report to the CPSC, that was out of Mr. Huang's control.[21]

---

[16] *See* Judicial Council of Cal. Jury Instns. (2015 edition) CACI No. 2202.
[17] See 15 U.S.C. § 2064(b).
[18] Ex. K (C. Loh Depo. Ex. 75).
[19] Ex. L. (T. Kamiya Depo. 58:12-60:7; 67:2-13; 71:8-72:12; 75:2-20; 108:19-110:24; 150:9-14).
[20] *See, e.g.*, Ex. C (L. Lam Depo. 136:9-12); Ex. M (MJC 0015247 and translation).
[21] Ex. K (C. Loh Depo. Ex. 75).

Fourth, MJC has not been able to identify a single Gree USA customer who cancelled an order due to any dehumidifier problems.[22]

Fifth, Gree has taken full responsibility for all recall costs and administration.

And sixth, a year after the recall, Charley Loh testified that Soleus Air was a "very valuable brand."[23]  Similarly, Jimmy Loh testified that the Soleus trademark is "always valuable."[24]

### b.     Gree Had No Intent to Disrupt the Relationship with MJC

Gree did not intentionally disrupt its relationship with MJC.  To the contrary, MJC decided to end the relationship with Gree.  Charley Loh testified that he decided to end the relationship with Gree over business issues,[25] Tyler Scott testified that MJC decided to separate from Gree because Gree would not sign another MJC commission statement for Lowe's,[26] and Jimmy Loh likewise testified he decided to stop doing business with Gree over a variety of business issues including Gree not signing a commission statement for the Sears business.[27] Neither Jimmy Loh, Charley Loh, nor Tyler Scott identified dehumidifier recall problems or "cover up" as the reason for stopping doing business with Gree.[28]

### c.     MJC Has Not Suffered Harm

MJC has not been harmed by Gree's alleged actions.  MJC has suffered no future lost profits.[29]

### D.     Count IV:  By MJC Holdings Derivatively On Behalf of Gree USA Against Gree For *Intentional Interference with Prospective Economic Advantage*

---

[22] Ex. K (C. Loh Depo. 298:17-19; 299:12-17; 300:10-19); Ex. N (T. Wang Depo. 155:6-156:2; 156:10-13); Ex. O (T. Scott Depo. 416:1-8).
[23] Ex. K (C. Loh Depo. 282:19-23).
[24] Ex. J (J. Loh Depo. 435:6-11).
[25] Ex. K (C. Loh Depo. 291:23-292:17).
[26] Ex. O (T Scott Depo. 365:19-366:4; 367:16-18).
[27] Ex. J (J. Loh Depo. 330:19-334:12).
[28] *Id.*
[29] Ex. P (Anderson Report at 3-4).

### 1.     Elements

The elements of intentional interference with prospective economic advantage are: (a) an economic relationship that would have resulted in an economic benefit; (b) knowledge of the relationship; (c) wrongful retaliatory conduct designed to interfere and disrupt the relationship; (d) intention to disrupt the relationship; (e) actual disruption of the relationship; (f) harm; and (g) the conduct was a substantial factor in causing the harm. *See* Judicial Council of Cal. Jury Instns. (2015 edition) CACI No. 2202.

### 2.     Facts In Opposition to Count IV

Gree did not intentionally interfere with Gree USA's prospective economic advantage. In addition to the reasons set forth above in Section C(1) (MJC's claim for interference with prospective economic advantage), it makes no sense that Gree would set out to "destroy" Gree USA—the only distributor of Gree brand products in the United States.

#### a.     There Was No Relationship That Would Have Resulted in Economic Benefit to Gree USA

MJC cannot meet the first element of its derivative claim on behalf of Gree USA for interference with prospective economic advantage because there was not a relationship resulting in an economic benefit to Gree USA. In fact, Gree USA lost more than $1,000,000 in 2012 – its "banner year" when it sold more than 1,000,000 units. Tellingly, neither of MJC's damages expert express any opinion regarding MJC's derivative claims on behalf of Gree USA.

#### b.     Gree Had No Intent to Disrupt the Relationship with Gree USA

As Gree was working to restructure Gree USA to become a profitable business, MJC had already decided to part ways with Gree. *See* Section I(C)(2)(b), *supra.*

### c.   Gree USA Has Not Suffered Harm Because of Gree's Action

Gree USA has not suffered harm because of any alleged interference by Gree, and MJC's damages experts do not express any opinion on such harm.

### E.   Count V: By MJC America and MJC Supply Against Gree For *Violation of Cal. Business & Prof. Code § 17200*

MJC claims that Gree engaged in unlawful and unfair business practices under California Business & Profession Code section 17200.[30]  MJC alleges that Gree knowingly sold defective dehumidifiers that posed safety hazards and failed to satisfy applicable safety, UL, and regulatory standards.[31]  Gree addresses that false allegation in Section I(A)(2)(a), *supra*.  MJC also alleges that when MJC encouraged Gree to report to CPSC, Gree refused and retaliated against MJC for refusing to participate in a "cover-up" of the dehumidifier defects.[32]  This is also a false allegation, as discussed in Section I(C)(2)(a), *supra*.

### F.   Count VI: By MJC Supply Against Hong Kong Gree For *Trademark Infringement*

Plaintiffs allege Gree infringed upon and continues to infringe upon the Soleus Air trademark.  This is incorrect.

### 1.   Elements

The elements of trademark infringement are (a) a valid, protectable trademark, (b) owned by the plaintiff; (c) use of the trademark without consent in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods.[33]

---

[30] The elements of a Section 17200 claim are (a) Gree engaged in an unlawful, unfair, or fraudulent business act or practice; and (b) MJC has suffered injury in fact and lost money or property as a result of such unfair competition.  *See* Cal. Bus. & Prof. Code § 17200 *et seq.*

[31] SAC, Count V.

[32] *Id.*

[33] *See* Ninth Cir. Model Civ. Jury Inst. 15.5 (2007); 15 U.S.C. § 1114(1).

### 2.   Facts In Opposition to Count VI

#### a.   Gree Did Not Make Unauthorized Sales of Any Goods Bearing the "Soleus Air" Trademark

In June 2013, several millions of dollars-worth of Gree-manufactured inventory (over 90,000 air conditioners not affected by the recall[34]) was being warehoused at Gree's expense in the United States in order to support Gree USA's operations.  This inventory was branded "Soleus Air Powered by Gree."[35]  The trademark for "Soleus Air Powered by Gree" was owned by Gree USA, not MJC.[36]  Moreover, it was abandoned by Gree USA on August 24, 2012.[37]  MJC cannot base its trademark claims on an abandoned trademark that it never owned.

#### b.   There Can Be No Consumer Confusion Because Gree Sold Genuine Soleus Air Powered By Gree Branded Goods

MJC's trademark infringement claim also fails because the alleged infringing goods are genuine, factory standard[38] "Soleus Air Powered by Gree" products.[39]  Trademark law is designed to prevent sellers from confusing consumers, harming another seller's reputation, and diluting the strength of famous trademarks.  Because the products were properly marked as genuine Soleus Air Powered by Gree products, MJC cannot establish the required consumer confusion, reputational harm, or dilution as a matter of law.  *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 923 (Fed. Cir. 1995) ("no likelihood of confusion can arise from the sale of genuine goods, even if the sale is unauthorized.").

#### c.   MJC Has Presented No Evidence of Consumer Confusion

MJC's trademark infringement claim also fails because, even if an

---

[34] Ex. P (Anderson Report at 3).
[35] Ex. Q, (S. Mao Depo 86:24-87:2)
[36] Ex. R (USPTO Print out for Soleus Air PBG).
[37] *Id.*
[38] *E.g.*, Ex. S (D. Fishman Depo. 41:15-18).
[39] Ex. Q (S. Mao Depo 86:24-87:2).

1   infringement claim could proceed based on genuine goods, MJC has not presented

2   any evidence of consumer confusion.  MJC will be unable to carry its proof burden.

3        "To prevail on the ultimate question ...--the likelihood of confusion of

4   consumers—[the plaintiff] must show sufficient evidence to permit a rational trier

5   of fact to find that confusion is 'probable,' not merely 'possible.' " *M2 Software,*

6   *Inc. v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005).   The "likelihood of

7   confusion" inquiry generally considers whether a reasonably prudent consumer in

8   the marketplace is likely to be confused as to the origin or source of the goods or

9   services bearing one of the marks or names at issue in the case.  *Rearden LLC v.*

10  *Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). "[A] handful of

11  examples of anecdotal confusion are insufficient to support a finding confusion."

12  *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1054 (C.D. Cal.

13  2013).

14       Here, none of MJC's experts opine on consumer confusion.  No consumer

15  confusion surveys have been introduced.  And no anecdotal evidence of consumer

16  confusion has been presented.  Of course, a consumer could not be "confused"

17  because the goods were genuine.  Thus, MJC's trademark infringement claim fails.

18  **G.     Count VII: By MJC Supply Against Hong Kong Gree For *Federal***
19  ***Unfair Competition (15 U.S.C. § 1125)***

20       Plaintiffs allege Gree unfairly competed with the Soleus Air mark in

21  interstate commerce by selling home comfort products using the Soleus Air mark.

22       **1.     Elements**

23       The elements of federal unfair competition under 15 U.S.C. § 1125 are (a)

24  use of a mark or trade dress confusingly similar to a valid, protectable trademark or

25  trade dress; and (b) consumer confusion.[40]

26

27  _____

[40] *See Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036,
28  1053-54 (9th Cir. 1999); *see* Ninth Cir. Model Civ. Jury Inst. 15.4 (2007).

### 2.     Facts In Opposition to Count VII

MJC's claim for federal unfair competition fails for the same reasons that MJC's trademark infringement claim fails.  *See* Section F, *supra*.  Additionally, MJC has no evidence that Gree used a mark or trade dress that was "confusingly similar to a valid, protectable trademark."

### H.     Count VIII: By MJC Supply Against Hong Kong Gree For *Trademark Dilution (15 U.S.C. § 1125)*

Plaintiffs allege Gree diluted the Soleus Air mark.  Wrong again.

### 1.     Elements

The elements of trademark dilution are (a) a famous mark that is distinctive; (b) use in commerce of an identical or nearly identical mark; (c) the use began after the mark became famous; and (d) use of the mark is likely to cause dilution by blurring or dilution by tarnishment of the mark.[41]

### 2.     Facts In Opposition to Count VIII

#### a.     There Is No Evidence that the Soleus Air Mark is Famous

Plaintiffs cannot show that the Soleus Air mark is famous and therefore cannot carry their burden of proof.  Fame requires that the mark be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). MJC has no evidence that the Soleus Air mark is recognized by the general consuming public.  None of MJC's experts opine on whether the mark is famous, and there is no testimony from any witness that the "Soleus Air" mark is famous.

#### b.     Gree Did Not Use In Commerce an Identical or Nearly Identical Mark

As set forth in Section I(F)(2)(a), *supra*, the alleged diluting inventory sold

---

[41] *See* 15 U.S.C. § 1125(c); *see Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1161 (9th Cir. 2011).

1  by Gree USA was branded "Soleus Air Powered by Gree."[42]  The trademark for

2  "Soleus Air Powered by Gree" was owned by Gree USA, not MJC.[43]  Moreover, it

3  was abandoned by Gree USA on August 24, 2012.[44]  MJC cannot base its dilution

4  claim on Gree's sale of goods bearing the "Soleus Air Powered by Gree"

5  trademark.

6  ### c.    MJC Has No Evidence of Dilution

7          Additionally, Plaintiffs cannot show that the Soleus Air mark has been

8  diluted and therefore cannot carry their burden.  In *Visa Int'l Serv. Ass'n v. JSL*

9  *Corp.*, the Ninth Circuit explained that "dilution isn't confusion; quite the contrary.

10  Dilution occurs *when consumers form new and different associations with the*

11  *plaintiff's mark*."  610 F.3d 1088, 1090 (9th Cir. 2010) (emphasis added).  The

12  Ninth Circuit further explained that "dilution always involves use of a mark by a

13  defendant that is 'different' from the plaintiff's use; the injury addressed by anti-

14  dilution law in fact occurs when marks are placed in new and different contexts,

15  thereby weakening the mark's ability to bring to mind the plaintiff's goods or

16  services."  *Id.* at 1092.  "[C]lassic examples of blurring include 'hypothetical

17  anomalies as Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos,

18  Bulova gowns, and so forth.'"  *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 111

19  (2nd Cir. 2010).  While "few consumers would likely confuse the source of a

20  Kodak camera with the source of a 'Kodak' piano," dilution refers to "the whittling

21  away of [the] established trademark's selling power and value through its

22  unauthorized use by others."  *Id.* (citation omitted.)

23          Here, the alleged diluting goods are genuine, "factory standard"[45] "Soleus

24  Air Powered by Gree."[46]  There is no evidence that (i) the goods at issue are

---

[42] Ex. Q (S. Mao Depo. 86:24-87:2)
[43] Ex. R (USPTO Print out for Soleus Air PBG).
[44] *Id.*
[45] *E.g.*, Ex. S (D. Fishman Depo. 41:15-18).
[46] Ex. Q (S. Mao Depo. 86:24-87:2).

anything other than genuine products manufactured by Gree China; (ii) consumers have or will form new and different associations with Plaintiffs' mark; (iii) the SoleusAir mark is being placed in a new and different context as a result of the sale of legitimate factory standard goods manufactured by Gree China; or (iv) there is any second mark or product at issue to blur with or tarnish the SoleusAir mark.

## I.     Count IX: By MJC America and MJC Supply Against Gree China For *Breach of Contract*

MJC claims that Gree breached the September 5, 2012 Indemnification Agreement, attached hereto as Exhibit T.  The facts do not support MJC's claim.

### 1.     Breach of Contract Elements

The elements for breach of contract are (a) that MJC and Gree China entered into a contract; (b) that MJC did all, or substantially all, of the significant things that the contract required it to do; (c) that all conditions required by the contract for Gree China's performance had occurred; (d) that Gree China failed to do something that the contract required it to do; and (e) that MJC was harmed by that failure.  *See* Judicial Council of Cal. Jury Instns. (2015 edition) CACI No. 303.

### 2.     Facts In Opposition to Count IX

#### a.     MJC and Gree Entered Into a Valid Contract With Respect to the Menards Dehumidifier Sales

On September 5, 2012, Gree Zhuhai issued a letter to MJC that stated that Gree would be responsible for economic damages "with regard to the quality issues concerning the *dehumidifiers sold to Menards*." (Emphasis added).  The contract further provided that "the specific types and amounts of the expenses will base on the invoices and relevant evidentiary materials submitted by MJC."[47]  Gree does not dispute that this is a binding contract.

---

[47]  See Ex. T.

### b.   MJC Did Not Do Anything that the Contract Required it to do.

On June 27, 2014, Charley Loh submitted a claim under the September 5, 2012 Menards letter.[48]  The claim included $688,545.69 customers allegedly withheld from MJC America due to the recall.  Menards was not one of these customers.  It also included $2,500,000 allegedly withheld by Menards from MJC Supply dba Soleus Home Comfort.  However, Gree issued a stop sale notice for the dehumidifiers on June 13, 2013[49] and a recall notice on September 12, 2013.[50]  MJC Supply did not record a dba for Soleus Home Comfort until September 16, 2013,[51] and it first registered www.soleushomecomfort.com on September 17, 2013.[52]  Soleus Home Comfort should not have sold any recalled Gree dehumidifiers to Menards as it did not exist until after the stop sale and recall notices were issued, and its first recorded sales were in December 2013.

Thus, MJC has not provided any relevant invoices or evidentiary materials to recover any amount under the September 5, 2012 Indemnification Agreement.

### J.   Count X: By MJC America and MJC Supply Against Gree China For *Promissory Estoppel*

MJC claims that it was acting in reliance on the promises and representations made by Gree in the September 5, 2012 Indemnification Agreement.  This promissory estoppel[53] claim fails for the same reasons that MJC's Count IX breach of contract claim fails.

---

[48]   See Ex. J (J. Loh Depo Ex. 51); Ex. K (C. Loh Depo. 156:11-160:19).
[49]   See Ex. U (Gree Stop Sale Notice, GREE0133661).
[50]   See Ex. V (Gree Recall Notice, GREE0110013).
[51]   See Ex. W (Soleus Home Comfort California Fictitious Business Name Statement).
[52]   See Ex. X (http://www.whois.com/whois/soleushomecomfort.com, last visited 3/3/2015).
[53]   The elements of promissory estoppel are: (a) a promise clear and unambiguous in its terms; (b) reliance by the party to whom the promise was made; (c) the reliance must be both reasonable and foreseeable; and (d) the party asserting the estoppel must be injured by its reliance. *See Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 792 (9th Cir. 2012).

**K.    Count XI: By MJC Holdings Derivatively On Behalf of Gree USA Against Gree China For *Breach of Contract***

MJC makes a derivative claim that Gree breached the January 23, 2013 Indemnification Agreement entered into between Gree and Gree USA.  This claim, as with the other indemnification claims, fails on the facts.

### 1.    Breach of Contract Elements

Section I(1), *supra*, sets forth the elements of a breach of contract claim.

### 2.    Facts In Opposition to Count XI

#### a.    The January 23, 2013 Indemnification Agreement Is a Valid Contract.

On January 23, 2013, Gree issued an "Agreement to Continue Sales in the U.S. of Dehumidifiers in Stock to Gree USA."  Gree does not dispute that in that letter, Gree stated that Gree USA had Gree's "agreement to continue to sell in the U.S. market the dehumidifiers you [Gree USA] have in stock" and "should we [Gree] discover . . . that it has become necessary to recall or report the product, we [Gree] will . . . assume the economic damages and legal responsibilities you have suffered as a result of quality issues involving the aforementioned dehumidifiers in your stock."[54]

#### b.    MJC Did Not Do Anything that the Contract Required It To Do.

This commitment was made to Gree USA, so any claim under it would be a derivative claim.  MJC has not provided any evidence of any loss Gree USA suffered by selling any dehumidifiers in stock on January 23, 2013.  Indeed, Gree USA had no dehumidifiers in its inventory on January 22, 23 or 24, 2013.[55]

---

[54] See Ex. J (J. Loh Depo Ex. 48).
[55] See Ex. Y (GREE0321316, p. 45).

**L.   Count XII: By MJC Holdings Derivatively On Behalf of Gree USA Against Gree China For *Promissory Estoppel***

MJC claims that it was acting in reliance on the promises and misrepresentations made by Gree in the January 23, 2013 Indemnification Agreement.  This promissory estoppel claim fails for the same reasons that MJC's Count IX breach of contract claim fails.

## II.   GREE'S DEFENSES

### A.   Defense 1: Unclean Hands

Gree will assert the unclean hands defense with respect to MJC's Counts II, III, V, and VI-VIII.

#### 1.   Unclean Hands Elements

The elements of unclean hands are: (a) inequitable conduct by MJC; (b) that MJC's conduct directly relates to the claim which it has asserted against Gree; and (c) MJC's conduct injured Gree. *See Survivor Prods. LLC v. Fox Broad. Co.*, No. CV 01-3234 LGB (SHx), 2001 U.S. Dist. LEXIS 25511, at *9 (C.D. Cal. June 11, 2001).

#### 2.   Facts In Support

##### a.   MJC Has Unclean Hands With Respect To Count II

In Count II, MJC alleges that Gree intentionally interfered with the Profit Distribution Agreement.  In addition to Gree's defense that the facts do not support Count II, MJC engaged in inequitable conduct with respect to this claim.

In June 2013, while Gree USA CFO Jian Chen was on vacation, Charley and Jimmy Loh ordered that $28,622,320.81 be paid out of a Gree USA bank account to MJC Supply,[56] knowing that Mr. Chen would not approve these payments.[57]  The

---

[56] Ex. Z (June 26, 2013 Order granting temporary restraining order and Order to Show Cause) (freezing any and all accounts in which any or all of the $28,622,320.81 was deposited); Ex. AA (November 18, 2013 Order granting application for writs of attachment and extending TRO).  Another $5 million, which MJC knew Gree disputed, was also transferred, and is at issue in the state court case, though not part of the writs of attachment.

1  majority of those payments were based on the alleged Profit Distribution

2  Agreement's provisions regarding the purported sales rebates and "shortfall"

3  payments.[58]  The Lohs then promptly caused MJC Supply to transfer "bonuses" to

4  the Lohs and related parties:  $1.5 million to Jimmy Loh; $2.73 million to Charley

5  Loh; $1.45 million to Jimmy Loh's wife, Leping Loh; $2.2 million to Simon Chu;

6  $5.93 million to MJC America; and $1.4 million to Mr. Scott's company.  $8.26

7  million remained in MJC Supply.[59]

8      After the fraudulent transfer, the Lohs issued corresponding improper

9  invoices from Gree USA to Gree Hong Kong, and then ordered a $29 million

10  "offset" to make it appear that Gree USA was solvent.  This offset was improper.[60]

11      MJC's inequitable conduct that stole $29 million from Gree USA, and then

12  left Gree Hong Kong, the 51% shareholder, holding the bag through the offset,

13  harmed Gree Hong Kong and in turn harmed Gree Zhuhai, Gree Hong Kong's

14  parent company.

15          **b.      MJC Has Unclean Hands With Respect To Count III**

16      In Count III, MJC alleges that Gree intentionally interfered with MJC's

17  relationship with Gree USA by engaging in a campaign to "destroy" Gree USA.

18  Nothing could be further from the facts, set forth in Section II(A)(2)(a), *infra*.  MJC

19  has unclean hands with respect to its relationship with Gree USA, which harmed

20

21  (Footnote continued from previous page.)

    [57] Ex. J (J. Loh Depo. 93:7-11).

22      [58] Ex. AK (Decl. of J. Chen Table A).  The APSUS is the Account Project
Set-Up Sheet that MJC representative Charley Loh and Gree Hong Kong

23  representative Larry Lam signed to determine the distribution of profits from each
sale for a large retail account.  The "shortfall" is the difference between the

24  "standard build-up" or standard commissions and expenses and the actual
commissions and expenses that were distributed based on the profits available from

25  the sale.  There was a shortfall any time that the difference was negative—i.e., the
actual profit percentage was smaller than the standard percentages allocated to

26  commissions and expenses.

    [59] *See* Ex. AA (November 18, 2013 Order).

27      [60] *See* Ex. P (February 5, 2015 - Expert Report of Douglas Anderson at
Opinion 7).

28

1  Gree USA, and in turn harmed Gree.

2  **(i)     MJC Surreptitiously Raised the Price Quote for the Sears 2014-2015 Business, Resulting in Losing the Bid**

3

4  On December 14, 2012, Tracy Wang of MJC covertly instructed Gree USA's

5  sales representative, Mr. Scott, to "build up at least 9% when you release [the] 2014

6  quotation to Sears."[61]  The purpose of the 9% addition was to provide for a

7  commission payment to MJC Supply,[62] despite that Gree had repeatedly expressed

8  that the business must be restructured and these payments under APSUS must come

9  to an end.  Mr. Scott testified that Ms. Wang added a 9% markup to all of Gree's

10  quotes to Sears.[63]

11  In response to Ms. Wang's quote, Mr. Scott told her that Gree USA could not

12  get the Sears business with the 9% markup.[64]

13  On January 15, 2013, Ms. Wang again submitted the Sears pricing to

14  Mr. Scott, which he called "a joke."[65]  Mr. Scott pointed out that Mr. Zhang of Gree

15  said to raise the previous year's price by 2%-3% for dehumidifiers and air

16  conditioners, but "the pricing [Ms. Wang] gave us [was] much higher."[66]

17  On January 16, Mr. Zhang explained that his target pricing for dehumidifiers

18  was only a 3% increase from the previous year, and a 2-3% increase for air

19  conditioners.[67]  Those prices left a 10.5% gross margin for Gree USA.[68]  In the next

20  round, Mr. Zhang was willing to make concessions which would keep the target

21  final margin for Gree USA at 8%-9%.[69]

22

23

24  [61] Ex. AB (MJC 0203498).
[62] Ex. N (T. Wang Depo. 103:24-104:25; 110:2-6).
[63] Ex. O (T. Scott Depo. 292:24-293:4; 305:16-18; 318:11-17).

25  [64] Ex. AC (MJC 0203957).
[65] Ex. AG (MJC 0203976).

26  [66] Id.
[67] Ex. AF (MJC 0203602-0203603).

27  [68] Id. (MJC 0203602).
[69] Id. (MJC 0203603).

28

On January 17, Ms. Wang wrote to Mr. Zhang:  "Please feedback on Sears [APSUS MJC commission] contract the soonest as we need to sign it by end of this week."[70]  Mr. Zhang provided Gree's thoughts on Gree USA on January 18 and 22 – including expressing that "we hope both of two parties can try their best to get orders considering the whole batch business of 3 years SEARS project."[71] Ms. Wang's response concluded that "it will be no meaning to attend the pre-biding (sic) meeting of SEARS if we cannot sign the [APSUS] contract."[72]

On January 24, Ms. Wang wrote: "The only result we want from you is confirmed reply [on the MJC commission] . . . we can only assume you intended to give up on this customer.  Then we will cancel the meeting next week and there's no need you flying there to catch it."[73]  Mr. Zhang answered that Gree "genuinely value SEARS and the business with it."[74]  Ms. Wang replied "we will cancel the meeting as you wish."[75]  Mr. Zhang responded: "We suggest to deal with Gree USA's operational infrastructure and SEARS business at the same . . . time.  Please go ahead organize and attend the pre-biding (sic) meeting."[76]  Ms. Wang replied: "We have cancelled the [Sears] business trip to Chicago because you are not willing to sign the contract."[77]

On January 25, 2013, Mr. Scott likewise wrote to Mr. Zhang that "we don't have a signed contract with Gree so I made a production review meeting only for Sears next week."  He continued "I'm sorry to cancel the sales portion of the meeting but Gree had plenty of time to sign the contract."[78]

---

[70] Ex. AH (GREE0102622).
[71] *Id*. (GREE0102618).
[72] *Id*.
[73] *Id*. (GREE0102616).
[74] *Id*.
[75] *Id*.
[76] *Id*. (GREE0102615).
[77] *Id*.
[78] Ex. O (T. Scott Depo. Ex. 28).

In fact, a sales meeting was held with Sears.  The purpose of the meeting was supposed to be to discuss pricing,[79] which was Mr. Zhang's responsibility. Mr. Zhang wanted to attend.[80]  However, he did not because Mr. Scott and Ms. Wang untruthfully told him the sales meeting was cancelled because Gree would not sign another commission statement for MJC Supply.[81]

Gree USA lost the Sears business because its price was too high.[82]

A few things must be noted here.  On July 25, 2011, Charley Loh wrote to Mr. Scott that "we need to realize the high commissions and price will not get the deal and sometimes it is better to have the deal but make less like in Sears."[83] Mr. Scott agreed that for a large account like Sears, it is better to get the deal and worry about the commission later than to lose the deal.[84]  Mr. Scott also testified that there is no reason why there should be any difference between the price that Gree USA gave to MJC and the price quoted to Sears because "this is trying to secure business which is in everyone's best interest.  It is not one interest over the other."[85]  Mr. Scott further testified that Gree USA's prices were between 4% and 9% above what he thought it would take to get the Sears business.[86]  Thus, the Sears business was lost due to Ms. Wang surreptitiously adding a 9% commission for MJC to Gree's price quotes—exactly what Charley Loh and Tyler Scott testified should not be done.

> **(ii)   MJC Surreptitiously Used Mr. Scott to Direct the Most Profitable Sales to MJC**

Gree also learned for the first time in discovery that the Lohs and Mr. Scott

---

[79] *Id.* (302:15-303:16).
[80] *Id.*
[81] Ex. AI (MJC 0012228 (Jan. 14, 2013 e-mail from Charley Loh to Tyler Scott); Ex. N (T. Wang Depo. 132:4-11; 133:10-23; 135:25-136:18; 137:21-25; 138:1-6).
[82] Ex. O (T. Scott Depo. Ex. 31; 332:5-334:5).
[83] *Id.* (T. Scott Depo. Ex. 8).
[84] *Id.* (T. Scott Depo. 230:5-12).
[85] *Id.* (T. Scott Depo. 358:17-359:3).
[86] *Id.* (T. Scott Depo Ex. 31; 332:5-334:5).

1   were directing the most profitable product sales to MJC rather than to Gree USA.

2   The April 23, 2010 Memorandum of Understanding between Gree and MJC

3   Holding provided that the mission of Gree USA was to advance sales of Gree

4   products, and that Gree USA should sell Gree products as its primary products and

5   other non-Gree products as "supplemental products."[87]  It turns out that

6   unbeknownst to Gree, that is not what MJC and Mr. Scott did.

7   First, MJC paid Mr. Scott's company higher commissions on non-Gree

8   products sold through MJC than on Gree products sold through Gree USA.[88]  To

9   make matters worse, according to Mr. Scott, "the more expensive higher end goods

10  were carried by MJC" and "the lower end, more competitive priced goods were

11  Gree USA's."[89]  As an example, Mr. Scott noted that "a 14,000 BTU window air

12  conditioner will sell for $599 retail and there is a lot more margin in a product like

13  that than there is in a $99 air conditioner."[90]  Therefore, the $599 units were sold

14  through MJC and the $99 air conditioners were sold through Gree USA.[91]  MJC

15  sold 14,000 BTU air conditioners made by Bole or Aoli even though Gree also

16  made 14,000 BTU air conditioners.[92]  Meanwhile, Mr. Scott acknowledged that

17  Gree "probably lost $5" on every $99 air conditioner sold.[93]  Mr. Scott and the Lohs

18  intentionally misled Gree on this, asking Gree to quote a price for the 14,000 BTU

19  unit so that it would not ask any questions, but having no intention whatsoever of

20  conveying the Gree quote to the customer.[94]

21  Thus, MJC and Mr. Scott intentionally and underhandedly directed the most

22  profitable sales to MJC and left Gree with the unprofitable business.

23

24  [87] See Ex. AM (Memorandum of Understanding, G. Zhang Depo. Ex. 3).
    [88] Ex. O (T. Scott Depo. Ex. 25; 312:4-313:16).
25  [89] Ex. O (T. Scott Depo. 313:11-16).
    [90] *Id.* (T Scott Depo. 313:22-314:3).
26  [91] *Id.* (T Scott Depo. 313:23-314:7).
    [92] *Id.* (T Scott Depo. 314:22-316:1).
27  [93] *Id.* (T Scott Depo. 313:17-314:3).
    [94] *Id.* (T Scott Depo. Ex. 14).
28

**B.** **Defense 2: Failure to Mitigate Damages**

**1.** **Elements**

The elements of failure to mitigate are (a) failure to use reasonable efforts to mitigate damages; (b) the amount by which damages would have been mitigated.[95]

**2.** **Facts In Support**

MJC's damages experts have no opinions on MJC's efforts to mitigate.

Before MJC filed suit, it had informed Lowe's that it had other manufacturers in place to fill any Lowe's orders.  In August 2013 it told the same thing to Menards.[96]  After MJC America filed for Chapter 11 bankruptcy on December 10, 2013, its business was redirected to Soleus Home Comfort, a dba of MJC Supply.[97] From December 10, 2013 through August 31, 2014 (the most recent financial information produced by MJC), Soleus Home Comfort had sales of approximately $11,100,000 to Lowe's, $7,000,000 to Menards, and $1,900,000 to Fry's.[98]

Mr. Scott noted that it does not make a difference to large retail customers when branded companies such as MJC change manufacturers.[99]  If MJC is as successful and prominent as it claims to be, then it should easily be able to mitigate its alleged damages with sales of products from other manufacturers.

**C.** **Defense 3: Setoff**

**1.** **Elements**

"The right of setoff (also called "offset") allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A."[100]

---

[95] *See* Ninth Cir. Model Civ. Jury Inst. 5.3 (2007).
[96] Ex. O (T. Scott Depo. 271:1-4, 377:20-378:6; 385:18-386:5).
[97] *Id.* (T Scott Depo. Ex. 45); Ex. 5 (J. Loh Depo. 404:14-405:18).
[98] Ex. P (Anderson Expert Report at Ex. U).
[99] Ex. O (T. Scott Depo. Ex. 34).
[100] *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (internal quotations omitted).

2.      **Facts In Support:**

a.      **Gree USA Owes Gree More Than $74 Million for Product**

Gree USA owes Gree Hong Kong more than $74 million for unpaid product.[101]

b.      **MJC owes Gree USA Nearly $29 Million**

The Lohs are officers and directors of Gree USA and they own MJC Supply. In June 2013, the Lohs stole $28,622,320.81 from Gree USA by making MJC Supply issue bogus invoices to Gree USA, and then making Gree USA immediately pay those invoices. Ex. AK (J. Chen Decl. ISO TRO Application at ¶¶ 31-39.) This scheme was executed while Gree USA's CFO Jian Chen (the only Gree Hong Kong representative at Gree USA) was on vacation. (*Id.* ¶ 31.)

The Lohs then caused MJC Supply to distribute most of the Funds to themselves, their business partner Simon Chu, Jimmy Loh's wife Leping Loh (who was not an employee of MJC or Gree USA), MJC America, and Tyler Scott's company Soleus East,[102] in the following amounts:

- Charley Loh       -       $2,730,000.00
- Jimmy Loh         -       $1,500,000.00
- Leping Loh        -       $1,450,000.00
- Simon Chu         -       $2,200,000.00
- MJC America       -       $5,929,487.28
- Soleus East       -       $1,400,728.00
- MJC Supply        -       $5,447,531.57
- Other entities    -       $2,813,651.00[103]

In an effort to justify the bogus MJC Supply Invoices and mitigate their adverse impact on Gree USA, the Lohs also made Gree USA issue "offsetting" corresponding  invoices to Gree Hong Kong and booked those invoiced amounts as

---

[101] Ex. AN (R. Li. Depo. 36:10-19).
[102] Tyler Scott and his company Soleus East is an outside sales agent for MJC, and previously served as an outside sales agent for Gree USA.
[103] Ex. AO (series of checks and notes showing these improper preferential payments).

Gree USA receivables. [104]

### c.    Gree Has Direct Damages of More Than $9 Million[105]

When this litigation commenced in June 2013, more than 90,000 air conditioners not affected by the recall[106] were being warehoused at Gree's expense in the United States in order to support Gree USA's operations.  This inventory was branded "Soleus Air Powered by Gree."[107]

Neither Gree USA nor MJC had paid Gree Hong Kong for the cost of the "Soleus Air Powered by Gree" inventory—over $14 million[108]—because the inventory had not yet been sold.  After the litigation was filed, MJC refused to permit Gree to sell the inventory, arguing that it bore the "Soleus Air" mark.[109] Gree Hong Kong was thus owed over $14 million from Gree USA for the cost of the inventory, and was also forced to continue to bear the significant fees associated with warehousing the inventory in the United States.  In order to recoup what it could of the costs of the inventory, terminate its obligation to warehouse the products, the mitigate the damage that MJC was causing Gree to incur related to the inventory, Gree began to shop the inventory to buyers who would remove all "Soleus Air Powered by Gree" (and any other marks) from the inventory before it was sold.[110]  In order to find buyers that would agree to remove the marks, Gree significantly reduced the price of the inventory causing Gree to incur over $9 million in losses based on cost of the goods.[111]

---

[104] Ex. J (J. Loh Dep. 176:18-178:3); Ex. AQ (July 30 J. Loh Decl. ¶ 39-40, and Exs. F and G attached thereto; Ex. AP J. Chen Decl. ISO Preliminary Injunction, executed July 1, 2013, ¶ 7.

[105] Gree has sought permission of the Court to conform its pleading to this evidence, which both parties' experts have already opined on.  *See* Dkt. No. 141.

[106] Ex. P (Anderson Report at 3).

[107] Ex. Q (S. Mao Depo. 86:24-87:2)

[108] Ex. P (Anderson Report at 3).

[109] Ex. AR (Lizzy Gao Depo. Ex. 14).

[110] Ex. AS (SMS P&I Agree. GREE0014779-83); Ex. Q (S. Mao Depo. 87:6-10; 91:5-9).

[111] Ex. P (Anderson Report at 3).

### III.   EVIDENTIARY ISSUES

Gree does not anticipate any evidentiary issues not covered by the parties' motions in limine, or that cannot be addressed through timely objections made during trial.

### IV.   ISSUES OF LAW

Gree does not anticipate any issues of law for the Court to decide.

### V.   JURY TRIAL

The parties have both timely demanded a jury trial on all issues.

Dated:  March 23, 2015          MORRISON & FOERSTER LLP


By:   ____/s/ Mark C. Zebrowski_____
          Mark C. Zebrowski

          Attorneys for Defendants and Counterclaimants
          GREE ELECTRIC APPLIANCES, INC. OF
          ZHUHAI AND HONG KONG GREE
          ELECTRIC APPLIANCES SALES LTD.

# CERTIFICATE OF SERVICE

I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 12531 High Bluff Drive, San Diego, California, 92130-2040. I am not a party to the within cause, and I am over the age of eighteen years.

I further declare that on March 23, 2015, I served a copy of:

**GREE DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW,**

☒    **BY ELECTRONIC SERVICE [Fed. Rule Civ. Proc. rule 5(b)]** by electronically mailing a true and correct copy  through Morrison & Foerster LLP's electronic mail system to the e-mail address(es) set forth below, or as stated on the attached service list per agreement in accordance with Federal Rules of Civil Procedure rule 5(b).

| | |
|---|---|
| Stephen J. Erigero | Neal Marder |
| Tahereh Mahmoudian | Ali R. Rabbani |
| Ropers, Majeski, Kohn & Bentley | Ian C. Eisner |
| 445 South Figueroa St., Suite 3000 | Winston & Strawn LLP |
| Los Angeles, CA  90071 | 333 South Grand Avenue |
| Telephone: (213) 312-2000 | Los Angeles, California 90071 |
| Facsimile: (213) 312-2001 | Telephone: (213) 615-1700 |
| Email Service on: | Facsimile: (213) 615-1750 |
| serigero@rmkb.com; | Email Service on: |
| tmahmoudian@rmkb.com; | nmarder@winston.com; |
| kcederquist@rmkb.com; | arabbani@winston.com; |
| jcecchini@rmkb.com; | ieisner@winston.com |
| keiko.kakiuchi@rmkb.com; | |
| sshaner@rmkb.com | |
| | Attorneys for Plaintiff MJC America, Ltd. dba Soleus International Inc.; |
| Attorneys for Counter-Defendants MJC America Holdings Co., Inc., MJC Supply, LLC, Charley Loh, Jimmy Loh and Simon Chu | Plaintiffs and Counter-Defendants MJC America Holdings Co., Inc. and MJC Supply, LLC; and Counter-Defendants Charley Loh, Jimmy Loh and Simon Chu |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 23, 2015, in San Diego, California.

| | |
|---|---|
| _____Mark C. Zebrowski_____ | _____/s/ Mark C. Zebrowski_____ |
| (typed) | (signature) |