MARK C. ZEBROWSKI (CA SBN 110175)
MZebrowski@mofo.com
DON G. RUSHING (CA SBN 87565)
DRushing@mofo.com
ELLEN NUDELMAN ADLER (CA SBN 235534)
EAdler@mofo.com
JOANNA L. SIMON (CA SBN 272593)
JoannaSimon@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendants and Counterclaimants
GREE ELECTRIC APPLIANCES, INC.
OF ZHUHAI and HONG KONG GREE
ELECTRIC APPLIANCES SALES LTD.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MJC America, Ltd. dba Soleus International, Inc. and MJC America Holdings Co., Inc., and MJC Supply, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>Gree Electric Appliances, Inc. of Zhuhai and Hong Kong Gree Electric Appliances Sales Ltd., and Does 1 through 10, inclusive,<br><br>Defendants,<br><br>and<br><br>Gree USA, Inc., a California corporation,<br><br>Nominal Defendant. | Case No. 2:13-cv-04264-SJO-(CWx)<br><br>**GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI and HONG KONG GREE ELECTRIC APPLIANCES SALES LTD.'S TRIAL BRIEF**<br><br>The Honorable S. James Otero<br><br>Continued Trial Date:  April 28, 2015<br>Complaint filed:  June 13, 2013 |

| | |
|---|---|
| 1 | Gree Electric Appliances, Inc. of Zhuhai and Hong Kong Gree Electric Appliances Sales Ltd., |
| 2 | |
| 3 | Counterclaimants, |
| 4 | vs. |
| 5 | MJC America Holdings Co., Inc., MJC Supply, LLC, Charley Loh, Jimmy Loh, and Simon Chu, and Does 11-20, inclusive, |
| 6 | |
| 7 | |
| 8 | Counterdefendants, |
| | and |
| 9 | |
| 10 | Gree USA, Inc., a California corporation, |
| 11 | Nominal Defendant. |

Gree Electric Appliances, Inc. of Zhuhai (Gree Zhuhai) and Hong Kong Gree Electric Appliances Sales Ltd. (Gree Hong Kong) (collectively, "Gree") submit this Trial Brief.

## I. WHAT THE CASE IS ABOUT

This is a business dispute between two partners (Gree and MJC) arising out of a joint venture called Gree USA that imploded due to mounting losses and MJC's decision to part ways rather than restructure the company.

### A. The Parties' History Together

MJC sold Gree-manufactured products in the U.S. for over ten years before Gree USA was formed. MJC never experienced any safety-related problem with Gree products during that time, nor did Gree experience any such problems.

### B. The Gree USA Joint Venture

Gree USA was formed in 2010 to sell products manufactured by Gree in the United States. Defendant Gree Hong Kong owned 51% of Gree USA and plaintiff MJC Holdings owned 49%.

From the beginning, Gree made clear to MJC principals Jimmy and Charley Loh that Gree desired that Gree USA become a "real" stand-alone company with its own employees. The Lohs understood Gree's objective.

Gree provided extensive support to assist Gree USA to be profitable, including:

- Gree agreed to make only 1% to 2% on the products it sold to Gree USA.
- Gree provided free credit to Gree USA and did not require payment until after Gree USA received payment from its customers. This allowed Gree USA to make sales to large retailers such as Sears and Lowe's.
- Gree paid to warehouse Gree USA's inventory in the U.S.
- Gree transferred its Gree-branded customers to Gree USA.

- Gree agreed to leave its share of profits in Gree USA for the first three years.

### C.  Payments to MJC Leave Gree USA Without a Profit

Gree relied on the Lohs to manage and operate Gree USA, with only one Gree representative on site—Gree USA Chief Financial Officer Jian Chen.  In the early fall of 2012, Gree learned that Gree USA was not profitable despite having nearly $150,000,000 in sales.  This was in large part because Gree USA's gross profit was being paid out as commissions to MJC based on Account Project Set Up Sheets ("APSUS").

The APSUS were negotiated and signed by Charley Loh and then-Gree employee Larry Lam.  The APSUS determined how much of Gree USA's gross profit on a particular sale would be retained in Gree USA and how much would be paid to MJC.  MJC and Mr. Lam signed a separate APSUS for each major sale.  Jimmy Loh referred to each APSUS as a "mini-contract."  (*E.g.*, Trial Ex. 641.)  Mr. Loh conceded that if MJC and Gree could not come to an agreement regarding payments for a particular sale, then an APSUS would not be signed. That is, Gree had no obligation to sign any particular APSUS.

Under the "standard build up" in the APSUS, Gree USA would retain 1% of the gross sales price for promotion and advertising expenses and a 1.5% to 3% reserve for defective returns.  MJC was then to be paid up to 7% of the gross sales price for after sales service and warranty, 2% for management expense, a 1% merchandising fee, and a 2%-3% sales commission, for a total of up to 12%-13%.

The marketplace in which Gree USA competes is extremely price competitive.  As a result, despite Gree Zhuhai's extremely small mark up on its sales to Gree USA, Gree USA's gross profit was not sufficient to pay the "standard build up" percentages in the APSUS.  Instead, only a weighted average 6.19% of the sales price was actually available for the payments to MJC.  After those payments were made, Gree USA had no profit.  The difference between the

percentage allocated to MJC and what was actually left to pay to MJC was referred to as the APSUS "shortfall."

### D. Gree USA's Restructuring

In light of Gree USA's lack of profitability, on September 19, 2012, Mr. Lam told MJC that Gree desired to get on with restructuring Gree USA into the stand-alone company it was meant to be. In November, Gordon Zhang of Gree again told MJC that Gree wanted Gree USA to be a standalone company with its own employees and to do away with the commission payments to MJC Supply. Gree and MJC discussed the Gree USA restructuring again in Hong Kong on December 18, 2012. Jimmy Loh also discussed Gree USA's materialization with Gree senior executives and he provided his plans on how Gree USA could be restructured. But the parties never reached an agreement.

### E. MJC Stops Being a Partner and Secretly Pursues its Own Self Interests

Facing the fact that the controlling shareholder would no longer allow MJC to continue to drain Gree USA's profits, and unbeknownst to Gree, MJC started separating from Gree and Gree USA and working contrary to Gree USA's interests.

#### 1. MJC Loses the Sears Business Over a Secret Commission

In the ordinary course of business, Gree would provide Gree USA with price quotes for customers and Gree USA would present those prices to the customers. Also, in the ordinary course of business, Gree's representative would participate in the price negotiation meetings with the customers to close the sale. Finally, in the ordinary course of business, an APSUS was not signed until after a customer agreed to buy from Gree USA.

As Gree was discussing restructuring Gree USA in 2012, the next sales season started with the Sears account. MJC insisted that Gree sign a three-year APSUS contract as a pre-condition to pursuing the Sears business. Gree explained that it was not willing to do so because Gree USA was to be restructured and that

MJC and Gree should pursue Sears and other business while they continued to work on the restructuring. In retaliation, MJC told Gree that it had cancelled the sales meeting with Sears because Gree would not sign another three-year APSUS for the Sears account, and that therefore Gree's manager Gordon Zhang should not travel to Chicago for the meeting.

That was not true. There was a sales meeting with Sears in January 2013, but Mr. Zhang, who was in charge of pricing for Gree, did not attend.

And that's not all. Unbeknownst to Gree, Tracy Wong instructed Gree USA's sales representative, Tyler Scott, to add 9% to Gree's price quotes to Sears in order to build in a secret commission for MJC. Mr. Scott called these prices a "joke," but did as instructed by Ms. Wong. Gree USA lost the Sears account because its prices were 4% to 9% too high on various products. MJC then brazenly blamed Gree for the loss of the Sears business.

### 2. MJC Decides to Part Ways

Tyler Scott testified that the decision to separate from Gree was made in March 2013 because Gree would not sign another MJC commission statement for Lowe's. By March 25, 2013, Mr. Scott had prepared an extensive plan for the separation, including aligning with new manufacturers. Jimmy Loh testified that he decided it was time to stop doing business with Gree in May 2013 due to a variety of business issues including Gree not signing a commission statement for the Sears business. In May 2013, MJC made a presentation to Lowe's stating that MJC was no longer doing business with Gree and that it had other manufacturers available to fill Lowe's orders. Gree knew none of this.

### F. MJC Sues Gree And Continues to Sell to Gree USA's Customers

In June 2013, after setting up its new business, MJC sued Gree claiming it is owed over one hundred million dollars in damages arising from the short-lived, unprofitable, failed joint venture that MJC chose to quit.

Since June 2013, MJC, through Mr. Scott, has sold over $30,000,000 of products including air conditioners and dehumidifiers to customers that were formerly Gree USA's customers. Gree has not sold products to former Gree USA customers.

### G. Gree USA Is In Dissolution

Gree USA's Articles of Association mandate dissolution if certain events occur. Jimmy Loh admitted that three mandatory dissolution events occurred. Jimmy Loh verified MJC's August 23, 2013 Superior Court complaint that included a claim to dissolve Gree USA, which MJC later inexplicably withdrew. Gree Hong Kong subsequently initiated dissolution by majority shareholder vote pursuant to California Corporations Code Section 1900(a) ("Any corporation may elect voluntarily to wind up and dissolve by the vote of the shareholders holding shares representing 50 percent or more of the voting power."). Gree USA is done.

## II. MJC'S CLAIMS TO BE TRIED TO THE JURY SUFFER MAJOR DEFICIENCIES

The Proposed Pretrial Conference Order ("Proposed PTCO"), which supersedes MJC's Second Amended Complaint,[1] highlights the legal and factual deficiencies in MJC's remaining claims.

### A. Claim 1: Fraud in the Inducement

In Plaintiffs' first claim, MJC America and MJC Supply claim that "Gree fraudulently induced MJC America and MJC Supply to enter into a joint venture through intentional misrepresentations and omissions regarding the quality, safety, and/or sales potential of Gree's products." (Dkt. No. 247-1, Proposed PTCO, at 5:18-21.)

---

[1] Fed. R. Civ. P. 16(e); *Northwest Acceptance Corp. v. Lynnwood Equip.*, 841 F.2d 918, 924 (9th Cir. 1988) ("A pretrial order has the effect of amending the pleadings, and controls the subsequent course of action in the litigation") (internal citations omitted); *Eagle v. American Tel. & Tel. Co*, 769 F.2d 541, 548 (9th Cir. 1985).

### 1. There Was No Fraud

There is no evidence that Gree intentionally made any misrepresentation to MJC concerning the quality or safety of Gree's products. MJC sold Gree-manufactured products for a decade before Gree USA was formed. MJC never experienced any substantial quality or safety issue with Gree's products during this time. Nonetheless, MJC alleges that Gree's representation that it made quality products was fraudulent and therefore induced MJC to form Gree USA.

MJC's fraud theory is based on the fact one Gree customer (GE) asked Gree to make to some changes to dehumidifiers manufactured for GE. MJC argues that because GE requested certain specification changes to GE dehumidifiers, Gree *knew* that its other dehumidifiers were defective. However, GE's own witness testified that the changes GE requested were simply part of GE's "continuous product improvement" process, GE had no information that there was any "specific risk" related to the Gree dehumidifiers, and GE did not believe its requested changes were "necessary." Gree was not aware of any problems with its dehumidifiers before Gree USA was formed.

### 2. MJC America and MJC Supply Do Not Have Standing to Pursue the Fraud Claim

"An action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17. MJC's fraud claim is legally flawed because MJC America and MJC Supply do not having standing to pursue the fraud claim.

Plaintiffs' fraud claim asserts that "Gree fraudulently induced MJC America and MJC Supply to enter into a joint venture[.]" However, neither MJC America nor MJC Supply entered into the joint venture to form Gree USA. As the Proposed PTCO correctly states in its "admitted facts" section:

- Gree USA had two shareholders: Gree Hong Kong (51%) and *MJC Holdings* (49%). (Proposed PTCO at 3:21-24.);
- *MJC Holdings* was formed for the purpose of holding a 49% ownership interest in Gree USA. (*Id.* at 4:19-20.);

- The Joint Venture Agreement and Articles of Association for Gree USA were signed by representatives from Gree Hong Kong and *MJC Holdings*. (*Id.* at 5:3-5.)

MJC Holdings is the only real party in interest with regard to Plaintiffs' fraud Claim because it is the only MJC entity that "entered into" the joint venture. MJC America and MJC Supply have no standing to prosecute the claim.

### 3. Plaintiffs Have No Recoverable Fraud Damages

Damages are an essential element of a fraud claim. (*See, e.g.*, Proposed PTCO at 7:6.) "The proper measure of damages in fraud actions under California law . . . is 'out-of-pocket' damages." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006). "The out-of-pocket measure of damages is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received." *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995) (internal quotations omitted).[2]

MJC Supply and MJC America have no evidence of any legally recoverable damages on their fraud claim – *i.e.*, any out of pocket expenses incurred in forming Gree USA in reliance on any alleged misrepresentations by Gree about the quality of Gree's product. MJC's damages expert, Mr. Wallace, only offers a "but for" lost profits analysis that assumes: (i) Gree USA would exist for 10 years, (ii) Gree would pay a volume rebate to Gree USA each year and 90% of that would go to

---

[2] *See also Simon v. San Paolo U.S. Holding Co.*, 35 Cal. 4th 1159, 1176 n.4 (Cal. 2005) (emphasis added):

> Simon cites our decision in *Lazar v. Super. Ct.,* 12 Cal.4th 631, 646 (1996) for the proposition that fraud plaintiffs generally may recover benefit-of-bargain as well as out-of-pocket damages. *The reliance is misplaced: our reference in that decision to benefit-of-bargain damages was to their recovery under a contract cause of action*.

MJC, and (iii) Gree would pay the shortfalls each year. Plaintiffs cannot recover such benefit of the bargain lost profits damages on their fraud claim.[3]

### B. Claim 2: Intentional Interference With Contractual Relations

In Plaintiffs' second remaining claim, MJC America and MJC Supply and assert that "Gree intentionally interfered with the contract between MJC America and MJC Supply, on the one hand, and Gree USA, on the other hand, as memorialized in the Agreement of Distribution[.]" (Proposed PTCO at 5:22-25.); (Trial Ex. 56 is the purported Agreement of Distribution.)

#### 1. MJC America Cannot Pursue Claim 2 Because It Is Not a Party to the Agreement of Distribution

The Agreement of Distribution states that it is made between Gree USA and MJC Supply "with consent of MJC America." MJC America purportedly signed to "consent" to the agreement. MJC America cannot state a claim for interference with the Agreement of Distribution because it is not a party to the contract. *See* CACI 2201; *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) (the first element of interference with contractual relations is "a valid contract between *plaintiff* and a third party") (emphasis added); *Curtis v. Shinsachi Pharm. Inc.*, 45 F. Supp. 3d 1190 (C.D Cal. 2014). MJC America cannot prosecute this claim.

#### 2. Claim 2 Fails Because It Is a Claim for Breach of Contract

The only rights purportedly granted to MJC Supply under the Agreement of Distribution – and thus the only rights with which Gree could interfere – are MJC's alleged rights to receive shortfall and rebate payments from Gree USA.

---

[3] If MJC Holdings was the claimant it could conceivably argue that it was entitled to "out of pocket" damages in the amount of its capital investment in Gree USA ($39,200). However, MJC Holdings received a $98,000 profit distribution from Gree USA in 2012. Therefore, it has no out of pocket damages.

Concerning shortfalls, the purported Agreement of Distribution states:

- "If the net amount is negative [*i.e.*, if there is a shortfall] . . . Gree HK shall make payment to Gree USA." (Trial Ex. 56, p. 1.); and
- "MJC Supply shall . . . receive 100% of the funds *from Gree USA* if the net build up is negative, and only when Gree USA receives settlement funds from Gree HK." (*Id.*, p. 2.)

If the Agreement of Distribution was legitimate, it would reflect two *contractual obligations* related to the shortfalls: (1) a *contractual obligation* for Gree Hong Kong to make shortfall payments to Gree USA, and (2) a *contractual obligation* for Gree USA to make shortfall payments to MJC Supply if, but only if, Gree USA received shortfall payments from Gree Hong Kong. (*See Id.*)

Concerning volume rebates, the Agreement of Distribution states:

- Based on the *promise* from Gree Zhuhai, *Gree USA* would receive for additional bonus . . . from Gree Zhuhai or Gree HK . . . it is agreed that Gree USA shall retain 10% for the bonus and rewards of this nature upon receipt and the remaining 90% shall be paid to MJC. (*Id.*, p. 2.)

If the Agreement of Distribution was legitimate, this would be another *contractual obligation* for Gree to pay Gree USA a rebate and a corresponding *contractual obligation* for Gree USA to pay 90% of that rebate to MJC Supply if, but only if, Gree USA received the rebate pursuant to its alleged contract with Gree.

The crux of MJC's interference claim is that MJC Supply did not receive any shortfall or rebate payments from Gree USA under the Agreement of Distribution *because Gree did not make any shortfall or rebate payments to Gree USA*. That is, MJC's interference claim is based and dependent on the assertion that Gree *breached a contract to pay Gree USA*.[4] That is the fatal legal problem with MJC

---

[4] Even if Gree *was not* contractually obligated to do so, MJC Supply has no interference claim because there was no other alleged "interfering" conduct.

Supply's interference claim: It is a breach of contract claim and only a breach of contract claim.

If Gree was contractually obligated to pay Gree USA, then MJC Holdings would have a derivative claim for breach of contract on behalf of Gree USA. However, MJC Holdings dismissed its derivative claims.[5] If Gree USA was contractually obligated per the Agreement of Distribution to then pay shortfall and rebate funds over to MJC Supply but failed to do so, then MJC Supply would have a breach of contract claim against Gree USA. ***MJC cannot convert these two separate breach of contract claims into one tortious interference claim.***

*Applied Equip. v. Litton Saudi Arabia, Ltd.*, 7 Cal. 4th 503, 514-16 (1994), is instructive. There, the California Supreme Court stated: "Contract and tort are different branches of law. Contract law exists to enforce legally binding agreements between parties; tort law is designed to vindicate social policy." *Id.* at 514. The Court emphasized that "***[a]n omission to perform a contract is never a tort***, unless that omission is also an omission of a legal duty." *Id.* at 515 (emphasis added.) Continuing, the Court stated that "[a] party who merely breaches his contract should in all cases be exposed only to contractual liability as he has not assumed the role of an intentional interferer." *Id.* at 517.

The only thing Gree did to "interfere" with MJC's purported rights under the alleged Agreement of Distribution was, at most, *breach its alleged contractual obligation* to pay rebates and shortfalls to Gree USA. While Gree's failure to pay rebates and shortfalls it was allegedly *contractually obligated* to pay Gree USA may give rise to a breach of contract claim by Gree USA, it cannot support MJC's

---

[5] In any event, the derivative claim previously pled (and now abandoned) by MJC Holdings never alleged a cause of action for breach of contract against Gree by Gree USA related to the Gree's failure to pay shortfalls or rebates. The derivative claim for breach of contract previously alleged by MJC Holdings concerned Gree's purported breach of an indemnity agreement to Gree USA.

tortious interference with contract claim.

### 3. There Is a Glaring Problem: Gree is Not a Party to the Alleged Agreement of Distribution

The Agreement of Distribution expressly purports to obligate Gree to make shortfall and rebate payments to Gree USA. However, Gree is not a party to it and did not sign it; it was only signed by the Lohs for Gree USA, MJC Supply and MJC America (MJC America as a "consent").

### 4. The Alleged Agreement of Distribution Cannot Support an Intentional Interference Claim Because Gree Had No Knowledge of It

Knowledge of the contract is an essential element of intentional interference with contractual relations. *625 3rd St. Associates, L.P. v. Alliant Credit Union*, 633 F. Supp. 2d 1040, 1047-48 (N.D. Cal. 2009) (second element of interference with contractual relations is "defendant's knowledge of this contract.") The Agreement of Distribution is only signed by the Lohs for MJC and Gree USA; it is not signed by anyone on behalf of Gree. While the Lohs claim Larry Lam was aware of and agreed to the Agreement of Distribution, Mr. Lam testified that he first saw the purported Agreement the evening before his deposition in December 2014. MJC cannot maintain its claim for interference with the Agreement of Distribution because Gree had no knowledge of the purported agreement.

## C. Claim 3: Intentional Interference With Prospective Economic Advantage

In Plaintiffs' third claim, MJC America and MJC Supply assert that "Gree intentionally and wrongfully disrupted MJC America and MJC Supply's economic relationship with Gree USA." (Proposed PTCO at 6:2-5.)[6]

---

[6] The Court determines whether the conduct alleged qualifies as wrongful, if proven.

### 1. Claim 3 Fails As to MJC Supply Because Its Economic Relationship With Gree USA Was Contractual

The interference with prospective economic advantage tort "applies to interference with existing non-contractual relations which hold the promise of future economic advantage." *O'Connor v. Uber Techs., Inc.*, Case No. C-13-3826 EMC, ---F. Supp.3d ---, 2014 WL 4382880 (N.D. Cal. Sept. 4, 2014).

MJC Supply's relationship with Gree USA was contractual; it was based on the APSUSs that Jimmy Loh testified were "mini-contracts" for each major account sale and determined how much of Gree USA's gross profit would be paid over to MJC Supply, and on the alleged Agreement of Distribution. Therefore, MJC Supply cannot prosecute this claim.

### 2. Claim 3 Fails as to MJC America Because It Had No Economic Relationship With Gree USA

Once Gree USA paid MJC Supply pursuant to an APSUS, it was up to MJC Supply to pay any of its obligations. Among others, *MJC Supply* made payments to MJC America; but *Gree USA* did not. MJC America also was not a party to the Agreement of Distribution or APSUS. MJC America had no economic relationship – contractual or otherwise – with Gree USA. Therefore, MJC America cannot prosecute this claim.

### 3. Gree Did Not Interfere with MJC Supply's Prospective Economic Relationship With Gree USA

There is no evidence that Gree intentionally interfered with either MJC Supply's or MJC America's prospective economic relationship with Gree USA. As discussed above, MJC itself caused the Sears contract to fall through in 2013 when Tracy Wang surreptitiously instructed Tyler Scott to increase the prices for Gree products that were presented to Sears *without Gree's knowledge or approval*. Tracy Wang interfered with MJC's prospective economic advantage with Gree USA; Gree did not.

### D. Claim 7: Federal Unfair Competition (Trademark)

In Plaintiffs' seventh claim, MJC Supply claims that "Gree Hong Kong's use in commerce of the term "Soleus Air" in connection with goods or services constitutes unfair competition in violation of 15 U.S.C. § 1125(a)." (Proposed PTCO at 6:10-13.)

#### 1. The Trademark Claim Fails Because MJC Does Not Own the Trademark That Was Actually on the Goods

To prove its trademark claim, MJC Supply must prove that it owned a trademark for "Soleus Air" and that Gree used the term "Soleus Air" in commerce in a way that was likely to cause confusion. (Proposed PTCO at 9:8-17.) The goods that were sold by Gree were air conditioners that were labeled "Soleus Air Powered by Gree." The Soleus Air Powered by Gree trademark was *owned by Gree USA,* not by MJC Supply. (*See* Trial Ex. 669.) Gree USA abandoned that trademark in August 2012, long before Gree sold the air conditioners in 2014.

#### 2. The Trademark Claim Fails Because There is No Evidence of Consumer Confusion

MJC Supply's claim also fails because MJC must prove that Gree Hong Kong used the mark in a way that "is likely to cause confusion[.]" 15 U.S.C. § 1125(a)(1)(A). "[W]hat is at issue is whether there is a likelihood of confusion as to source." *American Circuit Breaker Corp. v. Oregon Breakers, Inc.*, 406 F.3d 577, 580, 584 (9th Cir. 2005); *Jada Toys Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008); *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1998) ("The ultimate test for unfair competition is *exactly the same as for trademark infringement:* whether the public is likely to be deceived or confused by the similarity of the marks.") (emphasis added).

Consumer confusion is proven by direct consumer testimony or expert testimony which is typically based on consumer surveys. *Univision Music LLC v. Banyan Entertainment*, No. CV 04-9242 DSF (CTx), 2004 WL 5574359 at *3 (C.D. Cal. Nov. 15, 2004) ("Reactions of the public are typically tested through the

use of consumer surveys . . . a plaintiff's failure to conduct a consumer survey . . . may lead to an inference that the results of such a survey would be unfavorable.")

MJC Supply has no evidence of consumer confusion.

Furthermore, the air conditioners at issue were in fact genuine "Soleus Air Powered by Gree" products. There can be no likelihood of any consumer confusion as to source or authenticity when there is a sale of genuine goods, even if the sale is unauthorized. *McCoy v. Mitsuboshi Cutlery*, 67 F.3d 917 (Fed. Cir. 1995).

In *Brand Mgmt. Inc. v. Menard, Inc.*, Case No. 97-1329, 1998 U.S. App. LEXIS 493, *9 (Fed. Cir. Jan. 14, 1998), as here, the products at issue "were manufactured under a license and distributed in accordance with the same quality control procedures observed by the trademark owner." When the business relationship ended, the manufacturer had significant inventory remaining which was sold, according to the trademark holder, without permission. The court held that the lack of Lanham Act liability was an "inevitable legal conclusion" because the products were genuine. *Id.* at *11-12. The same conclusion is inevitable here as a matter of law (even if MJC Supply owned the trademark and had standing to bring trademark claim) because the goods at issue were genuine.

### 3. The Trademark Claim Fails Because There is No Evidence of Trademark Damages

MJC Supply must prove both the fact and the amount of trademark damages. *See, Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir.1993). MJC has no evidence of any damages related to its trademark claim.

### III. MJC'S 17200 CLAIM FAILS FOR LACK OF A REMEDY

In Plaintiffs' fifth claim, MJC Supply and MJC America assert that Gree violated California Business and Professions Code Section 17200. (Proposed PTCO at 6:6-9.) There is no right to a jury trial in cases under Section 17200. *C & K Eng'g v. Amber Steel Co.*, 23 Cal. 3d 1, 8 (1978); *Okura & Co. (America), Inc. v. Careau Group*, 783 F. Supp. 482, 490 (C.D. Cal. 1991).

The remedies available under Business and Professions Code Section 17200 include restitution and injunctions, but not damages. *See* Cal. Bus. & Prof. Code § 17203; *Deitz v. Comcast*, No. C 06-06352 WHA, 2006 WL 3782902, at *4-*5 (N.D. Cal. Dec. 21, 2006) ("An unfair competition action is equitable in nature; thus damages are not available to private plaintiffs who bring Section 17200 claims. As a result, prevailing plaintiffs are generally limited to injunctive relief and restitution") (internal quotations and citations omitted).

There is no basis for restitution because Plaintiffs do not claim that Gree wrongfully obtained anything of theirs to be returned to them. There is no basis for an injunction because Plaintiffs do not claim that there is any ongoing action or threat of future action to enjoin.

## IV. PLAINTIFFS' DAMAGE EXPERT'S OPINION IS UNRELATED TO PLAINTIFFS' CLAIMS OR LEGALLY RECOVERABLE DAMAGES

MJC's damage expert, Mr. Wallace, bases his opinion on what he determined to be the profits MJC Supply and MJC America purportedly would have earned in his "but for world" where Gree USA continued in business and Gree paid all APSUS shortfalls and volume rebates from 2012 to 2021. This has many problems.

First, Mr. Wallace's "but for world" is demonstrably not the real world. In the real world, Gree USA is in dissolution. Furthermore, the evidence will show that Gree never agreed to pay APSUS shortfalls or volume rebates. MJC cannot recover what Mr. Wallace opines it would have earned in his "but for world" when MJC would never have earned any of that alleged lost profit in the real world.

Second, the damages as to which Mr. Wallace opines are not legally recoverable on any of MJC's claims.

Plaintiffs cannot recover but for lost profits on their first claim for fraud; they can only recover out of pocket losses, and Mr. Wallace has no opinion on any out of pocket losses.

Plaintiffs cannot recover Mr. Wallace's but for lost profits damages on their second claim for interference with contractual relations because MJC America has no standing to bring the claim and the MJC Supply's claim also fails as a matter of law.

Plaintiffs cannot recover but for lost profits on their third claim for interference with their economic prospective advantage with Gree USA because the APSUSs were contracts that allegedly set forth how much MJC was to receive from Gree USA and MJC further claims that Gree promised (*i.e.*, was contractually obligated) to pay the APSUS shortfalls and the volume rebates on which Mr. Wallace's opinion depends. As such, MJC's claim, if any, would be for breach of contract, but MJC cannot sustain its claim for interference with prospective economic advantage.

Plaintiffs cannot recover but for lost profits on their fifth claim for unfair business practices because they cannot recover *any* damages on that claim.

Mr. Wallace does not have an opinion on any damages for Plaintiff's seventh claim for trademark unfair competition.

Finally, Mr. Wallace does not have an opinion on any damages allegedly sustained by MJC Holdings.

Mr. Wallace's but for lost profits claim is of no relevance to the claims asserted by Plaintiffs in the Proposed PTCO.

## V.     CONCLUSION

The Proposed PTCO governs the parties' claims, and under the Proposed PTCO, MJC's legal claims and damages are factually and legally defective. Accordingly, Gree anticipates moving for judgment as a matter of law on several of MJC's claims at the appropriate time.

| | | |
|---|---|---|
| 1 | Dated: April 23, 2015 | MORRISON & FOERSTER LLP |
| 2 | | |
| 3 | | By: /s/ Mark C. Zebrowski |
| 4 | | Mark C. Zebrowski |
| 5 | | Attorneys for Defendants and Counterclaimants GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI AND HONG KONG GREE ELECTRIC APPLIANCES SALES LTD. |