1  NEAL R. MARDER (SBN: 126879)
   nmarder@winston.com
2  ALI R. RABBANI (SBN: 253730)
   arabbani@winston.com
3  IAN C. EISNER (SBN: 254490)
   ieisner@winston.com
4  DREW A. ROBERTSON (SBN: 266317)
   darobertson@winston.com
5  **WINSTON & STRAWN LLP**
   333 S. Grand Avenue
6  Los Angeles, CA 90071-1543
   Telephone:  (213) 615-1700
7  Facsimile:   (213) 615-1750

8  *Attorneys for Plaintiffs and Counter-Defendants*

9  STEPHEN J. ERIGERO (SBN: 121616)
   serigero@rmkb.com
10 TAHEREH MAHMOUDIAN (SBN: 217120)
   tmahmoudian@rmkb.com
11 **ROPERS, MAJESKI, KOHN & BENTLEY**
   445 South Figueroa Street, Suite 3000
12 Los Angeles, CA 9071-1619
   Telephone:  (213) 312-2000
13 Facsimile:   (213) 312-2001

14 *Attorneys for Counter-Defendants*

15                **UNITED STATES DISTRICT COURT**

16                **CENTRAL DISTRICT OF CALIFORNIA**

17 MJC America, Ltd., et al.,              ) Case No. 13-CV-04264-SJO (CWx)
                                            )
18          Plaintiffs,                     ) **PLAINTIFFS' TRIAL BRIEF**
                                            )
19    vs.                                   )
                                            )
20 Gree Electric Appliances, Inc. of Zhuhai,) Complaint Filed: June 13, 2013
   et al.,                                  ) Trial Date: April 28, 2015
21                                          )
            Defendants.                     )
22                                          )
   and                                      )
23                                          )
   Gree USA, Inc.,                          )
24                                          )
            Nominal Defendant.              )
25                                          )
                                            )
26 _____ )

27

28

| | |
|---|---|
| 1 | Gree Electric Appliances, Inc. of Zhuhai, )<br>et al., ) |
| 2 | ) |
| 3 | Counterclaimants, )<br>) |
| 4 | vs. )<br>) |
| 5 | MJC America Holdings Co., Inc., et al., )<br>) |
| 6 | Counterdefendants, )<br>) |
| 7 | and )<br>) |
| 8 | Gree USA, Inc., )<br>) |
| 9 | Nominal Defendant. ) |

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

PLAINTIFFS' TRIAL BRIEF

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................1

II. FACTUAL BACKGROUND .................................................................................2

III. CAUSES OF ACTION...........................................................................................5

    A. Fraud..............................................................................................................5

    B. Intentional Interference With Contractual Relations. ..................................7

    C. Intentional Interference With Prospective Economic Advantage..............7

    D. Violation of California's Unfair Competition Law. ...................................8

    E. Federal Unfair Competition. ........................................................................9

IV. Responses to Gree's Affirmative Defenses.........................................................9

    A. MJC Does Not Have Unclean Hands..........................................................9

        1. MJC Does Not Have Unclean Hands on Count II..........................9

        2. MJC Does Not Have Unclean Hands on Count III. ......................10

            (a) MJC Did Not Interfere With Gree USA's Sears Business. ..................................................................................10

            (b) Mr. Scott Did Not Improperly Direct Sales to MJC. ..........11

        3. MJC Did Not Fail to Mitigate Damages.........................................11

        4. MJC Did Not Abandon The Relevant Trademark.........................12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Gantt v. Sentry Ins.*
   1 Cal. 4th 1083 (1992)...................................................................................8

*Gregory v. Albertson's, Inc.*
   104 Cal. App. 4th 845 (2002).......................................................................8

*Monreal v. GMAC Mortg., LLC*
   948 F. Supp. 3d 1069, 1075-76 (S.D. Cal. 2013).........................................8

*Pearson v. U.S. Bank Nat'l Ass'n*
   2014 WL 4163020 (D. Minn. Aug. 21, 2014)..............................................9

**STATUTES**

15 U.S.C. §1125(a) .............................................................................................8, 12

Cal. Bus. & Prof. Code § 17200 ..............................................................................8

**OTHER AUTHORITIES**

CACI 2201 ...............................................................................................................7

CACI No. 1900 ........................................................................................................5

CACI No. 1901 ........................................................................................................5

## I. INTRODUCTION

In 2010, MJC,[1] a well-established family-owned business selling home comfort appliances, entered into a joint venture with Gree,[2] a government-owned Chinese conglomerate, to form Gree USA, a California corporation, whose business purpose was to utilize MJC's substantial customer portfolio, well-developed marketing, sales, and after-sales service networks, and highly valuable intellectual property to sell Gree-manufactured dehumidifiers and air conditioners in the United States.[3] In the beginning, Gree USA was a colossal success.

But unbeknownst to MJC, Gree was knowingly manufacturing dehumidifiers with defectively designed parts that made them susceptible to catching fire during normal use. Also unbeknownst to MJC, Gree was knowingly using plastics that did not meet UL-flammability standards in the manufacture of the dehumidifiers.

MJC started receiving customer complaints of dehumidifiers catching fire in the middle of 2012. MJC immediately alerted Gree and urged Gree to report the fires to the Consumer Products Safety Commission ("CPSC"). But Gree wanted to sweep the complaints under the rug, attempting to convince MJC that they were isolated incidents and the result of human error—not a manufacturing or design defect.

When MJC stood its ground, Gree retaliated. It stopped manufacturing products under the brand name "SoleusAir Powered by Gree," which prevented Gree USA from fulfilling its 2013 orders. It attempted to force MJC to transfer its sales and marketing workforce to Gree USA, which did not have sufficient capitalization to pay those employees' salaries. And it attempted to poach MJC's sales representatives and customers. Although Gree eventually reported the defects to the CPSC (months later),

---

[1] MJC America Ltd. dba Soleus International, Inc.; MJC America Holdings Co., Inc.; and MJC Supply, LLC.
[2] Gree Electric Appliances, Inc. of Zhuhai and Hong Kong Gree Electric Appliances Sales Ltd.
[3] Gree owns 51% of Gree USA, and MJC owns 49%.

the damage was already done.

MJC seeks over $100 million in damages because it believes that Gree retaliated against it and destroyed its business for giving Gree an ultimatum and refusing to go along with Gree's plan to delay disclosing the defect issues.

## II. FACTUAL BACKGROUND

MJC is a local family-owned business that has sold home comfort appliances, such as dehumidifiers and air conditioners, in the United States for nearly 20 years. Gree, a multi-billion dollar Chinese conglomerate, is the world's top manufacturer of air conditioners. However, MJC had something that Gree wanted: an established U.S. presence, including long-term relationships with major U.S. retailers. As of 2008, Gree had sold very few units in the U.S. under its own "Gree" brand name. With Gree USA, Gree hoped to take advantage of MJC's established U.S. presence to strengthen the Gree brand in the U.S. market.

The terms of the joint venture are memorialized in a Memorandum of Understanding ("MOU") executed on April 23, 2010. Gree USA was incorporated on April 26, 2010, with an initial capital investment of $80,000. The parties further executed a Joint Venture Contract on October 30, 2010, and Articles of Association. Gree USA held a grand opening in the City of Industry, California on June 18, 2011.

Under the parties' agreement, MJC—which had existing relationships with major U.S. retailers and had long done business under the name Soleus International Inc.—would transfer its customer accounts to Gree USA. MJC's existing sales and marketing force would be responsible for Gree USA's sales and marketing activities. MJC would also be responsible for Gree USA's customer service. Gree USA had no employees of its own. Gree, on the other hand, would manufacture and export the products that Gree USA was to sell under the brand name "SoleusAir Powered by Gree."

After its grand opening in June 2011, Gree USA reported $19 million in sales for the remainder of that year. In 2012, its first full year of operation, Gree USA sold

more than 1.2 million units of air conditioners and dehumidifiers, with a sales volume of more than $150 million.

But the parties' relationship began to collapse in mid-2012 when MJC began receiving customer complaints regarding dehumidifiers catching fire. When MJC reported these complaints to Gree, Gree dismissed them as isolated incidents, telling MJC they were the result of human error. Dissatisfied, MJC urged Gree to further test its dehumidifiers to determine the cause of the fires. MJC informed Gree that MJC's own testing showed that the plastics used in Gree's dehumidifiers did not meet UL standards.

Unbeknownst to MJC, Gree knew about defects in its dehumidifiers as early as 2010, when GE requested that Gree alter components of its dehumidifiers that created an unacceptable risk of fire. Although Gree made the alterations in the dehumidifiers it manufactured for GE, it did *not* make the same modifications to the dehumidifiers it manufactured for Gree USA—in the very same factory. Also unbeknownst to MJC, Gree replaced certain plastics it used to manufacture GE's dehumidifiers so that the dehumidifiers were sufficiently fire-retardant, but it did not implement the same fix for Gree USA's dehumidifiers. Gree never disclosed these facts to MJC, even after learning of customer complaints regarding dehumidifiers catching fire.

In 2014, the Consumer Products Safety Commission conducted a massive recall of Gree dehumidifiers—the biggest dehumidifier recall in CPSC history. As a result of the fixes Gree implemented for GE, the GE recall applied only to dehumidifiers manufactured through 2010. But the recall of Gree USA's "Soleus Air Powered by Gree" dehumidifiers extended through July 2012—nineteen more months than the GE recall.

Despite receiving pressure from MJC to report the defects to the CPSC as early as August 2012, Gree delayed reporting until March 2013. In the interim, it instructed Gree USA *not* to report the defects, and it instructed Gree USA to instead continue selling the dehumidifiers it had in stock. In September 2012, Gree told MJC it wanted

3
PLAINTIFFS' TRIAL BRIEF

to delay the recall for six to nine months. It hoped that a delay would lessen the economic impact on Gree. Finally, after receiving an ultimatum from MJC, Gree agreed to report the defects to the CPSC in March 2013.

Gree, upset with MJC's insistence that the defective dehumidifiers be reported to the CPSC, retaliated against MJC:

First, Gree ordered Gree USA's CFO, Jian Chen (whose salary was paid by Gree), to stop paying MJC's expenses related to the sale and marketing of Gree USA's products.

Second, Gree stopped manufacturing dehumidifiers with the "SoleusAir Powered by Gree" brand and attempted to force Gree USA to start selling "Gree"-branded dehumidifiers. As a result, Gree USA could not fulfill retailer's 2013 orders for "SoleusAir Powered by Gree" dehumidifiers, and Gree USA's ability to sell additional dehumidifiers was seriously—indeed, fatally—impaired.

Third, Gree insisted on drastic changes to Gree USA's business model. Specifically, it demanded that MJC transfer all of its employees to Gree USA, despite the fact that Gree USA had no money to pay these employees. Gree then refused to fulfill orders pursuant to Gree USA's 2013 contracts with all but a few retailers, and insisted that Gree USA transfer the remaining orders back to MJC, knowing full well that MJC lacked the capability to fill those orders on its own.

Fourth, Gree refused to make significant commission payments due and owing to MJC, as reflected in the Account Project Set-up Sheets negotiated and signed by representatives of both MJC and Gree.

Fifth, Gree attempted to poach MJC's sales force and its customers. Gree approached MJC's third party sales representative, Soleus East, and requested that it abandon MJC and work directly for Gree. Gree also approached MJC's customers behind MJC's back, including Lowe's, Menards, Watsco, and Interline. Gree's misconduct permanently impaired Gree USA's relationships with these customers, costing both Gree USA and MJC millions in lost revenue.

4

PLAINTIFFS' TRIAL BRIEF

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Lastly, Gree began selling SoleusAir-branded products to U.S. customers behind MJC's back. MJC owns the federally-registered trademark for SoleusAir. In June 2013, MJC sent Gree a cease and desist letter instructing Gree not to sell any merchandise bearing the SoleusAir mark without MJC's written consent. Notwithstanding this clear instruction, Gree released thousands of SoleusAir-branded products to Golden Opportunity, a U.S. importer and distributor. In other words, Gree intentionally and willfully infringed MJC's trademark rights.

## III. CAUSES OF ACTION

MJC will be pursuing five causes of action at trial: (1) Fraud; (2) Intentional Interference with Contractual Relations; (3) Intentional Interference with Prospective Economic Advantage; (4) Violation of California's Unfair Competition Law; and (5) Federal Unfair Competition.

### A. Fraud.

MJC will prove its claim for fraud through intentional misrepresentation by establishing that (1) Gree made a representation to MJC regarding the quality, safety, and/or sales potential of Gree's products; (3) Gree knew that the representation was false when it made it, *or* it made the representation recklessly and without regard for its truth; (4) Gree intended that MJC rely on the representation; (5) MJC reasonably relied on Gree's representation; (6) MJC was harmed; and (7) MJC's reliance on Gree's representation was a substantial factor in causing its harm. CACI No. 1900 (2015).

MJC will prove its claim for fraud through concealment by establishing that (1) Gree and MJC were business partners and Gree intentionally failed to disclose certain facts to MJC, *or* Gree intentionally failed to disclose certain facts that were known only to it and that MJC could not have discovered, *or* Gree prevented MJC from discovering certain facts; (2) MJC did not know of the concealed facts; (3) Gree intended to deceive MJC by concealing the facts; (4) had the omitted information been disclosed, MJC reasonably would have behaved differently; (5) MJC was harmed; and

(6) Gree's concealment was a substantial factor in causing MJC's harm. CACI No. 1901 (2015).

Gree's fraud arises out of its failure to disclose the fact it was manufacturing defective dehumidifiers, and its intentional misrepresentations regarding the quality, safety, and/or sales potential of the products it manufactured for sale in the United States by Gree USA. The defects in the dehumidifiers include low refrigerant levels, degrading PVC sleeves, abnormal compressor overload protector function, insufficient terminal covers, and the use of plastic parts below the applicable UL flammability standard.

By the time of Gree USA's grand opening in June 2011, Gree *knew* its products were defective. In December 2010, another Gree OEM customer, GE, complained that Gree's products were not meeting GE's quality standards. In response, Gree made improvements to the dehumidifiers it manufactured for GE, but it did not make the same improvements to the dehumidifiers it manufactured for Gree USA in the very same factory.

Gree never informed MJC that the dehumidifiers it was manufacturing for Gree USA were inferior to the dehumidifiers it manufactured for its OEM customers. Indeed, upon receiving notification from MJC that dehumidifiers were catching fire, Gree dismissed the complaints as isolated incidents—without informing Gree it had fixed the fire-causing defects for GE more than a year earlier. The evidence will show that Gree purposely cut corners as a cost-cutting measure—hoping to boost its profits at MJC's expense.

As a result of Gree's misrepresentations and omissions, MJC sold thousands of defective dehumidifiers to its United States customers on behalf of Gree USA. This has irreparably damaged MJC's relationship with those customers. But for Gree's intentional manufacture of defective dehumidifiers, MJC would have made tens of millions of dollars in profits through Gree USA. MJC's damages expert estimates that MJC has lost profits in the range of $77.4 million to $116.5 million.

### B. Intentional Interference With Contractual Relations.

MJC claims that Gree intentionally interfered with the contract between MJC and Gree USA as memorialized in the Agreement of Distribution, and as evidenced by, among other things, the parties' conduct. MJC will prove its claim for intentional interference with contractual relations by establishing that (1) there was a contract between MJC and Gree USA; (2) Gree knew of the contract; (3) Gree's conduct prevented performance or made performance expensive or difficult; (4) Gree intended to disrupt the performance of this contract *or* knew that disruption of performance was certain or substantially certain to occur; (5) MJC was harmed; and (6) Gree's conduct was a substantial factor in causing MJC's harm. CACI 2201 (2015).

MJC was Gree USA's sales, marketing, and customer service force. On December 9, 2011, MJC and Gree USA executed a contract titled "Agreement of Distribution of Gross Profit of Major Account Sales between Gree USA, and MJC Supply." This document governed how MJC was to be compensated for its services by Gree USA. Gree was well aware of this contract because Gree USA could not operate without the services of MJC. Moreover, the terms of the Profit Distribution Agreement are consistent with other agreements that the parties had entered into, as well as the parties' conduct.

After MJC urged Gree to report the dehumidifier defects to the CPSC, Gree retaliated. Gree's Chairwoman and CEO Dong Mingzhu led the charge, ordering Gree USA's CFO to stop paying MJC's expenses. Then she ordered Gree to stop manufacturing "SoleusAir Powered by Gree" dehumidifiers. MJC could not fulfill its 2013 orders with major retailers, directly resulting in lost revenue and lost profits. Therefore, Gree's retaliatory conduct interfered with MJC's contractual relationship with Gree USA, causing MJC millions of dollars of damages in lost profits.

### C. Intentional Interference With Prospective Economic Advantage.

MJC claims that Gree intentionally interfered with an economic relationship between MJC and Gree USA that probably would have resulted in an economic

benefit to MJC. MJC will prove its claim for intentional interference with prospective economic advantage by establishing that (1) MJC and Gree USA were in an economic relationship that probably would have resulted in an economic benefit to MJC; (2) Gree knew of the relationship; (3) Gree engaged in wrongful conduct; (4) by engaging in this conduct, Gree intended to disrupt the relationship *or* knew that disruption of the relationship was certain or substantially certain to occur; (5) the relationship was disrupted; (6) MJC was harmed; and (7) Gree's conduct was a substantial factor in causing MJC's harm.

For the same reasons Gree is liable for intentional interference with contract, it is also liable for prospective interference with economic advantage. Gree's retaliation for MJC's refusal to remain silent about the dehumidifier defects constitutes a wrongful element in Gree's interference, subjecting it to liability for interference with prospective economic advantage. *See* Dkt. 30 (citing *Gantt v. Sentry Ins.*, 1 Cal. 4th 1083, 1094 (1992)). As set forth above, MJC was harmed as a result of Gree's misconduct and this misconduct was a substantial factor in causing MJC's harm.

### D. Violation of California's Unfair Competition Law.

MJC will prove its UCL claim by establishing that Gree engaged in "unlawful, unfair of fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. Gree's business practices were <u>unlawful</u> because it engaged in violations of law in the course of its business dealings. *See* Dkt. 30 (citing *Monreal v. GMAC Mortg., LLC*, 948 F. Supp. 3d 1069, 1075-76 (S.D. Cal. 2013) ("By proscribing 'any unlawful' business practice, the [UCL] 'borrows' violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable.")). If MJC proves that Gree is liable for fraud or intentional interference, it will have established that Gree's business practices are unlawful.

MJC's claim against Gree for <u>unfair</u> business practices is tethered to Gree's violations of the Consumer Product Safety Act. *See* Dkt. 30 (citing *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 853-54 (2002)). Gree's retaliation against

8
PLAINTIFFS' TRIAL BRIEF

MJC after MJC urged Gree to report its defective dehumidifiers to the CPSC, as set forth above, is an unfair business practice.

### E. Federal Unfair Competition.

MJC will prove its claim for federal unfair competition under 15 U.S.C. §1125(a) if it shows that (1) Gree used in commerce the term "SoleusAir"; (2) Gree's use of SoleusAir was likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Gree with MJC, or as to the origin, sponsorship, or approval of Gree's goods, services, or commercial activities by MJC; and (3) MJC has been or is likely to be damaged by such acts.

MJC owns the SoleusAir mark. Despite MJC's express written instructions to Gree to cease and desist using the SoleusAir mark unless Gree obtained written permission to do so, Gree released thousands of SoleusAir-branded products to Golden Opportunity, a U.S. importer and distributor. In other words, Gree intentionally and willfully infringed MJC's trademark rights. MJC was damaged as a result.

## IV. RESPONSES TO GREE'S AFFIRMATIVE DEFENSES

### A. MJC Does Not Have Unclean Hands.

#### 1. MJC Does Not Have Unclean Hands on Count II.[4]

Gree claims that it was not aware of the Profit Distribution Agreement between MJC and Gree USA, which was executed on December 9, 2011. However, Larry Lam, the Deputy Head of Gree's Export Department and executive at Gree responsible for servicing the U.S. market, approved the Profit Distribution Agreement. Moreover, the terms of the Profit Distribution Agreement are consistent with other agreements that the parties had entered into, as well as the parties' conduct.

---

[4] Gree's purported unclean hands defense with respect to Count II fails for the additional and independent reason that Gree belatedly raised this affirmative defense for the first time in the parties' proposed Fourth Amended Joint Final Pretrial Conference Order, which was filed on April 22, 2015. (Dkt. 247-1.)

Gree also contends that "the metadata shows [the Profit Distribution Agreement] was created after the date of this litigation." (Dkt. 247-1.) This argument not only fails on its merits, but it is also inappropriate because the interpretation of metadata is a matter for an expert witness, not Gree's lawyers. *See, e.g.*, *Pearson v. U.S. Bank Nat'l Ass'n*, 2014 WL 4163020, at *17 (D. Minn. Aug. 21, 2014) ("Plaintiff's attorney's opinion testimony about the document's metadata is not competent expert testimony and is inadmissible. Plaintiff seeks to offer conclusions about metadata that are speculative, especially in light of the common understanding that 'creation dates' in metadata may be altered by copying a document or moving it to a new location (e.g., 'save as' function on a word processor).") (citation omitted). Since Gree has not disclosed a computer forensic expert in this action, Gree should not be permitted to introduce evidence or argument regarding the Profit Distribution Agreement metadata.

### 2. MJC Does Not Have Unclean Hands on Count III.

#### (a) MJC Did Not Interfere With Gree USA's Sears Business.

Gree claims that Gree USA lost its Sears business because MJC allegedly added a 9% markup to the price Gree quoted Sears for window air conditioners. Not only is Gree's claim misleading and inaccurate, it is also irrelevant to this action. Indeed, MJC is not even seeking damages relating to that particular line of Sears products.

Moreover, it was Gree, not MJC, that caused Gree USA to lose the Sears business. Notably, MJC's relationship with Sears began years prior to the formation of Gree USA. During that time, MJC devoted millions of dollars of its own resources to foster this relationship and, as a result, Sears became a key customer of MJC. After Gree USA was formed, MJC, in accordance with its obligations under the MOU, transferred the lucrative Sears account (among other lucrative accounts) to Gree USA. After doing so, MJC continued to expend its own resources, both directly and through Soleus East, to further develop the relationship with Sears on behalf of Gree USA. As a direct result, in December 2011, Gree USA obtained a highly advantageous contract

with Sears (the "SSI Agreement"), pursuant to which Sears agreed to (i) purchase portable air conditioners and dehumidifiers from Gree USA for 2012-2013, and (ii) continue purchasing those products from Gree USA for two additional terms—2013-2014 and 2014-2015—without opening up the sales process to other manufacturers *provided* Gree USA's price quote stayed within a 1-2% range.

The Sears business was highly profitable for Gree USA in 2012 and would have continued to be highly profitable *at least* through 2015—*i.e.*, the period covered by the SSI—had Gree simply provided reasonable price quotes to Gree USA. However, when MJC would not go along with Gree's six to nine month plan of concealing the dehumidifier defects from the CPSC, Gree retaliated against MJC by ending Gree USA's relationship with Sears (so Gree could do business directly with them) by (i) repeatedly and intentionally providing Gree USA with inflated price quotes well above the 1-2% range which caused Sears to terminate its relationship with Gree USA, and (ii) contacting Sears' China office to work directly with it and circumvent Gree USA. Gree's plan worked to perfection, as Gree USA has ceased operating and Gree is now selling its products to Sears directly.

### (b) Mr. Scott Did Not Improperly Direct Sales to MJC.

Gree's contention that Tyler Scott improperly directed the most profitable product sales to MJC rather than Gree USA is an exercise in obfuscation. Under the MOU, the purpose of Gree USA was to initially "focus sales to [the] largest chain stores in [the] United States of America." Thus, as Gree is well aware, MJC's sale of certain low volume, high-margin goods would fall outside the scope of Gree USA's stated business purpose. As Mr. Scott testified, Gree products were sold to "bigger accounts" through Gree USA, and the products sold by MJC "would be more – could be for drop ship accounts or it could be for overflow, out of season." Gree cannot now claim unclean hands based on the business model the parties agreed to.

### 3. MJC Did Not Fail to Mitigate Damages.

Gree's claim that MJC failed to mitigate damages is specious, at best. Indeed,

11
PLAINTIFFS' TRIAL BRIEF

contrary to Gree's contention that MJC "should easily be able to mitigate its alleged damages with sales of products from other manufacturers" (Dkt. 247-1 at 28), MJC's damages expert, Mike Wallace, found that MJC's 2014 and 2015 sales to Lowe's, Menards, and other previous Gree USA customers were unprofitable. Not to mention, Gree's misconduct irreparably damaged MJC's long-standing business relationships with its lucrative customer accounts, and the SoleusAir brand itself.

### 4. MJC Did Not Abandon The Relevant Trademark.

Gree's contention that MJC abandoned the "SoleusAir Powered by Gree" trademark is unavailing because the relevant trademark here is the "SoleusAir" trademark, which is owned by MJC Supply. Moreover, MJC is not required to prove ownership of a registered trademark. *See* 15 U.S.C. § 1125(a) ("any person who believes that he or she is or is likely to be damaged" by the unfair competition may bring a claim). Thus, any abandonment of the "SoleusAir Powered by Gree" trademark is not a defense to MJC's unfair competition claim.

Respectfully submitted,

Dated: April 23, 2015   WINSTON & STRAWN LLP

By: */s/ Neal R. Marder*
  NEAL R. MARDER
  ALI R. RABBANI
  IAN C. EISNER
  DREW A. ROBERTSON

  *Attorneys for Plaintiffs and Counter-Defendants*