# EXHIBIT A



*Failure Analysis Associates*®

Exponent
4580 Weaver Parkway
Suite 100
Warrenville, IL 60555

telephone 630-658-7500
facsimile 630-658-7599
www.exponent.com

February 5, 2015

Ellen Nudelman Adler, Esq.
Morrison & Foerster, LLP
12531 High Bluff Drive, Suite 100
San Diego, California  92130

Subject:   Gree Dehumidifier Matter – Expert Opinions
           Exponent Project No. 1500606.000

Dear Ms. Adler:

You retained Exponent, Inc. (Exponent) to provide an expert opinion regarding the actions of
your client, Gree Electric Appliances (Gree), with regard to several aspects of their investigation
into alleged failures of dehumidifiers manufactured by Gree and exported to the United States
(U.S.), and their subsequent product recall negotiations and recall implementation. Specifically,
you requested that we review the following:

1. Gree's decision to retain outside expert assistance in replicating the alleged dehumidifier
   failures;
2. Gree's decision to negotiate a U.S. Consumer Product Safety Commission (CPSC) -
   approved corrective action plan and implement a recall of the affected dehumidifiers;
3. Gree's decision to retain Stericycle to assist in the administration of the CPSC-approved
   recall and associated corrective action plan; and
4. Gree's decision to retain an outside expert to conduct an independent review of their
   safety/compliance management program.

**Executive Summary**

Based on my knowledge of this matter from reviewing documents, discussions with Gree
employees, and my experience, education, background and expertise in the area of product and
process safety management as well as in consumer product safety regulatory interpretation,
enforcement and compliance, it is my expert opinion that:

1. Gree acted in a manner consistent with best industry safety management practices when
   they retained Exponent to assist in a very complex and difficult to replicate product
   failure analysis that was technically beyond their previous experience;

Ellen Nudelman Adler, Esq.
February 5, 2015
Page 2

2. Gree acted in a manner consistent with best industry safety management practices in working cooperatively with the staff of the CPSC to develop and implement an acceptable corrective action plan;
3. Gree acted in a manner consistent with best industry safety management practices when they hired Stericycle, a globally-recognized product recall service company with many years of experience implementing a wide variety of product recalls, to provide expert assistance in the implementation of the CPSC-approved corrective action plan and recall; and
4. Gree acted in a manner consistent with best industry safety management practices when they hired Exponent to conduct an independent review of their safety/compliance management programs to identify areas for possible improvement and provide recommendations on possible methods for improvement.

The opinions presented herein are made to a reasonable degree of professional certainty. My services for this work are billed at a rate of $320 per hour.

## 1. Expert Qualifications

My Curriculum Vitae is attached as Exhibit A. My opinions regarding the conduct of Gree are based on my experience, education, background, and expertise in the area of product and process safety management as well as in consumer product safety regulatory interpretation, enforcement, and compliance. I have been directly involved in all aspects of product and process safety management, as both a manufacturer and as a regulator.

I am currently employed at Exponent as a Manager in their Mechanical Engineering Practice. I have previously been employed as a General Engineer by the United States Department of Energy (DOE), as a Senior and Supervisory Compliance Officer by the CPSC, and as a Senior Product Safety Manager by Whirlpool Corporation. I am regularly requested by the John Cook School of Business at Saint Louis University to present workshops and seminars on Developing Effective Product Safety/Compliance Management Programs as part of their Center for Supply Chain Management Studies advanced training courses. I have also been requested by the National Transportation Safety Board to testify before them on CPSC regulations and enforcement as part of an investigation into a fire onboard a cargo plane, suspected to be caused by notebook computer batteries.

I have a Bachelor of Electrical Engineering from the Georgia Institute of Technology and passed the Engineer in Training exam[1] in Georgia in 1990. I am currently a member of the Institute of Electrical and Electronic Engineers (IEEE), the American Society of Safety Engineers (ASSE), and the International Consumer Product Health and Safety Organization (ICPHSO).

---

[1] The Engineer-in-Training exam, as it was called in 1990, is currently referred to as the Fundamentals of Engineering exam.



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 3

While working at the DOE, I was a headquarters program manager responsible for overseeing Electrical Safety, Training and Qualifications, Occupational Safety and Health, and other operational programs necessary for the safe operation of a large manufacturing complex in Tennessee. One of my duties was to participate in the investigation of onsite incidents and work with the operating contractor to develop effective and appropriate corrective actions. I was the headquarters approval authority for those corrective action plans.

While working at the CPSC, I personally conducted hundreds of alleged product safety defect investigations. I reviewed the product design and manufacturing processes of many of the largest consumer product companies in the United States. I negotiated product recalls and corrective action plans to minimize the risk to the public, and minimize the likelihood that the issue(s) leading to the recall would be repeated by that company. I was also closely involved in thousands of investigations conducted by the Compliance Officers who reported to me. In addition to the thousands of consumer product recalls I was directly and indirectly involved with, I also conducted thousands of additional product safety defect allegation investigations which did not result in a product recall.

While working at Whirlpool, I was their global product safety manager for innovation products and also their global safety manager for corporate product safety training. I was responsible for developing appropriate training materials, setting global product safety training schedules, and conducting training for Whirlpool employees around the world to ensure their understanding of Whirlpool's corporate product safety program and processes. I conducted more than ten training sessions every year for Whirlpool employees throughout the U.S. and I trained four regional trainers to conduct training outside of the U.S. when I was not available to teach or assist. I was responsible for ensuring that all new product categories (referred to by Whirlpool as "innovation products") investigated by Whirlpool were thoroughly reviewed for potential safety concerns. I participated in all aspects of product hazard identification, hazard evaluation, and hazard mitigation, while ensuring that Whirlpool engineers adhered to the company's corporate product safety process.

Although I have worked in the area of product and process safety for almost twenty years, I have only recently been in a position to be able to provide expert testimony in litigation matters. The first seventeen years of my professional career was with the United States federal government and was never involved in a matter associated with civil litigation. Since leaving federal service I have been retained as an expert on multiple occasions; however, thus far, all of these cases settled prior to trial, and only a single case[2] has proceeded far enough to require my deposition as an expert witness. In that case I am retained to review the available information and provide an expert opinion regarding the company's compliance with applicable product safety standards and regulations, including the Consumer Product Safety Act.

---

[2] Case No. 2012 CA 292, Division K in the Circuit Court in and for Escambia County, Florida – Darian Bunch, a minor, by Sherri Bunch and Lawrence Bunch as Natural Guardians and next friends, and Darian Bunch v. Kung Hsue She, Inc., KHS Bicycles, Inc., Free Agent BMX and Cycle Sports of Pensacola, Inc. d/b/a Cycle Sports Bicycles



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 4

While I have prepared and provided numerous presentations on the CPSC, its regulations and regulatory enforcement, and product safety management, I have not yet published any articles pertaining to these matters.

## 2. Case Background

Gree became aware of safety allegations pertaining to dehumidifiers they manufactured and exported to the United States. Specifically, Gree received reports involving allegations of fire damage due to the failure of their dehumidifier. Gree undertook an investigation into the allegations and was unable to replicate the alleged failures in their laboratory. Gree subsequently retained Exponent to provide expert engineering assistance in the forensic evaluation of field units and the development and conduct of creative laboratory simulations of the alleged failures.

As Gree's investigation progressed they determined that there was a sufficient basis to warrant a consumer-level product recall of the affected dehumidifiers. Gree worked cooperatively with the CPSC staff to develop an acceptable corrective action plan. Gree also retained Stericycle to provide expert recall assistance in implementing the CPSC-accepted corrective plan. Subsequent to the recall announcement, Gree again retained Exponent, this time to conduct an independent review of their product safety process and identify any areas for possible improvement.

## 3. Opinions

### A. Gree's Internal Technical Expertise

According to Gree's website,[3] the company was founded in 1991 and is "the world's largest specialized air conditioning enterprise which has integrated R&D, manufacturing, marketing and service." The website additionally states that "Gree is committed to providing global users with high-tech and high quality products." A company such as Gree that has expertise in designing and manufacturing high quality products might automatically be considered by some to also have expertise in product failure investigation, forensic engineering and forced failure testing[4] of the products they design and manufacture. In fact, product failure investigation, forensic engineering and forced failure testing is a very different and complex process compared to designing and manufacturing a product. Becoming proficient, let alone expert, in product failure investigation, forensic engineering and forced failure testing requires a significant amount of experience and practice with a wide range of products and product failure modes.

---

[3] www.gree.com.cn

[4] Forced failure testing refers to the process of producing (forcing) a product to failure in a worst-case condition in order to observe the effects and potential safety ramifications of such a failure.



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 5

Unless a manufacturer is frequently investigating product failure allegations and performing an associated root cause analysis and forced failure testing, a manufacturer may have very limited experience and practice in these matters. There is frequently an inverse relationship between a company designing and manufacturing quality products and the quantity of product failure investigations, forensic engineering and forced failure testing the company performs. On the other hand, Exponent has been performing product failure investigations, forensic engineering and forced failure testing for decades, and has done so in a wide variety of industries and with a wide array of products.

Gree attempted to use their expertise in designing and manufacturing dehumidifiers to investigate the alleged failures reported to them. Because they did not have a lot of experience in this area, their attempts to replicate the reported failures were unsuccessful.

## B. Gree's Retention of Exponent

When Gree found itself unable to replicate the reported failure, it is my expert opinion that they acted in a manner consistent with best industry safety management practices by seeking outside expertise to assist in replicating the reported failures and enabling Gree to complete its root cause analysis and develop appropriate corrective actions. Gree provided Exponent with design and manufacturing details for the dehumidifier models associated with the reported failures. They also provided Exponent with incident units as well as exemplar units for testing. Because of Exponent's significant experience and expertise in forensic engineering and forced failure testing, Exponent was able to develop a failure theory and devise a method of generating a product failure while bypassing the dehumidifier safety devices. After considerable effort, Exponent completed its investigation and reported their findings and recommendations to Gree.[5] Upon reviewing Exponent's report and discussing the results internally and with the associated Exponent staff, Gree determined that the information available to them regarding the reported dehumidifier failures warranted a product recall, and in my expert opinion Gree acted in a manner consistent with best industry safety management practices by determining that a voluntary recall of the affected dehumidifiers was warranted.

## C. Gree's Recall Program Development and Implementation

Once Gree determined that a recall of affected dehumidifiers was warranted, it is my expert opinion that Gree proceeded in a manner consistent with best industry safety management practices by working cooperatively with the CPSC staff to develop an acceptable corrective action plan for a voluntary recall. As Gree had no prior experience developing and implementing a product recall, it is my expert opinion they acted in a responsible manner by relying upon the guidance provided by CPSC and Exponent staff. It is my expert opinion that Gree continued to act in a manner consistent with best industry safety management practices by retaining Stericycle to assist with the implementation of the recall program.

---

[5] Exponent report *Gree Dehumidifier Investigation*, Exponent Project No. 1303054, dated July 19, 2013



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 6

### D. Gree's Retention of Stericycle

Stericycle, an expert recall service provider, has been assisting businesses to "protect people and brands, promote health, and safeguard the environment[6]" since 1989. Stericycle began its operation concentrating on disposal services for medical and biohazardous waste. They operate medical waste services in eleven countries,[7] and as such, have significant expertise researching, interpreting and complying with international safety regulations. Stericycle created their ExpertSOLUTIONS division to expand their service offerings to include manufacturers of durable goods and consumer goods and to "provide customized solutions to maintain brand integrity either proactively for quality assurance or reactively in recall situation.[8]"

I have had the opportunity to work with Stericycle while I was working at the CPSC. They were retained by multiple firms to assist in the development and implemention of corrective action plans and product recalls I was negotiating on behalf of the CPSC. My experience with Stericycle has been positive and I've observed the extensive breadth and depth of their recall services. It is my expert opinion that Gree acted in a manner consistent with best industry safety management practices by retaining Stericycle to assist in the dehumidifier recall.

### E. Safety/Compliance Program Review

After Gree obtained CPSC approval for their corrective action plan, and Gree successfully implemented the recall with the expert assistance of Stericycle, Gree took the additional proactive step of retaining the services of an outside expert in product and process safety management. Gree retained my services through Exponent to perform an independent evaluation of their product and process safety management programs. I had the opportunity to review Gree's safety-related policies, procedures and processes, visit their manufacturing facility in Zhuhai, China and meet with personnel directly involved in their dehumidifier design, testing, manufacturing and failure investigation programs. At the conclusion of my review I prepared a report of my evaluation, which included my conclusions and recommendations. This report is dated January 9, 2014, and titled *Gree Humidifier Matter – Compliance Program Review*. Gree acted proactively, and in my expert opinion, acted responsibly and in a manner consistent with best industry safety management practices in seeking out an independent review of their safety/compliance management program and in quickly seeking to identify and implement safety program improvements. This report incorporates by reference my January 9, 2014 report, provided as Exhibit B.

Based on my experience, education, background and expertise in the area of product and process safety management as well as in consumer product safety regulatory interpretation, enforcement and compliance, it is my expert opinion that:

---

[6] www.stericycle.com

[7] United States, United Kingdom, Ireland, Canada, Mexico, Brazil, Argentina, Chile, Romania, Spain, and Portugal

[8] www.stericycle.com



Ellen Nudelman Adler, Esq.
February 5, 2015
Page 7

1. Gree acted in a manner consistent with best industry safety management practices when they retained Exponent to assist in a very complex and difficult to replicate product failure analysis that was technically beyond their previous experience;
2. Gree acted in a manner consistent with best industry safety management practices in working cooperatively with the staff of the CPSC to develop and implement an acceptable corrective action plan;
3. Gree acted in a manner consistent with best industry safety management practices in retaining the services of Stericycle to assist in the implementation of the CPSC-approved dehumidifier recall program; and
4. Gree acted in a manner consistent with best industry safety management practices in retaining the services of an outside expert in safety/compliance program management to conduct a review their systems and offer recommendations on areas for possible improvement.

## Limitations

At the request of Morrison & Foerster, LLP, Exponent reviewed information pertaining to Gree's investigation into reported dehumidifier failures and their subsequent recall actions. The limited scope of services performed during this evaluation may not adequately address the needs of other users of this report, and any reuse of this report or its findings, conclusions, or recommendations is at the sole risk of the user. The opinions and comments formulated during this evaluation are based on observations and information available at the time of the evaluation. The ultimate responsibility for the design, manufacture, performance, compliance, and safety of Gree's products lies completely with Gree.

The findings presented herein are made to a reasonable degree of professional certainty. Exponent has endeavored to be accurate and complete in the assignment. If new data become available or there are perceived omissions or misstatements in this report, we ask that they be brought to our attention as soon as possible so that we have the opportunity to address them.

If you have any questions or require additional information, please do not hesitate to contact Exponent.

Sincerely,

Richard L. Stern
Manager
Mechanical Engineering Practice

## Exhibit A

**Cirriculum Vitae of
Richard L. Stern**



*Failure Analysis Associates®*

Exponent
4580 Weaver Parkway
Suite 100
Warrenville, IL 60555

telephone 630-658-7500
facsimile 630-658-7599
www.exponent.com

## Richard L. Stern
**Manager**

### Professional Profile

Mr. Richard Stern is a Manager in Exponent's Mechanical Engineering practice. Mr. Stern specializes in evaluating and developing management systems and processes intended to design, manufacture, import, distribute, and sell safe products. He has 23 years of experience enforcing or complying with local, state, federal and international laws and regulations pertaining to product and personnel safety, including 6 years with Whirlpool Corporation and 10 years with the U.S. Consumer Product Safety Commission.

As a Senior Manager with Whirlpool Corporation's Global Product Safety Department, Mr. Stern taught employees around the world about the firm's product hazard management systems and how to properly use them. Mr. Stern also provided daily product safety and compliance advice and guidance to Whirlpool staff involved in developing and manufacturing new or innovative products.

As a Senior Compliance Officer and Associate Director for the U.S. Consumer Product Safety Commission's Recalls and Compliance Division, Mr. Stern conducted investigations into potential consumer product safety hazards, performed risk assessments, and negotiated corrective action plans in accordance with the Consumer Product Safety Act and other regulations under the agency's jurisdiction.

### Academic Credentials and Professional Honors

B.E.E., Electrical Engineering, Georgia Institute of Technology, 1990

### Presentations

Stern RL. Product safety program development workshop. Saint Louis University, John Cook School of Business, 2013.

Stern RL. Developing a product safety program. Saint Louis University, John Cook School of Business, 2013

Stern RL. Guest Instructor – "Building product safety into manufacturing," and "Developing a product safety program. Saint Louis University Center for Supply Chain Management Studies, 2011–present.

Stern RL. Panelist – "Introduction to the Consumer Product Safety Commission, Consumer Product Safety Act, and the Consumer Product Safety Improvement Act of 2008," American Bar Association Inaugural Consumer Products Subcommittee Meeting, September 17, 2009.
09/13

Stern RL. Health & safety issues. U.S. Patent & Trademark Office – Global Intellectual Property Academy, July 11, 2007.

Stern RL. Enforcement of intellectual property rights. U.S. Patent & Trademark Office – Global Intellectual Property Academy, June 15, 2007.

Stern RL. CPSC program updates and status. Lighter Association Annual Meeting, May 16, 2007.

Stern RL. Recalls process – From case building to CAP. International Consumer Product Safety Organization Conference, April 2007.

Stern RL. Battery investigations & recalls, codes & standards. 24th International Battery Seminar, March 19, 2007.

Stern RL. CPSC – Who we are, what we do, how we do it. Consumer Electronics Association Technology and Standards Forum, February 27, 2007.

Stern RL. U.S. Consumer Product Safety Commission Electronics and Appliance Safety Symposium, Shanghai, China, October 16, 2006.

Stern RL. Electronics and appliances safety symposium. Hong Kong Electronics Fair, October 14, 2006.

Stern RL. CPSC-negotiated battery recalls. Lithium Battery Technical/Safety Group, September 6, 2006.

Stern RL. CPSC compliance overview. U.S. Customs and CPSC Regulations with Joint Enforcement-Product Surveillance and Ports. International Consumer Product Safety Organization Conference, May 9–12, 2006.

Stern RL. Battery safety and consumer product recalls. 23rd International Battery Seminar, March 13, 2006.

Stern RL. Carbon monoxide hazards and investigations. New York City Office of Coroner and Medical Examiner, July 26, 2005.

**Prior Experience**

- Senior Manager, Whirlpool Corporation, Global Product Safety Department, 2007–2013
- Associate Director, U.S. Consumer Product Safety Commission, Recalls and Compliance Division, 1998–2007
- General Engineer, U.S. Department of Energy, Defense Programs, 1990–1998



**Academic Appointments**

- Visiting Instructor, Saint Louis University, John Cook School of Business, 2011–present

**Professional Affiliations**

- Institute of Electrical and Electronics Engineers (member)

## Exhibit B

## Exponent Report of
## January 9, 2015



*Failure Analysis Associates®*

Exponent
4580 Weaver Parkway
Suite 100
Warrenville, IL 60555

telephone 630-658-7500
facsimile 630-658-7599
www.exponent.com

January 9, 2014

Ellen Nudelman Adler, Esq.
Morrison & Foerster, LLP
12531 High Bluff Drive
Suite 100
San Diego, California  92130

Subject:   Gree Dehumidifier Matter – Compliance Program Review
           Exponent Project No. 1305806.000

Dear Ms. Adler:

At your request, on behalf of Gree Electric Appliances ("Gree"), Exponent Failure Analysis Associates ("Exponent") conducted a reliability and safety/compliance program review related to Gree dehumidifiers.  This limited review was focused on Gree's programs, processes and procedures associated with dehumidifier design and manufacture, and was based on a review of available documentation as well as onsite meetings at Gree's facilities in Zhuhai, China.  Based on the review completed to date, which is detailed below, we have reached the following conclusions:

1. Gree management is committed to fostering a culture that embraces product reliability, compliance and safety.

2. Gree has a comprehensive set of policies, procedures and worker aides addressing important aspects of the design and manufacturing process.

3. Gree has policies, procedures and requirements for the collection and investigation of post-sale field complaints, but has to rely on their foreign agents to adhere to those requirements and to inform Gree of potential field issues.

4. Gree's combined approach toward addressing reliability, compliance and safety has been effective in minimizing reliability and compliance issues, but might not maximize the potential to identify very low likelihood safety-related failures with potentially unacceptable severity levels.

5. Gree's existing reliability, compliance and safety program provides a well-established and effective framework from which to build upon to incorporate changes to further minimize potential safety risks associated with their products.

Ellen Nudelman Adler, Esq.
January 9, 2014
Page 2

6. Gree should consider implementing internal audits (or utilize external auditors) of their production and customer service departments to identify potential nonconformance to their internal quality, compliance and safety program.

7. Gree should consider revising the existing customer service process and procedures to more aggressively pursue the return of field units related to potential safety-related allegations.

## Background

According to Gree's website, Gree Electric Appliances, Inc. of Zhuhai was founded in 1991, and represents the largest air conditioner enterprise that integrates R&D, manufacturing, marketing and services globally.

Gree has nine production facilities located in Zhuhai, Chongqing, Hefei, Zhengzhou, Wuhan, Shijiazhuang, Brazil, Pakistan and Vietnam with an annual production capacity of 60 million residential air conditioners (RAC) and 5.5 million commercial air conditioners (CAC). With more than 200 million users globally, Gree is reportedly the largest RAC manufacturer in the world in terms of sales volume since 2005.

In addition to Gree's experience in the residential air conditioner market, they also design and manufacture a wide array of other consumer products, including:

- dehumidifiers
- air purifiers
- electric fans
- electric heaters
- water dispensers
- induction cookers
- rice cookers
- kettles

Prior to 2013, Gree reportedly had not identified any product safety issues associated with their product line that would have presented a substantial product hazard necessitating a product recall. In 2013, however, Gree conducted a voluntary product recall of certain dehumidifiers in both the United States and Canada.

As part of Gree's dehumidifier investigation, they sought to identify any technical and programmatic changes necessary to properly address the recalled products and to minimize the likelihood of any similar safety-related issues occurring in the future.

Exponent was retained to assist Gree in their investigation to provide technical support in identifying the most likely root cause(s) of the reported dehumidifier failures and to evaluate the



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 3

role(s) of engineering changes over time in the event of a product failure. They also retained Exponent to provide support in identifying and addressing any safety program weaknesses which could have contributed to the dehumidifier recall and to assist Gree in their process improvement efforts.

This report solely addresses the review of Gree's safety program related to dehumidifiers and does not address any specific technical issues associated with the recalled dehumidifiers.

## Gree's Dehumidifier Product Safety/Compliance Program

The review of Gree's current product safety/compliance program was conducted through a combination of a document review, a facility site visit, and discussions with both Gree management and staff, and addresses the design process, production process, and post-production process. The documents reviewed included a broad range of policies, procedures, checklists, assembly aides and standards. The list of available documents that were reviewed includes:

1. QC1200.03-02 Product Risk Management (English)
2. QG0302.03-04 Product Development Management (English)
3. QC0600.05-02 Product Sampling Test Management (English)
4. QC0203.01-05 Product Certification Control Management Measures (English)
5. Gree Product Safety Issues Handling Procedure (English)
6. Design Checklist (English)
7. CKB-SHZ-201203—01 Overseas Sales Agent Monitoring and Management Regulations (English)
8. GX110560_01_GDN100AM-A3EBA1A Process Audit Document Pack in Sample Evaluation Phase (Chinese)
9. GX110560 US Dehumidifier GDN100AM-A3EBA1A Testing Summary (Chinese)
10. GX110560-US New 100 pint Dehumidifier GDN100AM-A3EBA1A-Check List for High Risk Problems in Controller (Chinese)
11. GX1105600.1_GDN100AM-A3EB1A_Approval Form for Sample Evaluation of Display Board D10803 and PCB GRJ108-B 6-2 (Chinese)
12. Product Testing Checklist and Summary for Audited Problems – GX110560.01_GDN100AM-A3EBA1A_Evaluation (Non-inverter) (Chinese)
13. GX110560 01_GDN100AM-A3EBA1A New development 100p dehumidifier review application form for North America export (Chinese)
14. GX110560 Export for North America New 100pint dehumidifier display board D10803 and PCB board GRJ108-B etc. electric controller inspection form- 1 (Chinese)



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 4

15. GX110560 GDN100AM-A3EBA1A dehumidifier export for North America test
    information collection (Chinese)
16. GX110560.01 certification application form (Chinese)
17. GX110560.01 GDN100AM-A3EBA1A dehumidifier export for North America
    production document(Lambda QXA-A081xL130A) (Chinese)
18. GX110560.01 GDN100AM-A3EBA1A dehumidifier export for North America
    specification (Chinese)
19. GX110560.01 GDN100AM-A3EBA1A dehumidifier export for North America
    standardization inspection report (sample) (Chinese)
20. GX110560.01_display board D10803 and PCB board GRJ108-B of 100 pint
    dehumidifier for North America electric controller inspection form-2 (Chinese)
21. GX110560_GDN100AM-A3EBA1A electric controller matching declaration form
    (Chinese)
22. GX110560.01_GDN100AM-A3EBA1A intellectual property rights inspection form
    (Chinese)
23. GX110560.01_GDN100AM-A3EBA1A plan review patent inspection report
    (Chinese)
24. GX110560.01 GDN100AM-A3EBA1A Certification inspection report (Chinese)
25. "GX110560.01-GDN100AM-A3EBA1A New product trail produce information
    feedback" (sic) (Chinese)
26. GX110560.01-GDN100AM-A3EBA1A Printing materials inspection form (Chinese)
27. GX110560_01_GDN100AM-A3EBA1A sample crafts reviewing inspection
    information collection form (Chinese)
28. GX110560_2012 100pint dehumidifier export for North America 2012 development
    plan (Chinese)
29. Need to make improvement questions record (Chinese)
30. Procedure record (Chinese)
31. GX110560_01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier
    product design plan confirmation letter (Chinese)
32. GX110560_01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier
    raw material cost inspection form (Chinese)
33. 100 pint dehumidifier key questions form during the process of development (Chinese)
34. 2012 plan-new 100 pint dehumidifier export for North America_SM0 0314447
    (Chinese)
35. GX110560.01_GDN100AM-A3EBA1A electric controller matching declaration form
    (Chinese)
36. GX110560.01_GDN100AM-A3EBA1A electrical reviewing report (Chinese)



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 5

37. GX110560.01_GDN100AM-A3EBA1A packaging inspection form (Chinese)
38. GX110560.01_GDN100AM-A3EBA1A technical service manual information integrality (sic) inspection form (Chinese)
39. GX110560.01_GDN100AM-A3EBA1A_100P dehumidifier new design standard man-hours inspection (Chinese)
40. GX110560.01_GDN100AM-A3EBA1A printing material inspection form (Chinese)
41. GX110560.01_GDN100AM-A3EBA1A New development 100 Pint dehumidifier design summary report (Chinese)
42. GX110560.01_GDN100AM-A3EBA1A sample evaluating craft inspection data summary (Chinese)
43. GX110560.01_GDN100AM-A3EBA1A_Ne development 100 pint dehumidifier new design and improved design, new technology application inspection form (Chinese)
44. GX110560.01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier contents of inspection documents (Chinese)
45. GX110560.01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier customized requirements inspection form (Chinese)
46. GX110560.01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier key components matching space form (2D drawing) (Chinese)
47. GX110560.01_GDN100AM-A3EBA1A_New development 100 pint dehumidifier muti-mold (sic) and cavity parts inspection summary (Chinese)
48. 22_GL03_001-02-Abnormal quality problem's handling procedure and requirements feedback by after sales service (Chinese – flowcharts)

The documents reviewed demonstrate a comprehensive and detailed program to design and manufacture dehumidifiers with a heavy focus on reliability and regulatory/standards compliance. In its current form, product safety evaluations are integrated into this program to create a single process used for the reliability, compliance and safety system.

## Gree's Design Process

Compliance, reliability and safety are most effectively controlled during the design process. If a product is designed with a focus toward achieving compliance with applicable regulations and standards and reasonably maximizing reliability and safety, the production and post-production processes can then be used for verification and feedback of the design assumptions. A general outline of Gree's overall design process is summarized as follows:

1. Applicable laws, industry standards, internal standards and customer requirements are identified and provided to the project team by the responsible departments.



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 6

2.   The project team reviews the design plan with the Chief Engineer and any changes are incorporated.

3.   The structure of the product is designed and the necessary components are identified.

4.   If necessary, new tooling is designed and built.

5.   Prototype is manufactured and assembled.

6.   Prototype is tested to all previously identified requirements (regulatory, reliability, safety, customer-supplied, and any other applicable product requirements).

7.   Any issue associated with product compliance or performance is evaluated and corrections are incorporated.

8.   A revised prototype is subsequently manufactured and assembled.

9.   Any non-compliant tests are repeated and any additional testing is performed.

10.  Any issue associated with product non-compliance or performance is evaluated and corrections are incorporated to address these non-compliant areas.

11.  The project team reviews the prototype product and any design revisions with the Chief Engineer.

12.  If approved by the Chief Engineer, an application for third-party certification is prepared and submitted.  If the product and design are not approved by the Chief Engineer, necessary changes are incorporated and an application for third-party certification is prepared and submitted.

13.  Pilot production commences and assembled products are tested for compliance with previously-identified requirements.

14.  Any issue with product compliance or performance is evaluated and corrections are incorporated, as necessary.

15.  Pilot production resumes with corrections incorporated and testing is repeated to verify that the corrections incorporated resolved previously non-compliant test results.

16.  If any additional issues are identified at this time, modifications are incorporated and the testing process is repeated until the pilot production process results in compliant products.  Once pilot production results in compliant products, a final evaluation is conducted by the Chief Engineer.

17.  Any necessary changes are incorporated; if no changes are necessary, the product is approved for high volume production.

For any system to function as intended, the responsible people must be aware that a system is in place, understand the system, and use the system correctly.  As indicated by the depth and breadth of the system documents previously identified, Gree has created and documented a formalized system to design and manufacture products which are expected to comply with

Ellen Nudelman Adler, Esq.
January 9, 2014
Page 7

applicable regulations, standards and expectations while minimizing the potential for quality,
reliability or safety issues. Gree has developed new employee training and an Employee
Manual that creates awareness of this system. Through its Employee Manual and training, Gree
provides clear notification to all employees that reliability and safety is critically important to
the company and that all employees are required to report any such issues they may encounter.
Any attempt by a Gree employee to intentionally avoid these issues can result in employee
discipline, up to and including termination of employment. The message is reinforced to the
employees throughout the workplace via the use of posters, signage and other messaging
systems championing quality and safety. While it is important to have clearly defined employee
requirements regarding safety-related issues, those policies are ineffective if they are not
enforced. Although Exponent did not have the opportunity to interview random employees in
the plant, we were informed that employees have been disciplined for failure to fully comply
with Gree's policy on safety. This provides a clear and strong message that the staff's safety
responsibilities are important and are being enforced by Gree's management team.

Gree's product design process begins with the identification of the applicable laws, regulations,
codes, industry standards, internal standards and customer-specific requirements. To assist in
this process, Gree has a Corporate Management department which is responsible for keeping
track of global regulations and industry standards and updating Gree's internal standards
accordingly to ensure that compliance with Gree's standards will result in compliance with the
applicable regulations and industry standards. This same group is responsible for incorporating
any "lessons learned" changes to internal standards identified by Gree's Quality or Safety
departments.

Once Gree's technical department obtains the full list of requirements for a specific product,
they begin the design process. Per Gree's policy, as part of the design phase of product
development, the technical department "should list main components and their design plans,
including the function, performance, reliability, serviceability, safety, indemnification and so on
and should give full consideration to their impact on the product safety, compliance and quality;
and should do hazard evaluation on anticipated use and find all potential failure modes and
analyze the outcomes."[1] Furthermore, Gree's process department "is responsible to evaluate the
manufacturing, packaging and storage of the products and list impacts from all relevant
manufacturing process, transportation, storage process and environment; to identify key impact
on consumer safety, such as pollution from foreign matters, chemical and biological pollution
and so on; to find all potential failure modes and to analyze the possible outcomes."[2]

[1] Gree's supplied translation of QG1200 03-02 *GREE Electric Appliances Inc., of Zhuhai, Management Criterion.
System Running and Assessment Management Criterion. Product Risk Assessment Management Rules. Page 8.
Number 1.*

[2] Gree's supplied translation of QG1200 03-02 *GREE Electric Appliances Inc., of Zhuhai, Management Criterion.
System Running and Assessment Management Criterion. Product Risk Assessment Management Rules. Page 8.
Number 2.*



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 8

Once the product design has been completed and approved by the Chief Engineer, a prototype is
produced and evaluated for compliance with respect to the previously identified requirements.
Gree has the laboratory capabilities to conduct all of the necessary testing in-house. They
conduct a complete analysis of incoming materials to determine compliance with global
regulations such as the Federal Hazardous Substances Act (FHSA) and the Restriction of the
Use of Certain Hazardous Substances in Electrical and Electronic Equipment (RoHS). Gree's
laboratories conduct testing to determine compliance with the applicable industry standards and
any additional customer-specific requirements. All of Gree's products exported to the United
States are Underwriter's Laboratories (UL) Listed and their laboratory is UL accredited.

Based on their prior experience and knowledge gained through their interaction with other
manufacturers, customers and technical organizations, Gree has developed additional internal
standards which, where determined to be appropriate, go beyond the minimum requirements of
the industry standards. Including these additional internal requirements is likely to increase the
cost and time to market of their products, but where Gree has determined that meeting the
industry standard alone does not meet their corporate expectations for reliability, performance
and safety of their products, they accept these additional cost and time burdens. Some of the
areas where Gree has developed more stringent internal standards related to their dehumidifier
and other products include:

1. Fan blade life testing
2. Salt spray testing
3. Burn testing
4. Testing protocol for unit operation representing a range of low refrigerant conditions
   (developed recently in response to the recall investigation)

Another critical aspect of Gree's design process is their risk assessment process. As
summarized in Gree's program documents, after all potential failures have been identified,
"these failures need to be evaluated according "Affiliate 4: Severity Scoring Standard",
"Affiliate 5: Occurrence Scoring Standard", "Affiliate 6: Difficulty of being tested Scoring
Standard"; and need to be recorded into "Affiliated Chart 1: Failure Mode and Impact Analysis
Chart" and relevant failure mode, outcome, severity, occurrence, difficulty of being tested,
current control methods should be recorded."[3]

Gree performs a Failure Mode and Effects Analysis (FMEA) for each product. The FMEA is
used to identify the potential failure modes for the product being designed and manufactured. A
critical aspect of the FMEA is the evaluation of the risk associated with each potential failure
mode. Gree uses the Risk Priority Number (RPN) methodology and their past experience and

---

[3]  Gree's supplied translation of QG1200 03-02 *GREE Electric Appliances Inc., of Zhuhai, Management Criterion.
System Running and Assessment Management Criterion. Product Risk Assessment Management Rules. Page 9.
Number 3.3.4.*



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 9

engineering judgment to rate each potential failure according to three rating scales: Severity, Likelihood, and Testability.

Gree's Severity Scoring Standard has a range of failure severities, and is scored as follows:

| IMPACT | SCORE |
|---|---|
| None | 1 |
| Very Minor | 2 |
| Minor | 3 |
| Very Low | 4 |
| Low | 5 |
| Moderate | 6 |
| High | 7 |
| Very High | 8 |
| Hazardous-with warning | 9 |
| Hazardous-without warning | 10 |

Gree's Occurrence Scoring Standard has a similar range:

| OCCURRENCE | SCORE | FAILURE % |
|---|---|---|
| Remote | 1 | ≤ 0.67PPM |
| Very Low | 2 | 6.67 PPM |
| Low | 3 | 67 PPM |
| Moderate | 4 | 500 PPM |
|  | 5 | 0.0025 |
|  | 6 | 0.0125 |
| High | 7 | 0.05 |
|  | 8 | 0.125 |
| Very High | 9 | 0.33 |
|  | 10 | ≥ 50% |

Gree's Testability Scoring Standard attempts to assign a score based on the likelihood that laboratory testing being used to assess a risk will be able to create/recreate a particular failure. The scoring is assigned as follows:

| TESTABILITY | SCORE | RATE OF BEING TESTED |
|---|---|---|
| Almost Certain | 1 | 90 – 100 % |



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 10

| Very High | 2 | 0.8 |
|---|---|---|
| High | 3 | 0.7 |
| Moderately High | 4 | 0.6 |
| Moderate | 5 | 0.5 |
| Low | 6 | 0.4 |
| Very Low | 7 | 0.3 |
| Remote | 8 | 0.2 |
| Very Remote | 9 | 0.1 |
| Almost Never | 10 | 0 |

Once all three scores have been determined for each potential failure mode, those scores are then used to calculate the resultant RPN, where:

$$RPN = Severity \times Likelihood \times Testability$$

Once the RPN has been calculated, a determination is then made regarding the acceptability of the individual failures. This step of determining the risk acceptability is a fundamental element of an effective risk management program.

Because it is not possible to eliminate all risk from any product, each company involved in designing, manufacturing, importing and distributing a product has to determine their individual company's risk tolerance. In determining a company's risk tolerance, the senior leaders of the company must consider the difficult balance between the risk of a product or particular failure mode and the cost necessary to make an incremental reduction in that risk. At some point, the incremental cost of reducing a particular risk further becomes unreasonable or impractical. Each company has to determine their own definition of "reasonable" and in so doing, they determine their risk tolerance.

Gree's senior management has considered their corporate risk tolerance and documented that in QG1200.03-02. Specifically, they have determined that a combination of either of the following is unacceptable:

Severity $S \geq 7$, and Risk Priority Number $RPN \geq 60$; or,
Severity $S < 7$, and Risk Priority Number $RPN \geq 100$

An unacceptable risk results in the responsible departments taking proactive steps (i.e., change the product design, change component(s), change the manufacturing process) to reduce the risk. Once those proactive steps have been implemented, the product is re-evaluated. If the re-evaluation finds that the Severity and Risk Priority Number have decreased to an acceptable level, the project can proceed. If the re-evaluation determines that the Severity and Risk Priority Number are still unacceptable, the process repeats until the risk is reduced to level which is acceptable to Gree.



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 11

Once the product design process has completed, Gree has a product that, if produced in
accordance with its approved design, will comply with all applicable regulation, industry
standards, customer-specific requirements, Gree internal standards, and have reasonably
maximized reliability and safety. The next step is to manufacture the product.

## Gree's Production Process

Gree's corporate headquarters in Zhuhai, China, has more than 20,000 employees and over 1
million $ft^2$ of production facilities, laboratories and office space. Gree follows the Six Sigma
approach in its manufacturing. Six Sigma is a disciplined, data-driven approach and
methodology for eliminating defects. To achieve Six Sigma, a process must not produce more
than 3.4 defects per million opportunities. A Six Sigma defect is defined as anything outside of
both internal and customer specifications. A Six Sigma opportunity is then the total quantity of
chances for a defect.

At the same time that Gree is working on obtaining internal approval from the Chief Engineer
for the product design, they are also working on the development of production-specific
documents and equipment. Where necessary, they design and construct special tooling, develop
assembly aids for production workers, determine the order of production/assembly steps and
what, if any, sections of the product will be produced as sub-assemblies which are then
assembled into the product. Based on all of the information available from the product design
and the production-specific process requirements, Gree develops a quality plan that is specific to
a given product design and manufacturing process.

The first critical step in producing the product as designed is identifying suppliers for raw
materials and components. Gree specifically tailors the material receipt inspection program to
the individual supplier. Because of Gree's large production volume they purchase large
quantities of materials and components and have developed a list of trusted suppliers. Even
when obtaining materials and parts from a trusted supplier, Gree conducts material receipt
inspection and testing to verify that the supplier has sent exactly what was ordered. This
inspection and testing includes chemical analysis of materials to ensure compliance with global
chemical regulations as well as component performance, reliability and safety testing. At a
minimum, all batches received are randomly sampled. Shipments from suppliers with whom
Gree does not have extensive experience receive a higher frequency of inspection.

Prior to beginning production, Gree determines what worker aids and instructions are important
to ensure the correct production of the product, as designed. They evaluate the product design
and determine the appropriate assembly order and prepare assembly instructions and worker
aids specific to the individual production line stations. The quality department reviews the
production plans and determines the most appropriate places throughout the process to conduct
required quality checks and tests. The same process is followed for the production of any



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 12

product sub-assemblies. Full production does not begin until Gree is satisfied that they have the materials specified by the design and the production workers have been instructed on the proper manufacturing and assembly aspects of the product.

Staff from the quality department are located in the production facility and readily available to respond to questions or concerns from the production lines. There is also constant oversight from supervisors along the product lines to verify that procedures are followed and that the product is properly assembled.

Random quality control checks are performed every two hours on products at the end of the production line. Certain critical aspects of the product, such as weld seam integrity of any component intended to be pressurized, are tested and verified multiple times throughout the production process. Each sub-assembly production process has its own quality control checks specific to the sub-assembly. An additional random quality control check is performed on the finished product in Gree's warehouse.

Gree recently implemented improvements to their process as a result of their investigation and recall of certain dehumidifiers in the U.S. and Canada. During that investigation, it was determined that plastic parts intended for use in dehumidifiers outside of North America had been inadvertently used for the construction of dehumidifiers distributed in North America. Although the North America and non-North America components appear identical and have identical physical dimensions, they have different flammability ratings based on the requirements of the respective markets.[4]

In response to this discovery, Gree implemented the following changes[5] to the production (and design) process to minimize the potential for an inadvertent use of incorrect parts in the future:

    1. Change the color and/or physical characteristics of identical parts with different certification requirements to differentiate these parts.

    2. Reinforce to the injection molding workshop the need to divide and isolate different materials. Check if the mold recycling logo is consistent with the production status before mass production.

    3. Implement a dual verification system with the assembly staff and inspector during the initial assembly inspection. The assembly staff must compare the actual material code on the part against the code specified in Bill of Materials

---

[4] As explained on page 1 of Gree's report to the U.S. Consumer Product Safety Commission titled *Explanation of Inadvertent Use of Non-compliant ABS Materials*

[5] Paraphrased from pages 2-5 of Gree's report to the U.S. Consumer Product Safety Commission titled *Explanation of Inadvertent Use of Non-compliant ABS Materials*



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 13

(BOM) and document the confirmation. This new requirement has been written into the management document "KSGB-0203-03–Management of Product Initial Inspection".

4. Reinforce control of material on Parts Delivery Carts. Each Delivery Cart must have clear signage identifying the parts on the cart and the location for delivery. Once all parts have been removed from the Delivery Cart, the signage is to be removed to avoid confusion. This requirement has been written into the management document "KSGB-0407-02–Management of Dispatching Device".

5. Reinforce control of material in Parts Transfer Carts. When moving items from one production stage to the next, a green sticker must be placed on the materials before putting them on the Transfer Cart to distinguish the materials being transferred from the materials already present at the next stage and the Transfer Cart must include complete documentation of the contents of the Transfer Cart. Workers receiving the Transfer Cart are authorized to reject the Cart if it does not contain the proper documents and the materials are not properly marked. This requirement has been written into the management document "KSGB-0203-03–Management of Product Initial Inspection".

6. Reinforce management of residual materials during production. Residual materials are to be clearly marked, separated and placed in segregated areas. When residual parts are later transferred back to the production line, the worker is to use the Product Initial Inspection process to verify that the part delivered matches the part specified on the BOM. This requirement has been written into the management document "KSGB-0212-03–Management of Quality Supervision".

Once products have been manufactured and shipped, the final piece of a comprehensive quality/safety program is to identify any product failures in the field, evaluate these failed products and feed that information back into the design and production processes for any necessary changes to the existing product. In addition, this information can be considered in the design process of future similar products, including the introduction of new internal standards.

## Gree's Post-Production Process

The post-production process (i.e., timeframe beginning after the customer purchases the product) serves not only as a mechanism to identify potential problems with existing products, but also serves as a check of the design and production processes. Potential safety-related problems discovered post-production require comprehensive evaluation in order to determine whether the scenario presents a risk of injury and, if so, whether or not that risk is high enough



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 14

(i.e., unreasonable) to require reporting to the responsible government(s), potentially requiring a product recall. Whether the potential problem presents a risk of injury or only reflects a customer satisfaction issue, the issue requires investigation into the direct and contributing cause(s) so that changes can be made to the product design and/or manufacturing to prevent future products from being produced with the same issue. There also needs to be a determination made whether the issue necessitates a broader review and possible revision to higher level policies, programs and procedures which apply to other products designed and manufactured by the company.

For products distributed within China, consumers have the ability to contact Gree directly with product complaints and allegations of quality or safety concerns. Those contacts go to Gree's Customer Service department which then is responsible for forwarding quality-related and potential safety-related complaints to the Quality Department. The Quality Department reviews the complaints and either evaluates the allegations in their department or forwards the complaint to the responsible department (i.e., Safety, Engineering, Manufacturing). It is possible that the field unit could be returned to Gree for physical examination and testing. If the field unit is not available for examination and Gree believes testing is necessary to complete their investigation, they will check their inventories for a unit of the same design as the field unit. If a sample unit is not available and Gree believes testing is necessary to complete their investigation, they will build a unit to the specifications applicable to the field unit. Once an investigation into the allegation has been completed and direct and contributory causes have been identified, Gree will evaluate the potential risk presented by the products manufactured and distributed and determine if the potential risk meets the requirements for government reportability for each country where the product was distributed. At the same time, Gree will identify the necessary design, manufacturing and process changes to eliminate, if reasonably possible, or minimize the potential for the problem to occur in the future. For products distributed outside of China, Gree only has limited, if any, access to field information and units.

Dehumidifiers manufactured by Gree are sold in the U.S. under the following brand names:
1. Danby
2. De'Longhi
3. Fedders
4. Fellini
5. Frigidaire
6. General Electric
7. Gree
8. Kenmore
9. Norpole
10. Premiere
11. Seabreeze
12. SoleusAir
13. SuperClima



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 15


The dehumidifiers are imported and distributed in the U.S. by multiple companies. Gree USA
and MJC America Ltd. are the U.S. importers for Soleus Air and Kenmore brand dehumidifiers.
As described on the Gree USA website (www.greeusa.com):

> GreeUSA is a joint venture established by MJC America Holdings and Hong Kong Gree
> Electric Appliances Sales, Ltd. in 2010 to be the exclusive US distributor of certain
> SoleusAir and other products manufactured by Gree Electric Appliances of Zhuhai
> China.
>
> GreeUSA is not a subsidiary or affiliate of Gree Electric Appliances Inc. of Zhuhai
> China. Headquartered just outside of Los Angeles, California; GreeUSA strives to
> provide reliable products that are easy to use and look great in your home.

Because sales and distribution outside of China is not conducted by Gree, Gree attempts to
standardize the responsibilities of their foreign agents through the use of a document titled
"Guidelines of oversea (sic) after-sales service for Gree agents." The general format and
content of this document is as follows:

1.   Purpose
2.   Applicable range
3.   Responsibility
4.   Basic requirements for Gree agents
5.   Basic principles for after-sales service
6.   Basic principles for after-sales service personnel
7.   After-sales service standards
8.   Spare parts management
9.   Basic principle for feedback of after-sales quality information
10.  Warning and related principles of installation and maintenance
11.  Other clauses by mutual agreement
12.  Supplement (sic) clauses
13.  Subsidiary clauses

Focusing on Section 9 of the guidelines as the section most directly related to Gree's quality and
safety management program, the specific requirements state:

> The contents below should be fed backed to Gree in time as required and fill in the "sheet
> of after-sales quality information":
> 9.1 When the product is tested by third part institute, the result may go against the product;
> 9.2 The air conditioners (three or more than 3 sets) of the same model appear the same quality
> problem in the same region;
> 9.3 Injury, fire hazard or other incidents due to electricity leakage of the product, but the cause and
> responsibility are being investigated;
> 9.4 The product occurs big quality problems which is universal and can't be solved.



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 16

> 9.5 If the spare parts are used for solving epidemic quality problem, the agent must inform us before
> placing the spare part order;
> 9.6 Requirement of filling "sheet of after-sales quality information"
> 9.6.1 When filling the sheet, all the items must be filled, especially the model, manufacture date,
> barcode, name and contact way of installation and maintenance;
> 9.6.2 For the problems of package, transportation, loading, storing and leakage, the agent must
> provide related picture of the problems except filling the sheet.
> 9.6.3 For the system problem of the unit, the maintenance personnel must write down the malfunction
> phenomenon in details and provide related specification such as running time, pressure and current,
> etc.

If the information required by Section 9 of the guidelines is collected by Gree's agents and is
provided to Gree in a timely manner, Gree will have the information necessary to be able to
identify potential compliance, quality and safety issues, and to begin the appropriate
investigation and possible correction. Gree must rely upon their agents fulfilling their
obligations under the agreement. If their agents do not meet their obligations in reporting field
issues back to Gree, Gree might not become aware of a potential issue for an extended period of
time, if at all, introducing a level of corporate risk.

When investigating potential product safety allegations, the most useful and informative step is
to perform a thorough examination of field, incident units in question. A basic description of the
incident provided by a customer may not be accurate or complete. For example, individuals can
fail to note critical distinctions such as "fire" versus "smoke", "electric shock" versus "static
electricity" or "burned" versus "melted". A detailed examination of the incident unit by an
expert(s) experienced in performing product investigations can resolve many of these issues and
aid in the determination of the operative root cause and failure mechanism. This evaluation can
also help determine if the failure is the result of an isolated or limited production issue or is
likely systemic in nature

Because of the importance of being able to examine field, incident units which potentially
present a safety risk, a firm should have an aggressive process in place to both request and
incentivize the return of field, incident units from consumers. Customer Service Operators
should be instructed how to effectively identify potential safety-related reports, and either
directly, or through a supervisor or specially trained "safety team", take reasonable steps to
obtain these field, incident units. This could range from paying for the cost of shipping the
product back to the firm to purchasing the product from the consumer. In certain circumstances,
where the specific conditions warrant, paying the consumer more than the price of the product
might be reasonable if the potential safety risk is sufficiently high.

## Summary/Recommendations

The review of Gree's quality, compliance and safety program described in this report is a broad
overview of policies, programs and procedures in place at the time of the review and is
primarily a review of Gree's intended program. Although an in-depth audit of Gree's actual



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 17

practices was not performed to determine the extent of their day-to-day compliance with their documented program, enough information was available and observed to have indicated if any clear areas of noncompliance with their program existed. No obvious areas of noncompliance were identified during this review. A detailed, independent audit of Gree's day-to-day adherence to their written procedures and specifications would be beneficial in identifying any less obvious internal noncompliance or manufacturing quality control issues. Such an audit would include a detailed review of daily quality and performance checks along with all associated actions taken and the actions of operators in each manufacturing process step. A detailed review of customer/ consumer complaints should also be considered, with an audit performed on the actions taken in response to allegations of potential safety concerns.

The existing foundation of Gree's combined quality, compliance and safety program is strong enough that the potential oversight of unusual, low likelihood and high severity failure modes could be minimized with some targeted program revisions. The purpose of this report is to provide Gree's senior management with enough information to discuss with their quality, compliance and safety departments and determine what, if any, specific program changes are warranted.

Gree developed and implemented a comprehensive quality control, compliance and safety program. The depth, breadth and enforcement of this program are indicative of Gree's corporate commitment to the program. They instruct all new employees regarding this program and the responsibility for all employees to report potential safety issues or face disciplinary action.

Gree has developed a strong in-house laboratory capable of testing to the applicable industry standards and regulatory requirements. They also coordinate with the engineering department to identify areas where the regulations and standards are believed to be insufficient for the Gree products. Where such areas are identified, Gree develops their own internal standards (performance, quality and safety) to address their desire for and commitment to the highest reasonably attainable quality and safety.

Gree has embedded staff from their quality department in the manufacturing facility and that staff provide a constant presence on the production line to reinforce Gree's commitment to quality. Gree conducts regular, random incoming material inspections to ensure they are receiving the material and components specified and ordered. They conduct multiple, random quality inspections throughout the production process as well as random inspections of product in their warehouse.

Gree has a process in place to handle incoming product complaints and forward them to the quality department for review and resolution. Where appropriate, they work with the other departments (i.e., safety, engineering, production) to ensure that a complete evaluation of the allegation is performed and any lessons learned from the evaluation are incorporated into their



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 18

internal standards, designs, production process, quality control plans, policies and any other
portion of their program which should be revised to address the issue and minimize the
likelihood of recurrence. Gree requires their foreign (non-China) agents to sign an agreement
which obligates the agent to both collect and report to Gree any field complaints related to
quality.

Gree's combined quality, compliance and safety program attempts to equally address all three
components. The foundation of their program is the quality component and this aspect of their
product design and manufacturing, as described throughout this report, appears to be largely
effective. The compliance component is also a critical piece and, as described in this report,
Gree established a department which is responsible for researching, tracking and documenting
legal and regulatory requirements as well as all applicable industry standards in every country
where their products are distributed.

Gree's combined program places a reliance on the quality and compliance components to also
address many aspects of the safety component. The risk presented by a product is a
combination of the likelihood of a particular failure occurring and the severity of the potential
injury should the failure actually occur. It follows that the higher the quality of the product, the
lower the rate of failure and therefore the lower the risk. While this approach to minimizing the
potential risk from a product is sound and reasonably effective, it tends to rely upon evaluating
the types of failures most easily identified based on technical knowledge of expected failure
modes and on those failures which previously occurred. This approach to identifying failure
modes which require evaluation can potentially miss failure modes because they have a low
likelihood of occurring and have not previously occurred in one of Gree's products. A failure
mode with a low or very low likelihood of occurrence might still warrant a design or
manufacturing change if the potential severity of the failure is unacceptable.

After reviewing the documented quality, compliance and safety program and having discussions
with Gree staff to determine Gree's intent, an attempt was made to identify any evidence that
the intended program is not being implemented. Prior to the 2013 dehumidifier recall, Gree had
not conducted any product recalls. While it is possible that the need for a recall could have been
missed or ignored by Gree, this appears to be unlikely. Given the large quantity of products
Gree distributes globally, even a problem with a low likelihood of occurrence could equate to
hundreds or even thousands of failures. With the growing global awareness of consumer
product safety by consumers, governments and media, a problem resulting in hundreds of
failures annually is likely to be detected, even if not made aware to or acknowledged by Gree.

Furthermore, in examining the results of the investigation into the 2013 dehumidifier matter, it
appears as if the primary reason for the reported failures was a failure to identify the specific
failure mode during the design process and make the appropriate changes prior to unit
production. The failure to identify the specific failure mode was due to Gree's reliance on their
historical experience with their products and their scientific and engineering knowledge. Had



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 19

the specific failure mode been identified during the FMEA process, Gree would have documented it and the resulting effect(s) of extended operation without refrigerant would have been evaluated and tested and changes would have been incorporated, as is done for other failure modes identified. Subsequent to the dehumidifier investigation, Gree modified the relevant procedures, test protocols and internal standards to require that the potentially hazardous condition of operating for an extended duration without refrigerant will be evaluated going forward, regardless of the underlying root cause(s). The recalled dehumidifier design resulted from a failure of Gree's highly experienced engineers to identify a low likelihood failure mechanism that reportedly was not previously encountered in any of their products.

To assist Gree in determining what specific program/process changes could be considered, Exponent provides the following:

1. Expand the hazard/failure mode identification process and technical makeup of the responsible team with internal and/or external resources to identify and consider a broader array of potential failures, even if the potential failure has not occurred in a Gree product previously.

2. Incorporate the identification of foreseeable use/misuse actions into the hazard identification process to assist in identifying low likelihood failures associated with foreseeable consumer action or inaction.

3. Utilize a template or other document to create a comprehensive list of potential hazards associated with every product Gree has designed and manufactured that will serve as a tool for future project teams to use in identifying all of the potential hazards for a product which must be considered.

4. Adapt the existing risk assessment process, which is primarily focused on the risk of product failure, to create a companion risk assessment process focused on the risk to the user from the specific product failure mode.

5. Evaluate potential methods to enforce and increase the compliance of Gree's foreign agents with their requirement to report field after-sales quality issues to Gree in a timely manner.

6. Consider conducting worst-case, forced failure testing to better understand the potential severity of very low likelihood failure modes to determine if the potential failure creates an unacceptable injury severity even with a low likelihood of failure. External resources can provide assistance, if necessary.

7. Conduct a detailed audit of the day-to-day actions of the production and customer service departments to identify potential nonconformance with Gree's internal quality, compliance and safety program requirements.

8. Consider revising the existing customer service process and procedures to more aggressively pursue the return of field units related to potential safety-related allegations.



Ellen Nudelman Adler, Esq.
January 9, 2014
Page 20

## Limitations

At the request of Morrison & Foerster, LLP, Exponent has conducted a targeted review of Gree's existing Reliability, Compliance and Safety Programs. Exponent reviewed and evaluated documents provided by Gree and visited one of Gree's manufacturing locations in Zhuhai, China. The limited scope of services performed during this investigation may not adequately address the needs of other users of this report, and any reuse of this report or its findings, conclusions, or recommendations is at the sole risk of the user. The opinions and comments formulated during this investigation are based on observations and information available at the time of the investigation. The ultimate responsibility for the design, manufacture, performance, compliance, and safety of Gree's products lies completely with Gree.

The findings presented herein are made to a reasonable degree of scientific certainty. Exponent has endeavored to be accurate and complete in the assignment. If new data become available or there are perceived omissions or misstatements in this report, we ask that they be brought to our attention as soon as possible so that we have the opportunity to address them.

If you have any questions or require additional information, please do not hesitate to contact Exponent.

Sincerely,

Richard L. Stern
Manager
Mechanical Engineering Practice

